**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JEFFREY ADAM TRAINA, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:24-cv-12976-DJC |
| Plaintiff, | **CLASS ACTION** |
| v. | <u>Demand for Jury Trial</u> |
| SYMBOTIC INC., RICHARD B. COHEN, THOMAS C. ERNST, CAROL J. HIBBARD, and WALTER ODISHO, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**
<u>**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

1

TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................. 5

II.   JURISDICTION AND VENUE ........................................................................... 10

III.  THE PARTIES..................................................................................................... 10

    A.   Plaintiffs..................................................................................................... 10

    B.   Defendants ................................................................................................. 11

    C.   Relevant Non-Parties ................................................................................. 12

IV.   ADDITIONAL SUBSTANTIVE ALLEGATIONS............................................ 14

    A.   Symbotic's Warehouse Management Systems ................................................ 14

    B.   Symbotic Generates Revenues Primarily from the Sale and Deployment of its
         Automation Systems ................................................................................... 15

    C.   Walmart is Symbotic's Largest Customer and Accounts for the Majority of Revenue ... 18

    D.   Defendants Closely Track and Monitor Symbotic's Financial Performance ................. 18

        1.   Defendants Track Key Performance Indicators ........................................... 18

        2.   Symbotic's CFO Approves and Closely Analyzes Symbotic's Forecasts and Actual
             Financial Results ................................................................................... 21

    E.   Defendants Decide to Outsource the EPC Function to Fluor, Resulting in Lengthy System
         Deployment Delays and Massive Cost Overruns that Place Customer Contracts in Jeopardy 21

        1.   Symbotic Outsources the EPC Function to Flour in Order to Scale Deployments ...... 21

        2.   Fluor Immediately Causes Project Delays and Cost Overruns by Failing to Timely
             Order Inventory, Losing Inventory, and Shipping Incomplete Robots to Project Sites ....... 24

            a.   CW4 ................................................................................................. 24
            b.   CW2 ................................................................................................. 26
            c.   CW5 ................................................................................................. 27
            d.   CW3 ................................................................................................. 28

    F.   Continuous Cost Overruns and Extensive Project Delays Force Symbotic to Bring the
         EPC Function Back In-House................................................................... 30

    G.   Symbotic Secretly Books Cost Overruns as Revenue, Despite that Customers Were
         Unwilling and Had No Obligation to Pay.................................................. 32

    H.   Symbotic Announces Multiple Material Restatements of Financial Results Due to
         Improper and Premature Revenue Recognition.......................................... 34

    I.   Symbotic's Amended SEC Filings Disclose Restated Figures, SEC Investigation into
         Efforts to Silence Whistleblower, and Adverse Audit Opinion................................. 37

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS..................................................................................................... 43

    A.    November 20, 2023 Earnings Call............................................................. 43

    B.    February 5, 2024 Press Release and Earnings Call................................... 56

    C.    February 8, 2024 Form 10-Q..................................................................... 61

    D.    May 6, 2024 Press Release and Earnings Call.......................................... 67

    E.    May 7, 2024 Second Quarter Form 10-Q ................................................. 76

    F.    May 9, 2024 Investor Day Presentation.................................................... 80

VI.    DEFENDANTS REVEAL THE TRUTH OVER SEVERAL PARTIALLY CORRECTIVE DISCLOSURES WHILE CONTINUING TO MAKE FALSE STATEMENTS IN ATTEMPT TO MINIMIZE THE IMPACT ON SYMBOTIC'S STOCK PRICE ................. 84

    A.    The July 29, 2024 Press Release and Earnings Call ................................. 84

    B.    The July 31, 2024 Form 10-Q................................................................... 89

    C.    The November 18, 2024 Press Release and Earnings Call........................ 93

    D.    November 27, 2024 Form 8-K/A............................................................... 97

    E.    December 4, 2024 Annual Report on Form 10-K and Amended Forms 10-Q................ 99

    F.    February 5, 2025 Press Release and Quarterly Report .................................. 102

VII.    POST CLASS PERIOD EVENTS...................................................................... 103

VIII.    DEFENDANTS' NUMEROUS VIOLATIONS OF GENERALLY ACCEPTED ACCOUTNING PRINCIPLES AND INTERNAL CONTROL VIOLATIONS...................... 104

    A.    Symbotic's stated revenue recognition policies............................................ 105

    B.    Symbotic Violated GAAP by Recording Revenue for Uncollectible Cost Overruns .... 107

    C.    Symbotic Violated GAAP by Improperly Inflating the Percent Complete of its Projects 108

    D.    Symbotic Overstated Contract Assets, Contract Liabilities and Other Current Liabilities 109

IX.    SYMBOTIC'S INTERNAL CONTROL DEFICIENCIES................................................. 110

X.    ADDITIONAL SCIENTER ALLEGATIONS.................................................... 114

    A.    Defendants' Own Admissions Support Scienter............................................ 114

    B.    Defendants' Attendance at Episodic Meetings Discussing Cost Overruns, Project Delays and Financial Forecasts Supports Scienter .............................................. 115

    C.    That Defendants Spoke in Detail to Investors about Cost Overruns and Project Deployment Times Supports Scienter ........................................................ 118

D.    Defendants' Access to and Review of "A Ton of Data" Regarding Project Deployments and Costs Supports Scienter ..................................................................................... 121

E.    That Defendant Cohen Signed Customer Master Agreements Prohibiting Symbotic from Charging for Cost Overruns and Containing Regular Reporting Requirements Supports Scienter ................................................................................................................................ 122

F.    Defendant Cohen's Regular Site Visits Supports Scienter ............................................. 123

G.    Defendants' Violations of Symbotic's Internal Revenue Recognition Policies and Internal Control Violations Support Scienter .................................................................................. 123

H.    The SEC's Investigation of Symbotic Supports Scienter .............................................. 124

I.    Core Business Operations .............................................................................................. 125

J.    Defendants' Motive Adds to the Scienter Inference ...................................................... 126

XI.    LOSS CAUSATION AND ECONOMIC LOSS ................................................................ 129

A.    The July 29, 2024 Press Release and Earnings Call ...................................................... 130

B.    November 27, 2024 Form 8-K/A .................................................................................... 131

C.    February 5, 2025 Press Release and Earnings Call ........................................................ 132

XII.    PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET ............................... 135

XIII.    NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE 136

XIV.    CLASS ACTION ALLEGATIONS .............................................................................. 137

COUNT I ............................................................................................................................... 139

COUNT II .............................................................................................................................. 142

COUNT III ............................................................................................................................. 144

PRAYER FOR RELIEF ........................................................................................................ 145

DEMAND FOR TRIAL BY JURY ....................................................................................... 146

1.       Lead Plaintiff Jeffrey Adam Traina ("Lead Plaintiff") and Additional Plaintiff Joseph De John (collectively, "Plaintiffs") bring this class action pursuant Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of themselves and all persons and entities similarly situated, other than Defendants (defined below), who purchased or otherwise acquired Symbotic Inc. ("Symbotic" or "Company") Class A common stock ("common stock" or "Class A common stock") between November 20, 2023 and February 5, 2025, inclusive (the "Class Period"), and suffered losses as a result of Defendants' fraudulent statements and conduct.

2.       Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding Symbotic; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in; (iii) interviews with individuals who are former employees of Symbotic; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Symbotic and the industry in which the Company operates; and (v) pertinent court filings.

## I.  NATURE OF THE ACTION

3.       This case arises from a pervasive securities fraud perpetrated by Symbotic and its executive officers, Richard B. Cohen, Thomas C. Ernst, Carol J. Hibbard and Walter Odisho (collectively, with Symbotic, the "Defendants") upon Symbotic's investors beginning November 20, 2023 and continuing through February 5, 2025.

4.      Symbotic's primary business during the Class Period was the sale of robotic, automated warehousing systems ("systems") to large retailers and wholesalers. Walmart was Symbotic's largest customer, accounting for 88% of the Company's annual sales.

5.      Because the demand for Symbotic systems was high during the Class Period, the limiting factor to Symbotic's revenue growth and profitability was the speed at which Symbotic could deploy new systems for customers. Analysts and investors viewed Symbotic's ability to reduce project deployment times and increase the number of systems deployed as critical to the Company's ability to scale and its long-term growth. Thus, during the Class Period, Symbotic stated its goal was to reduce deployment times from the 24 months (or longer) average time it was currently taking to deploy each system, to 12 months and, ultimately, "to get it under 6 months."

6.      To achieve a faster deployment time, Symbotic outsourced its deployment and supply chain function called Engineering, Procurement, and Construction ("EPC") to general contractors or "outsourcing partners."

7.      Confidential witnesses ("CWs") who were former Symbotic employees reported that Symbotic's primary outsourcing partner for EPC was a company called Fluor. According to CWs, Symbotic's decision to outsource EPC to Fluor was a disaster. Shortly after engaging Flour around August 2022, Symbotic began missing project deadlines because, among other reasons, necessary inventory and parts were ordered up to 45 days late, inventory was frequently lost, and Fluor was constantly "dropping the ball" regarding ordering and scheduling delivery of necessary parts. Unbeknownst to investors, Symbotic secretly tried to compensate for these problems by shipping incomplete robots to customer sites, and "robbing Peter to pay Paul" by stealing parts from other projects to complete deployments. This practice was unsuccessful and always left project sites short on parts and unfinished.

6

8.      Fluor's missed deadlines negatively impacted Symbotic's financial results. For example, Symbotic routinely incurred cost overruns from having to, among other things, replace lost parts, pay for expedited shipping to have late-ordered parts delivered, and pay employees who were left "standing around" at job sites with nothing to do because the inventory had not arrived. These delays also required Symbotic to push back deadlines for delivering systems to customers (the "Go-Live" dates), placing contracts with Walmart and other customers in jeopardy. According to the CWs, they had "never seen a more unorganized or incompetent company" than Fluor.

9.      Despite the constant project delays and cost overruns throughout the Class Period, Defendants falsely represented to the market that Symbotic was continuing to "accelerate our time to deploy systems[]" and "shrink the time of deployments with the help of our partnership initiatives" such that Symbotic could "go faster, we can go a lot faster[]" because "our network of outsourcing partners is executing well[]" and "ramping [up] so well."

10.     Defendants also concealed their disastrous decision to outsource EPC to Fluor by improperly recognizing revenue for cost overruns in Symbotic's financial statements, even though customers were not contractually obligated or willing to pay for cost overruns, resulting in Symbotic's publicly reported financial statements being materially overstated during the Class Period.

11.     The Individual Defendants were aware of the project delays and cost overruns and that Symbotic's financial statements were materially misstated because they attended meetings at least quarterly where they personally reviewed the financial forecasts compared to Symbotic's actual reported financial results and, admittedly, "chair a weekly cross-functional meeting" during which they discussed project schedules and delays and reviewed "a ton of data" regarding project deployments. Defendant Hibbard admitted during a Q3 2024 earnings call that the cost overruns

were "[n]ot a surprise" and Cohen admitted that Defendants had known about the problems for more than six months, prompting Symbotic to start hiring in early 2024 to bring the EPC function back in-house.

12.    Defendants reported inflated financial results to avoid missing quarterly guidance and to reap millions of dollars in proceeds from unloading their personal holdings of Symbotic common stock at artificially inflated prices during the Class Period. Indeed, Symbotic would not have hit EBITDA guidance for two quarters reported in 2024, but for its misstated financial statements. What's more, Defendant Cohen sold 5 million shares of Symbotic stock for proceeds of $183.45 million at a time when Symbotic was secretly hiring EPC employees to bring that function back in house due to the massive cost overruns the Company was experiencing from Fluor's incompetence.

13.    Defendants began to reveal the truth on July 29, 2024 when, during Symbotic's Q3 2024 earnings call, they disclosed Symbotic was abandoning its outsourcing initiative and "bringing some of these functions back in-house" due to "elongated construction schedules and implementation costs" caused by its outsourcing partners, resulting in delays in getting parts and leaving "hundreds of people standing around the site for weeks" because Symbotic lacked necessary parts for construction. Defendants further admitted the outsourcing partners Symbotic hired lacked the necessary skill and experience, stating "some of the general contractors [we hired] probably are better at defense than our kind of work" and, thus, "our projects are taking longer" and "[l]onger system deployment creates higher costs[.]"

14.    Upon the news, Symbotic's common stock price declined from a closing price of $35.63 per share on July 29, 2024 to a close price of $27.25 per share on July 30, 2024, a decline of approximately 24% in a single day on heavy trading volume.

15.    Four months later, on November 27, 2024, Defendants issued a press release disclosing that Symbotic's fourth quarter and full year 2024 results were materially overstated and required restatement. Upon this news, Symbotic's common stock price fell from $37.41 per share on November 26, 2024 to $24.00 per share on November 27, 2024, a decline of approximately 36% in a single day on heavy trading volume.

16.    Finally, on February 5, 2025, Defendant Hibbard admitted that Symbotic had not achieved a 20-month average deployment time, as previously represented, and was "*still* averaging 24 months" and Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time." Defendants also revealed that Symbotic received a subpoena from the SEC related to Symbotic's multiple restatements and alleged efforts to impede whistleblowers from reporting possible securities fraud in connection with the restatements.

17.    Upon this news, Symbotic's common stock price fell from $30.92 per share on February 5, 2025, to $25.99 per share on February 6, 2025, dropping $4.93 per share, a 16% decline in a single day on heavy trading volume.

18.    Defendants' materially false and misleading statements and omissions published throughout the Class Period caused Plaintiffs' losses when the market price of Symbotic's Class A common stock plummeted after a series of disclosures that corrected the Defendants' misstatements and omissions. Defendants are culpable for the fraud they knowingly perpetrated on the market and Plaintiffs bring this action to hold them responsible for the harm to investors arising from their purchases of Symbotic's Class A common stock at artificially inflated prices.

## II.  JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

21.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Symbiotic is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

22.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.   THE PARTIES

### A.    Plaintiffs

23.     Court-appointed Lead Plaintiff, Jeffrey Adam Traina, purchased Symbotic Class A common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Lead Plaintiff's certification evidencing his transactions in Symbotic Class A common stock at ECF No. 12-1, is incorporated herein by reference.

24.     Additional Plaintiff Joseph De John purchased Symbotic Class A common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. De John's certification evidencing his transactions in Symbotic Class A common stock at ECF 15-2 is incorporated herein by reference.

**B.     Defendants**

25.     Symbotic Inc. is an automation technology company incorporated in Delaware and headquartered in Wilmington, Massachusetts, with its Canadian headquarters in Montreal, Quebec. Symbotic was formed pursuant to a merger between SVF Investment Corp. 3, a SPAC formed in December 2020, and Warehouse Technologies LLC ("Legacy Warehouse"), a New Hampshire limited liability company formed in December 2006 to invest in new technology companies that improve operating efficiencies in modern warehouses. Symbotic LLC, a technology company that develops and commercializes innovative technologies for use within warehouse operations, and Symbotic Group Holdings, ULC ("Symbotic Canada"), were wholly owned subsidiaries of Legacy Warehouse at the time of the merger.

26.     As of December 2, 2024, Symbotic had more than 106 million shares of Class A common stock outstanding. Symbotic's Class A common stock is listed and traded on NASDAQ under the trading symbol "SYM".

27.     Defendant Richard B. Cohen ("Cohen") was, at all relevant times, the Chairman and Chief Executive Officer of Symbotic.

28.     Defendant Thomas C. Ernst was Symbotic's Chief Financial Officer from 2020 until the end of calendar year 2023.

29.     Defendant Carol J. Hibbard ("Hibbard") was Symbotic's Chief Financial Officer and Treasurer beginning in December 2023 and continuing through the date of the filing of this Complaint. Defendant Hibbard's tenure as CFO will end August 8, 2025, at which time Hibbard will continue her employment at Symbotic as a Senior Vice President to assist Symbotic in transitioning to a new CFO, before ending her employment on January 1, 2026.

30.     Defendant Walter Odisho was, at all relevant times, Symbotic's Chief Manufacturing and Supply Chain Officer.

31.    Defendants Cohen, Ernst, Hibbard and Odisho are sometimes referred to herein as the "Individual Defendants."

32.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Symbotic's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for each of the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

33.    Symbotic is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

34.    The scienter of the Individual Defendants and other employees and agents of the Company are similarly imputed to Symbotic under respondeat superior and agency principles.

C.    **Relevant Non-Parties**

35.    CW1 worked at Symbotic as a Senior Financial Analyst from September 2023 throughout the Class Period. CW1 was responsible for forecasting, budgeting, and revenue modeling, which included working with Symbotic's senior executives, including CFO Carol Hibbard, on scenario planning and analyzing variances between projected financial results and

actual results. CW1 reported to Kenny Desmarais who reported to the Director of Financial Planning and Analysis ("FP&A"), Jason Kyle, who reported to Tiffany Hemann, VP of FP&A and CFO Carol Hibbard.

36.    CW2 worked at Symbotic as an Advanced PLC Integration Specialist throughout all of 2023 and all of 2024. CW2 was responsible for commissioning projects, which included ensuring that equipment had been installed and was performing correctly. CW2's role included communicating with installation personnel to instruct them on elements of an installation or deployment that needed correction. CW2 worked at a large number of deployment sites, including sites in Brookville, Florida and New Braunfels, Texas.

37.    CW3 worked at Symbotic as a Strategic Director of Supply Chain from January 2022 to October 2022 reporting to Jason Hardy, VP of Supply Chain, who reported to Defendant Cohen. As a Strategic Director of Supply Chain, CW3 was responsible for vendor management and supply chain matters, including coordinating with Symbotic's suppliers to ensure that products Symbotic ordered would be received on time. CW3 was responsible for ensuring materials for the robots, such as wiring harnesses and injection-molded plastic pieces, were received on time. CW3's boss, Hardy, handled fulfilling the materials requirements for all of Symbotic's robotic facilities. CW3 then worked as a Consultant at Symbotic from October 2022 to August 2024. In that role, CW3 was responsible for entering vendor data and assisting Symbotic's Project Mangers with purchase orders through Symbotic's internal Oracle NetSuite application, ensuring vendor orders went smoothly and assisted Symbotic's project managers.

38.    CW4 worked at Symbotic as a Warehouse Operations Supervisor and Logistics Specialist from September 2016 to December 2023. From approximately September 2016 through 2018, CW4 worked at a warehouse where CW4 was responsible for coordinating the shipping of

products from vendors to the projects. In 2020, after the warehouse closed in connection with the COVID pandemic, CW4 worked from home as a Logistics Specialist responsible for coordinating the shipping of vendor products directly to Symbotic's project sites and assisting accounts payable with reviewing and approving vendor invoices, reporting to John Bernardo, Logistics Supervisor at Symbotic since October 2016, who reported to Jason Hardy, VP of Supply Chain / SIOP. Hardy reported to Defendant Cohen. Bernardo and Hardy also reported to Defendant Odisho.

39.     CW5 worked at Symbotic as an Advanced System Reliability Test Engineer from approximately January 2023 through January 2024. CW5 was responsible for testing and evaluating systems that had been installed by general contractors to ensure that work done by the general contractors was acceptable. CW5's responsibilities spanned multiple phases of installation and required CW5 to visit approximately ten different deployment sites in the eastern and central United States. CW5 reported to a team lead, who reported to a manager, who reported to the Director of Reliability and Testing, who reported to the Senior Director of Operations.

## IV.    ADDITIONAL SUBSTANTIVE ALLEGATIONS

### A.    Symbotic's Warehouse Management Systems

40.     Symbotic purports to be an automation technology company that uses "end-to-end, A.I.-powered robotic and software platform [to] reinvent[] the warehouse as a strategic asset for the world's largest retail, wholesale, and food & beverage companies." According to Symbotic's SEC filings, the Company's systems manage every aspect of warehouse logistics, from the time merchandise is off-loaded from a producer's truck or container until that merchandise is ready to be delivered to a store, pick-up location, or individual customer.

41.     The purported benefits of Symbotic's systems are that they allow for: (i) faster order fulfillment; (ii) lower operating costs that allow retailers to offer more competitive pricing and improve profitability; (iii) speedier inventory turns so retailers can sell products and restock faster;

and (iv) improved inventory management, which lowers the risk of running out of product in times of high demand.

42.     Symbotic systems divide inbound freight into a common unit from pallets-to-cases and cases-to-items, digitize the attributes of these units without re-labeling them and move the units to buffering in their original (or native) packaging with bottom lift technology on its autonomous mobile robots, rather than re-transferring goods to trays, shuttles, or cranes. As the distribution center receives replenishment orders from stores, Symbotic's autonomous robots retrieve the desired units in specified sequence to facilitate orderly fulfillment.

43.     Defendants claim that Symbotic's platform and applications differentiate its system from competitors by using high-speed, fully autonomous mobile robots that travel up to 25 miles-per-hour, controlled by A.I.-enabled system software, to move goods through its proprietary buffering structure.

**B.      Symbotic Generates Revenues Primarily from the Sale and Deployment of its Automation Systems**

44.     Symbotic's warehouse automation systems accounted for approximately 96.6% and 95.3%, or nearly all, of Symbotic's total revenues in 2023 and 2024, respectively. *See* Figure 1, below. The remainder of Symbotic's revenues are derived from software maintenance and support and operations services after deployment of the system has been completed.

**Figure 1**.



45. The Symbotic system is a capital asset that is built, configured, tested, and operated by Symbotic for a limited time before the customer assumes control over the system. This process, referred to as the project deployment lifecycle, or deployment, occurs in four phases: (1) Procurement; (2) Installation; (3) Commissioning; and (4) Go-Live.

46. The Procurement phase begins with a project statement of work encompassing the system design and bill of materials and includes delivery to the job site of finished goods such as bots, adapter cells, lift systems and iron scaffolding. The Installation phase involves building the system and has several components, including Engineering, Procurement and Construction (EPC) which Defendant Hibbard described as the most "critical" component of Installation during the July 29, 2024 Earnings Call.

47. According to Defendants in the July 29, 2024 Earnings Call, EPC involves manufacturing and installation and concerns the "directing of resources throughout that installation process." Defendants stated in the Q2 2024 Earnings Call that the EPC function focuses on making sure all the pieces come together by managing the scheduling and costs. EPC employees are in the best position to do this because they receive the equipment from vendors directly at the site and,

thus, "have the first visibility in terms of [] potential delay[s]." According to Defendants, the EPC function gave Symbotic "a better view around all of [its] program management to predict when those delays might be impacting" the project.

48.    The Commissioning Phase involves the configuration and testing of the built system ending in customer acceptance and "Go-Live" when the system is fully operational in real world conditions. After the "Go-Live" phase and the project deployment lifecycle is complete, Symbotic charges a monthly software maintenance fee over the remaining system life, which is typically 25 to 30 years. Revenues from software maintenance fees amounted to 0.6% of the Company's total revenues in fiscal year 2023 and 0.8% of total revenues in fiscal year 2024.

49.    Symbotic recognizes revenues from the initial sale of its automation systems on a "cost-to-cost" or a "percentage-of-completion" method of accounting. Under this method, Symbotic's revenue recognition is tied to the progress of the project deployment lifecycle, where the share of total anticipated revenues recorded matches the proportion of total expected costs incurred. For instance, if 20% of the estimated costs to deploy a system have been incurred, 20% of the total revenue and profits expected from the sale of that system is recognized.

50.    During the May 18, 2023 Investor Day presentation, Defendant Ernst explained that "the strongest concentration of revenue is in that main installation phase." This is because the Installation phase is when the largest portion of costs are incurred. Defendant Hibbard reiterated this point during a May 6, 2024 earnings call, stating that Symbotic receives "the most revenue coming from those systems that are in the middle of install."

51.    Prior to and during the Class Period, the average deployment time for Symbotic's systems was 24 months due to extensive project delays and cost overruns in the Installation phase, which Defendants acknowledged was too long to allow Symbotic to scale its operations.

Accordingly, Symbotic's goal was to reduce deployment time to 6 months which, to date, it has been unable to do. In fact, as of May 7, 2025, Defendant Hibbard confirmed that the average deployment, from the start of a project until customer acceptance, remained "about 24 months." CW1, who worked with Hibbard on scenario planning in the FP&A group during the Class Period, confirmed that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's average system deployment time remained around 24 months.

C.    **Walmart is Symbotic's Largest Customer and Accounts for the Majority of Revenue**

52.    Symbotic boasts that it has "a strong blue chip customer base that includes some of the world's largest retailers and wholesale grocers, including Walmart, Albertsons, AFS, [its] affiliate, C&S Wholesale Grocers, Giant Tiger, GreenBox, Target, and UNFI." Walmart is, by far, Symbotic's largest customer, accounting for approximately 88% of Symbotic's total revenue during the Class Period and for the majority of its backlog.

53.    According to a July 6, 2023 Seeking Alpha article entitled, *Symbotic: A Fast-Growing Supply Chain Automation Company*, Symbotic claims the total addressable market for its warehouse management systems is approximately $400 billion.

D.    **Defendants Closely Track and Monitor Symbotic's Financial Performance**

1.    **Defendants Track Key Performance Indicators**

54.    Throughout the Class Period, Symbotic tracked several key metrics, including new system installations started, systems deployed, total backlog, and adjusted EBITDA (earnings before interest, taxes, depreciation and amortization).

55.    Symbotic's "new system installations started" metric is a measure of how many new system deployments are started in a given period. According to Defendant Hibbard, during the July 29, 2024 Earnings Call, Symbotic purports to have visibility into its "new system

[installation] starts" by "map[ping] out" with customers a "6-month and a 12-month outlook" for the expected time "[to] start deployment at a particular site" and then "stay[ing in] lockstep with [its] customers[.]"

56.    "Systems deployed" are the number of systems Symbotic has completed through installation at a customer site and "backlog" consists of all the orders from customers that have yet to be started.

57.    CW2 stated that throughout the Class Period, Symbotic used a software application, Jira, to track the progress of system deployments. CW2 stated that Jira contained checklists of all the tasks that had been completed and all the tasks that still needed to be completed for each project site that was being deployed. Jira is offered as a cloud-based service, allowing users to access the application from any computer or mobile device with an internet connection.

58.    CW3 confirmed that project milestones were tracked on a "burn down chart" issued for each project that showed the progress towards building out project infrastructures, as well as how many systems and robots had been produced on a weekly basis and shipping targets by amount and date. The "burn down charts" were issued for each project every two to three weeks. The milestone goals were managed by O'Connell and the Director of Manufacturing.

59.    Defendant Hibbard confirmed during a May 9, 2024 Investor Day presentation that she and the other Individual Defendants tracked "a ton of data" relating to how well deployments were being executed and relating to suppliers' ability to provide the necessary goods and services to scale Symbotic's deployments, stating, in relevant part:

> And so we have a ton of data in the system, reliability data, KPIs that were measured for how the system is working. We're also putting those in place for how we're running the business. And so we're looking at across our supply chain and looking at the health of our suppliers, looking at, can they scale, can they ramp? What is their quality on the product they're delivering to us and safety.

19

60.    In addition to tracking the number of systems in deployment, Symbotic's master agreements with its largest customers, Walmart Inc. and GreenBox Systems LLC, contained clauses requiring Symbotic to keep its customers informed with regular reports of Symbotic's progress toward delivery of the systems.

61.    As demonstrated in the chart below, throughout the Class Period, Symbotic's backlog was stagnant or declining and the Company was only able to add approximately two new customers per year. Moreover, new and completed system deployments remained stagnant and EBITDA (as restated) declined for four of the five quarters during the Class Period.

|  | Q4 2023 | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 | Q1 2025 |
|---|---|---|---|---|---|---|
| Total Backlog [in billions] | $23.3 | $23.2 | $22.8 | $22.8 | $22.4 | $22.4 |
| Total Customers Added [cumulative] | 8 | 9 | 9 | 9 | 9 | 10 |
| System Deployments Started | 4 | 5 | 3 | 5 | 9 | 4 |
| System Deployments Completed | 2 | 3 | 3 | 3 | 4 | 4 |
| Revenue [restated] [in millions] | $392 | $360 | $393 | $470 | $565 | $487 |
| % Change YoY | 60% | 75% | 47% | 51% | 44% | 35% |
| Adjusted EBITDA [restated] [in millions] | $13 | $8 | $9 | $3 | $42 | $18 |
| Net Income/(Loss) [restated] | ($45) | ($19) | ($55) | ($27) | $16 | ($19) |

62.    Facing mounting pressure from investors due to the Company's continued net losses, stagnant customer growth and slow time to system deployment completion, Defendants engaged in a fraud on the market to prematurely and improperly recognize revenue to increase profitability and meet financial forecasts while touting unrealistic outlier system deployment times as being consistently achieved and improving when, in fact, the opposite was true.

2.      **Symbotic's CFO Approves and Closely Analyzes Symbotic's Forecasts and Actual Financial Results**

63.      As system deployments generated nearly all of Symbotic's revenues during the Class Period, CFO Hibbard carefully tracked the progress of system installations and any delays or cost overruns in those projects and, with the assistance of the FP&A group, considered various risks and scenarios and their financial impact on Symbotic's financial results and business.

64.      CW1 stated that Symbotic's FP&A group was responsible for preparing Symbotic's quarterly financial forecasts, and revenue modeling, which Defendant Hibbard approved. The FP&A group also analyzed variances between projected financial results and actual results and provided those results to Hibbard every quarter during the Class Period.

65.      CW1 prepared a PowerPoint presentation every quarter that CW1 provided to Hibbard at quarterly meetings CW1 and the FP&A group attended with Defendant Hibbard. The PowerPoint presentations included, among other things, analyses of Symbotic's forecasts compared to actual results and risks and opportunities for Symbotic's business. Among the risks presented were project delays and cost overruns and the associated financial impact of delays and overruns. During every quarterly meeting throughout the Class Period, CW1 recalled that Hibbard was told Symbotic was experiencing project delays and cost overruns and that these issues were negatively impacting Symbotic's business and financial results.

E.      **Defendants Decide to Outsource the EPC Function to Fluor, Resulting in Lengthy System Deployment Delays and Massive Cost Overruns that Place Customer Contracts in Jeopardy**

1.      **Symbotic Outsources the EPC Function to Fluor in Order to Scale Deployments**

66.      Throughout the Class Period, the primary limiting factor on Symbotic's ability to grow revenues and profitability was the speed at which Symbotic could deploy systems for customers. Indeed, according to Defendant Hibbard during the Company's Q1 2024 February 5,

2024 Earnings Call, Symbotic's "future revenue growth is really driven by [its] ability to scale deployments and progress."

67.     Therefore, in 2022, Symbotic embarked on a strategy to outsource its deployment processes, including the EPC function, to "complete sites faster, [] do more sites" and "scale at a rapid pace."

68.     By January 2023, Symbotic's outsourcing partners spanned the entire deployment process. On the January 30, 2023 Earnings Call, Defendant Cohen explained:

> These outsourcing partners now span our full deployment process for manufacturing of bots, cells and [lists] to construction and installation. We're excited about our partners['] growing contributions as they help us accelerate delivery of systems while maintaining our extraordinary rate of growth. These partnerships will also help us to reduce system costs and streamline deployments and reduced deployment time creates the capacity to satisfy the high demand of our solutions.

69.     During the question-and-answer segment of the January 30, 2023 Earnings Call, Matt Summerville, a securities analyst from D.A. Davidson & Co., asked Defendants about the progress of Symbotic's outsourcing ramp up and inquired as to when Symbotic expected to reach an optimal implementation rate. In response, the Defendants assured investors that Symbotic had locked-in its outsourcing and supply chain partners and would be ramping up in the second and third quarters of 2023, *i.e.,* January 2023 through June 2023, and that investors "should see a full benefit of the outsourcing of the suppliers" within "the next 3 to 6 months":

> **Matt J. Summerville,** *D.A. Davidson & Co., Research Division*
>
> That makes sense. Yes, that does. And then just as a follow-up, from here forward, what are the key incremental steps Symbotic needs to take, from an outsourcing standpoint, to further accelerate system implementations? And when do you think the company will reach an optimal sort of implementation rate?
>
> **Richard B. Cohen,** *Chairman of the Board & CEO*
>
> Yes. So we spent this last quarter a lot of face-to-face time with suppliers. So we're pretty much locked in our suppliers. We have a couple of very good suppliers that

are going to be ramping up in the second and third quarter. So we're pretty well set with our outsourcing supplier mix.

And we're seeing -- as they learn to make the systems better and a little competition, we're seeing the pricing come down. We're also seeing efficiencies of rollout. And as we work with the suppliers and redesign small components of it, we're finding that the installs will happen faster. So I think the next 3 to 6 months, you should see a full benefit of the outsourcing of the suppliers.

**Thomas C. Ernst,** *CFO & Treasurer*

And I'll add to that, Matt, as we just think about the long term, we see this as a continuous opportunity for us to -- where the system can be engineered for faster deployments. Our partners are going to gain efficiency, we're going to gain speed with it. So we think that, in addition to Rick highlighting these 3 to -- next 3 to 6 months, are huge for us. There's gains that we can have over the coming years to continue to speed deployments and get more efficient.

70.    According to CW4, Symbotic primarily outsourced EPC to a company called Fluor. Fluor purports to be a Fortune 500 enterprise that delivers engineering, procurement, and construction services globally. CW4 stated that, in addition to EPC functions, Fluor's responsibilities included logistics and inventory management.

71.    CW2 confirmed that Symbotic retained Fluor to act as a general contractor for system deployments and was responsible for overseeing deployment sites, ensuring materials were delivered to the sites on time, and maintaining safety at the sites.

72.    CW1 corroborated the accounts of CW2 and CW4 and confirmed that Symbotic was shifting work on system deployments to third-parties when CW1 joined the Company in September 2023, identifying Fluor as the outsourcing partner who was primarily responsible for managing system deployment projects. CW1 explained that throughout CW1's entire tenure at Symbotic, Fluor managed logistics, inventory, and labor at deployment sites, managing 90-95% of Symbotic's projects.

73.    Unbeknownst to investors, Fluor lacked the skill or expertise to properly manage the EPC deployment function.

2.      **Fluor Immediately Causes Project Delays and Cost Overruns by Failing to Timely Order Inventory, Losing Inventory, and Shipping Incomplete Robots to Project Sites**

a.  **CW4**

74.     According to CW4, beginning around August 2022 to at least December 2023 when CW4 departed, Fluor did a "terrible" job scheduling and receiving materials, was terrible at inventory record-keeping, and "lost inventory and system components constantly," resulting in project delays of one to six months due to a wide variety of parts needed to complete projects not being available.

75.     For example, CW4 recalled that beginning in 2022 and continuing throughout 2023 the deployments of Symbotic's Brookville projects in Florida, Brookville 2.5 and Brookville 3.0, had been seriously impacted by Fluor's failures. According to CW4, in connection with the Brookville projects, Fluor was unable to properly receive or manage materials at the project sites. For example, CW4 recalled that Fluor lost an entire truckload of rivets, which were needed to put the systems together, and that the rivets had to be reordered when they could not be found. CW4 recalled incidents of Fluor losing truckloads of inventory occurred throughout 2023.

76.     CW4 stated that Fluor's inability to manage inventory and logistics required CW4 to travel to Brookville to teach Flour personnel how to do their jobs and to assist in attempting to find lost inventory. According to CW4, incidents similar to the lost truckload of rivets happened "pretty often" and other mistakes, like failing to send vendor invoices, occurred nearly every week. Fluor's failures and mistakes at the Brookville sites, CW4 said, caused the "Go-Live" dates to be pushed back, placing Symbotic's contract with Walmart in jeopardy. In fact, CW4 recalled that some of the delays caused by Fluor were serious enough to cast doubt about whether Walmart would pull out of its contract with Symbotic. CW4 stated that Fluor's inability to manage inventory

24

and logistics prevented Symbotic from reducing average deployment times below 24 months during CW4's tenure at the Company.

77.    CW4 recalled several other projects whose "Go-Live" dates were missed and had to be pushed back. For example, CW4 stated one such delay involved Albertsons, which agreed to extend the project deadline. CW4 stated that the Albertsons' deadline was extended several times and recalled that Albertsons threatened to terminate its relationship with Symbotic because of repeated missed deadlines.

78.    According to CW4, Symbotic attempted to meet deadlines by shipping incomplete robots to project sites. But that was unsuccessful because, CW4 reported, Symbotic and its outsourcing partners often resorted to "robbing Peter to pay Paul," meaning that parts that were needed to complete a project were often removed from one site for use at another site, moving one project forward, but putting the other project behind. CW4 recalled that this issue and practice began around June 2022 and was still an issue when CW4 departed in December 2023.

79.    Fluor's failures required CW4 to interact with Flour on a near-daily basis to correct various inventory issues. Such delays and lost inventory, CW4 recalled, also caused Symbotic to incur extra costs from having to expedite freight. According to CW4, it was regular practice for the Company to incur cost overruns from expedited freight in the two years leading up to CW4's departure from Symbotic.

80.    Despite Fluor's failure to properly manage and account for inventory, CW4 was told to approve Fluor's vendor invoices for payment without first confirming work had been completed or inventory had been received. CW4 approved invoices in Symbotic's NetSuite application, but it was Accounts Payable that actually made the payments. CW4 stated that CW4 got in trouble for calling the project sites and attempting to verify the invoices before approving

the invoices and was instructed by CW4's superiors—Hardy, Tucker, and Bernardo—that CW4 needed to just approve the invoices, even without verification.

81.     CW4 confirmed that Fluor was also slow to respond to emails, typically taking two to four days, because Fluor did not prioritize Symbotic's needs. CW4 described Fluor employees as untrained, temporary laborers who did not care about the work they were tasked to complete. CW4 had complained in 2023 about Fluor's slow response time to John Tucker, a Warehouse and Logistics manager at Symbotic from September 2021 to March 2024, who had been trying to do something to improve communications between Symbotic and Fluor, but Tucker was let go around March 2024 and the problem persisted.

### b. CW2

82.     CW2 corroborated CW4's account that Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount and that Fluor was to blame for ordering inventory "too little too late."

83.     Like CW4, CW2 confirmed that incomplete robots that lacked parts were shipped to project sites, and it was necessary "to rob" necessary parts from other project sites. As CW2 explained, it was often the case that the "last work cell" at a project site would be robbed of parts to provide parts needed to get other work cells functioning. A cell was "a major portion of a system." For instance, a project might have six to eight "inbound cells," an equal number of outbound cells, and perhaps several additional cells that required manual processes as opposed to automated ones. CW2 stated that Symbotic's contractors were unable to document or keep track of parts that had been robbed from other cells, resulting in delays in the system deployment schedule and hundreds of thousands of dollars of wasted materials and parts.

84.     According to CW2, in early 2024, Symbotic laid off the most experienced Symbotic employees who had an average of ten years of experience and replaced them with 250 to 300 contract engineers who were disorganized, inefficient, and wasteful in their work, especially with regard to the shipment and use of inventory and tools. CW2 explained that many times Symbotic's general contractor, Fluor, left hundreds of thousands of dollars of unused parts and equipment at project sites in Texas and Florida. CW2 stated Fluor was "unable to keep track of parts" and just did "not give a crap" about looking after Symbotic's best interests.

85.     CW1 also confirmed Fluor's terrible performance. CW1 stated that in winter of 2023, CW1 heard during implementation meetings that included the FP&A team that Fluor was not performing well and that working with Fluor was difficult, challenging, and less efficient.

86.     Like CW4, CW2 reported that it was difficult to get in touch with Flour personnel when needed, describing the subcontracted laborers who were responsible for installing systems as untrained and unconcerned with the quality or accuracy of their work.

### c.  <u>CW5</u>

87.     CW5 corroborated CW4 and CW2's accounts, reporting that throughout 2023, Symbotic suffered significant delays in deploying systems for major clients, including Walmart. CW5 recalled that the general contractor/outsourcing partners' slow progress during deployments that occurred throughout 2023 caused Symbotic to miss Go-Live deadlines for the Company's largest customer, Walmart.

88.     CW5 also corroborated CW4's account that components needed to complete a particular portion of an installation might show up on time, but the next day they were missing because they had been taken away to be used in another portion of the installation or different location. Moreover, like CW4, CW5 reported that incomplete robots were shipped frequently

enough that CW5 questioned whether the shipments of incomplete robots were shipped that way to ostensibly meet deadlines.

89.     CW5 also reported that during CW5's tenure at Symbotic, between April 2023 and February 2024, Defendant Cohen frequently visited different deployment sites to "meet and greet" customers and interact directly with the Symbotic employees who were deploying the systems. CW5 knows this because CW5 spoke with Defendant Cohen during one such visit.

### d.  CW3

90.     CW3 corroborated CW4 and CW2's accounts that prior to and throughout the Class Period, it was "always known" internally at Symbotic that there were delays in meeting project milestones. In CW3's experience, many delays were caused by shortages in wiring harnesses, which represented a "bottleneck" to manufacturing the robots. Part of the reason for the delays, CW3 recalled, was because, while the contract terms with Symbotic's vendors required a 90-day lead time from when an order was placed, Symbotic's system deployments were scheduled based on a 45-day lead time. That meant orders of necessary parts and inventory arrived only partially filled within the 45-days.

91.     CW3 stated that Symbotic would ship robots that were missing components to customer sites hoping that the remaining parts and work to complete the robot build could be completed at the customer site within a couple of weeks. To make matters worse, CW3 said the robots were shipped before the warehouse infrastructure was finished. CW3 knew this firsthand as a part of CW3's job responsibilities and then from conversations with Dan O'Connell, a Symbotic Senior Project Manager from May 2021 to March 2023 and Director of Supply Chain, Robotics from March 2023 to August 2024 when CW3 was a consultant. CW3 stated that the directive to ship incomplete robots came from someone above Hardy in operations. CW3 recalled that the

incomplete robots typically shipped within a couple weeks to a couple days before the end of a quarter.

92.    CW3 explained that the missing parts typically included green injected-molded plastic covers for the robots, PCB Boards and, most critically, wiring harnesses. According to CW3, the robot construction could not be completed until the wiring harnesses arrived. As CW3 put it, it was like "shipping cars without wheels, but the roads were not finished."

93.    Like CW4 and CW5, CW3 recalled that prior to and during the Class Period, Symbotic shipped containers with 75 to 100 incomplete robots out every week to different project sites, which were not finished for months because parts and inventory were not ordered on time. CW3 recalled one instance in 2022 where 400 or 500 unfinished robots were shipped to sites at New Braunfels and Bentonville. This resulted in Symbotic having to pay for expedited airfreight from places like Taiwan and Mexico to ship the missing parts. In some instances, Symbotic even paid for daily air shipments to get the materials the vendor had made each day. According to CW3, this resulted in "tons of fees to expedite" materials to complete the robots and sites.

94.    CW3 believed that Defendants shipped incomplete robots to avoid disclosing project delays to customers and to be able to recognize revenue by completing milestones. CW3 reported that project milestones were tracked on a "burn down chart." A burn down chart is a visual tool commonly used in project management to track the progress of work over time. Symbotic issued burn down charts for each project that showed progress towards building out project infrastructures, the number of systems and robots that had been produced on a weekly basis and shipping targets by amount and date. It also showed the amount of work remaining on a project compared to the time left to complete it, helping teams monitor whether they are on pace to meet deadlines.

95.     CW3 said that the milestone goals were managed by O'Connell and the Director of Manufacturing. The burn down charts that were issued for each project every two to three weeks would have shown that Symbotic's system deployments were suffering from delays and missing Go-Live deadlines and that Symbotic was not improving its average time to deploy a system.

96.     CW3 participated in virtual weekly and bi-weekly meetings, attended by "everybody," including Defendant Cohen, Jason Hardy, Project Managers and Senior Engineers where Dan O'Connell provided updates on the status of Symbotic's projects. At these meetings, CW3 advocated for telling customers like Walmart that there were going to be delays in Symbotic's ability to get materials delivered to project sites. However, during meetings attended by Rick Cohen, CW3 was instructed by superiors that customers should only be told that parts were going to be delivered on time or at most there would be a small delay, even when that was not the case and parts were on backorder for eight weeks.

### F.    Continuous Cost Overruns and Extensive Project Delays Force Symbotic to Bring the EPC Function Back In-House

97.     CW4 estimated that approximately 20-25% of Symbotic's projects suffered from cost overruns because of the above-described delays.

98.     Defendants were aware of the cost overruns from meetings they attended, reports they received and access to and review of data. For instance, during a May 9, 2024 Investor Day Presentation, Defendant Hibbard admitted that *both Hibbard and Odisho chaired a weekly meeting with multiple teams that discussed precisely the issues at the heart of the false statements about system deployment timelines,* stating:

> So when you think about our 37 systems that we have in deployment. It is a very integrated critical path across all of that to ensure the material is arriving on time and ensure we have the commissioning resources there. ***And what Walt and I do is we chair a weekly cross-functional meeting that goes through critical paths on those schedules***. And as you're ramping and growing at the level we are, that's critical.

99.     During the May 9, 2024 Investor Presentation, Defendant Hibbard also admitted that the Defendants had "a ton of data" relating to how well deployments were being executed and relating to suppliers' ability to provide the necessary goods and services to scale Symbotic's deployments:

> And so we have a ton of data in the system, reliability data, KPIs that were measured for how the system is working. We're also putting those in place for how we're running the business. And so we're looking at across our supply chain and looking at the health of our suppliers, looking at, can they scale, can they ramp? What is their quality on the product they're delivering to us and safety.

100.     CW1 confirmed that Hibbard had access to information regarding projects status through Symbotic's ERP software, SAP, which CW1 confirmed Hibbard accessed to approve purchase requests that exceeded $1 million.

101.     Likewise, CW3 confirmed that project milestones were tracked on a "burn down chart" issued for each project that showed the progress towards building out project infrastructures, as well as how many systems like robots had been produced on a weekly basis and shipping targets by amount and date. The "burn down charts" were issued for each project every two to three weeks. The milestone goals were managed by O'Connell and the Director of Manufacturing.

102.     On July 29, 2024, Defendant Hibbard revealed to the market during the Fiscal Q3 2024 Earnings Call that Symbotic had been experiencing "elongated construction schedules and implementation costs" caused by the previously outsourced EPC part of the deployment process, requiring Symbotic to bring EPC back in-house to "focus on schedule and focus on cost[.]" Hibbard explained that "one of the reasons why that EPC role is so critical, [is] they're the ones receiving equipment on site, they're the ones who will have the first visibility in terms of a potential delay. And that's why we want to bring that back in house."

103.    Defendant Cohen corroborated the CWs accounts during the Fiscal Q3 2024 Earnings Call, admitting that "cables came in late" and bots were shipped with only 90% functionality and there were "hundreds of people standing around the site for weeks" because "parts aren't here." Cohen blamed these issues on the outsourcing partners not being experienced or qualified, stating: "some of the general contractors who [Symbotic hired] probably are better at defense than our kind of work" and that instead of speeding up deployments, outsourcing partners slowed them down.

104.    During the July 29, 2024 Earnings Call, Defendant Hibbard admitted Defendants knew all along about the cost overruns and project delays so they were "*[n]ot a surprise*[.]" Thus, Defendant Cohen stated, Symbotic had already "been hiring people in the supply chain in the EPC space *over the last 6 months*[.]"

105.    Thus, Defendants had known for more than six months, or at least since the start of the Class Period, that outsourcing partners were causing delays and causing Symbotic to incur cost overruns.

**G.    Symbotic Secretly Books Cost Overruns as Revenue, Despite that Customers Were Unwilling and Had No Obligation to Pay**

106.    CW1 confirmed that the FP&A group's revenue forecasts that Defendant Hibbard approved and analyzed against actual results every quarter included an estimation of revenues expected from billing customers for cost overruns for the quarter. CW1 explained that the budget for cost overruns was based on experience from prior quarters and that management expected Symbotic to continue incurring cost overruns every quarter.

107.    However, while some pre-existing customer agreements had the ability to pass cost overruns on to customers when CW1 joined the Company in September 2023, new contracts in 2024 were written to disallow Symbotic from passing cost overruns on to customers. CW1 stated

that everyone at Symbotic understood there had been a change in contractual terms and statements of work ("SOWs") for newer projects that eliminated Symbotic's ability to pass along cost overruns to customers.

108.    CW1 confirmed that CFO Hibbard was aware customer contracts prohibited Symbotic from passing cost overruns on to customers and, accordingly, led an effort in 2024 to reduce cost overruns, which were negatively impacting Symbotic's profitability.

109.    CW1 stated that, despite the shift in contractual terms that disallowed cost overruns from being billed to customers and recorded as revenues, the forecasts that the FP&A group discussed with Hibbard throughout the Class Period, and the actual results that were compared to the forecasts, continued to include cost overruns recorded as revenue.

110.    CW1 stated that CFO Hibbard was also aware of the project delays that occurred throughout the Class Period as Hibbard was always one of the first executives to learn of delays in system deployments. CW1 explained that there were three or four different teams reporting to Hibbard regarding system deployment scheduling. These teams included the supply chain team, the implementation team, and possibly the research and development team. After receiving information from these various teams, Hibbard then communicated that information to the FP&A team to assist her in tracking, budgeting, forecasting, and scenario planning.

111.    CW1 recalled that CFO Hibbard had access to Symbotic's Enterprise Resource Planning ("ERP") software applications, SAP and NetSuite. CW1 knew this because CFO Hibbard used these systems to approve purchase requests that required the CFO's approval when the request exceeded $1 million. CW1 explained that the SAP system was used for a multitude of activities, such as supply chain and project tracking, and was intended to aggregate all the data and

information of the Company in one place, though CW1 only had access to the data and applications that pertained to CW1's position.

112.    During the Class Period, however, Defendants falsely told investors that Symbotic was absorbing the cost overruns to "keep the customer happy." Instead, the opposite was true and Symbotic was recording cost overruns as revenue and not absorbing the cost overruns as they claimed.

113.    Defendants would ultimately admit that they improperly booked the cost overruns as revenue and also used them to improperly calculate a higher percentage-of-completion, thereby allowing Defendants to recognize a higher portion of the contract revenue, even though customers were not willing or obligated to pay for the cost overruns. Defendants did this to make the Company appear more profitable and make financial forecasts.

114.    Symbotic would later restate its 2024 financial statements to remove this improperly recorded revenue.

## H.    Symbotic Announces Multiple Material Restatements of Financial Results Due to Improper and Premature Revenue Recognition

115.    As a result of improperly recognizing revenue from cost overruns, Defendants were forced to restate Symbotic's financial statements not once, but *twice*.

### 1.    Restatement No. 1

116.    On November 18, 2024, Symbotic reported Fiscal Q4 and Annual 2024 financial results. While the Company reported 55% revenue growth year-over-year and purported "recovery in our gross margin to historical levels," Symbotic revealed it was restating its financial results for Q1, Q2 and Q3 of Fiscal 2024 to reflect the improper accelerated recognition of revenue and cost of revenue recognition under the percentage of completion accounting method, prior to when the expected costs had been incurred:

**RESTATEMENT OF INTERIM FISCAL 2024 FINANCIAL RESULTS**

We have restated our financial statements for the quarters within fiscal year 2024 with respect to our accounting of goods and services received. As we were reviewing our business processes and preparing our full year financial statements, we identified occurrences during fiscal year 2024 ***where goods and services, primarily relating to specific milestone achievements, were expensed prior to the time that the corresponding milestones were achieved***. ***This resulted in the acceleration of the recognition of cost of revenue. Given that we recognize revenue on a percentage of completion basis, this resulted in the acceleration of recognition of revenue.*** The quarterly statements of operations and statements of cash flows numbers included in this earnings press release have been restated to record cost of revenue and revenue in the periods in which the milestones were achieved, and the comparisons presented are based on the restated amounts.

117.    Defendants downplayed the restatement to a mere timing issue that did not impact the Company's fourth quarter and 2024 annual results, stating: "***these [restatements] represent timing differences between quarters with no impact to full-year fiscal year 2024 results***. In connection with our decision to restate the previously reported quarters, we also recorded other individually insignificant items affecting fiscal 2024 that were also timing related."

>    **2.    Symbotic Announces *Second* Restatement to Reverse Improperly Booked Revenue Relating to Cost Overruns, Internal Control Deficiencies, and Delayed Filing of Annual Report on Form 10-K**

118.    On November 27, 2024, just nine days after Defendants reported Symbotic's Q4 and Fiscal 2024 results and the First Restatement, Defendants reported that Symbotic was unable to file its 2024 annual report on time due to internal control deficiencies resulting in the Company needing to, again, restate its financial results for Fiscal 2024, including the recently reported Fiscal Q4 financial results ("Second Restatement") and slash Q1 2025 guidance. Specifically, in a Form 8-K, Defendants revealed that Symbotic had materially overstated revenue, EBITDA and earnings by improperly recognizing revenue from cost overruns that customers were not obligated or willing to pay:

Symbotic has determined that it is unable to file its Annual Report on Form 10-K for the fiscal year ended September 28, 2024 by the prescribed filing due date, without unreasonable effort or expense, because the Company requires additional time to complete its assessment of the financial impacts of correcting an error *related to system revenue recognition and the impacts of that error on internal controls over financial reporting*.

Management has identified in its preliminary assessment of internal control over financial reporting for the fiscal year ended September 28, 2024 *certain material weaknesses*. The Company is implementing measures designed to improve internal control over financial reporting to remediate these material weaknesses.

As disclosed on November 18, 2024 in its earnings press release, as Symbotic was reviewing its business processes and preparing its full year financial statements, the company identified occurrences during fiscal year 2024 where goods and services, primarily relating to specific milestone achievements, were expensed prior to the time that the corresponding milestones were achieved. This resulted in the acceleration of the recognition of cost of revenue. Given that Symbotic recognizes revenue on a percentage of completion basis, this resulted in the acceleration of recognition of revenue. As a result of identifying these occurrences, Symbotic's earnings press release included restated financial results for the interim quarters of fiscal year 2024.

Subsequently, on November 25, 2024, Symbotic *identified errors in its revenue recognition related to cost overruns that will not be billable on certain deployments*, which additionally impacted system revenue recognized in the second, third, and fourth quarters of fiscal year 2024. As a result, gross profit, income (loss) before income tax, net income (loss) and adjusted EBITDA[] were also impacted. The company *estimates the total impact of correcting these errors will be to lower system revenue, system gross profit, income (loss) before income tax, and adjusted EBITDA[] by $30 million to $40 million for fiscal year 2024* compared to the financial results released on November 18, 2024.

119.     In addition, to reflect its inability to record revenue from cost-runs, Symbotic slashed its Fiscal Q1 2025 EBITDA forecasts nearly in half from $27 to $31 million to $12 to $16 million and cut revenue guidance by approximately $15 million at the midpoint, from $495 to $515 million to $480 to $500 million.

Additionally, *Symbotic is also revising its outlook for the first quarter of fiscal year 2025 based on its analysis of these deployments. Symbotic now expects revenue of $480 million to $500 million, and adjusted EBITDA[] of $12 million to $16 million*.

Symbotic will also be amending its Current Report on Form 8-K with respect to this matter to indicate that its financial results for fourth quarter and fiscal year 2024 (including those included in its earnings press release and supplemental presentation) issued on November 18, 2024 should no longer be relied upon.

120.    As discussed below, this was not the end of the negative news announced by Symbotic. Symbotic would go on to report an ongoing SEC investigation into the Company's attempts to silence whistleblowers about the multiple restatements.

**I.    Symbotic's Amended SEC Filings Disclose Restated Figures, SEC Investigation into Efforts to Silence Whistleblower, and Adverse Audit Opinion**

121.    On December 4, 2024, Defendants filed Symbotic's Annual Report on Form 10-K for the Fiscal year-ended September 28, 2024 (the "2024 Form 10-K") and amended Forms 10-Q for all 2024 fiscal quarters and annual 2024 financial results:

| Three Months Ended December 30, 2023 | | | | |
|---|---|---|---|---|
| Fiscal Q1 2024 (in millions) | Reported | Restated | $ Change | % Change |
| Revenue | $368 | $360 | $8 | 2% |
| Cost of Revenue | $298 | $296 | $2 | 1% |
| Gross Profit | $70 | $64 | $6 | 9% |
| Net Income/(Loss) | ($13) | ($19) | $6 | 46% |
| Adjusted EBITDA | $14 | $8 | $6 | 43% |
| Unbilled Receivables | $148 | $139 | $9 | 6% |
| Accounts Payable | $106 | $103 | $3 | 3% |

| Three Months Ended March 30, 2024 | | | | | |
|---|---|---|---|---|---|
| Fiscal Q2 2024 (in millions) | Reported | 1st Restatement | 2nd Restatement | $ Change | % Change |
| Revenue | $424 | $399 | $393 | $31 | 7% |
| Cost of Revenue | $380 | $363 | $363 | $17 | 4% |
| Gross Profit | $44 | $36 | $30 | $14 | 32% |
| Net Income/(Loss) | ($41) | ($49) | ($55) | $14 | 34% |
| Adjusted EBITDA | $22 | $14 | $9 | $13 | 59% |
| Unbilled Receivables | $174 | N/A | $139 | $35 | 20% |
| Accounts Payable | $150 | N/A | $133 | $17 | 11% |

| Six Months Ended March 30, 2024 | | | | |
|---|---|---|---|---|
| **Fiscal Q2 2024 (in millions)** | **Reported** | **Restated** | **$ Change** | **% Change** |
| Revenue | $793 | $753 | $40 | 5% |
| Cost of Revenue | $678 | $659 | $19 | 3% |
| Gross Profit | $114 | $94 | $20 | 18% |
| Net Income/(Loss) | ($54) | ($74) | $20 | 37% |
| Adjusted EBITDA | $37 | $17 | $20 | 54% |
| Unbilled Receivables | $174 | $139 | $35 | 20% |
| Accounts Payable | $150 | $133 | $17 | 11% |

| Three Months Ended June 29, 2024 | | | | | |
|---|---|---|---|---|---|
| **Fiscal Q3 2024 (in millions)** | **Reported** | **1st Restatement** | **2nd Restatement** | **Total $ Change** | **% Change** |
| Revenue | $492 | $486 | $470 | $22 | 5% |
| Cost of Revenue | $424 | $415 | $415 | $9 | 2% |
| Gross Profit | $67 | $71 | $55 | $12 | 18% |
| Net Income/(Loss) | ($14) | ($11) | ($27) | ($13) | 93% |
| Adjusted EBITDA | $15 | $19 | $3 | $12 | 80% |
| Unbilled Receivables | $161 | N/A | $103 | $58 | 36% |
| Accounts Payable | $156 | N/A | $128 | $28 | 18% |

| Nine Months Ended June 29, 2024 | | | | |
|---|---|---|---|---|
| **Fiscal Q3 2024 (in millions)** | **Reported** | **Restated** | **$ Change** | **% Change** |
| Revenue | $1,285 | $1,224 | $61 | 5% |
| Cost of Revenue | $1,103 | $1,074 | $29 | 3% |
| Gross Profit | $182 | $149 | $33 | 18% |
| Net Income/(Loss) | ($68) | ($101) | ($33) | 49% |
| Adjusted EBITDA | $52 | $19 | $33 | 63% |
| Unbilled Receivables | $161 | $103 | $58 | 36% |
| Accounts Payable | $156 | $128 | $28 | 18% |

| Three Months Ended September 28, 2024 | | | | |
|---|---|---|---|---|
| **Fiscal Q4 2024 (in millions)** | **Reported** | **Restated** | **$ Change** | **% Change** |
| Revenue | $577 | $565 | $12 | 2% |
| Gross Profit | $109 | $96 | $13 | 12% |
| Net Income/(Loss) | $28 | $16 | $12 | 43% |
| Adjusted EBITDA | $55 | $42 | $13 | 24% |
| Unbilled Receivables | $252 | $218 | $34 | 13% |

122.    Defendants also restated Symbotic's annual 2024 financial results:

| For the Fiscal Year Ended September 28, 2024 | | | | |
|---|---|---|---|---|
| Annual 2024 (in millions) | Reported | Restated | $ Change | % Change |
| Revenue | $1,822 | $1,788 | $34 | 2% |
| Gross Profit | $280 | $246 | $34 | 12% |
| Net Income/(Loss) | ($51) | ($85) | $34 | 40% |
| Adjusted EBITDA | $96 | $62 | $34 | 35% |
| Unbilled Receivables | $252 | $218 | $34 | 13% |

123.    In the 2024 Form 10-K, Defendants revealed for the first time that Symbotic was being investigated by the SEC for alleged attempts to silence a whistleblower in connection with its earlier announced multiple restatements of financial results in November 2024, stating:

*SEC Request for Information*

We have been responding to requests for information from the SEC relating to an investigation by the SEC of ***alleged violations by us of Rule 21F-17, which prohibits actions to impede an individual from communicating directly with the SEC*** staff about a possible securities law violation. We intend to continue to defend this matter vigorously and cannot predict the outcome of this investigation.

124.    Defendants further revealed that Symbotic's internal control over financial reporting and disclosure controls and procedures were inadequate:

Our management has conducted an evaluation of the effectiveness of our internal control over financial reporting as of September 28, 2024*. **Based upon this evaluation and those criteria, management concluded that, as of September 28, 2024, the Company's internal control over financial reporting was not effective due to the identification of material weaknesses. As of September 28, 2024, the Company did not effectively design procedures and controls over the timing of the recognition of cost of revenue. This resulted in the acceleration of the recognition of cost of revenue. Given that we recognize revenue on a percentage of completion basis, this resulted in the acceleration of recognition of revenue. Additionally, the Company did not effectively design and execute controls over revenue recognition related to cost overruns on certain deployments that will not be billable. This resulted in an overstatement of revenue during the year. These deficiencies in internal control over financial reporting constituted material weaknesses***. For further discussion of these material weaknesses, see Item 9A.

125.    In Item 9A of the December 4, 2024 Form10-K, Defendants admitted that "our Chief Executive Officer and Chief Financial Officer have concluded that as of September 28, 2024, *our disclosure controls and procedures were not effective at the reasonable assurance level because of the existence of the material weaknesses described in Management's Report on Internal Control over Financial Reporting*."

126.    According to the 2024 Form 10-K, Symbotic was purportedly implementing a remediation plan to: (i) augment controls over the receipt of goods and services "with a focus on milestone related expenses;" (ii) enhance the Company's ERP system for goods and services receipts with enhanced documentation requirements for milestone related expenses; (iii) better train employees and redesign the organizational structure receiving goods and services; and (iv) include compensating controls over revenue recognition for non-billable cost overruns.

127.    Symbotic's external auditor, Grant Thornton LLP, issued an adverse opinion with respect to the Company's internal control over financial reporting:

Report of Independent Registered Public Accounting Firm

Board of Directors and Shareholders

Symbotic Inc.

**Opinion on internal control over financial reporting**

We have audited the internal control over financial reporting of Symbotic Inc. and subsidiaries (the "Company") as of September 28, 2024 based on criteria established in the 2013 Internal Control —Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). *In our opinion, because of the effect of the material weaknesses described in the following paragraphs on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of September 28, 2024, based on criteria established in the 2013 Internal Control—Integrated Framework issued by COSO*. A material weakness is a deficiency, or combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be

prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment.

***The Company did not effectively design and execute controls over the timing of the recognition of revenue and cost of revenue. Additionally, the Company did not effectively design and execute controls over the recognition of revenue from cost overruns that are not billable to customers.*** We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended September 28, 2024. The material weaknesses identified above were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2024 consolidated financial statements, and this report does not affect our report dated December 4, 2024 which expressed an unqualified opinion on those financial statements….

128.    As a result of Symbotic's internal control violations, the Company was forced to restate its financial statements, ***twice***.

129.    The 2024 Form 10-K also confirmed CW1's account, disclosing that in 2024, Walmart began capping the costs Symbotic can charge Walmart: "the cost of implementation, including the cost of material and labor, plus a specified net profit amount, ***subject in certain cases to a capped cost amount***."[1] In other words, Symbotic could no longer charge Walmart for cost overruns.

130.    On December 5, 2024, the day after Symbotic filed its 2024 Form 10-K, Hunterbrook issued a report (the "Hunterbrook Report") analyzing Symbotic's financial statements disclosed in the 2024 Form 10-K with the assistance of a forensic accountant, Nick Gibbons, who teaches accounting at New York University and has significant accounting experience at companies like Citadel, Two Sigma and Norges Bank Investment Management. According to the Hunterbrook Report, Gibbons found "seven different major [red] flags" ranging

---

[1] The prior year's Form 10-K for the Fiscal year-ended September 30, 2023 contained no such cap: "the cost of implementation, including the cost of material and labor, plus a specified net profit amount."

from "basic operational uncertainties, such as the company's inability to predict customer acceptance of its work, to more technical concerns about how [Symbotic] classifies expenses and recognizes revenue."

131.    First, the Hunterbrook Report identified two concerns from the Second Restatement and accompanying disclosures—whether Symbotic has "been playing accounting games with when they record expenses to make their results look better" and whether Symbotic's "backlog might have been inflated because they assumed they could charge customers for cost overruns?"

132.    Second, Symbotic has unusual patterns in capital spending and depreciation, indicating the Company was reclassifying operating expenses as capital investments to lower expenses and make earnings look better. According to the Hunterbrook Report, for 2021 through 2023, Symbotic's CAPEX as a percentage of revenue followed a logical decline as business scaled from 4.8% in 2021 to 3% in 2022 and to .8% in early 2024. However, in the second half of 2024, coinciding with the cost overruns, CAPEX as a percentage of revenue jumped to 3.6% in Q3 and 3.8% in Q4, indicating that operating expenses were reclassified as CAPEX.

133.    Depreciation expense follows a similar pattern, declining from 1.8% of revenue in 2021 to 1% in 2022 and 2023 and .8% by early 2024. It then spiked in Q3 2024 to 2.3% before dropping in Q4 2024 to 1.1%. Such volatility, according to Gibbons "defies fundamental accounting principles."

134.    Third, during Q2 2024, Symbotic appears to have inexplicably moved $38.4 million from deferred costs to property and equipment, indicative of improper cost overrun capitalization.

135.    Fourth and fifth, the backlog related to Walmart had not changed much, causing analysts such as William Blair to question the quality of the backlog, particularly given Walmart has now limited certain cases to a "capped cost amount." Further, according to Symbotic's balance

sheet, in 2021, current deferred revenue (money received from customers for work not yet completed) covered 60% of expected revenue for the following 12 months. By September 2024, however, deferred revenue covered just 30% of expected revenue and deferred revenue has fallen to 36%, indicating less financial backing for future work and that customers were more reluctant to pay upfront for Symbotic's systems.

136.    The Hunterbrook Report concluded that Symbotic's accounting resulted in inflated performance metrics, boosted backlog and deferred loss recognition that amounted to more than mere technical corrections.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS[2]

137.    Throughout the Class Period, Defendants made materially false and misleading statements and omissions relating to, *inter alia*: (1) reported revenues, expenses, and earnings; (2) the execution and success of Symbotic's outsourcing partners; (3) the average time to deploy a system; (4) purported cost savings; (5) disclosure controls and procedures and internal control over financial reporting; and (6) compliance with GAAP and Symbotic's internal accounting policies. Defendants' material misstatements misled investors and artificially inflated the price of Symbotic Class A common stock throughout the Class Period.

### A.    November 20, 2023 Earnings Call

138.    On November 20, 2023, at 5:00 p.m. ET after the market had closed, Defendants hosted a webcast to discuss Symbotic's fourth quarter and full year fiscal 2023 results (the "FY2023 Call"). During the FY2023 Call, Defendants Cohen and Ernst falsely represented that

---

[2] Statements alleged to be false and misleading are bolded and underlined. The remaining statements are provided for context.

Symbotic's deployments were continuing to accelerate as a result of the purported strong performance of the Company's outsourcing partners.

139.    In particular, during the FY2023 Call, Cohen falsely claimed that Symbotic was "**continu[ing] to accelerate**" deployments and that the Company's supply chain and outsourcing partnerships positioned the Company "**for even faster deployments**," stating in relevant part:

> [W]ith such high demand for our systems, our ability to scale operations is the primary governor on our revenue growth. To that end, we have continued to invest heavily in extending and strengthening our network of outsourcing partners and manufacturing and installation, so we can maintain our focus on innovation and product development. **Concurrently, we have hardened our supply chain to position Symbotic for even faster deployments, continued revenue growth and steadily improving margins.** […]

> Now turning to what we plan to achieve in 2024, our goal will be to do more of the same. That is to scale, execute and innovate to deliver for our customers in the new year. We'll maintain our focus on delivering great systems for customers, while scaling for rapid growth **as we continue to accelerate our time to deploy systems.**"

140.    Defendant Cohen's statements above were materially false and misleading when made because Symbotic was not continuing to accelerate the time to deploy its systems and because Symbotic omitted that, beginning as early as 2022, the Company's primary outsourcing partner, Fluor, who was responsible for EPC, supply chain, logistics, labor, safety, and managing deployment sites, was failing to order materials in a timely manner, was unable to accurately track and account for materials and inventory that had been delivered to deployment sites, lost truckloads of materials which caused deployment delays of between one and six months, and was inefficient at managing labor at deployment sites, resulting in hundreds of people standing around at job sites doing no work.

141.    Moreover, when Defendant Cohen chose to speak about Symbotic's outsourcing partners as a way to increase the Company's ability to scale operations and grow revenue, Defendant Cohen, as well as the other Individual Defendants who participated in the FY2023 Call,

had a duty to correct and/or disclose the ongoing poor performance of the outsourcing partners, which had persisted for more than a year, and to disclose the delays and cost overruns the outsourcing partners had caused. Defendants' omission of that information rendered Defendant Cohen's statements materially misleading.

142.    The factual allegations supporting the falsity of Cohen's statements are:

a) According to CW4, from August 2022 to at least December 2023 when CW4 departed, Symbotic's outsourcing partners, including Fluor, did not adequately keep records of inventory, failed to order materials with sufficient lead time, needed to be shown how to do their work, regularly failed to submit vendor invoices, and "dropped the ball constantly" regarding ordering and scheduling deliveries of necessary parts. CW4 stated that Fluor's frequent failures necessitated that CW4 work with Fluor on a near-daily basis to correct various inventory issues.

b) CW4 and CW3 confirmed that prior to and during the Class Period Symbotic incurred "tons of fees to expedite" materials that had not been ordered on time, resulting in cost overruns.

c) According to CW4, throughout CW4's tenure, Symbotic's outsourcing partners regularly lost truckloads of inventory that were needed to complete deployments.

d) CW4 stated that during 2022 and 2023, multiple project deployments, including with customers Walmart and Albertsons, were significantly delayed due to the terrible performance of Symbotic's outsourcing partners, including delays that caused go-live dates to be missed or extended. CW4's account was corroborated by CW5 who stated that throughout CW5's tenure, the outsourcing partners were so slow that they caused Symbotic to miss go-live deadlines with Symbotic's largest customer, Walmart. CW2 also confirmed that throughout the Class Period, Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount.

e) CW4, CW5, CW3, and CW2 all reported that, during their tenures and/or throughout the Class Period, incomplete robots were being shipped to project sites, which caused employees and outsourcing partners to rob one site of inventory and system parts to be used at another site, helping one project but setting the other behind. Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that robots were shipped to deployment sites were only 90% functional and lacked parts.

f) CW1 reported that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's ongoing deployment delays and cost overruns were discussed during every quarterly meeting with defendant Hibbard and Symbotic's average system deployment time remained around 24 months. CW1 also recalled hearing during implementation meetings throughout CW1's tenure that Fluor's performance was terrible and that working with Fluor was difficult, challenging and less efficient.

g) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Symbotic's poor gross margins reflected "elongated construction schedules and implementation costs" because "parts aren't here" and "cables came in late," leaving "hundreds of people standing around the site for weeks[.]" Cohen admitted that Fluor was ill-suited for the EPC function at Symbotic and that Symbotic was "spending a lot of time managing the contractors."

h) Hibbard admitted during the Q3 2024 Earnings Call on July 29, 2024 that "we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient." Hibbard also admitted that cost overruns were "not a surprise."

i) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Defendants had known about outsourcing partners' failures for more than six months and, thus, Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*" to bring EPC back in-house.

j) On February 5, 2025, Hibbard admitted that Symbotic was "*still* averaging 24 months" for project deployments and Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time."

k) As a result of a) through j) above, Symbotic was not achieving faster deployment times, as falsely represented.

143.    During the FY2023 Call, CFO Thomas C. Ernst falsely claimed that Symbotic was growing revenue faster as a result of its ability to continue shortening average deployment timelines, crediting the purportedly strong performance of Symbotic's outsourcing partners, stating in relevant part:

> **The revenue growth this quarter was driven primarily by faster execution on deployments. The pace of new system starts and the acceleration of system installations saw a marked improvement. […]** Time to deploy a system is also important in driving revenue growth, **and we continue to shrink the time of deployments with the help of our partnership initiatives[,]** as well as through

our ongoing efforts to standardize our platform and streamline our deployment processes. As Rick mentioned, **our network of outsourcing partners is executing well. We continue to see significant opportunities and gain efficiencies over time** [indiscernible] **as we continue to add more partners to our outsourcing network. Our outsourcing partners are ramping up so well** that during the fourth quarter, we chose to end autonomous bot manufacturing operations in our Wilmington, Massachusetts location and established a $14 million restructuring reserve, primarily associated with the dissolution of materials and inventory.

144. Defendant Ernst's statements above were materially false and misleading when made because Symbotic's revenue growth was driven by improperly recording revenue from cost overruns and accelerating revenue recognition, not by faster deployments, and Symbotic was not "continu[ing] to shrink the time of deployments." Rather, outsourcing partners were performing terribly and causing delays and cost overruns. The Company's primary outsourcing partner, Fluor, was failing to order materials in a timely manner, was unable to accurately track and account for materials and inventory that had been delivered to deployment sites, lost truckloads of materials which caused deployment delays of between one and six months, and was inefficient at managing labor at deployment sites, resulting in hundreds of people standing around at job sites doing no work.

145. Moreover, when Defendant Ernst chose to speak about Symbotic's outsourcing partners as a way to increase the Company's ability to scale operations and grow revenue, Defendant Ernst, as well as the other Individual Defendants who participated in the FY2023 Call, had a duty to correct and/or disclose the ongoing terrible performance of the outsourcing partners and the delays and cost overruns the outsourcing partners had caused.

146. The factual allegations supporting the falsity and/or misleadingness of Ernst's statements are:

    a) According to CW4, from August 2022 to at least December 2023 when CW4 departed, Symbotic's outsourcing partners, including Fluor, did not adequately keep records of inventory, failed to order materials with

sufficient lead time, needed to be shown how to do their work, regularly failed to submit vendor invoices, and "dropped the ball constantly" regarding ordering and scheduling deliveries of necessary parts. CW4 stated that Fluor's frequent failures necessitated that CW4 work with Fluor on a near-daily basis to correct various inventory issues.

b) CW4 and CW3 confirmed that prior to and during the Class Period, Symbotic incurred "tons of fees to expedite" materials that had not been ordered on time, resulting in cost overruns.

c) According to CW4, throughout CW4's tenure, Symbotic's outsourcing partners regularly lost truckloads of inventory that were needed to complete deployments.

d) CW4 stated that during 2022 and 2023, multiple project deployments, including with customers Walmart and Albertsons, were significantly delayed due to the terrible performance of Symbotic's outsourcing partners, including delays that caused go-live dates to be missed or extended. CW4's account was corroborated by CW5 who stated that throughout CW5's tenure, the outsourcing partners were so slow that they caused Symbotic to miss go-live deadlines with Symbotic's largest customer, Walmart. CW2 also confirmed that throughout the Class Period, Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount.

e) CW4, CW5, CW3, and CW2 all reported that, during their tenures and/or throughout the Class Period, incomplete robots were being shipped to project sites, which caused employees and outsourcing partners to rob one site of inventory and system parts to be used at another site, helping one project but setting the other behind. Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that robots were shipped to deployment sites were only 90% functional and lacked parts.

f) CW1 stated that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's ongoing deployment delays and cost overruns were discussed during every quarterly meeting with defendant Hibbard and Symbotic's average system deployment time remained around 24 months. CW1 also recalled hearing during implementation meetings throughout CW1's tenure that Fluor's performance was terrible and that working with Fluor was difficult, challenging and less efficient.

g) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Symbotic's poor gross margins reflected "elongated construction schedules and implementation costs" because "parts aren't here" and "cables came in late," leaving "hundreds of people standing around the site for weeks[.]"

Cohen admitted that Fluor was ill-suited for the EPC function at Symbotic and that Symbotic was "spending a lot of time managing the contractors."

h) Hibbard admitted during the Q3 2024 Earnings Call on July 29, 2024 that "we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient." Hibbard also admitted that cost overruns were "not a surprise."

i) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 Defendants had known about outsourcing partners' failures for more than six months and, thus, Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*" to bring EPC back in-house.

j) On February 5, 2025, Hibbard admitted that Symbotic was "*still* averaging 24 months[.]" Hibbard further admitted Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time."

k) As a result of a) through j) above, Symbotic was not achieving faster deployment times an outsourcing partners were not executing well, as falsely represented.

147.    In response to questions from securities analysts during the FY2023 Call, Defendant Ernst further misled investors by falsely claiming that Symbotic was "**getting faster**" and expected to continue increasing the speed of deployments:

**Andrew Alec Kaplowitz**, *Citigroup Inc., Research Division*

[] Tom, over the last few quarters, your quarterly revenue has been beating quarterly guidance by really an increasing rate. I know you want to be conservative, but maybe talk about what has been getting better versus your own expectations? *I think you said it's the pace of deployments that's accelerating.* […]

**Thomas C. Ernst**, *CFO, Principal Accounting Officer & Treasurer*

Yes. Thanks for the question, Andy. […] What we've experienced here, particularly as 2023 has transpired is that we've seen a combination of 2 things. **We've seen very healthy improvement in our ability to deliver across the spectrum of our build phase and installation phase of our deployments, meaningful improvements in our speed to do so. And so as we think about that and as we look forward, we continue to expect that we're going to deliver systems faster.** However, that speed can come as a stair-step function. We don't expect that we'll see accelerations every quarter. In fact, we anticipate some quarters, you can see challenges and these can come not just from our own capabilities, but then it can

come from customer issues. So you never know when there's going to be a tornado or a flood or a hurricane that slows us down. And so that's the other half as while **we are getting faster, we just have not had those kinds of things that have really slowed us down that are beyond our control as well, particularly here in the second half of 2023**. So I don't think you should expect Symbotic to be beating their numbers by greater amounts every quarter. It's just that we've had a couple of very strong quarters here in a row. And as we think about our setting guidance forward, we try to kind of bring that all together.

148.    Defendant Ernst's statements above were materially false and misleading when made because Symbotic was not "getting faster" at deploying systems in November 2023 and had not seen "healthy" and "meaningful improvements" in the speed of Symbotic's deployments. Rather, outsourcing partners were performing terribly and causing delays and cost overruns. The Company's primary outsourcing partner, Fluor, who was responsible for EPC, supply chain, logistics, labor, safety, and managing deployment sites, was failing to order materials in a timely manner, was unable to accurately track and account for materials and inventory that had been delivered to deployment sites, lost truckloads of materials which caused deployment delays of between one and six months, and was inefficient at managing labor at deployment sites, resulting in hundreds of people standing around at job sites doing no work.

149.    Moreover, when Defendant Ernst chose to speak about Symbotic's outsourcing partners as a way to increase the Company's ability to scale operations and grow revenue, Defendant Ernst, as well as the other Individual Defendants who participated in the FY2023 Call, had a duty to correct and/or disclose the ongoing terrible performance of the outsourcing partners and the delays and cost overruns the outsourcing partners had caused.

150.    The factual allegations supporting the falsity and/or misleadingness of Ernst's statements are:

      a)    According to CW4, from August 2022 to at least December 2023 when CW4 departed, Symbotic's outsourcing partners, including Fluor, did not adequately keep records of inventory, failed to order materials with

sufficient lead time, needed to be shown how to do their work, regularly failed to submit vendor invoices, and "dropped the ball constantly" regarding ordering and scheduling deliveries of necessary parts. CW4 stated that Fluor's frequent failures necessitated that CW4 work with Fluor on a near-daily basis to correct various inventory issues.

b) CW4 and CW3 confirmed that prior to and during the Class Period, Symbotic incurred "tons of fees to expedite" materials that had not been ordered on time.

c) According to CW4, throughout CW4's tenure, Symbotic's outsourcing partners regularly lost truckloads of inventory that were needed to complete deployments.

d) CW4 stated that, in 2022 and 2023, multiple project deployments, including with customers Walmart and Albertsons, were significantly delayed due to the terrible performance of Symbotic's outsourcing partners, including delays that caused go-live dates to be missed or extended. CW4's account was corroborated by CW5 who stated that during CW5's tenure, the outsourcing partners were so slow that they caused Symbotic to miss go-live deadlines with Symbotic's largest customer, Walmart. CW2 also confirmed that during CW2's tenure, Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount.

e) CW4, CW5, CW3, and CW2 all reported that during their tenures and prior to and throughout the Class Period, incomplete robots were being shipped to project sites, which caused employees and outsourcing partners to rob one site of inventory and system parts to be used at another site, helping one project but setting the other behind. Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that robots were shipped to deployment sites were only 90% functional and lacked parts.

f) CW1 stated that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's ongoing deployment delays and cost overruns were discussed during every quarterly meeting with defendant Hibbard and Symbotic's average system deployment time remained around 24 months. CW1 also recalled hearing during implementation meetings throughout CW1's tenure that Fluor's performance was terrible and that working with Fluor was difficult, challenging and less efficient.

g) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Symbotic's poor gross margins reflected "elongated construction schedules and implementation costs" because "parts aren't here" and "cables came in late," leaving "hundreds of people standing around the site for weeks[.]"

Cohen admitted that Fluor was ill-suited for the EPC function at Symbotic and that Symbotic was "spending a lot of time managing the contractors."

h) Hibbard admitted during the Q3 2024 Earnings Call on July 29, 2024 that "we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient." Hibbard also admitted that cost overruns were "not a surprise."

i) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 Defendants had known about outsourcing partners' failures for more than six months and, thus, Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*" to bring EPC back in-house.

j) On February 5, 2025, Hibbard admitted that Symbotic was "*still* averaging 24 months[.]" Hibbard further admitted Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time."

k) As a result of a) through j) above, Symbotic was not achieving faster deployment times, as falsely represented.

151.    In response to another analyst question during the FY2023 Call, Defendant Ernst falsely claimed that that Symbotic was "seeing progress" in reducing deployment timelines and, without disclosing the consistent delays caused by Symbotic's outsourcing partners like Fluor, claimed that the Company expected deployment timelines in 2024 to be "under 22 months":

**Derek John Soderberg**, *Cantor Fitzgerald & Co., Research Division*

*So I think you guys are really on an ongoing basis, finding areas where you can speed up the deployment timelines.* Can you talk maybe a little bit about where along the project you're seeing – you're finding ways to sort of speed up that process and maybe if you could just quantify how long the average deployment takes at this point?

**Thomas C. Ernst**, *CFO, Principal Accounting Officer & Treasurer*

[…] Derek, when we first became a public company and we talked about those systems that we were starting, we expect it to be around 2 years or so in terms of from the start of a project launch until we actually turned it up and customer took acceptance and began ramping full usage. Those first systems that actually went live were actually north of 2.5 years. And so what we're experiencing now though is that we're hitting effectively on these systems here in 2024 are going to hit on that 2-year time frame and **the systems that we're rolling out now, we expect to**

**be under 22 months. So what we're seeing progress in is we're carving days
out and occasional innovations or carving weeks out….**

152.    Defendant Ernst's statements above were materially false and misleading when
made because Symbotic was not improving average deployment times, which had stalled at 24
months. The statements were also materially misleading because rather than reducing deployment
times and carving days or weeks from those times, the outsourcing partners Symbotic was
employing were performing terribly and causing delays and cost overruns. The Company's
primary outsourcing partner, Fluor, who was responsible for EPC, supply chain, logistics, labor,
safety, and managing deployment sites, was failing to order materials in a timely manner, was
unable to accurately track and account for materials and inventory that had been delivered to
deployment sites, lost truckloads of materials which caused deployment delays of between one
and six months, and was inefficient at managing labor at deployment sites, resulting in hundreds
of people standing around at job sites doing no work.

153.    Moreover, when Defendant Ernst chose to speak about Symbotic's purported
progress in reducing system deployment times, Defendant Ernst, as well as the other Individual
Defendants who participated in the FY2023 Call, had a duty to correct and/or disclose the ongoing
terrible performance of the outsourcing partners and the delays and cost overruns the outsourcing
partners had caused.

154.    The factual allegations supporting the falsity and/or misleadingness of Ernst's
statements are:

a)    According to CW4, from August 2022 to at least December 2023 when CW4
      departed, Symbotic's outsourcing partners, including Fluor, did not adequately
      keep records of inventory, failed to order materials with sufficient lead time,
      needed to be shown how to do their work, regularly failed to submit vendor
      invoices, and "dropped the ball constantly" regarding ordering and scheduling
      deliveries of necessary parts. CW4 stated that Fluor's frequent failures

necessitated that CW4 work with Fluor on a near-daily basis to correct various inventory issues.

b) CW4 and CW3 confirmed that prior to and during the Class Period, Symbotic incurred "tons of fees to expedite" materials that had not been ordered on time.

c) According to CW4, throughout CW4's tenure, Symbotic's outsourcing partners regularly lost truckloads of inventory that were needed to complete deployments.

d) CW4 stated that, in 2022 and 2023, multiple project deployments, including with customers Walmart and Albertsons, were significantly delayed due to the terrible performance of Symbotic's outsourcing partners, including delays that caused go-live dates to be missed or extended. CW4's account was corroborated by CW5 who stated that during CW5's tenure, the outsourcing partners were so slow that they caused Symbotic to miss go-live deadlines with Symbotic's largest customer, Walmart. CW2 also confirmed that during CW2's tenure, Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount.

e) CW4, CW5, CW3, and CW2 all reported that during their tenures and prior to and throughout the Class Period, incomplete robots were being shipped to project sites, which caused employees and outsourcing partners to rob one site of inventory and system parts to be used at another site, helping one project but setting the other behind. Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that robots were shipped to deployment sites were only 90% functional and lacked parts.

f) CW1 stated that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's ongoing deployment delays and cost overruns were discussed during every quarterly meeting with defendant Hibbard and Symbotic's average system deployment time remained around 24 months. CW1 also recalled hearing during implementation meetings throughout CW1's tenure that Fluor's performance was terrible and that working with Fluor was difficult, challenging and less efficient.

g) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Symbotic's poor gross margins reflected "elongated construction schedules and implementation costs" because "parts aren't here" and "cables came in late," leaving "hundreds of people standing around the site for weeks[.]" Cohen admitted that Fluor was ill-suited for the EPC function at Symbotic and that Symbotic was "spending a lot of time managing the contractors."

h) Hibbard admitted during the Q3 2024 Earnings Call on July 29, 2024 that "we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources

to each of those sites, which is extremely inefficient." Hibbard also admitted that cost overruns were "not a surprise."

i) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 Defendants had known about outsourcing partners' failures for more than six months and, thus, Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*" to bring EPC back in-house.

j) On February 5, 2025, Hibbard admitted that Symbotic was "*still* averaging 24 months[.]" Hibbard further admitted Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time."

k) As a result of a) through j) above, Symbotic was not achieving faster deployment times, as falsely represented.

155.   Securities analysts who followed Symbotic gave great weight to the Company's false claims on November 20, 2023 regarding Symbotic's purported improvements in deployment time and performance of outsourcing partners. For example, on November 21, 2023, Cantor Fitzgerald reported: "SYM is consistently finding ways to shrink timelines and continues to see meaningful improvements ahead to eventually reach its long-term goal of 6 months or less."

156.   That same day, on November 21, 2023, Citi reported: "We think SYM could continue to invest and expand its outsourcing partner ecosystem, which we think is enabling the company to deploy more systems as well as is leading to faster execution on ongoing deployment (reflected in strong revenue growth)."

157.   On November 21, 2023, analysts from Craig Hallum reported: "Once again, commentary suggests the company continues to accelerate its pace of deployments through outsourcing, which has led to a stronger ramp in system revenues (as evidenced by this quarter) and should lead to higher contribution of recurring revenues (software and service) in the coming quarters/years."

158.   On November 21, 2023, Northland Capital Markets reported: "Faster deployments aided by outsourcing and standardization efforts helped revenue growth. … System deployments

are the biggest governor of growth given the high demand, and management sees stair step improvements over time. Outsourcing has helped revenue growth recently, and can help margins over the long run."

159.    On November 21, 2023, Baird Equity Research reported: "Though SYM did not guide beyond F1Q, we view positively the company's determination to continue engaging new supply chain partners, enabling the company to deliver against its significant backlog."

160.    On November 21, 2023, analysts at William Blair reported: "Symbotic's fourth quarter 2023 results were yet again well above expectations, highlighted by accelerating lead times, ramping up production, and favorable mix (four systems added to procurement during the quarter)."

**B.    February 5, 2024 Press Release and Earnings Call**

161.    On February 5, 2024, Defendants issued a press release announcing Symbotic's First Fiscal Quarter Earnings for the three months ended December 30, 2023 ("Q1 2024 Press Release"). **In the Q1 2024 Press Release, Defendants reported falsely inflated revenue, cost of revenue, gross profit, adjusted EBITDA and net loss figures for the three months ended December 30, 2023 of $368 million, $298 million, $70 million, $14 million and ($13 million), respectively. Symbotic also falsely reported inflated unbilled accounts receivable and accounts payable figures of $148 million and $106 million, respectively**.

162.    On February 5, 2024, Defendants held an investor call to discuss Symbotic's first fiscal quarter 2024 earnings ("Q1 2024 Earnings Call"). During the Q1 2024 Earnings Call, Defendant Hibbard repeated the same false financial results as stated in the Q1 2024 Press Release, stating: **"[o]ur first quarter revenue grew to $369 million, up nearly 80% compared to the same quarter last year, and reflects an accelerated pace of growth from last quarter's 60%**

year-on-year growth" and "**we achieved a 3.8% adjusted EBITDA rate compared to a 3.4%**

**rate last quarter**."

163.    Defendants have admitted that the above reported figures for Fiscal Q1 2024 were

materially false and misleading when made, requiring Symbotic to restate its financial results. On

December 4, 2024, Symbotic filed its Amended Quarterly Report on Form 10-Q, signed by Maria

G. Freve, VP, Controller and Chief Accounting Officer, restating the above reported (false) figures

as follows:

| Fiscal Q1 2024 (in millions) | Reported | Restated | $ Change | % Change |
|---|---|---|---|---|
| Revenue | $368 | $360 | $8 | 2% |
| Cost of Revenue | $298 | $296 | $2 | 1% |
| Gross Profit | $70 | $64 | $6 | 9% |
| Net Income/(Loss) | ($13) | ($19) | $6 | 46% |
| Adjusted EBITDA | $14 | $8 | $6 | 43% |
| Unbilled Receivables | $148 | $139 | $9 | 6% |
| Accounts Payable | $106 | $103 | $3 | 3% |

164.    Defendants also reported in the Q1 2024 Press Release, **false Fiscal Q2 2024**

**forecasts for revenue of $400 - $420 million and adjusted EBITDA of $12 million - $15**

**million,** which Defendant Hibbard repeated in the Q1 2024 Earnings Call, stating "[f]or the

**second quarter of fiscal 2024, we expect revenue of $400 million to $420 million and adjusted**

**EBITDA between $12 million and $15 million, which represents revenue growth of over 50%**

**and improved adjusted EBITDA margin of over 700 basis points, both on a year-on-year**

**basis**."

165.    Symbotic's Fiscal Q1 forecasts were materially false and misleading and lacked

any reasonable basis because they included revenue from cost overruns that customers were not

obligated or willing to pay. But for the alleged misconduct and resulting overstatement, Symbotic

would have missed its Fiscal Q2 2024 revenue and EBITDA forecasts.

166.    During the Q1 2024 Earnings Call, Defendant Hibbard touted that "in just 20 months," Symbotic had deployed a system of undefined scope for an unnamed customer, and falsely claimed that Symbotic was having "**continued reductions in system deployment time as demonstrated by the system we recently deployed in just 20 months**[.]"

167.    When asked by analyst Piyush Avasthy during the Q1 2024 Earnings Call about Symbotic's future margins, Defendant Hibbard responded that Symbotic's projected Q2 margins "**reflect[] our flexibility to … accelerate deployment schedules**," and that nonetheless "**we continue to be on a trajectory to improve, and you're going to see that start to improve in the second half of the year and year-over-year, continued improvement in our profitability**."

168.    During the Q1 2024 Earnings Call, in response to a question from analyst Nicole Sheree DeBlase of Deutsche Bank about Symbotic's purported success at decreasing the length of deployment, Defendant Hibbard cited factors that purportedly enabled Symbotic to reduce the length of deployment to 20 months and would enable it to continue to decrease further, stating:

> One [factor] was we now have continuous learning over multiple deployments. **So our outsourcing partners**, they've now got multiple deployments under their belt and **they're improving on each one**. We've also got **increased collaboration from our entire deployment team**. So our deployment team includes Symbotic resources, our suppliers, as well as our customer. **And we've really seen an increase in that collaboration over the past quarter.** And then, the last one is the quality and standardization of what I'll call the build. **So our build instructions, our test procedures, we're standardizing that more and more from deployment to deployment, and that's really enabling the improvement from our partners**.

169.    In response to a question from analyst Gregory Palm of Craig-Hallum Capital Group, LLC, regarding whether there were "*any constraints to not maintaining that current pace [of deployments], but accelerating it further,*" Defendant Cohen stated that "**we can go faster, we can go a lot faster**."

170.    The above statements were materially false and misleading when made and lacked any reasonable basis because deployment times were still averaging 24 months and not improving, Symbotic did not have the ability to "accelerate deployment schedules," and Symbotic's outsourcing partners were not improving with each deployment. Rather, outsourcing partners were performing terribly and causing delays and cost overruns. The Company's primary outsourcing partner, Fluor, who was responsible for EPC, supply chain, logistics, labor, safety, and managing deployment sites, was failing to order materials in a timely manner, was unable to accurately track and account for materials and inventory that had been delivered to deployment sites, lost truckloads of materials which caused deployment delays of between one and six months, and was inefficient at managing labor at deployment sites, resulting in hundreds of people standing around at job sites doing no work.

171.    Moreover, when Defendants Hibbard and Cohen chose to speak about Symbotic's outsourcing partners as improving with each deployment and improving profitability, Defendants Hibbard and Cohen, as well as the other Individual Defendants who participated in the Q1 2024 Earnings Call, had a duty to correct and/or disclose the ongoing poor performance of the outsourcing partners and the delays and cost overruns the outsourcing partners had caused.

172.    The factual allegations supporting the falsity and/or misleadingness of Ernst's statements are:

    a) According to CW4, from August 2022 to at least December 2023 when CW4 departed, Symbotic's outsourcing partners, including Fluor, did not adequately keep records of inventory, failed to order materials with sufficient lead time, needed to be shown how to do their work, regularly failed to submit vendor invoices, and "dropped the ball constantly" regarding ordering and scheduling deliveries of necessary parts. CW4 stated that Fluor's frequent failures necessitated that CW4 work with Fluor on a near-daily basis to correct various inventory issues.

b) CW4 and CW3 confirmed that prior to and during the Class Period, Symbotic incurred "tons of fees to expedite" materials that had not been ordered on time.

c) According to CW4, throughout CW4's tenure, Symbotic's outsourcing partners regularly lost truckloads of inventory that were needed to complete deployments.

d) CW4 stated that, in 2022 and 2023, multiple project deployments, including with customers Walmart and Albertsons, were significantly delayed due to the terrible performance of Symbotic's outsourcing partners, including delays that caused go-live dates to be missed or extended. CW4's account was corroborated by CW5 who stated that during CW5's tenure, the outsourcing partners were so slow that they caused Symbotic to miss go-live deadlines with Symbotic's largest customer, Walmart. CW2 also confirmed that during CW2's tenure, Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount.

e) CW4, CW5, CW3, and CW2 all reported that during their tenures and prior to and throughout the Class Period, incomplete robots were being shipped to project sites, which caused employees and outsourcing partners to rob one site of inventory and system parts to be used at another site, helping one project but setting the other behind. Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that robots were shipped to deployment sites were only 90% functional and lacked parts.

f) CW1 stated that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's ongoing deployment delays and cost overruns were discussed during every quarterly meeting with defendant Hibbard and Symbotic's average system deployment time remained around 24 months. CW1 also recalled hearing during implementation meetings throughout CW1's tenure that Fluor's performance was terrible and that working with Fluor was difficult, challenging and less efficient.

g) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Symbotic's poor gross margins reflected "elongated construction schedules and implementation costs" because "parts aren't here" and "cables came in late," leaving "hundreds of people standing around the site for weeks[.]" Cohen admitted that Fluor was ill-suited for the EPC function at Symbotic and that Symbotic was "spending a lot of time managing the contractors."

h) Hibbard admitted during the Q3 2024 Earnings Call on July 29, 2024 that "we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient." Hibbard also admitted that cost overruns were "not a surprise."

i) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024
Defendants had known about outsourcing partners' failures for more than six
months and, thus, Defendants had "been hiring people in the supply chain in
the EPC space *over the last 6 months*" to bring EPC back in-house.

j) On February 5, 2025, Hibbard admitted that Symbotic was "*still* averaging
24 months[.]" Hibbard further admitted Symbotic did not expect any
improvement to the 24-month average in the near future, explaining "that's
going to take some time."

k) Symbotic was not achieving faster deployment times and outsourcing
partners were not executing well, as falsely represented.

l) As a result of a) through k) above, Symbotic did not have the ability to
"accelerate deployment schedules" and Symbotic's outsourcing partners
were not improving with each deployment.

173.    Analysts understood Defendants' statements to mean that Symbotic was able to
complete project deployments, on average, within 20 months or less. As Cantor Fitzgerald stated
in a February 6, 2024 report:

> **Deployment timelines are shrinking.** *New system deployments now average ~20
> months* compared to commentary on the F4Q23 earnings call of "less than 22
> months." SYM is working with outsourcing partners consistently to streamline the
> production and installation of systems. Longer term, SYM is targeting a roughly 9-
> to 12-month deployment timeline. *We believe progress here is significant, and that
> SYM is tracking ahead of expectations*.

**C.    February 8, 2024 Form 10-Q**

174.    On February 8, 2024, Defendants filed Symbotic's Form 10-Q for the first fiscal
quarter ended December 30, 2023 ("FQ1 2024 Form 10-Q") with the SEC, signed by Defendant
Hibbard. In the FQ1 2024 Form 10-Q, Defendants repeated the same false and misleading financial
statements as in the Q1 2024 Press Release at pages 1-4, 26.

175.    Defendants have admitted that the above reported figures for Fiscal Q1 2024 were
materially false and misleading when made, requiring Symbotic to later restate the financial
results. On December 4, 2024, Symbotic filed an amended Quarterly Report on Form 10-Q, signed

by Maria G. Freve, VP, Controller and Chief Accounting Officer, reducing the above reported

(false) figures as follows:

| Fiscal Q1 2024 (in millions) | Reported | Restated | $ Change | % Change |
|---|---|---|---|---|
| Revenue | $368 | $360 | $8 | 2% |
| Cost of Revenue | $298 | $296 | $2 | 1% |
| Gross Profit | $70 | $64 | $6 | 9% |
| Net Income/(Loss) | ($13) | ($19) | $6 | 46% |
| Adjusted EBITDA | $14 | $8 | $6 | 43% |
| Unbilled Receivables | $148 | $139 | $9 | 6% |
| Accounts Payable | $106 | $103 | $3 | 3% |

176.    Defendants also claimed in the FQ1 2024 Form 10-Q that Symbotic's financial

statements complied with GAAP and that the Company followed its own revenue recognition

accounting policies, stating:

**2. Summary of Significant Accounting Policies**

*Basis of Presentation and Consolidation*

**The accompanying unaudited condensed consolidated financial statements have been prepared in U.S. dollars, in accordance with accounting principles generally accepted in the United States of America ("GAAP")**…The accompanying unaudited condensed consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries and majority-owned subsidiaries and reflect all adjustments (consisting solely of normal, recurring adjustments) **which are, in the opinion of management, necessary for a fair statement of results for the interim periods presented.**

\*        \*        \*

**4. Revenue**

\*        \*        \*

**The Company recognizes revenue upon transfer of control of promised goods or services in a contract with a customer, generally as title and risk of loss pass to the customer, in an amount that reflects the consideration the Company expects to receive in exchange for those products or services. Revenue is recognized only to the extent that it is probable that a significant reversal of revenue will not occur and when collection is considered probable**.

*       *       *

The design, assembly, and installation of a System includes substantive customer-specified acceptance criteria that allow the customer to accept or reject systems that do not meet the customer's specifications. **When the Company cannot objectively determine that acceptance criteria will be met upon contract inception, revenue relating to systems is deferred and recognized at a point in time upon final acceptance from the customer. If acceptance can be reasonably certain upon contract inception, revenue is recognized over time based on an input method, using a cost-to-cost measure of progress**.

177.    The above statement was materially false and misleading when made because Symbotic's financial statements did not comply with GAAP. Rather, Defendants have admitted that Symbotic prematurely and improperly recognized revenue, resulting in the restatement of the Company's FQ1 2024 revenue, cost of revenue, gross profit, adjusted EBITDA, and net loss. For these same reasons, Symbotic violated the Company's own revenue recognition policy.

178.    In the FQ1 2024 Form 10-Q, Defendants also falsely claimed that Symbotic maintained adequate control over financial reporting, stating:

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer (our principal executive officer and principal financial officer, respectively), evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act… **Based on that evaluation of our disclosure controls and procedures as of December 30, 2023, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level**.

179.    In addition, Defendants Cohen and Hibbard signed certifications under Section 302 of the Sarbanes-Oxley Act of 2002, attached to the FQ1 2024 Form 10-Q as Exhibits 31.1 (Cohen) and 31.2 (Hibbard), attesting that Symbotic maintained adequate controls over financial reporting. Defendant Cohen's stated:

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT
TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Richard B. Cohen, certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q for the fiscal quarter ended December 30, 2023 of Symbotic Inc.;

2.      Based on my knowledge, **this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.      Based on my knowledge, **the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.  **Designed such internal control over financial reporting**, or caused such internal control over financial reporting to be designed under our supervision, **to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles**;

c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal

quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 8, 2024                    By: /s/ Richard B. Cohen
                                               Richard B. Cohen

                                          Chairman and Chief Executive Officer
                                          (Principal Executive Officer)

180.   Defendant Hibbard signed an identical Section 302 Sarbanes-Oxley certification.

181.   Both Cohen and Hibbard also signed certifications under Section 906 of the Sarbanes-Oxley Act, attached as Exhibits 32.1 and 32.2 to the FQ1 2024 Form 10-Q. Defendant Cohen's stated:

**Exhibit 32.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Symbotic Inc. (the "Company") for the fiscal quarter ended December 30, 2023, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Richard B. Cohen, Chairman and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

65

(2) **The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company**.

Date: February 8, 2024                    By: /s/ Richard B. Cohen
                                              Richard B. Cohen

                                          Chairman and Chief Executive Officer
                                          (Principal Executive Officer)

182.    Defendant Hibbard signed an identical Sarbanes-Oxley certification under Section 906.

183.    Defendants admit the above statements were materially false and misleading when made because Symbotic lacked effective internal controls over its financial reporting in 2024. Symbotic disclosed in its 2024 Form 10-K that "the Company's internal control over financial reporting was not effective due to the identification of material weaknesses" and "the Company did not effectively design and execute controls over revenue recognition related to cost overruns on certain deployments that will not be billable." Defendants also disclosed in the 2024 Form 10-K that Symbotic's "independent registered public accounting firm, Grant Thornton LLP" had "issued an adverse opinion on the effectiveness of the Company's internal control over financial reporting."

184.    The falsity of Defendants statements above is further evidenced by:

   a.  Symbotic's multiple restatements of its 2024 quarterly and annual results evidencing Defendants' improper recognition of revenue from cost accelerations and cost overruns;

   b.  Defendants subsequently admitted on November 27, 2024 in connection with the Second Restatement that customers were unwilling to pay for the cost overruns;

   c.  Symbotic's 2024 Form 10-K revealed Walmart had capped costs for which it could be billed;

   d.  CW1 reported that customer contracts in 2024 did not allow Symbotic to bill customers for cost overruns;

e. Cohen's admission that Symbotic shipped robots with missing parts that were not completely functional; and

f. CW4's account that, throughout CW4's tenure, CW4 was instructed to approve vendor invoices without confirming receipt of goods or completion of work.

**D.    May 6, 2024 Press Release and Earnings Call**

185.    On May 6, 2024, Defendants issued a press release announcing Symbotic's Second Fiscal Quarter Earnings for the three and six months ended March 30, 2024 ("Q2 2024 Press Release"). **In the Q2 2024 Press Release, Defendants reported falsely inflated revenue, cost of revenue, gross profit, EBITDA and earnings figures for the three months ended March 30, 2024 of $424 million, $380 million, $44 million, $22 million and ($41 million), respectively, and for the six months ended March 30, 2024 of $793 million, $678 million, $114 million, $37 million and ($54 million), respectively**.

186.    **Symbotic also falsely reported inflated unbilled accounts receivable and accounts payable figures for the three months ended March 30, 2024 of $174 million and $150 million, respectively.**

187.    On May 6, 2024, Defendants held an investor call to discuss Symbotic's second quarter 2024 earnings ("Q2 2024 Earnings Call"). During the Q2 2024 Earnings Call, Defendant Hibbard repeated the same false financial results as stated in the Q2 2024 Press Release, stating "**[s]econd quarter revenue grew to $424 million, up 59% compared to the same quarter last year….**" According to Defendant Hibbard, "**[s]ystem adjusted gross margin remained stable at 20% and generally in line with last quarter**" and Symbotic "**achieved a 5.3% adjusted EBITDA rate, compared to a 3.8% rate last quarter**."

188.    Defendants have admitted that the above reported figures for Fiscal Q2 2024 were materially false and misleading when made, requiring Symbotic to restate the financial results. On

December 4, 2024, Symbotic filed an amended Quarterly Report on Form 10-Q, signed by signed by Maria G. Freve, VP, Controller and Chief Accounting Officer, reducing the false figures reported for the three months and six ended March 30, 2024 as follows:

| Three Months Ended March 30, 2024 | | | | |
|---|---|---|---|---|
| Fiscal Q2 2024 (in millions) | Reported | Restated | $ Change | % Change |
| Revenue | $424 | $393 | $31 | 7% |
| Cost of Revenue | $380 | $363 | $17 | 4% |
| Gross Profit | $44 | $30 | $14 | 32% |
| Net Income/(Loss) | ($41) | ($55) | $14 | 34% |
| Adjusted EBITDA | $22 | $9 | $13 | 59% |
| Unbilled Receivables | $174 | $139 | $35 | 20% |
| Accounts Payable | $150 | $133 | $17 | 11% |

| Six Months Ended March 30, 2024 | | | | |
|---|---|---|---|---|
| Fiscal Q2 2024 (in millions) | Reported | Restated | $ Change | % Change |
| Revenue | $793 | $753 | $40 | 5% |
| Cost of Revenue | $678 | $659 | $19 | 3% |
| Gross Profit | $114 | $94 | $20 | 18% |
| Net Income/(Loss) | ($54) | ($74) | $20 | 37% |
| Adjusted EBITDA | $37 | $17 | $20 | 54% |
| Unbilled Receivables | $174 | $139 | $35 | 20% |
| Accounts Payable | $150 | $133 | $17 | 11% |

189.    In the Q2 2024 Press Release, Defendant Cohen attributed Symbotic's positive second quarter results, in part, to Symbotic's purported ability to "**accelerate deployment times**." Defendant Hibbard echoed Cohen, claiming Symbotic made "advancements" that "**helped us to accelerate deployment progress during the quarter**" to "**achieve[] faster revenue growth, higher margins and stronger cash generation than planned for the quarter**."

190.    Defendant Hibbard doubled down on these misstatements during the Q2 2024 Earnings Call held on May 6, 2024. During the Q2 2024 Call, Defendant Hibbard falsely claimed

that improvements to revenue were driven by an acceleration of deployments that would continue

throughout the year and that would create additional deployment capacity:

> **We expect quarterly system starts to accelerate during the rest of the year. For this quarter, our revenue numbers reflect that significant revenue growth can be driven by our ability to accelerate deployments in progress. And just as important, reductions in system deployment time create capacity to support future customer demand.**

191.     During the Q2 2024 Earnings Call, Defendant Cohen touted Symbotic's purported

"accelerating deployment" time, a key metric to investors and analysts:

> Our second quarter reflects solid financial progress. At the same time, **we accelerated the pace of innovation significantly during the quarter. … Key innovations this quarter[] include** advancing our core technologies and artificial intelligence and automation, improving system performance and the customer experience, enhancing safety and **accelerating deployment**.

192.     Defendant Hibbard echoed Cohen's false statements claiming, in response to a

question from analyst Andrew Kaplowitz of Citigroup, Inc., that deployments were continuing to

accelerate:

> And as a reminder, **some of the things that are enabling that faster deployment, we're seeing the benefit of continuous learning over multiple deployments from our supply chain, as well as our own folks. We've got increased collaboration across ourselves and our customer**. And then, we talked quite a bit last quarter about the quality and the standardization to build on build instructions and our test procedures. We're seeing the benefit of all of that.
>
> **So, going forward**, we do have some straggler deployments, I'll call them, that we'll complete in the second half of this year that might take a little bit longer than that 20 months, because each deployment is not the same size or complexity, but **we're still on target for the future to have a number of opportunities that we see driving deployment time less than 12 months**.

193.     The above statements were materially false and misleading when made and lacked

any reasonable basis because deployment times were still averaging 24 months and not improving

and faster deployments were not improving revenue growth. Rather, outsourcing partners were

performing terribly and causing delays and cost overruns and revenue growth was improving because Defendants were prematurely and improperly booking revenue.

194.    Moreover, when Defendants Cohen and Hibbard chose to speak about Symbotic's purported improvements in the speed of system deployments, Defendants Cohen and Hibbard, as well as the other Individual Defendants who participated in the Q2 2024 Earnings Call, had a duty to correct and/or disclose the ongoing poor performance of the outsourcing partners, the delays and cost overruns the outsourcing partners had caused, and that Defendants were already hiring to bring EPC back in-house. Defendants' omission of that information rendered Defendant Cohen's and Defendant Hibbard's statements materially misleading.

195.    The factual allegations supporting the falsity and/or misleadingness of Cohen and Hibbard's statements are:

    a)    According to CW4, from August 2022 to at least December 2023 when CW4 departed, Symbotic's outsourcing partners, including Fluor, did not adequately keep records of inventory, failed to order materials with sufficient lead time, needed to be shown how to do their work, regularly failed to submit vendor invoices, and "dropped the ball constantly" regarding ordering and scheduling deliveries of necessary parts. CW4 stated that Fluor's frequent failures necessitated that CW4 work with Fluor on a near-daily basis to correct various inventory issues.

    b)    CW4 and CW3 confirmed that prior to and during the Class Period Symbotic incurred "tons of fees to expedite" materials that had not been ordered on time, resulting in cost overruns.

    c)    According to CW4, throughout CW4's tenure, Symbotic's outsourcing partners regularly lost truckloads of inventory that were needed to complete deployments.

    d)    CW4 stated that during 2022 and 2023, multiple project deployments, including with customers Walmart and Albertsons, were significantly delayed due to the terrible performance of Symbotic's outsourcing partners, including delays that caused go-live dates to be missed or extended. CW4's account was corroborated by CW5 who stated that throughout CW5's tenure, the outsourcing partners were so slow that they caused Symbotic to miss go-live deadlines with Symbotic's largest customer, Walmart. CW2

70

also confirmed that throughout the Class Period, Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount.

e) CW4, CW5, CW3, and CW2 all reported that, during their tenures and/or throughout the Class Period, incomplete robots were being shipped to project sites, which caused employees and outsourcing partners to rob one site of inventory and system parts to be used at another site, helping one project but setting the other behind. Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that robots were shipped to deployment sites were only 90% functional and lacked parts.

f) CW1 reported that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's ongoing deployment delays and cost overruns were discussed during every quarterly meeting with defendant Hibbard and Symbotic's average system deployment time remained around 24 months. CW1 also recalled hearing during implementation meetings throughout CW1's tenure that Fluor's performance was terrible and that working with Fluor was difficult, challenging and less efficient.

g) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Symbotic's poor gross margins reflected "elongated construction schedules and implementation costs" because "parts aren't here" and "cables came in late," leaving "hundreds of people standing around the site for weeks[.]" Cohen admitted that Fluor was ill-suited for the EPC function at Symbotic and that Symbotic was "spending a lot of time managing the contractors."

h) Hibbard admitted during the Q3 2024 Earnings Call on July 29, 2024 that "we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient." Hibbard also admitted that cost overruns were "not a surprise."

i) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Defendants had known about outsourcing partners' failures for more than six months and, thus, Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*" to bring EPC back in-house.

j) On February 5, 2025, Hibbard admitted that Symbotic was "***still*** averaging 24 months" for project deployments and Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time."

k) As a result of a) through j) above, Symbotic was not achieving faster deployment times, as falsely represented.

196.    Defendants also reported in the Q2 2024 Press Release **false Fiscal Q3 2024 forecasts for revenue of $450 - $470 million and adjusted EBITDA of $27 million - $29 million**, which Defendant Hibbard repeated in the Q2 2024 Earnings Call stating "**[f]or the third quarter of fiscal 2024, we expect revenue of $450 million to $470 million and adjusted EBITDA between $27 million and $29 million. This represents revenue growth of over 47% and an adjusted EBITDA margin increase**." But for the alleged misconduct and resulting overstatement, Symbotic would have missed its fiscal Q3 2024 EBITDA forecast.

197.    Symbotic's Fiscal Q3 2024 forecasts lacked any reasonable basis because they included revenue from cost overruns that customers were not obligated or willing to pay, omitting that outsourcing partners were not accelerating deployment times as needed to achieve the forecasted financial results, and omitting that Symbotic was suffering delays in deployments and incurring cost overruns that would not be recoverable from customers, as evidenced by:

   a) According to CW4, from August 2022 to at least December 2023 when CW4 departed, Symbotic's outsourcing partners, including Fluor, did not adequately keep records of inventory, failed to order materials with sufficient lead time, needed to be shown how to do their work, regularly failed to submit vendor invoices, and "dropped the ball constantly" regarding ordering and scheduling deliveries of necessary parts. CW4 stated that Fluor's frequent failures necessitated that CW4 work with Fluor on a near-daily basis to correct various inventory issues.

   b) CW4 and CW3 confirmed that prior to and during the Class Period Symbotic incurred "tons of fees to expedite" materials that had not been ordered on time, resulting in cost overruns.

   c) According to CW4, throughout CW4's tenure, Symbotic's outsourcing partners regularly lost truckloads of inventory that were needed to complete deployments.

   d) CW4 stated that during 2022 and 2023, multiple project deployments, including with customers Walmart and Albertsons, were significantly delayed due to the terrible performance of Symbotic's outsourcing partners, including delays that caused go-live dates to be missed or extended. CW4's account was corroborated by CW5 who stated that throughout CW5's tenure, the outsourcing partners were so slow that they caused Symbotic to

miss go-live deadlines with Symbotic's largest customer, Walmart. CW2 also confirmed that throughout the Class Period, Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount.

e) CW4, CW5, CW3, and CW2 all reported that, during their tenures and/or throughout the Class Period, incomplete robots were being shipped to project sites, which caused employees and outsourcing partners to rob one site of inventory and system parts to be used at another site, helping one project but setting the other behind. Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that robots were shipped to deployment sites were only 90% functional and lacked parts.

f) CW1 reported that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's ongoing deployment delays and cost overruns were discussed during every quarterly meeting with defendant Hibbard and Symbotic's average system deployment time remained around 24 months. CW1 also recalled hearing during implementation meetings throughout CW1's tenure that Fluor's performance was terrible and that working with Fluor was difficult, challenging and less efficient.

g) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Symbotic's poor gross margins reflected "elongated construction schedules and implementation costs" because "parts aren't here" and "cables came in late," leaving "hundreds of people standing around the site for weeks[.]" Cohen admitted that Fluor was ill-suited for the EPC function at Symbotic and that Symbotic was "spending a lot of time managing the contractors."

h) Hibbard admitted during the Q3 2024 Earnings Call on July 29, 2024 that "we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient." Hibbard also admitted that cost overruns were "not a surprise."

i) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Defendants had known about outsourcing partners' failures for more than six months and, thus, Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*" to bring EPC back in-house.

j) On February 5, 2025, Hibbard admitted that Symbotic was "*still* averaging 24 months" for project deployments and Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time."

k) As a result of a) through j) above, Symbotic was not achieving faster deployment times, as falsely represented.

198.    Defendant Hibbard also falsely touted Symbotic's purported "**effective cost management and solid project execution**," when, in fact, as Defendants would later admit, Symbotic was experiencing higher costs from project delays:

> Overall, non-GAAP gross margin was down slightly from last quarter, but still better than expected. The innovations we deployed during the second quarter weighed upon system gross margin, **but were largely offset by effective cost management and solid project execution**.

199.    The above statements were materially false and misleading when made because Symbotic did not have effective cost management and solid project execution. Rather, Symbotic's gross margins declined due to the terrible performance of the Company's outsourcing partners which caused massive deployment delays and resulted in cost overruns, as evidenced by:

a)   According to CW4, from August 2022 to at least December 2023 when CW4 departed, Symbotic's outsourcing partners, including Fluor, did not adequately keep records of inventory, failed to order materials with sufficient lead time, needed to be shown how to do their work, regularly failed to submit vendor invoices, and "dropped the ball constantly" regarding ordering and scheduling deliveries of necessary parts. CW4 stated that Fluor's frequent failures necessitated that CW4 work with Fluor on a near-daily basis to correct various inventory issues.

b)   CW4 and CW3 confirmed that prior to and during the Class Period Symbotic incurred "tons of fees to expedite" materials that had not been ordered on time, resulting in cost overruns.

c)   According to CW4, throughout CW4's tenure, Symbotic's outsourcing partners regularly lost truckloads of inventory that were needed to complete deployments.

d)   CW4 stated that during 2022 and 2023, multiple project deployments, including with customers Walmart and Albertsons, were significantly delayed due to the terrible performance of Symbotic's outsourcing partners, including delays that caused go-live dates to be missed or extended. CW4's account was corroborated by CW5 who stated that throughout CW5's tenure, the outsourcing partners were so slow that they caused Symbotic to miss go-live deadlines with Symbotic's largest customer, Walmart. CW2 also confirmed that throughout the Class Period, Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount.

e) CW4, CW5, CW3, and CW2 all reported that, during their tenures and/or throughout the Class Period, incomplete robots were being shipped to project sites, which caused employees and outsourcing partners to rob one site of inventory and system parts to be used at another site, helping one project but setting the other behind. Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that robots were shipped to deployment sites were only 90% functional and lacked parts.

f) CW1 reported that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's ongoing deployment delays and cost overruns were discussed during every quarterly meeting with defendant Hibbard and Symbotic's average system deployment time remained around 24 months. CW1 also recalled hearing during implementation meetings throughout CW1's tenure that Fluor's performance was terrible and that working with Fluor was difficult, challenging and less efficient.

g) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Symbotic's poor gross margins reflected "elongated construction schedules and implementation costs" because "parts aren't here" and "cables came in late," leaving "hundreds of people standing around the site for weeks[.]" Cohen admitted that Fluor was ill-suited for the EPC function at Symbotic and that Symbotic was "spending a lot of time managing the contractors."

h) Hibbard admitted during the Q3 2024 Earnings Call on July 29, 2024 that "we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient." Hibbard also admitted that cost overruns were "not a surprise."

i) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Defendants had known about outsourcing partners' failures for more than six months and, thus, Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*" to bring EPC back in-house.

j) On February 5, 2025, Hibbard admitted that Symbotic was "*still* averaging 24 months" for project deployments and Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time."

k) As a result of a) through j) above, Symbotic was not achieving faster deployment times, as falsely represented.

200. Analysts from Cantor Fitzgerald understood from Defendants' false statements that Symbotic's quarterly results were "in-line or better than expected" and concluded: "System starts

are expected to accelerate from here, with *deployment timelines for systems continuing to shrink*."

Analysts from Cantor Fitzgerald elaborated:

> Deployment timelines continue to shrink. **Multiple new system deployments have now been completed in ~20 months. Over the past twelve months, Symbotic has shrunk deployment timelines by more than a week every single month. We believe progress here is significant.** Based on new innovations with standardizing the procurement, system architecture and installation, **SYM feels confident in continuing to shrink deployment timelines**. We note SYM is targeting a roughly 9- to 12-month deployment timeline longer term. We also note management's confidence in new system starts accelerating throughout the remainder of the year.

201.    Similarly, analysts from Deutsche Bank also believed Defendants' false statements, stating in a May 6, 2025 report: "[Symbotic announced] encouraging news on the speed of deployments on the earnings call, with the number of new deployments expected to accelerate into year-end. We think today's release and the tone/positive commentary shared on the conference call should push the share price up tomorrow."

**E.    May 7, 2024 Second Quarter Form 10-Q**

202.    On May 7, 2024, Defendants filed Symbotic's Form 10-Q for the second fiscal quarter ended March 30, 2024 ("FQ2 2024 Form 10-Q") with the SEC, signed by Defendant Hibbard. In the FQ2 2024 Form 10-Q, Defendants repeated the same false and misleading financial statements as in the Q2 2024 Press Release at pages 1-4, 32.

203.    Defendants have admitted that the above reported figures for Fiscal Q2 2024 were materially false and misleading when made, requiring Symbotic to restate the financial results. On December 4, 2024, Symbotic filed an amended Quarterly Report on Form 10-Q, signed by signed by Maria G. Freve, VP, Controller and Chief Accounting Officer, reducing the false figures reported for the three months and six ended March 30, 2024 as follows:

| Three Months Ended March 30, 2024 | | | | |
|---|---|---|---|---|
| Fiscal Q2 2024 (in millions) | Reported | Restated | $ Change | % Change |
| Revenue | $424 | $393 | $31 | 7% |
| Cost of Revenue | $380 | $363 | $17 | 4% |
| Gross Profit | $44 | $30 | $14 | 32% |
| Net Income/(Loss) | ($41) | ($55) | $14 | 34% |
| Adjusted EBITDA | $22 | $9 | $13 | 59% |
| Unbilled Receivables | $174 | $139 | $35 | 20% |
| Accounts Payable | $150 | $133 | $17 | 11% |

| Six Months Ended March 30, 2024 | | | | |
|---|---|---|---|---|
| Fiscal Q2 2024 (in millions) | Reported | Restated | $ Change | % Change |
| Revenue | $793 | $753 | $40 | 5% |
| Cost of Revenue | $678 | $659 | $19 | 3% |
| Gross Profit | $114 | $94 | $20 | 18% |
| Net Income/(Loss) | ($54) | ($74) | $20 | 37% |
| Adjusted EBITDA | $37 | $17 | $20 | 54% |
| Unbilled Receivables | $174 | $139 | $35 | 20% |
| Accounts Payable | $150 | $133 | $17 | 11% |

204.    Defendants also claimed in the FQ2 2024 Form 10-Q that Symbotic's financial statements complied with GAAP and that the Company followed its own revenue recognition accounting policies, stating:

**2. Summary of Significant Accounting Policies**

*Basis of Presentation and Consolidation*

**The accompanying unaudited condensed consolidated financial statements have been prepared in U.S. dollars, in accordance with accounting principles generally accepted in the United States of America ("GAAP")**…The accompanying unaudited condensed consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries and majority-owned subsidiaries and reflect all adjustments (consisting solely of normal, recurring adjustments) **which are, in the opinion of management, necessary for a fair statement of results for the interim periods presented.**

*            *            *

**4. Revenue**

\*       \*       \*

**The Company recognizes revenue upon transfer of control of promised goods or services in a contract with a customer, generally as title and risk of loss pass to the customer, in an amount that reflects the consideration the Company expects to receive in exchange for those products or services. Revenue is recognized only to the extent that it is probable that a significant reversal of revenue will not occur and when collection is considered probable**.

\*       \*       \*

The design, assembly, and installation of a System includes substantive customer-specified acceptance criteria that allow the customer to accept or reject systems that do not meet the customer's specifications. **When the Company cannot objectively determine that acceptance criteria will be met upon contract inception, revenue relating to systems is deferred and recognized at a point in time upon final acceptance from the customer. If acceptance can be reasonably certain upon contract inception, revenue is recognized over time based on an input method, using a cost-to-cost measure of progress**.

205.    The above statement was materially false and misleading when made because Symbotic's financial statements did not comply with GAAP. Rather, Defendants have admitted that Symbotic improperly recognized revenue from cost overruns that customers were not obligated, nor willing to pay, resulting in the restatement of the Company's FQ2 2024 revenue, cost of revenue, gross profit, net loss, EBITDA, unbilled accounts receivable and accounts payable. For these same reasons, Symbotic violated the Company's own revenue recognition policy.

206.    In the FQ2 2024 Form 10-Q, Defendants also falsely claimed that Symbotic maintained adequate control over financial reporting, stating:

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer (our principal executive officer and principal financial

officer, respectively), evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act.… **Based on that evaluation of our disclosure controls and procedures as of March 30, 2024, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level**.

207.    In addition, Defendants Cohen and Hibbard signed certifications under Section 302 of the Sarbanes-Oxley Act of 2002, attached to the FQ2 2024 Form 10-Q as Exhibits 31.1 (Cohen) and 31.2 (Hibbard), attesting that Symbotic maintained adequate control over financial reporting that were identical to those in paragraphs ¶¶179-182.

208.    Defendants admit the above statements were false when made because Symbotic lacked internal control over its financial reporting. Symbotic disclosed in its 2024 Form 10-K that "the Company's internal control over financial reporting was not effective due to the identification of material weaknesses" and "the Company did not effectively design and execute controls over revenue recognition related to cost overruns on certain deployments that will not be billable." Defendants also disclosed in the 2024 Form 10-K that Symbotic's "independent registered public accounting firm, Grant Thornton LLP" had "issued an adverse opinion on the effectiveness of the Company's internal control over financial reporting."

209.    The falsity of Defendants statements above is further evidenced by:

a.  Symbotic's multiple restatements of its 2024 quarterly and annual results evidencing Defendants' improper recognition of revenue from cost accelerations and cost overruns;

b.  Defendants subsequently admitted on November 27, 2024 in connection with the Second Restatement that customers were unwilling to pay for the cost overruns;

c.  Symbotic's 2024 Form 10-K revealed Walmart had capped costs for which it could be billed;

d.  CW1 reported that customer contracts in 2024 did not allow Symbotic to bill customers for cost overruns;

e.  Cohen's admission that Symbotic shipped robots with missing parts that were not completely functional; and

f.  CW4's account that, throughout CW4's tenure, CW4 was instructed to approve vendor invoices without confirming receipt of goods or completion of work.

**F.    May 9, 2024 Investor Day Presentation**

210.    On May 9, 2024, Defendants hosted an "Investor Day" that included a "Management Panels Presentation" segment (the "Investor Day Presentation") in which VP of Investor Relations Jeffrey K. Evanson moderated a panel with Defendants Hibbard and Walter Odisho, Symbotic's Chief of Manufacturing and Supply Chain.

211.    During the panel, Hibbard explained that she and Walter Odisho were focused on improving the efficiency of "the entire life cycle" of a deployment and claimed that Symbotic had achieved success at reducing the time it took to complete a deployment. Hibbard stated:

> So think about a build process for us [that] includes build, installation, commissioning and then we go live. We've talked about in the past, our early systems were about a 2.5-year [*i.e.*, 30-month] process to get through this [deployment] life cycle. **And over the last couple of quarters, we've had several proof points where we have that** [deployment life cycle] **down to 20 months.** And our goal is to continue to find ideas to be able to reduce that.

212.    During the same panel, the moderator stated: "**We're going to present some slides that show actual capacity improvement data and actual efficiency improvement data.** All the numbers have been stripped off, but everything starts on a 0 axis. **So it will be a very accurate representation of the progress that we're making. And then we're going to talk about some specific examples of how we're engineering in greater efficiency, faster deployment time.**"

213.    One slide presented was titled "**Increased Installation Efficiency**" and stated that Symbotic had achieved "**33% Total Project Duration Improvements with Projects Delivered in Last 2 Years**" which aligned with Hibbard's earlier comment that Symbotic had purportedly reduced the deployment process "down to 20 months." *See* Figure 2, below.

**Figure 2**.



214.    The above statements made during the Investor Day presentation were materially false and misleading when made because deployment times were still averaging 24 months and not improving and Symbotic's installation efficiency was not improving. Rather, outsourcing partners were performing terribly and causing delays and cost overruns. The Company's primary outsourcing partner, Fluor, who was responsible for EPC, supply chain, logistics, labor, safety, and managing deployment sites, was failing to order materials in a timely manner, was unable to accurately track and account for materials and inventory that had been delivered to deployment sites, lost truckloads of materials which caused deployment delays of between one and six months, was difficult to work with and slow to respond to communications from Symbotic, and was inefficient at managing labor at deployment sites, resulting in hundreds of people standing around at job sites doing no work. Moreover, as Defendant Cohen admitted during the Q2 2024 Earnings Call on July 29, 2024, at the time of these misstatements in May 2024, Defendants were already

hiring internally to bring EPC, the largest part of deployment, back in-house to mitigate the outsourcing partners' terrible performance. This negative information that Defendants concealed from the investors would have been material when deciding to purchase Symbotic stock.

215.    Moreover, the information that was not disclosed to the public was needed to make the Defendants' statements not misleading. When Defendants Hibbard and Odisho chose to speak about Symbotic's purported improvements in installation efficiency and the speed of system deployments, Defendants Hibbard and Odisho, as well as the other Individual Defendants who participated in the Investor Day, had a duty to correct and/or disclose the ongoing poor performance of the outsourcing partners which had persisted for more than a year, the delays and cost overruns the outsourcing partners had caused, and that Defendants were already hiring to bring EPC back in-house. Defendants' omission of that information rendered Defendant Cohen and Defendant Hibbard's statements materially misleading.

216.    The factual allegations supporting the falsity and/or misleadingness of Hibbard and Odisho's statements are:

a)    According to CW4, from August 2022 to at least December 2023 when CW4 departed, Symbotic's outsourcing partners, including Fluor, did not adequately keep records of inventory, failed to order materials with sufficient lead time, needed to be shown how to do their work, regularly failed to submit vendor invoices, and "dropped the ball constantly" regarding ordering and scheduling deliveries of necessary parts. CW4 stated that Fluor's frequent failures necessitated that CW4 work with Fluor on a near-daily basis to correct various inventory issues.

b)    CW4 and CW3 confirmed that prior to and during the Class Period Symbotic incurred "tons of fees to expedite" materials that had not been ordered on time, resulting in cost overruns.

c)    According to CW4, throughout CW4's tenure, Symbotic's outsourcing partners regularly lost truckloads of inventory that were needed to complete deployments.

d) CW4 stated that during 2022 and 2023, multiple project deployments, including with customers Walmart and Albertsons, were significantly delayed due to the terrible performance of Symbotic's outsourcing partners, including delays that caused go-live dates to be missed or extended. CW4's account was corroborated by CW5 who stated that throughout CW5's tenure, the outsourcing partners were so slow that they caused Symbotic to miss go-live deadlines with Symbotic's largest customer, Walmart. CW2 also confirmed that throughout the Class Period, Fluor caused system deployment delays by failing to order necessary materials on time and in the right amount.

e) CW4, CW5, CW3, and CW2 all reported that, during their tenures and/or throughout the Class Period, incomplete robots were being shipped to project sites, which caused employees and outsourcing partners to rob one site of inventory and system parts to be used at another site, helping one project but setting the other behind. Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that robots were shipped to deployment sites were only 90% functional and lacked parts.

f) CW1 reported that throughout CW1's tenure, between September 2023 and February 2025, Symbotic's ongoing deployment delays and cost overruns were discussed during every quarterly meeting with defendant Hibbard and Symbotic's average system deployment time remained around 24 months. CW1 also recalled hearing during implementation meetings throughout CW1's tenure that Fluor's performance was terrible and that working with Fluor was difficult, challenging and less efficient.

g) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Symbotic's poor gross margins reflected "elongated construction schedules and implementation costs" because "parts aren't here" and "cables came in late," leaving "hundreds of people standing around the site for weeks[.]" Cohen admitted that Fluor was ill-suited for the EPC function at Symbotic and that Symbotic was "spending a lot of time managing the contractors."

h) Hibbard admitted during the Q3 2024 Earnings Call on July 29, 2024 that "we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient." Hibbard also admitted that cost overruns were "not a surprise."

i) Cohen admitted during the Q3 2024 Earnings Call on July 29, 2024 that Defendants had known about outsourcing partners' failures for more than six months and, thus, Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*" to bring EPC back in-house.

j)   On February 5, 2025, Hibbard admitted that Symbotic was "***still*** averaging 24 months" for project deployments and Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time."

k)   As a result of a) through j) above, Symbotic was not achieving faster deployment times, as falsely represented.

## VI.  DEFENDANTS REVEAL THE TRUTH OVER SEVERAL PARTIALLY CORRECTIVE DISCLOSURES WHILE CONTINUING TO MAKE FALSE STATEMENTS IN ATTEMPT TO MINIMIZE THE IMPACT ON SYMBOTIC'S STOCK PRICE

### A.  The July 29, 2024 Press Release and Earnings Call

217.   On July 29, 2024, after market close, Defendants issued a press release reporting Symbotic's Q3 2024 financial results that were below expectations and forecasted lower-than-expected Fiscal Q4 2024 guidance (the "Q3 2024 Press Release"). According to Defendant Cohen in the Q3 2024 Press Release, "system gross margin fell below expectations due to elongated construction schedules and implementation costs." Cohen further admitted in the Q3 2024 Press Release that Symbotic had to "focus[] on improving our planning, speed of implementation and project management to improve performance."

218.   That same day, Defendants held Symbotic's third quarter earnings call with analysts (the "Q3 2024 Earnings Call"). During the Q3 2024 Earnings Call, Defendant Cohen reiterated Symbotic's poor system gross margin attributing it to "elongated construction schedules and implementation costs associated with last quarter's rapid pace innovation:"

Our third quarter reflects record revenue growth, strong recurring revenue gross margin, and careful management of operating expenses. However, ***our system gross margin reflects elongated construction schedules and implementation costs associated with last quarter's rapid pace of innovation***.

For example, during the quarter, we decided to retrofit all Symbots in the field with our new sensor array to enhance performance capabilities at the majority of our customer sites. ***While we believe much of the cost growth is now behind us, we could continue to see some impacts in the coming quarters as we focus on scaling high-quality deployments for our customers***.

As you recall, 2 years ago, we embarked on a strategy to outsource much of the manufacturing and installation of our systems. This approach enabled us to scale at a rapid pace. ***Based on our key learnings over multiple deployments, we plan to reabsorb a portion of the construction management processing starting this quarter, which will reduce costs. We believe bringing some of these functions back in-house will help us put a sharper focus on the implementation process and reduce costs further***.

***In the short term, our revenue growth may slow as we make these changes***. Our backlog demonstrates that demand continues to be very strong for our systems, but we will always prioritize execution on existing deployments ahead of chasing growth….

*       *       *

Our partners that we picked on supply chains, they got the work done, ***but then they came in with extra bills at the end***. And it's a part of the business we have to manage, and we have to make sure we play defense, but it's not what drives the business. We just got to shore it up. And so that's my answer. And yes, when you finish a project, and you're saying, okay, we're ready to gear it up. ***And they're saying, no, no, no, these parts aren't here. And you have hundreds of people standing around the site for weeks. That's the problem***. So, the systems are running well, and ***they just took longer to bring online than we thought***. And we're not going to tolerate that.

219.    Defendant Hibbard echoed Cohen's comments, stating "system gross margin fell below expectations due to schedule growth and higher labor costs during the quarter. We are focused on improving our planning, speed of implementation, and project management to enhance performance of the business." While admitting during the Q3 2024 Earnings Call that the cost overruns were "***[n]ot a surprise***," Hibbard explained Symbotic's reasons for bringing EPC back inhouse in response to a question from Citigroup Inc. analyst Andrew Kaplowitz, was so that Symbotic could have more control over the projects:

Yes. So, I'll start and then Rick can chime in terms of some of the things we're putting in place to improve gross margin going forward. So, on the outsourcing, as we talked about outsourcing, our primary reason why we chose outsourcing over a year ago was to go ahead and scale. And so, we did that across multiple areas of our supply chain so that we could also have redundancy.

85

We're looking at bringing back in-house just 1 element, which is the EPC, so the Engineering Procurement Construction piece of that. And we continue to own a piece of that. So, actually, Symbotic continued to deploy at some of our sites and then we had multiple supply chain partners off doing that.

What we're finding is why that's not a significant item in terms of the overall cost of the system, it's a significant item in terms of that final mile of installation when you're extremely focused on making sure that everything comes together. *We're finding that focus on schedule and focus on cost, that's a critical point for us. So, that's one of the elements that we're going to bring back in-house so that we have more control over that overall integration*.

In terms of the other things that really drove our gross margin performance in this quarter, Rick mentioned *we've had delays in construction creating inefficiencies. And so, some of our more complex projects, we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient*.

*And our projects are taking longer*. I think last quarter I referred to some of the projects that we had in flow where we're not always going to see that 20-month deployment because I think I called them stragglers. *And what we're seeing now is some of those complex systems where they're just taking longer. Longer system deployment creates higher costs*….

220. Defendant Cohen further admitted (as CW4 had reported) that Symbotic experienced "things like delays, because things weren't placed orders on time, and you have 200 people standing around the site, that's just not acceptable." Cohen admitted that Symbotic had known about the cost overruns and need to bring EPC back in house for more than least 6 months stating that Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*, and they finally got in place."

221. Defendant Cohen further explained that another reason for the lower gross margins was because cables came in late requiring Symbotic to later "retrofit the cables in the field" which was very "expensive", thereby corroborating CW4 and CW3's accounts:

That was unforeseen. Some of the cables that enable the vision enhancement on the bots, which is one of the ways that we use vision to connect to our boards and use AI a lot, *number of those cables came in late.* So, we shipped the bots to the

customer so they could still do 90% of what they were supposed to do. And then we made the decision to retrofit the cables in the field, which was expensive.

222.    In response to the reason for Symbotic's lower guidance, Hibbard reiterated the same problems, including "construction delays" which would "delay revenue recognition for implementation milestones in the next quarter," as well as purportedly improving technology to upgrade or retrofit some of the bots.

223.    When asked during the call by analyst Joseph Giordano of TD Cowen "what gives you the comfort that bringing this in-house to do something that's not your core of what you do that you'd be able to do it that much better," Defendant Cohen admitted that Symbotic did not properly vet the vendors it outsourced EPC to and selected vendors based on the lower cost instead of competence:

> Yes. So actually, what we did, Joe, fair question, is a lot of the people that we had hired when we were doing this ourselves were then hired by some of the general ***contractors who probably are better at defense*** than our kind of work. And so, ***some of these contractors that we will then go back and take over will actually reduce the price***. ***And we're finding that we're spending a lot of time managing the contractors***.
>
> And what we've done -- so that's 1 thing. The other thing we've done is ***we've actually been able to hire people that have done this from some of the large automation firms that do this in-house***. ***And so, that's given us real comfort that we don't need, in some cases, the middleman***. And in some cases, we're just better off to hire people ourselves. So, the answer is simply ***we've been disappointed at the performance for some of the suppliers that we've hired. And we know we can do it better ourselves***.

224.    In the Q3 2024 Press Release and Q3 2024 Earnings Call, Defendants continued to make false and misleading statements. In the Q3 2024 Press Release, **Defendants reported falsely inflated revenue, cost of revenue, gross profit, EBITDA and earnings figures for the three months ended June 29, 2024 of $492 million, $424 million, $67 million, $15 million and ($14 million), respectively, and for the nine-months ended June 29, 2024 of $1,285 million, $1,103**

**million, $182 million, $52 million and ($68 million), respectively. Symbotic also falsely reported inflated unbilled accounts receivable and accounts payable figures of $161 million and $156 million, respectively.**

225.    During the Q3 2024 Earnings Call, Defendant Hibbard reiterated the same false financial figures, stating, "**[t]hird quarter revenue grew to $492 million, up 58% compared to the same quarter last year**."

226.    Defendants have admitted that the above reported figures for Fiscal Q3 2024 were materially false and misleading when made, requiring Symbotic to restate its financial results. On November 18, 2024, Symbotic filed the Fiscal Q4 2024 Press Release reporting Symbotic's Fiscal fourth quarter and year-end results, in which they restate the false figures reported for the three months ended June 29, 2024 as follows:

| Three Months Ended June 29, 2024 | | | | | |
|---|---|---|---|---|---|
| Fiscal Q3 2024 (in millions) | Reported | 1st Restatement | 2nd Restatement | Total $ Change | % Change |
| Revenue | $492 | $486 | $470 | $22 | 4% |
| Cost of Revenue | $424 | $415 | $415 | $9 | 2% |
| Gross Profit | $67 | $71 | $55 | $12 | 18% |
| Net Income/(Loss) | ($14) | ($11) | ($27) | ($13) | 93% |
| Adjusted EBITDA | $15 | $19 | $3 | $12 | 80% |
| Unbilled Receivables | $161 | N/A | $103 | $58 | 36% |
| Accounts Payable | $156 | N/A | $128 | $28 | 18% |

227.    Defendants have also admitted that the above reported figures for the nine months ended June 29, 2024 were materially false and misleading when made, requiring Symbotic to restate its financial results. On December 4, 2024, Symbotic filed an amended Quarterly Report on Form 10-Q, signed by signed by Maria G. Freve, VP, Controller and Chief Accounting Officer,

for the three and nine months ended June 29, 2024, restating the Company's previously reported
nine months results as follows:

| Nine Months Ended June 29, 2024 | | | | |
|---|---|---|---|---|
| | Reported (in millions) | Restated (in millions) | $ Change | % Change |
| Revenue | $1,285 | $1,224 | $61 | 5% |
| Cost of Revenue | $1,103 | $1,074 | $29 | 3% |
| Gross Profit | $182 | $149 | $33 | 18% |
| Net Income/(Loss) | ($68) | ($101) | ($33) | 49% |
| Adjusted EBITDA | $52 | $19 | $33 | 63% |
| Unbilled Receivables | $161 | $103 | $58 | 36% |
| Accounts Payable | $156 | $128 | $28 | 18% |

228.    Upon the mixed news, Symbotic's stock price declined from a closing price of
$35.63 per share on July 29, 2024 to a closing price of $27.25 per share on July 30, 2024, an overall
decline of approximately 24% on heavy trading volume.

**B.    The July 31, 2024 Form 10-Q**

229.    On July 31, 2024, Symbotic filed its Fiscal third quarter Form 10-Q for the period
ended June 29, 2024 with the SEC, signed by Maria G. Freve, VP, Controller and Chief
Accounting Officer (the "FQ3 2024 Form 10-Q"). In the FQ3 2024 Form 10-Q, Defendants
repeated the same false and misleading financial statements as in the Q2 2024 Press Release at
pages 1-4, 34.

230.    Defendants have admitted that the above reported figures for Fiscal Q3 2024 were
materially false and misleading when made, requiring Symbotic to restate its financial results. On
November 18, 2024, Symbotic filed the Fiscal Q4 2024 Press Release reporting Symbotic's Fiscal
fourth quarter and year-end results, in which they restate the false figures reported for the three
months ended June 29, 2024 as follows:

| Three Months Ended June 29, 2024 | | | | | |
|---|---|---|---|---|---|
| Fiscal Q3 2024 (in millions) | Reported | 1st Restatement | 2nd Restatement | Total $ Change | % Change |
| Revenue | $492 | $486 | $470 | $22 | 4% |
| Cost of Revenue | $424 | $415 | $415 | $9 | 2% |
| Gross Profit | $67 | $71 | $55 | $12 | 18% |
| Net Income/(Loss) | ($14) | ($10) | ($27) | ($13) | 93% |
| Adjusted EBITDA | $15 | $19 | $3 | $12 | 80% |
| Unbilled Receivables | $161 | N/A | $103 | $58 | 36% |
| Accounts Payable | $156 | N/A | $128 | $28 | 18% |

231.    Defendants have also admitted that the above reported figures for the nine months ended June 29, 2024 were materially false and misleading when made, requiring Symbotic to restate its financial results. On December 4, 2024, Symbotic filed an amended Quarterly Report on Form 10-Q, signed by signed by Maria G. Freve, VP, Controller and Chief Accounting Officer, for the three and nine months ended June 29, 2024, restating the Company's previously reported nine months results as follows:

| Nine Months Ended June 29, 2024 | | | | |
|---|---|---|---|---|
| | Reported (in millions) | Restated (in millions) | $ Change | % Change |
| Revenue | $1,285 | $1,224 | $61 | 5% |
| Cost of Revenue | $1,103 | $1,025 | $29 | 3% |
| Gross Profit | $182 | $149 | $33 | 18% |
| Net Income/(Loss) | ($68) | ($101) | ($33) | 49% |
| Adjusted EBITDA | $52 | $19 | $33 | 63% |
| Unbilled Receivables | $161 | $103 | $58 | 36% |
| Accounts Payable | $156 | $128 | $28 | 18% |

232.    Defendants also claimed in the FQ3 2024 Form 10-Q that Symbotic's financial statements complied with GAAP and that the Company followed its revenue recognition own accounting policies, stating:

**2. Summary of Significant Accounting Policies**

*Basis of Presentation and Consolidation*

**The accompanying unaudited condensed consolidated financial statements have been prepared in U.S. dollars, in accordance with accounting principles generally accepted in the United States of America ("GAAP")**…The accompanying unaudited condensed consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries and majority-owned subsidiaries and reflect all adjustments (consisting solely of normal, recurring adjustments) **which are, in the opinion of management, necessary for a fair statement of results for the interim periods presented.**

\*        \*        \*

**4. Revenue**
\*        \*        \*

**The Company recognizes revenue upon transfer of control of promised goods or services in a contract with a customer, generally as title and risk of loss pass to the customer, in an amount that reflects the consideration the Company expects to receive in exchange for those products or services. Revenue is recognized only to the extent that it is probable that a significant reversal of revenue will not occur and when collection is considered probable**.

\*        \*        \*

The design, assembly, and installation of a System includes substantive customer-specified acceptance criteria that allow the customer to accept or reject systems that do not meet the customer's specifications. **When the Company cannot objectively determine that acceptance criteria will be met upon contract inception, revenue relating to systems is deferred and recognized at a point in time upon final acceptance from the customer. If acceptance can be reasonably certain upon contract inception, revenue is recognized over time based on an input method, using a cost-to-cost measure of progress**.

233.    The above statements were materially false and misleading when made because Symbotic's financial statements did not comply with GAAP. Rather, Defendants have admitted

that Symbotic prematurely and improperly recognized revenue from cost overruns that customers were not obligated, nor willing to pay, resulting in the restatement of the Company's FQ3 2024 revenue, cost of revenue, gross profit, net loss, EBITDA, unbilled accounts receivable and accounts payable. For these same reasons, Symbotic violated the Company's own revenue recognition policy.

234.    In the FQ3 2024 Form 10-Q, Defendants also falsely claimed that Symbotic maintained adequate control over financial reporting, stating:

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer (our principal executive officer and principal financial officer, respectively), evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act…. **Based on that evaluation of our disclosure controls and procedures as of June 29, 2024 , our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level**.

235.    In addition, Defendants Cohen and Hibbard signed certifications under Section 302 of the Sarbanes-Oxley Act of 2002, attached to the FQ3 2024 Form 10-Q as Exhibits 31.1 (Cohen) and 31.2 (Hibbard), attesting that Symbotic maintained adequate control over financial reporting that were identical to those in paragraphs ¶¶179-182.

236.    Defendants admit the above statements were false when made because Symbotic lacked effective internal control over its financial reporting. Symbotic disclosed in its 2024 Form 10-K that "the Company's internal control over financial reporting was not effective due to the identification of material weaknesses" and "the Company did not effectively design and execute controls over revenue recognition related to cost overruns on certain deployments that will not be

billable." Defendants also disclosed in the 2024 Form 10-K that Symbotic's "independent registered public accounting firm, Grant Thornton LLP" had "issued an adverse opinion on the effectiveness of the Company's internal control over financial reporting."

237. The falsity of Defendants statements above is further evidenced by:

a.  Symbotic's multiple restatements of its 2024 quarterly and annual results evidencing Defendants' improper recognition of revenue from cost accelerations and cost overruns;

b.  Defendants subsequently admitted on November 27, 2024 in connection with the Second Restatement that customers were unwilling to pay for the cost overruns;

c.  CW1 reported that customer contracts in 2024 did not allow Symbotic to bill customers for cost overruns;

d.  Symbotic's 2024 Form 10-K revealed Walmart had capped costs for which it could be billed;

e.  Cohen's admission that Symbotic shipped robots with missing parts that were not completely functional; and

f.  CW4's account that, throughout CW4's tenure, CW4 was instructed to approve vendor invoices without confirming receipt of goods or completion of work.

## C.    The November 18, 2024 Press Release and Earnings Call

238. On November 18, 2024, Defendants issued a press release announcing Symbotic's fourth quarter and full year financial results (the "Q4 2024 Press Release"). In the Q4 2024 Press Release, Defendants announced that Symbotic would be restating the prior three quarters' financial results to revise, downward, revenue that was overstated due to prematurely recognizing revenue before certain project milestones had been achieved under the percentage of completion method of accounting, but downplayed the restatement as "timing differences between quarters with no impact to full-year fiscal 2024 results:

We have restated our financial statements for the quarters within fiscal year 2024 with respect to our accounting of goods and services received. As we were reviewing our business processes and preparing our full year financial statements, we identified occurrences during fiscal year 2024 where goods and services,

primarily relating to specific milestone achievements, were expensed prior to the time that the corresponding milestones were achieved. ***This resulted in the acceleration of the recognition of cost of revenue. Given that we recognize revenue on a percentage of completion basis, this resulted in the acceleration of recognition of revenue***. The quarterly statements of operations and statements of cash flows numbers included in this earnings press release have been restated to record cost of revenue and revenue in the periods in which the milestones were achieved, and the comparisons presented are based on the restated amounts. Given that this first occurred in fiscal year 2024 and we identified this matter in preparing the fiscal year 2024 financial statements, ***these represent timing differences between quarters with no impact to full-year fiscal year 2024 results.*** In connection with our decision to restate the previously reported quarters, we also recorded other individually insignificant items affecting fiscal 2024 that were also timing related.

239.    Defendants held an earnings call with investors the same day during which they discussed the Company's fourth quarter and year-end 2024 results ("Q4 2024 Earnings Call"). During the Q4 2024 Earnings Call, Defendant Hibbard admitted Symbotic recorded revenues and related expenses "***prior to the time that the corresponding milestones were achieved***" but again downplayed the restatement as having no impact on full year results:

> As we were reviewing our business processes and preparing our full year financial statements, we identified occurrences during fiscal year 2024 where goods and services, primarily relating to specific milestone achievements were ***expensed prior to the time that the corresponding milestones were achieved***. The net ***result is essentially timing differences*** between the quarters within fiscal 2024 and has ***no impact on our full year results*** since the appropriate expenses were properly recorded in the fourth quarter.

240.    Defendants, however, continued to report false financial figures. In the Q4 2024 Press Release, Defendants reported **revenue, cost of revenue, gross profit, adjusted EBITDA, and earnings for Fiscal Q4 and 2024 of $577 million, $468 million, $109 million, $55 million and $28 million, respectively**.  Defendants also falsely reported **annual revenue, cost of revenue, gross profit, adjusted EBITDA, and net loss for Fiscal Year 2024 of $1,822 million, $1,543 million, $280 million, $96 million, and ($51) million, respectively**.

241.    Defendant Cohen touted these results in the Q4 2024 Earnings Call, stating:

> **For the full year, we grew revenue 55%**, more than doubled the number of sites in operation and more than doubled our software revenue, reflecting our ability to convert our backlog and scale. **Importantly, we expect to maintain a high rate of year-over-year revenue growth while continuing to stabilize our gross margin in our first quarter**. Carol will expand on this in the guidance.

242.    Defendant Hibbard echoed Cohen's statements in the Q4 2024 Earnings Call, stating:

> **Fourth quarter revenue grew to $577 million** with strong revenue growth driven by solid progress across our 44 systems in the process of deployment. Our exceptionally strong fourth quarter results reflect a favorable alignment of Symbotic vendor and customer collaboration and helped contribute to **$1.8 billion of full year revenue**.

243.    Defendant Hibbard further claimed that in Q4 2024, Symbotic experienced a "**return to [] historical gross margin levels**."

244.    During the Q4 2024 Earnings Call, Defendant Hibbard also boasted that "**system margins rebounded strongly, returning to historical levels**" and "**[t]his quarter, we also recorded our first quarter of net income as a public company.**" In fact, by improperly recording revenue, Symbotic was able to report income instead of a loss for the year of at least $85 million and much lower systems margins.

245.    With respect to Symbotic's balance sheet, Defendants falsely reported **unbilled receivables and accounts payable for the year-ended September 28, 2024 of $252 million and $175 million, respectively**.

246.    Defendants have admitted the above statements were materially false and misleading when made when they filed Symbotic's annual report on Form 10-K for the 3 months ended September 28, 2024 in which they restated Symbotic's financial results that were previously published in the November 18, 2024 press release and earnings call:

| For the 3 months ended September 28, 2024 | | | | |
|---|---|---|---|---|
| **Fiscal Q4 2024 (in millions)** | **Reported** | **Restated** | **$ Change** | **% Change** |
| Revenue | $577 | $565 | $13 | 2% |
| Gross Profit | $109 | $96 | $13 | 12% |
| Net Income/(Loss) | $28 | $16 | $12 | 43% |
| Adjusted EBITDA | $55 | $42 | $12 | 22% |
| Unbilled Receivables | $252 | $218 | $34 | 13% |

247.        Defendants also restated Symbotic's annual 2024 financial results:

| For the Fiscal Year ended September 28, 2024 (in millions) | | | | |
|---|---|---|---|---|
| | **Reported** | **Restated** | **$ Change** | **% Change** |
| Revenue | $1,822 | $1,788 | $34 | 2% |
| Gross Profit | $280 | $246 | $34 | 12% |
| Net Income/(Loss) | ($51) | ($85) | $34 | 67% |
| Adjusted EBITDA | $96 | $62 | $34 | 35% |
| Unbilled Receivables | $252 | $218 | $34 | 13% |

248.        Defendants also reported false financial **forecasts for Fiscal Q1 2025 of revenue between $495 million to $515 million and adjusted EBITDA of $27 million to $31 million**. During the Q4 2024 Earnings Call, Hibbard also reaffirmed Symbotic's false forecasts, stating "**[f]or the first quarter of fiscal 2025, we expect revenue of $495 million to $515 million and adjusted EBITDA between $27 million and $31 million, reflecting continued strong year-over-year growth**[.]"

249.        Symbotic's Fiscal Q1 2025 forecasts were materially false and misleading and lacked any reasonable basis because they included revenue from cost overruns that customers were not obligated or willing to pay. These statements were also materially misleading because they omitted information necessary to make the forecasts not misleading, including that Symbotic was suffering delays in deployments and incurring cost overruns that would not be recoverable from customers. But for the misconduct alleged herein, Symbotic would not have met its revenue and

EBITDA forecasts. Indeed, days later, on November 27, 2024, Symbotic would revise its financial forecasts downward.

250.    In explaining to analyst Natalie Back of Citigroup the reason for the purported gross margin improvement and responding to analyst James Ricchiuti of Needham & Company, Hibbard falsely stated during the Q4 2024 Earnings Call that "**our gross margin this quarter hit 19.6%, which was a rebound back to historical levels**" and Symbotic purportedly "**quickly returned to those historical gross margins**" because "**scheduled delays that we had in the third quarter that we talked about those elongated construction delays, they corrected faster than we had planned, which allowed us to complete additional milestones this quarter.**"

251.    The above statements were materially false and misleading when made because the only reason Symbotic's gross margin had increased was due to Defendants' undisclosed improper recognition of revenue for cost overruns that customers were not obligated, nor willing to pay. Moreover, the project delays had not, as Defendants claimed, "corrected" and, thus, Symbotic's project completion time was "*still* averaging" 24 months or higher, as Defendants ultimately admitted on February 5, 2025. Falsity is evidenced by (a) Defendant Hibbard's admission on February 5, 2025 that "the systems that we're deploying right now, we're still averaging 24 months"; (b) CW1's account that deployment times had remained stagnant throughout 2024; and (c) CW4's account that Fluor's inability to manage inventory and logistics prevented Symbotic from reducing average deployment times below 24 months during CW4's tenure at the Company.

D.    **November 27, 2024 Form 8-K/A**

252.    On November 27, 2024, Defendants filed Form 12b-25 Notification of Late Filing and a press release entitled "Symbotic Provides Update to Restatement of Fiscal Year 2024 Financial Results and First Quarter of Fiscal Year 2025 Outlook, Symbotic to Delay Form 10K Filing" (the "November 2024 Press Release"). In the November 2024 Press Release, Defendants

revealed that Symbotic would be delaying the filing of its annual report on Form 10-K due to the need to, again, restate the Company's financial results as a result of improper revenue recognition for cost overruns that customers were not obligated or willing to pay, and admitted inadequate internal controls over financial reporting:

> Symbotic has determined that it is unable to file its Annual Report on Form 10-K for the fiscal year ended September 28, 2024 by the prescribed filing due date, without unreasonable effort or expense, because the Company requires additional time to complete its assessment of the financial impacts of correcting an error related to system revenue recognition and the impacts of that error on internal controls over financial reporting.

> Management has identified in its preliminary assessment of internal control over financial reporting for the fiscal year ended September 28, 2024 certain material weaknesses. The Company is implementing measures designed to improve internal control over financial reporting to remediate these material weaknesses.

> As disclosed on November 18, 2024 in its earnings press release, as Symbotic was reviewing its business processes and preparing its full year financial statements, the company identified occurrences during fiscal year 2024 where goods and services, primarily relating to specific milestone achievements, were expensed prior to the time that the corresponding milestones were achieved. This resulted in the acceleration of the recognition of cost of revenue. Given that Symbotic recognizes revenue on a percentage of completion basis, this resulted in the acceleration of recognition of revenue. As a result of identifying these occurrences, Symbotic's earnings press release included restated financial results for the interim quarters of fiscal year 2024.

> ***Subsequently, on November 25, 2024, Symbotic identified errors in its revenue recognition related to cost overruns that will not be billable on certain deployments, which additionally impacted system revenue recognized in the second, third, and fourth quarters of fiscal year 2024*. *As a result, gross profit, income (loss) before income tax, net income (loss) and adjusted EBITDA[] were also impacted. The company estimates the total impact of correcting these errors will be to lower system revenue, system gross profit, income (loss) before income tax, and adjusted EBITDA[] by $30 million to $40 million for fiscal year 2024 compared to the financial results released on November 18, 2024*.**

253.    In the November 2024 Press Release, Defendants also revealed they identified material weaknesses in Symbotic's internal control over financial reporting:

Management has identified in its preliminary assessment of internal control over financial reporting for the fiscal year ended September 28, 2024 certain material weaknesses. The Company is implementing measures designed to improve internal control over financial reporting to remediate these material weaknesses.

254.    In the November 2024 Press Release, Defendants also revised Symbotic's Q1 2025 outlook, slashing adjusted EBITDA nearly in half:

Additionally, Symbotic is also revising its outlook for the first quarter of fiscal year 2025 based on its analysis of these deployments. Symbotic now expects revenue of $480 million to $500 million, and adjusted EBITDA of $12 million to $16 million.

255.    Upon the news, Symbotic's stock price fell from $37.41 per share on November 26, 2024 to $24.00 per share on November 27, 2024, dropping $13.41 per share, or 36% on heavy trading volume.

**E.    December 4, 2024 Annual Report on Form 10-K and Amended Forms 10-Q**

256.    On December 4, 2024, Symbotic filed its Fiscal 2024 Annual Report on Form 10-K, signed by Defendants Cohen, Hibbard, Freve, and the Symbotic board of directors (the "2024 Form 10-K") and amended Fiscal 2024 Forms 10-Q for Q1, Q2, and Q3 signed by Defendant Freve.

257.    In the 2024 Form 10-K, Defendants reported restated financial results for all quarters in 2024 in line with the previously disclosed estimate of "lower system revenue, system gross profit, income (loss) before income tax, and adjusted EBITDA by $30 million to $40 million for fiscal year 2024 compared to the financial results released on November 18, 2024." *See* Section IV.I., *supra*.

258.    In footnote 3 of the audited financial statements, Defendants described the previously announced restatement:

### 3. Restatement of Previously Issued Unaudited Condensed Consolidated Financial Statements (Unaudited)

As described in Item 4.02 of the Company's Current Report on Form 8-K filed with the SEC on November 18, 2024, on November 18, 2024, the Audit Committee of the Board of Directors of the Company, after discussions with the Company's management, determined that the Company's unaudited condensed consolidated financial statements included in each of the Company's Quarterly Reports on Form 10-Q for the periods ending December 30, 2023 (the "Q1 2024 Form 10-Q"), March 30, 2024 (the "Q2 2024 Form 10-Q"), and June 29, 2024 (the "Q3 2024 Form 10-Q", and together with the Q1 2024 Form 10-Q and Q2 2024 Form 10-Q, the "2024 Form 10-Qs"), filed with the SEC on February 8, 2024, May 7, 2024, and July 31, 2024, respectively, should no longer be relied upon. As described in Item 4.02 of the Company's Current Report on Form 8-K/A filed with the SEC on November 27, 2024, on November 25, 2024, the Company identified errors in its revenue recognition related to cost overruns on certain deployments that will not be billable, which additionally impacted the Company's unaudited condensed consolidated financial statements included in the Q1 2024 Form 10-Q and the Q2 2024 Form 10-Q. The Company, on the recommendation of the Audit Committee of the Company's Board of Directors, determined to also correct these errors in the previously issued unaudited interim financial statements for the second and third quarters of fiscal year 2024 that were previously filed in the Fiscal 2024 Form 10-Qs (the "Restatement").

The restatement of the 2024 Form 10-Qs is being made in connection with the Company's identification, during fiscal year 2024, of goods and services, primarily relating to specific milestone achievements, being expensed prior to the time that the corresponding milestones were achieved. This resulted in the acceleration of the recognition of cost of revenue. Given that the Company recognizes revenue on a percentage of completion basis, this resulted in the acceleration of recognition of revenue. Additionally, errors were identified in the Company's revenue recognition related to cost overruns on certain deployments that will not be billable, which additionally impacted System revenue. Further, the Company identified, during fiscal year 2024, a classification error within equity, which was corrected as part of the Restatement.

259.    In the 2024 Form 10-K and in its amended Forms 10-Q, Symbotic further reported restated numbers for each fiscal quarter in 2024. *See* Section IV.I., *supra*.

260.    Defendants also elaborated on the previously disclosed internal control deficiencies in the 2024 Form 10-K, stating:

> Our management has conducted an evaluation of the effectiveness of our internal control over financial reporting as of September 28, 2024. Based upon this evaluation and those criteria, management concluded that, as of September 28, 2024, **the Company's internal control over financial reporting was not effective due to the identification of material weaknesses**. As of September 28, 2024, the Company did not effectively design procedures and controls over the timing of the recognition of cost of revenue. This resulted in the acceleration of the recognition of cost of revenue. Given that we recognize revenue on a percentage of completion basis, this resulted in the acceleration of recognition of revenue. **Additionally, the Company did not effectively design and execute controls over revenue recognition related to cost overruns on certain deployments that will not be billable**. This resulted in an overstatement of revenue during the year. These deficiencies in internal control over financial reporting constituted material weaknesses. For further discussion of these material weaknesses, see Item 9A. *Controls and Procedures* . A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis.

261.    Defendants also reported in the 2024 Form 10-K that Symbotic's "independent registered public accounting firm, Grant Thornton LLP, who audited the consolidated financial statements included in this Annual Report on Form 10-K, issued an adverse opinion on the effectiveness of the Company's internal control over financial reporting." The audit opinion identified Symbotic's "Estimation of Costs at Completion" used to record revenue as a critical audit matter as a "Critical audit matter."

262.    In addition, Symbotic disclosed for the first time that the SEC was investigating Defendants' alleged efforts to impede a whistleblower from coming forward about Defendants' restatement:

**SEC Request for Information**

We have been responding to requests for information from the SEC relating to an investigation by the SEC of alleged violations by us of Rule 21F-17, which prohibits actions to impede an individual from communicating directly with the

SEC staff about a possible securities law violation. We intend to continue to defend this matter vigorously and cannot predict the outcome of this investigation.

**F.    February 5, 2025 Press Release and Quarterly Report**

263.    On February 5, 2025, Defendants issued a press release reporting Symbotic's first fiscal quarter 2025 results for the three-months ended December 28, 2024 (the "Q1 2025 Press Release"). In the Q1 2025 Press Release, Symbotic reported first quarter 2025 revenue of $487 million, at the low end of the Company's previously revised guidance of $480-$500 million and below analyst estimates of $490 million. Defendants also issued disappointing Fiscal Q2 2025 guidance of revenue between $510-$530 million and adjusted EBITDA of $26 to $30 million.

264.    During the first quarter earnings call that same day, Defendant Hibbard disclosed that Symbotic only had four new system deployments as compared to nine in the prior quarter. When asked by analyst Ross Sparenblek of William Blair & Co. LLC about whether Defendants had made any progress reducing the time of project deployment from the previously-touted time of 20 months, after initially dodging the question, Defendant Hibbard was forced to admit that Symbotic had not achieved a 20-month average deployment time but was "***still averaging 24 months***[.]" (Emphasis added). Hibbard further admitted Symbotic did not expect any improvement to the 24-month average in the near future, explaining "that's going to take some time." Thus, contrary to Defendants' prior statements, Symbotic never was improving on its project deployment times and Defendants did not expect to see improvement for quite some time. In fact, three months later, on May 7, 2025, Defendant Hibbard would again admit that deployment times remained "about 24 months."

265.    Defendants also revealed in Symbotic's quarterly report on Form 10-Q filed on February 5, 2025 that Symbotic received an SEC subpoena related to its restatement process, adding to the Company's disclosure in December 2024 that the SEC was investigating Defendants'

alleged efforts to impede a whistleblower from disclosing information regarding potential securities fraud violations.

266.    Upon the news, Symbotic's stock price fell from $30.92 per share on February 5, 2025, to $25.99 per share on February 6, 2025, dropping $4.93 per share, or 16% on heavy trading volume.

**VII.    POST CLASS PERIOD EVENTS**

267.    On May 7, 2025, during the FQ2 2025 Earnings Call, Defendant Hibbard confirmed that the average deployment, from the start of a project until customer acceptance, remained "about 24 months." Furthermore, Defendant Cohen implicitly admitted that efforts to reduce deployment timelines had been unsuccessful, stating that "the changes we have made to improve our deployment processes *are beginning* to pay off" and only occurred after "in-sourcing construction management"—again admitting that Symbotic's outsourcing strategy had not been the success it was claimed to be during the Class Period.

268.    On May 15, 2025, Symbotic issued a press release reporting that the Company was expanding its board of directors, adding Eric Branderiz to the board. In the May 15 release, Symbotic described its newest board member as a "[s]easoned CFO" who would bring "finance and accounting leadership" to the Company.

269.    On June 9, 2025, Symbotic announced a CFO transition plan in which Izzy Martins would join Symbotic as the CFO-designate on July 1, 2025 to replace Defendant Carol Hibbard. Hibbard is expected to remain employed at Symbotic until January 1, 2026 to assist in the transition to a new CFO, after which Hibbard's employment will be terminated.

## VIII.   DEFENDANTS' NUMEROUS VIOLATIONS OF GENERALLY ACCEPTED ACCOUTNING PRINCIPLES AND INTERNAL CONTROL VIOLATIONS

270.   As alleged above, throughout the Class Period, Symbotic issued financial statements that were materially misstated and not presented in accordance with GAAP. The SEC requires that publicly traded companies such as Symbotic present their financial statements in accordance with GAAP. GAAP are a set of criteria used to determine measurement, recognition, presentation, and disclosure of all material items appearing in financial statements.[3]

271.   SEC regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC, which are not presented in accordance with GAAP "*will be presumed to be misleading or inaccurate*, despite footnote or other disclosures[.]" Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.01-01(a).

272.   Symbotic's improper accounting practices alleged herein, as well as Defendants' misrepresentations and omissions, standing alone, were material violations of GAAP, Company policy, and/or SEC regulations.

273.   As discussed below, each quarter of Symbotic's reported Fiscal 2024 financial results was materially misstated and violated GAAP by: (i) overstating revenue, cost of revenue, gross profit, adjusted EBITDA, earnings, unbilled revenues and accounts payable, and accrued expenses and other current liabilities; (ii) failing to appropriately record revenue under the percentage of completion method of accounting; and (iii) recording as revenue, cost overruns that customers were neither obligated, nor willing to pay.

---

[3] American Institute of Certified Public Accountants ("AICPA") Auditing Standards Board ("ASB"), Auditing Standards – Clarified, Section ("AU-C") *Glossary of Terms.*

A.    **Symbotic's stated revenue recognition policies**

274.    Symbotic's SEC filings represented that the Company enters into contracts with customers that typically include promises to (1) design and install the System, (2) provide software maintenance and support related to the System, and (3) assist customers in operating the System, which are each accounted for as separate performance obligations. As a result, each customer contract may contain multiple performance obligations that typically include:

(i)    *Systems*: the delivery of hardware and an essential software component, that automate customers' depalletizing, storage, selection, and palletization warehousing processes wherein fees for systems are typically fixed or cost-plus fixed fee amounts that are due based on the achievement of a variety of milestones beginning at contract inception through final acceptance;

(ii)    *Software maintenance and support*: support services that provide the customer with technical support, updates, and upgrades to the software license wherein fees are typically payable in advance on a quarterly, or annual basis over the term of the software maintenance and support service contract (typically 15 years); and

(iii)    *Operation services*: provides assistance with operating the System and ensuring user experience is optimized for efficiency and effectiveness for which fees are typically invoiced to customers on a time and materials basis monthly in arrears or using a fixed fee structure.

275.    According to Symbotic's SEC filings, the Company purportedly recognizes revenue according to ASU 2014-09, Topic 606, *Revenue from Contracts with Customers*, pursuant to a "five-step model:"

*Revenue Recognition*

Revenue is recognized in accordance with the five-step model set forth by Accounting Standards Update ("ASU") 2014-09, Revenue from Contracts with Customers ("Topic 606"), which involves identification of the contract, identification of performance obligations in the contract, determination of the transaction price, allocation of the transaction price to the previously identified performance obligations, and revenue recognition as the performance obligations are satisfied.

276.    Under step 5, revenue is recognized "when (or as) the performance obligation is satisfied." ASC 606-10-05-4. Topic 606 prohibits the recognition of revenue unless "[i]t is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer…." In evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the customer's ability and intention to pay that amount of consideration when it is due…." ASC 606-10-25-1. The objective of this assessment is to evaluate whether there is a substantive transaction between the entity and the customer, which is a necessary condition for the contract to be accounted for under the revenue model in this Topic." ASC 606-10-55-3A. When the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer is variable, Topic 606 requires revenue recognized to be constrained so that "it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved." ASC 606-10-32-5 and ASC 606-10-32-11.

277.    With respect to performance obligations satisfied over time, as here, ASC 606 requires companies to "recognize revenue over time by measuring the progress toward complete satisfaction of that performance obligation. The objective when measuring progress is to depict an entity's performance in transferring control of goods or services promised to a customer (that is, the satisfaction of an entity's performance obligation)." ASC 606-10-25-31. Under Topic 606, "[a]n entity shall apply a single method of measuring progress for each performance obligation satisfied over time, and the entity shall apply that method consistently to similar performance obligations and in similar circumstances. At the end of each reporting period, an entity shall

remeasure its progress toward complete satisfaction of a performance obligation satisfied over time." ASC 606-10-25-32.

278.    Here, Symbotic selected the percentage-of-completion method of accounting for revenue based on cost incurred as a percentage of total estimated project costs. As discussed below, Symbotic improperly recognized revenue under Topic 606 by prematurely recording revenue and recording revenue where there was no customer requirement or intention to pay.

### B.    Symbotic Violated GAAP by Recording Revenue for Uncollectible Cost Overruns

279.    Under ASC 606-10-05-4, the contract price "is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer." Symbotic's SEC filings represented during the Class period that the Company purportedly recognizes revenue upon transfer of control of promised goods or services in a contract with a customer "*in an amount that reflects the consideration the Company expects to receive* in exchange for those products or services." Further, "[r]evenue is recognized *only to the extent that it is probable* that a significant reversal of revenue will not occur and when collection is considered probable." [Emphasis added.]

280.    As discussed above, Symbotic outsourced the EPC manufacturing component of the installation phase of project deployment to a third-party that failed to obtain permits or order parts on time, among other issues, resulting in massive project delays and cost overruns, with employees standing around being paid to do nothing, and not properly overseeing and managing the projects. Accordingly, by the start of the Class Period, Symbotic was experiencing material cost overruns for which its customers were not obligated, nor willing to pay. Indeed, as CW1 and Symbotic's own 2024 Form 10-K confirmed, customer contracts in 2024 did not obligate customers to pay for cost overruns.

281.     Yet, in the second, third and fourth quarters of 2024, Defendants improperly recognized corresponding revenue in the amount of those cost overruns so as not to impact Symbotic's profitability. Accordingly, Symbotic violated GAAP and its own internal policies because the amount of revenue recognized was materially in excess of the consideration Symbotic expected to receive, and it was not "***probable that a significant reversal in the amount of cumulative revenue recognized will not occur***" for the cost-overrun portion of revenue recognized.

282.     This resulted in a material overstatement of revenue and unbilled receivables for Fiscal 2024, as described above. Section IV.I., *supra*.

**C.     Symbotic Violated GAAP by Improperly Inflating the Percent Complete of its Projects**

283.     Symbotic also violated GAAP by accelerating recognition of certain costs to increase the percentage complete and, thus, the percentage of revenue recognized. Under GAAP, improperly accelerated project costs should not have been included in the calculation of percentage complete because they do not depict progress toward completion. ASC 606-10-25-34.

284.     However, by improperly recognizing costs that had not yet been incurred and including those in the costs incurred numerator when measuring progress toward completion, Symbotic overstated the percent complete and, thus, the revenue and profit it recognized in the first three quarters of 2024. As the Company revealed in a Form 8-K filed on November 18, 2024:

> The planned restatement being disclosed today is being made in connection with the Company's identification, during fiscal year 2024, of goods and services, primarily relating to specific milestone achievements, **being expensed prior to the time that the corresponding milestones were achieved. This resulted in the acceleration of the recognition of cost of revenue. Given that the Company recognizes revenue on a percentage of completion basis, this resulted in the acceleration of recognition of revenue.**

285.    Accordingly, for Q1, Q2 and Q3 2024, Symbotic overstated revenue and expenses. Thus, Defendants did not comply with Symbotic's own policies or GAAP. Specifically, Symbotic violated ASC 606-10-25-31, ASC 606-10-25-32, ASC 606-10-25-34 and ASC 606-10-55-21 by failing to properly recognize revenue over time by improperly measuring the progress toward complete satisfaction of Symbotic's performance obligations.

**D.    Symbotic Overstated Contract Assets, Contract Liabilities and Other Current Liabilities**

286.    According to Symbotic's SEC filings, "consideration is due from customers ***in advance or upon the achievement of billing milestones***, the timing of which does not always align with the satisfaction of performance obligations, ***creating contract assets or contract liabilities***. Contract assets primarily relate to the Company's rights to consideration for work completed but not billed at the reporting date."

287.    "Contract assets are presented as unbilled receivables in the consolidated balance sheets." Symbotic overstated unbilled receivables due to inclusion of cost overruns that it could not recoup and revenues recognized on improperly accelerated costs.

288.    Accounts payable, accrued expenses and other current liabilities represent an entity's current obligations (i.e., short-term financial obligations that are due to be paid within one year or the company's normal operating cycle, whichever is longer). "Contract liabilities consist of deferred revenue and relate to the Company's obligation to transfer goods and services in exchange for consideration already received or due from customers. … Deferred revenue that will be recognized during the succeeding 12-month period is recorded as current deferred revenue, and the remaining portion is recorded as long-term deferred revenue." Defendants misstated Symbotic's accounts payable, accrued expenses and other current liabilities, as well as deferred

revenue by improperly recording accelerated costs and improperly accounting for cost overruns
for which customers were not obligated or willing to pay.

## IX.    SYMBOTIC'S INTERNAL CONTROL DEFICIENCIES

289.    During the Class Period, Defendants falsely represented that Symbotic maintained
effective disclosure controls and procedures and effective internal controls over financial reporting
to ensure the reliability of the Company's financial reporting. Yet, throughout the Class Period,
Defendants concealed a chronic and systematic breakdown of the Company's internal accounting
controls, thereby allowing the Company to, among other things, overstate revenue and earnings
and inflate the value of the Company's stock price.

290.    Defendants would eventually admit that Symbotic lacked effective internal control
over financial reporting, stating, among other things, that "the Company's internal control over
financial reporting was not effective due to the identification of material weaknesses" and "the
Company did not effectively design and execute controls over revenue recognition related to cost
overruns on certain deployments that will not be billable."

291.    As the SEC has explained, internal controls are fundamental and critical for
summarizing and reporting financial data. 15 U.S.C. § 78m(b)(2).[4] Indeed, a lack of fundamental
internal controls, as here, constitutes a "***material*** weakness" that should be immediately disclosed
to investors.

292.    PCAOB standards set forth the role of a Company's management in an audit of an
entity's financial statements. Specifically:

> The financial statements are management's responsibility. The auditor's
> responsibility is to express an opinion on the financial statements. Management is

---

[4] Specifically, the SEC requires a public company to: (a) "make and keep books, records, and
accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions
of the assets of the issuer;" and (b) "devise and maintain a system of internal accounting controls
. . . . " 15 U.S.C. § 78m(b)(2)(A)-(B).

responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. The independent auditor may make suggestions about the form or content of the financial statements or draft them, in whole or in part, based on information from management during the performance of the audit. However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them.[5] [Footnote omitted.]

293.    The Individual Defendants were further required under Rule 302 of the Sarbanes-Oxley Act of 2002 to provide certifications relating to the company's internal controls over financial reporting.

294.    Additionally, Section 302 of the Sarbanes-Oxley Act of 2002 required Defendants to maintain, assess and report on the effectiveness of the Company's internal control over financial reporting. The language provides the following, in relevant part:

(a) REGULATIONS REQUIRED.—The Commission shall, by rule, require, for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)), that the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that—

(1) the signing officer has reviewed the report;

(2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material

---

[5] AS 1001.02.

respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

(4) the signing officers—

    (A) are responsible for establishing and maintaining internal controls;

    (B) have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

    (C) have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and

    (D) have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date . . .

295.    The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") framework, which Defendants used in assessing the effectiveness of the Company's internal control over financial reporting during the class period, recognizes that a company's control environment sets the tone of an organization and is the foundation for all other components of internal control, providing discipline and structure. The COSO framework also discusses a Company's control environment as being one of five interrelated components of internal control, stating:

> The control environment is the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization. The board of directors and senior management establish the tone at the top regarding the importance of internal control and expected standards of conduct.

> The board of directors and senior management establish the tone at the top regarding the importance of internal control including expected standards of conduct. Management reinforces expectations at the various levels of the organization. … The resulting control environment has a pervasive impact on the overall system of internal control.

> Tone is impacted by the operating style and personal conduct of management and the board of directors, attitudes toward risk, and positions, which may be conservative or aggressive (e.g., position on estimates, policy choices), and degree of formality (e.g., in a smaller family business, controls may be more informal),

112

all of which sends a message to the organization. Personal indiscretions, lack of receptiveness to bad news, or unfairly balanced compensation practices could impact the culture and ultimately provide an incentive for inappropriate conduct.

In contrast, a history of ethical and responsible behavior by management and the board of directors and demonstrated commitment to addressing misconduct send strong messages in support of integrity. Employees are likely to develop the same attitudes about right and wrong—and about risks and controls—as those shown by management. Individual behavior is often influenced by the knowledge that the chief executive officer has behaved ethically when faced with a tough business-based or personal decision, and that all managers have taken timely action to address misconduct.

Tone at the top and throughout the organization is fundamental to the functioning of an internal control system. Without a strong tone at the top to support a strong culture of internal control, awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and communication may falter, and feedback from monitoring activities may not be heard or acted upon. Therefore tone can be either a driver or a barrier to internal control.

The chief executive officer (CEO) is accountable to the board of directors and is responsible for designing, implementing, and conducting an effective system of internal control. … More than any other individual, the CEO sets the tone at the top that affects the control environment and all other components of internal control.

296.   The Company's most senior executive management, consisting in substantial part of the Individual Defendants herein, embraced an admitted "tone at the top" of improperly and/or prematurely recording revenue and failing to update project cost estimates for cost overruns to inflate revenue and earnings. The purported control environment created by the Individual Defendants allowed for the concealment of material information concerning cost overruns and contract value in order to keep the Company's stock price artificially inflated throughout the Class Period.

297.   Moreover, Defendants' failure to identify such control deficiencies (*e.g.*, material weaknesses) within the Company rendered Defendants' Sarbanes Oxley reports in the False and

Misleading Statements section materially false and misleading in turn and contributed to the Company's issuance of materially false and misleading financial statements in violation of GAAP.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

298.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Defendants, by virtue of their receipt of information reflecting the true facts regarding Symbotic, and their control over and/or receipt and/or modification of Symbotic's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants' scienter and that of other senior executives is properly imputed to Symbotic.

### A. Defendants' Own Admissions Support Scienter

299.    During the Q3 2024 Earnings Call on July 29, 2024, Defendants made several admissions demonstrating they knew of the project delays and cost overruns as they were occurring.

300.    For instance, in response to a question from analyst Gregory Palm of Craig-Hallum Capital Group during the Q3 2024 Earnings Call asking "what is your visibility? … Do you have pretty strong visibility [into deployment times,]" Defendant Hibbard admitted that Symbotic does "a six-month and a 12-month outlook, and we stay lockstep with our customers...it's a joint decision with our customer. And so we look out 12 months and map that out." Defendant Cohen added that "we have pretty good visibility. Once the permits are issued, it just flows."

301.    Defendant Odisho further admitted, during the May 9, 2024 Investor Presentation, co-presented with Defendant Hibbard, that "we can clearly understand [deployment] progress on a daily basis and monitor it with the tools that we have in place." Moreover, Defendant Hibbard explained during that same presentation that Hibbard and Odisho were "focused on the entire [deployment] life cycle" which "includes build, installation, commissioning and [] go live." Thus, Defendants admitted they would have known about project delays.

302.    Defendant Hibbard further admitted during the Q3 2024 Earnings Call that the cost overruns were "*[n]ot a surprise*" and Defendant Cohen admitted during the same call that Symbotic had known about the cost overruns and need to bring EPC back in house *for more than 6 months*, stating that Defendants had "been hiring people in the supply chain in the EPC space *over the last 6 months*, and they finally got in place."

303.    Defendants' own admissions support scienter.

## B. Defendants' Attendance at Episodic Meetings Discussing Cost Overruns, Project Delays and Financial Forecasts Supports Scienter

304.    According to CW1, Hibbard worked with the FP&A group to forecast Symbotic's financial performance each quarter. CW1 stated that Hibbard reviewed Symbotic's quarterly performance with the FP&A groups once or twice per quarter and that during those meetings, Hibbard was presented with PowerPoint presentations that described any risks and opportunities for Symbotic's business. During every quarterly meeting throughout the Class Period, CW1 recalled that Hibbard was told Symbotic was experiencing project delays and cost overruns and the financial impact of those delays and overruns.

305.    CW1 stated that Hibbard also received information about project delays and cost overruns every quarter during the Class Period from other teams within Symbotic, such as the supply chain team, the implementation team, and the research and development team. After

receiving information from these various teams, Hibbard then communicated that information to the FP&A team to assist her in tracking, budgeting, forecasting, and scenario planning.

306.    CW1 explained that Hibbard reviewed and approved Symbotic's financial forecasts every quarter, which included an estimate for cost overruns in the revenue line item. According to CW1, Hibbard also reviewed with CW1 and the FP&A team, Symbotic's actual quarterly results compared to quarterly forecasts. Thus, Defendant Hibbard was aware that Symbotic was recording cost overruns in revenue throughout the Class Period.

307.    CW1 stated that Hibbard was aware of the shift in contractual terms in 2024 that eliminated Symbotic's ability to bill customers for cost overruns, explaining that, as a result, Hibbard led an effort to reduce cost overruns during the Class Period.

308.    Thus, despite that customers were not contractually obligated, nor willing to pay for cost overruns during the Class Period, Defendants still included them in the forecasts that Hibbard reviewed and booked them as revenues in the Company's actual reported financial results.

309.    CW1 also interacted with Hibbard through the Director of FP&A by way of "the chain of command." The Director of FP&A had frequent face-to-face and email communications with Hibbard and would then pass on to CW1 and the FP&A group what had been communicated. Feedback from the FP&A group would, in turn, be presented to Hibbard through the FP&A Director.  CW1 recalled that Hibbard's communications with the FP&A group occurred at least weekly through FP&A leadership, which included Tiffany Hemann, VP of FP&A, and Jason Kyle, Director of FP&A.

310.    According to CW3, this witness participated in virtual weekly and bi-weekly meetings, attended by "everybody," including Defendant Cohen, Jason Hardy, Project Managers and Senior Engineers during which Dan O'Connell, a Symbotic Senior Project Manager from May

2021 to March 2023 and Director of Supply Chain, Robotics from March 2023 to August 2024, provided updates on the status of Symbotic's projects. Among those project updates, attendees discussed project delays where CW3 advocated for telling customers like Walmart that there were going to be delays in Symbotic's ability to get materials delivered to project sites. However, during meetings attended by Rick Cohen, CW3 was instructed by superiors that customers should only be told that parts were going to be delivered on time or at most there would be a small delay, even when that was not the case and parts were on backorder for eight weeks.

311.    CW3's allegations that the Defendants held weekly meetings to discuss the status of Symbotic's deployments are corroborated by Defendants' own admissions. Indeed, during a May 9, 2024 Investor Day Presentation, Defendant Hibbard admitted that *both Hibbard and Odisho chaired a weekly meeting with multiple teams that discussed precisely the issues at the heart of the false statements about system deployment timelines*. Defendant Hibbard stated:

> So when you think about our 37 systems that we have in deployment. It is a very integrated critical path across all of that to ensure the material is arriving on time and ensure we have the commissioning resources there. ***And what Walt and I do is we chair a weekly cross-functional meeting that goes through critical paths on those schedules***. And as you're ramping and growing at the level we are, that's critical.

312.    In short, while Defendants told the market that Symbotic's deployment times were decreasing, they knew from the above reports and meetings that the opposite was true, and contrary to Defendants' claim that Symbotic was absorbing cost overruns to keep customers happy, they knew Symbotic was secretly and improperly recording cost overruns as revenue and improperly using the cost overruns to calculate a higher percentage-of-completion, thereby allowing Defendants to recognize a higher portion of the contract revenue, even though customers were not willing or obligated to pay for the cost overruns.

C. **That Defendants Spoke in Detail to Investors about Cost Overruns and Project Deployment Times Supports Scienter**

313. Throughout the Class Period, Defendants discussed the status of project deployments and associated costs and analysts frequently asked about them, demonstrating faster deployments and lower project costs were of importance to the market.

314. For example, during the Q1 2023 Earnings Call on January 30, 2023, analyst Matt Summerville of D.A. Davidson & Co. asked the Defendants: "[F]rom here forward, what are the key incremental steps Symbotic needs to take, from an outsourcing standpoint, to further accelerate system implementations? And when do you think the company will reach an optimal sort of implementation rate?" Defendant Cohen responded:

> [W]e spent this last quarter a lot of face-to-face time with suppliers. So we're pretty much locked in our suppliers. We have a couple of very good suppliers that are going to be ramping up in the second and third quarter. So we're pretty well set with our outsourcing supplier mix. And we're seeing -- as they learn to make the systems better and a little competition, we're seeing the pricing come down. We're also seeing efficiencies of rollout. And as we work with the suppliers and redesign small components of it, we're finding that the installs will happen faster. So I think the next 3 to 6 months, you should see a full benefit of the outsourcing of the suppliers.

315. Defendant Cohen's response provided a detailed timeline (3 to 6 months) for when outsourcing benefits would fully materialize and highlighted specific outcomes, like reduced pricing and faster installations due to supplier competition and component redesigns. Defendant Cohen's mention of face-to-face supplier engagement and a stabilized supplier mix also demonstrated a deep, hands-on understanding of the outsourcing process and its impact on deployment success. Defendant Cohen answered similar questions with the same level of detail and understanding during each earnings call throughout the Class Period.

316. During the Q4 2023 Earnings Call on November 20, 2023, Defendant Ernst demonstrated that he closely tracked and understood the Company's deployment timelines. In response to a question from analyst Derek Soderberg of Cantor Fitzgerald & Co. about whether

Ernst could "just quantify how long the average deployment takes at this point[,]" Defendant Ernst stated:

> Derek, when we first became a public company and we talked about those systems that we were starting, we expect it to be around 2 years or so in terms of from the start of a project launch until we actually turned it up and customer took acceptance and began ramping full usage.
>
> Those first systems that actually went live were actually north of 2.5 years. And so what we're experiencing now though is that where we're hitting effectively on these systems [indiscernible] going to hit on that 2-year time frame and the systems that we're rolling out now, we expect to be under 22 months. So what we're seeing progress in is we're carving days out and occasional innovations or carving weeks out. But we continue to see over the long run that there's meaningful opportunities not only from a process standpoint or a partnership standpoint but from technology insertion that we can do over the long run that can meaningfully carve into that.
>
> So we look to try to drive that under 22 months total deployment time to -- our long audacious goal is to get it under 6 months over the long, long run. But Rick, you want to talk about some of the things that we can do.

317.    Defendant Ernst's answer demonstrated that he understood the history, progress, and goals of Symbotic's efforts to speed up deployments and that the Defendants were paying close attention to these details.

318.    During the Q1 2024 Earnings Call on February 5, 2024, Defendant Hibbard demonstrated her detailed knowledge of Symbotic's efforts to scale deployments when responding to several questions from Goldman Sachs Group analyst Mark Delaney. In response to questions about the rate at which Symbotic would be starting new system deployments, Defendant Hibbard stated, in relevant part:

> You'll see that by stabilizing, so last quarter, we introduced 4 new systems into the quarter. This quarter, you're seeing 5. By stabilizing, we're indicated don't expect that to continue to grow to 6 to 7 to 8 every single quarter, but we will see improved number of systems as we grow over the next couple of years. When you think about what we already have in our backlog, the other comment related to that stabilizing is you're going to start seeing us delivering on our systems with the backlog that we currently have. And so, we're going to continue to ramp the number of systems that we turn operational every quarter. And then the number that we continue to add from either new customers expect a new customer, 1 to 2 every year, as we've

indicated in the past, there's really no change to that. And then as we expand into GreenBox into '24 and '25, I think that's when you'll really start seeing the additional ramp. […]

So in terms of our guide, when we talk about wanting the ability to deploy on schedule, as we are now in the stage where we have 37 different projects in deployment. So that's up from 22 a year ago. And so we are scaling right now. And what we want to make sure, we do is that we adhere to schedule and that we're able to deliver that high quality. So if that means providing a few additional resources or taking a week or 2 longer to go ahead and deliver, that's what you're going to see in some of what I'll call the lumpiness in the next quarter around both revenue and in our margin.

319.   Defendant Hibbard's comments demonstrated that she was fully informed about the length of Symbotic's deployments, the number of deployments started in the current and previous years and the number expected to be started in future years, knew the customers by name, had visibility into delays as short as one week, and understood the contours of Symbotic's efforts to scale deployments.

320.   During the Q2 2024 Earnings Call on May 6, 2024, Citigroup analyst Andrew Kaplowitz asked the Individual Defendants, in relevant part: "did you, for instance, further accelerate deployment time?" In response, Defendant Hibbard stated, in relevant part: "I'll tackle the accelerated deployment time. So, last quarter, we highlighted that we had achieved our first deployment in 20 months. So, this quarter, out of the 3 systems that we deployed, we had several that also achieved a 20-month deployment time." Defendant Hibbard's ability to answer questions about deployment times again demonstrated that the Defendants carefully monitored deployment times throughout the Class Period.

321.   Likewise, on May 9, 2024, Defendants Hibbard and Odisho presented slides at Symbotic's Investor Day that showed purported actual capacity improvement data and actual efficiency improvement data. During that presentation, Defendant Odisho stated that "over the last 13 sites, as shown here, we've been able to reduce the commissioning hours." Defendant Hibbard

explained that "we have a ton of data in the system, reliability data, KPIs that were measured for how the system is working."

322.    Thus, Defendants' detailed answers to analysts about deployments, outsourcing, revenues, and EBITDA strongly support scienter.

## D. Defendants' Access to and Review of "A Ton of Data" Regarding Project Deployments and Costs Supports Scienter

323.    CW3 confirmed that project milestones were tracked on a "burn down chart" issued for each project that showed the progress toward building out project infrastructures, as well as how many systems like robots had been produced on a weekly basis and shipping targets by amount and date. The "burn down charts" were circulated for each project every two to three weeks. The milestone goals were managed by O'Connell and the Director of Manufacturing.

324.    CW1 explained that Hibbard also had access to project tracking data regarding system deployments, among other things, through Symbotic's ERP software, SAP, which CW1 confirmed Hibbard accessed to approve purchase requests that exceeded $1 million.

325.    CW allegations that Defendants tracked data in burn down charts and in SAP are corroborated by Defendants' own admissions. For example, on May 9, 2024, Defendant Hibbard admitted that the Defendants had "a ton of data" relating to how well deployments were being executed and relating to suppliers' ability to provide the necessary goods and services to scale Symbotic's deployments:

> And so we have a ton of data in the system, reliability data, KPIs that were measured for how the system is working. We're also putting those in place for how we're running the business. And so we're looking at across our supply chain and looking at the health of our suppliers, looking at, can they scale, can they ramp? What is their quality on the product they're delivering to us and safety.

326.    Thus, Defendants were also aware of project deployment times and costs through their access to such information in Symbotic's internal systems.

**E.    That Defendant Cohen Signed Customer Master Agreements Prohibiting Symbotic from Charging for Cost Overruns and Containing Regular Reporting Requirements Supports Scienter**

327.    According to Symbotic's SEC filings, Defendant Cohen signed all major customer contracts, including agreements with Walmart Inc. and GreenBox Systems LLC. Thus, Cohen was presumably aware of the contractual terms prohibiting Symbotic from billing customers for cost overruns. Indeed, Symbotic's 2024 Form 10-K confirms this, disclosing that the Walmart agreement in 2024 capped costs that Symbotic could charge Walmart.

328.    Moreover, Symbotic's contracts with its biggest customers had specific provisions requiring Defendants to report project progress to clients. For example, pursuant to paragraph 1.6 of the "MASTER SERVICES, LICENSE AND EQUIPMENT AGREEMENT" by and between GreenBox Systems LLC and Symbotic LLC, dated July 23, 2023, the Defendants had a duty to, among other things, "keep Customer reasonably informed of Symbotic's progress related to Services and Deliverables. In addition to the reports systematically generated by the Symbotic System itself, Symbotic shall provide reports related to the Work in accordance with the applicable SOW."

329.    Similarly, pursuant to paragraph 1.13 of the "SECOND AMENDED AND RESTATED MASTER AUTOMATION AGREEMENT" among Walmart Inc., Symbotic LLC and Warehouse Technologies LLC, dated May 20, 2022, the Company agreed that: "In addition to the reports systematically generated by the Symbotic System itself, the Parties shall provide each other with reports related to this Agreement and the Work hereunder in accordance with Exhibit C (Reporting)."

330.    Thus, Defendants' duty to keep Symbotic's largest customers informed with reports about the progress the Company was making toward system deployments supports that Defendants

made the alleged false and misleading statements and omissions during the Class Period with scienter.

**F.  Defendant Cohen's Regular Site Visits Supports Scienter**

331.    CW5 reported that during CW5's tenure at Symbotic, between April 2023 and February 2024, Defendant Cohen frequently visited different deployment sites to "meet and greet" customers and interact directly with the Symbotic employees who were deploying the systems. CW5 knows this because CW5 spoke with Defendant Cohen during one such visit.

332.    CW2 also confirmed CW5's account, explaining that during CW2's tenure at Symbotic, between December 2022 and December 2024, CW2 personally observed Defendant Cohen visiting and walking around deployment sites, including at least a half dozen visits to the Brookville location. CW2 stated that Defendant Odisho also visited deployment sites during CW2's tenure at Symbotic.

**G.  Defendants' Violations of Symbotic's Internal Revenue Recognition Policies and Internal Control Violations Support Scienter**

333.    Throughout the Class Period, the Individual Defendants violated GAAP and Symbotic's own internal revenue recognition policies and failed to maintain adequate control over the Company's financial reporting by making the material misstatements of Symbotic's financial statements and financial forecasts alleged herein.  The Individual Defendants' violations of GAAP and Symbotic's internal Company policies support a strong inference of scienter.

334.    First, as detailed above, Symbotic's revenue recognition policy prohibited revenue recognition unless "it is probable that a significant reversal of revenue will not occur and when collection is considered probable" and only "in an amount that reflects the consideration the Company expects to receive in exchange for those products or services." Further, under the percentage of completion method of revenue recognition, Symbotic can only recognize revenue

according to the percentage complete, calculated as costs incurred divided by total estimated project costs, with total estimated project costs being the contract price the customer is willing to pay.

335.    Defendants admittedly violated GAAP and this policy throughout the Class Period by: (i) recognizing revenue from cost overruns that customers were not obligated or willing to pay; and (ii) including costs from cost overruns in the calculation of percentage complete, thereby prematurely recognizing revenue. Defendants further violated GAAP and Symbotic's policies by including revenue where it was not "probable" a customer would pay.

336.    Defendants' violations of GAAP and Symbotic's own revenue policies resulted in Symbotic's admitted failure to maintain adequate controls over financial reporting.

**H.  The SEC's Investigation of Symbotic Supports Scienter**

337.    On December 4, 2024, Symbotic disclosed that the SEC was investigating Defendants' alleged efforts to impede a whistleblower from coming forward about a possible securities fraud violation:

> **SEC Request for Information**
>
> We have been responding to requests for information from the SEC relating to an investigation by the SEC of alleged violations by us of Rule 21F-17, which prohibits actions to impede an individual from communicating directly with the SEC staff about a possible securities law violation. We intend to continue to defend this matter vigorously and cannot predict the outcome of this investigation.

338.    Then, on February 5, 2025, Symbotic disclosed in its quarterly report on Form 10-Q that the Company received a subpoena from the SEC relating to its November 27, 2024 restatement of revenues for the year ended September 28, 2024.

339.    That the SEC has sufficiently strong evidence to open an investigation into Defendants for seeking to impede the disclosure of securities law violations and to move forward

with a subpoena seeking additional information adds to the inference that Defendants' misrepresentations throughout the Class Period were made with scienter.

**I. Core Business Operations**

340.    As demonstrated in the following chart, prior to and throughout the Class Period, the revenues Symbotic derived from system deployments comprised more than 95% of the Company's overall revenues. Thus, it is indisputable that system deployments were Symbotic's core business and of utmost importance to Defendants.



341.    Every quarter, Defendants reported on the number of new systems completed and deployed, as well as the value of Symbotic's backlog. Symbotic's backlog of system deployments throughout the Class Period totaled approximately $23 billion, meaning Symbotic would be able to increase revenue as quickly as it could scale its ability to deploy new systems.

342.    Indeed, Defendant Ernst explained prior to the Class Period during the January 30, 2023 Earnings Call that "[Symbotic's] goal is really not to drive backlog growth" but was to "scale against the opportunity we have[,]" meaning that the Defendants were not focused on increasing backlog and instead were focused on scaling and speeding up system deployments to recognize the potential revenues already in the backlog.

343.    The Defendants' focus on scaling system deployments persisted throughout the Class Period as Defendant Hibbard explained during the February 5, 2024 Earnings Call that Symbotic's "future revenue growth is really driven by [its] ability to scale deployments and progress."

344.    That system deployments were Symbotic's core operation prior to and throughout the Class Period, and that Defendants' goal and focus was to increase the speed and scale of system deployments, creates a strong inference of scienter.

### J.   Defendants' Motive Adds to the Scienter Inference

#### 1.   Defendants Were Motivated to Make the Alleged False Statements Because, But for Defendants' Fraud, Symbotic Would Have Missed EBITDA and Revenue Quarterly Forecasts

345.    Prior to the Class Period, Symbotic had never turned a profit. While Symbotic was reporting significant revenue growth year over year, it still was unable to report net income and investors and analysts wanted an explanation. Thus, Symbotic was under significant pressure from analysts and investors, alike, to turn the Company profitable.

346.    Accordingly, Defendants were motivated to overstate revenue and earnings to meet or attempt to meet quarterly forecasts. Indeed, Symbotic would not have hit its Adjusted EBITDA forecasts for the first two quarters in 2024 and revenue for Q2 2024 had it reported accurate figures. Moreover, in Q3 2024, Defendants overstated EBITDA by $12 million, or 454%, to avoid reporting that EBITDA had fallen to almost zero. *See* Figure 3 and Figure 4, below.

**Figure 3.**



**Figure 4.**

| (in millions) | Q1 2024 | | | Q2 2024 | | | Q3 2024 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Misstated Actual | Restated Actual | Forecast | Misstated Actual | Restated Actual | Forecast | Misstated Actual | Restated Actual |
| Adj. EBITDA | $11-14 | $14 | $8 | $12-15 | $22 | $9 | $27-29 | $15 | $3 |
| Revenue | $350-$370 | $368 | $360 | $400-$420 | $424 | $393 | $450-$470 | $492 | $470 |

347.    Moreover, CW3's account that incomplete robots were usually shipped within a couple of weeks before the end of a quarter with that directive coming from above (someone above Jason Hardy in operations), creates an inference that Defendants were particularly focused on meeting quarterly numbers, even if it meant prematurely shipping goods to deployment sites to record additional work as complete and recognize the corresponding revenues. CW3's allegations were confirmed by Cohen who admitted to shipping incomplete robots during the July 29, 2024

Earnings Call and by CWs4 and5 who also observed Symbotic shipping incomplete robots to project sites.

348.    Thus, Defendants' motive to hit forecasts and avoid reporting a dramatic drop in EBITDA adds to the strong inference of scienter.

### 2.  Defendant Cohen's Suspicious Insider Sales

349.    On February 21, 2024, Symbotic announced a Primary and Secondary Offering of its Class A Common stock "by the Company and certain trusts for the benefit of, and entities ***controlled by, Richard Cohen***, the Company's founder, chairman and chief executive officer, or members of his family (the "Selling Securityholders"). According to the release, in the offering, Symbotic was offering 5,000,000 shares of Class A common stock for a price of $40.50 per share, which was purportedly being used "for general corporate purposes." Defendant Cohen was also expected to sell 5,000,000 shares of his personal holdings of Symbotic Class A common stock. Goldman Sachs & Co. was to act as the sole book-runner in these transactions.

350.    Indeed, on February 26, 2024, Defendant Cohen and his wife, Jill Cohen, sold a total of 5,000,000 shares of Symbotic Class A common stock through entities, trusts, and GRATs they controlled, for a combined total sales price of $183,450,000.

351.    Specifically, on February 26, 2024, Defendant Cohen caused the "Richard B. Cohen Revocable Trust" to sell 33,449 shares, the "RBC 2021 4 Year GRAT" to sell 2,279,097 shares, and RJJRP Holdings, Inc. to sell 602,158 shares, all at a price of $36.69 per share, generating sale proceeds of $1,327,591, $90,457,360, and $23,899,651, respectively. That same day, Defendant Cohen's wife caused the "RBC Millenium Trust" to sell 2,085,296 shares at a price of $36.69 per share, generating sale proceeds of $82,765,398.

128

352.    The size and timing of Defendant Cohen's colossal sale on February 26, 2024 that generated proceeds of $183,450,000 is highly suspicious and supports scienter as that sale occurred just days after Symbotic first published misstated financials and occurred at a time when Symbotic was experiencing massive cost overruns, was suffering deployment delays due to the outsourcing partners' terrible performance, and—unbeknownst to investors—had just begun hiring employees to bring EPC back in-house to rectify the disastrous performance of Fluor and other outsourcing partners.

## XI.    LOSS CAUSATION AND ECONOMIC LOSS

353.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Symbotic's Class A common stock and operated as a fraud or deceit on Class Period purchasers of Symbotic's Class A common stock by materially misleading the investing public. Later, as Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Symbotic's Class A common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Symbotic's Class A common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

354.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants materially misstated the Company's reported financial results and made or caused to be made a series of materially false and/or misleading statements concerning the execution and success of Symbotic's outsourcing partners, implementation time for projects, purported cost savings, internal controls over financial reporting and compliance with GAAP and

the Company's internal accounting policies. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of Symbotic and its well-being and prospects, thus causing the Company's Class A common stock to be overvalued and artificially inflated at all relevant times.

355.    By not disclosing the adverse facts detailed herein, Defendants presented a misleading picture of Symbotic's business and current and future financial prospects. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Symbotic's Class A common stock declined significantly as the prior, artificial inflation came out of the prices of the Class A common stock as follows:

### A.  The July 29, 2024 Press Release and Earnings Call

356.    On July 29, 2024, after market close, Defendants issued Symbotic's third quarter 2024 financial results that were below market expectations "due to elongated construction schedules and implementation costs." Accordingly, Defendants revealed that Symbotic would have to reverse course from its prior restructuring that outsourced the EPC function and bring that back in-house, which would have short-term negative affect on revenue and costs.

357.    Upon the news, Symbotic's stock price declined from a closing price of $35.63 per share on July 29, 2024 to a closing price of $27.25 per share on July 30, 2024, an overall decline of approximately 24% on heavy trading volume.

358.    This disclosure corrected Defendants' prior misstatements that, for example, "**we continue to accelerate our time to deploy systems.**"

359.    Indeed, analyst Northland Capital Markets lowered its guidance for Symbotic in a July 29, 2024 report citing the Company's construction delays and higher implementation costs:

> While new system starts and revenue per deployment improved in 3Q24, *management cited elongated construction schedules and implementation costs depressing gross margin*. Hence, SYM missed EBITDA and guided to slower

***growth in 4Q*** as the company adjusts. Sees new system starts improving in 4Q and 1Q25, with revenue growth rates improving in 1Q25. ***Lowering target to $50 from $60…management citing longer construction cycles and more implementation costs. The bulk of the extra costs are people costs***. … Management is focused on improving planning, speed of implementation and project management to improve performance. They indicated this could slow revenue growth in the near term. Fewer system starts in 2Q24, and delayed milestones from construction delays and sensor array updates are affecting 4Q24 growth.

360.    Similarly, analysts from Cantor Fitzgerald reported on July 29, 2024 that Symbotic's earnings were "***a negative surprise given our view that SYM had already moved past short-term system deployment challenges***. Management cited incremental project delays due to permitting, procurement, construction and increased project costs. In response, Symbotic is now opting to take certain functions in house that were previously outsourced to engineering, procurement and construction (EPC) firms." Despite the negative surprise, the analysts reported favorable after Defendants' reassurances, stating: "Our bet is that SYM is now largely through any major deployment challenges."

### B.  November 27, 2024 Form 8-K/A

361.    On November 27, 2024, Defendants disclosed that Symbotic was restating its financial results to remove the impact of cost overruns improperly recorded as revenue that Symbotic's customers were unwilling and not obligated to pay.

> Symbotic identified errors in its revenue recognition related to cost overruns that will not be billable on certain deployments, which additionally impacted system revenue recognized in the second, third, and fourth quarters of fiscal year 2024. As a result, gross profit, income (loss) before income tax, net income (loss) and adjusted EBITDA 1 were also impacted. The company estimates the total impact of correcting these errors will be to lower system revenue, system gross profit, income (loss) before income tax, and adjusted EBITDA[] by $30 million to $40 million for fiscal year 2024….

362.    Thus, "[m]anagement has identified in its preliminary assessment of internal control over financial reporting for the fiscal year ended September 28, 2024 certain material

weaknesses." Defendants also slashed Symbotic's Q1 2025 guidance, cutting EBITDA nearly in half.

363.    These disclosures corrected Defendants' prior reported annual and quarterly 2024 financial statements for, *inter alia*, revenue, cost of revenue, earnings, and adjusted EBITDA.

364.    Upon the news, Symbotic's stock price fell from $37.41 per share on November 26, 2024 to $24.00 per share on November 27, 2024, dropping $13.41 per share, or 36% on heavy trading volume.

365.    Analysts understood these disclosures to be correcting Defendants' prior financial misstatements. According to a November 27, 2024 Willliam Blair equity report:

> ***The accounting error occurred as a result of previously recognized revenue related to cost overruns that were not billable to customers in the second, third, and fourth fiscal quarters of 2024***. This will ultimately result in revenue, gross profit, adjusted EBITDA, and net income for those quarters being revised downward by a total of $30 million to $40 million across the three quarters... A simple explanation of the restatements is that Symbotic booked revenue for cost overruns that customers have been unwilling to pay. However, the scope of analysis currently being undertaken by auditors adds a layer of uncertainty for a possible extension to the December 12 10-K filing deadline, implying greater risk of further volatility ahead for the stock.

366.    Similarly, on December 3, 2024, an article entitled "Symbotic's going down, down, down" published in The Net Gains, an accounting newsletter, commented that Symbotic's financial statements suffered from "major accounting mistakes" and its "financials are getting a much-needed redo." According to the article, the "financial misstep has had a major impact on Symbotic's outlook," now "significantly lower than previous forecasts."

## C.  February 5, 2025 Press Release and Earnings Call

367.    On February 5, 2025, Symbotic issued a press release reporting Q1 2025 earnings with disappointing Q2 2025 guidance below analyst expectations due to fewer new system

deployments, revealing that Symbotic's project deployment times were still averaging 24 months rather than the 20 months previously touted, and disclosing the receipt of an SEC subpoena.

368.    In particular, during the Q1 2025 Earnings Call on February 5, 2025, at a time when analysts still believed deployment times were averaging approximately 20 months, analyst Ross Sparenblek of William Blair & Company asked whether in-sourcing had sped up deployments and questioned: "are we getting close to closing on kind of the 18 months with a path to 12?"

369.    Defendant Hibbard responded bluntly: "So the systems that we're deploying right now, we're ***still*** averaging 24 months[.]" Defendant Hibbard added that "we still see a path forward of how we streamline that improvement, ***but that's going to take some time***."

370.    These disclosures corrected Defendants' prior misstatements that project deployment time had improved to 20 months, that Symbotic "can go faster, we can go a lot faster[,]" and that such "reductions in system deployment time create capacity to support future customer demand[,]" even though system deployments in Q1 2025 declined by more than half as compared to the prior quarter. Moreover, the SEC investigation was a materialization of the risk of Defendants' accounting improprieties alleged herein.

371.    Upon the news, Symbotic's stock price fell from $30.92 per share on February 5, 2025, to $25.99 per share on February 6, 2025, dropping $4.93 per share, or 16% on heavy trading volume.

372.    Analysts expressed concern over Defendants' new revelations that were an about-face from what they had been told in prior quarters. For example, Raymond James issued a US Equity Research report downgrading Symbotic to Market Perform "following 1Q results and a 2Q guide that missed the mark, along with flat backlog ($22.4B) and slowing pace of system deployments (44 vs RJ est 49)." The Raymond James report further cited as a reason for the

downgrade, that "SYM's success in reducing time-to-deployment was a core tenet of our thesis, and ***the current pace of 24 months shows little improvement from the rate achieved two years ago***[,]" noting "the inconsistent execution has shaken our confidence that the company can profitably ramp its system deployments this year."

373.    A February 7, 2025 Seeking Alpha article likewise noted "disappointing" guidance "***with stagnant system deployments*** and backlog" as its key concerns.

374.    Each of the declines in the prices of Symbotic's Class A common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' misrepresentations and/or fraudulent conduct being revealed to investors and the market. The timing and magnitude of the price declines in Symbotic Class A common stock negate any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' material misrepresentations and/or fraudulent conduct.

375.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of Defendants' false statements that artificially inflated, or maintained the artificial inflation in the price of Symbotic Class A common stock and the subsequent significant declines in the value of Symbotic Class A common stock when Defendants' prior misrepresentations were disclosed.

376.    The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's Class A common stock at artificially inflated prices, thus causing the damages complained of herein.

## XII.    PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

377.    At all relevant times, the market for Symbotic's Class A common stock was trading in an efficient market for the following reasons, among others:

a.    Symbotic's Class A common stock met the requirements for listing and was listed and actively traded on the Nasdaq during the Class Period, a highly efficient and automated market;

b.    Symbotic communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

c.    Symbotic was followed by several securities analysts employed by major brokerage firms who wrote reports during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

d.    Unexpected material news about Symbotic was reflected in and incorporated into the Company's stock price during the Class Period.

378.    As a result of the foregoing, the market for Symbotic's Class A common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Symbotic's stock price. Under these circumstances, all purchasers of Symbotic's Class A common stock during the Class Period suffered similar injury through their purchase of Symbotic's securities at artificially inflated prices, and a presumption of reliance applies.

379.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery

135

pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## XIII.    NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

380.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems, in part, from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes and internal controls. Defendants provided the public with forecasts that failed to account for the Company's improper accounting and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes or internal controls.

381.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

382.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Symbotic who knew that the "forward-looking statement" was false. Alternatively, none of the Defendants' historical or present-tense statements were assumptions underlying or related to any plan, projection, or statement of future economic performance. These statements were not presented as such assumptions when made, nor

were the Defendants' projections or forecasts explicitly tied to or dependent on those historical or present-tense statements at the time they were made. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XIV. CLASS ACTION ALLEGATIONS

383.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Symbotic's securities during the Class Period and were damaged upon the revelation of the alleged corrective disclosure (the "Class"). Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

384.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Symbotic's securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Symbotic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 5, 2023, there were 83.7 million shares of the Company's Class A common stock outstanding. Upon information and belief, these shares are held by

thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

385.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws that are complained of herein.

386.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

387.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Symbotic;

c.   whether the Individual Defendants caused Symbotic to issue false and misleading financial statements during the Class Period;

d.   whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.   whether the prices of Symbotic's Class A common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

    f.   whether the members of the Class have sustained damages and, if so, what is

the proper measure of damages.

388.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against All Defendants for Violations of
### Section 10(b) and Rule 10b-5(b) Promulgated Thereunder

389.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

390.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

391.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Symbotic Class A common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise

acquire Symbotic's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

392.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Symbotic's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

393.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

394.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Symbotic's internal affairs.

395.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Symbotic's business, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Symbotic's Class A common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Symbotic's Class A common stock at artificially inflated prices and relied upon the price of the Class A common stock, the integrity of the market for the Class A common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

396.    During the Class Period, Symbotic's Class A common stock was traded on the Nasdaq in an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Symbotic's Class A common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said Class A common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Symbotic's Class A common stock was substantially lower than the prices paid by Plaintiffs and the other members of

the Class. The market price of Symbotic's Class A common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

397.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

398.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's Class A common stock during the Class Period, upon the disclosure that Symbotic's system deployment times had not been improving and that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c)*

399.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

400.    During the Class Period, Defendants named in this count carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period: (a) deceived the investing public, including Plaintiffs and other Class members, as alleged herein; and (b) caused Plaintiffs and other members of the Class to purchase Symbotic common stock at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants made false statements and engaged in other unlawful acts as alleged herein.

401.    The Defendants named in this count, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Symbotic as specified herein.

402.    The Defendants named in this count employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct, as alleged herein, in an effort to ensure Symbotic achieved its quarterly financial forecasts which, in turn, gave investors the false impression that Symbotic's outsourcing of the EPC function was a success that was allowing Symbotic to improve project deployment times and scale. As set forth more particularly herein, these acts included, among others, secretly accelerating recognition of costs to increase revenue and/or improperly recording revenue from cost overruns that customers were not contractually obligated nor willing to pay and sending incomplete robots to project sites one or two days prior to quarter end to accelerate and increase recognized project costs. Defendants also secretly concealed that they had begun hiring for the EPC function to bring it back in-house due to Fluor's poor performance in early 2024, approximately six months before they disclosed the project delays and cost overruns to the market.

403.    These acts deliberately concealed project delays and cost overruns, and concealed that Symbotic was failing to hit EBITDA targets and was nowhere near reducing project deployment times to the degree needed to scale. These practices and courses of business operated as a fraud and deceit upon the purchasers of Symbotic common stock during the Class Period.

404.    As a result of Defendants' fraudulent scheme and failure to disclose material facts, as set forth above, the market price for Symbotic common stock was artificially inflated during the Class Period.

405.    In ignorance of the fact that market prices of Symbotic's publicly traded common stock were artificially inflated or distorted, and relying directly or indirectly on the false and

misleading financial and other statements disseminated by Defendants, or upon the integrity of the market in which the Company's common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants named in this count but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Symbotic common stock during the Class Period at artificially high prices and were damaged thereby.

## COUNT III

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

406.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

407.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Symbotic's misstatements.

408.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Symbotic which had become materially false or misleading.

409.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Symbotic disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Symbotic to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning

144

of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Symbotic's Class A common stock.

410.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Symbotic to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

411.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 11, 2025                              Respectfully submitted,

**LEVI & KORSINSKY, LLP**


_/s/ Shannon L. Hopkins_

Shannon L. Hopkins (BBO# 657485)
Gregory M. Potrepka
David C. Jaynes
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
Tel. (203) 992-4523
Fax: (212) 363-7500
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: djaynes@zlk.com

_Attorneys for Lead Plaintiff_


**THE ROSEN LAW FIRM, P.A.**


_/s/ Jacob A. Goldberg_

Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

_Additional Counsel for Additional Plaintiff Joseph De John_

**CERTIFICATE OF SERVICE**

I, Shannon L. Hopkins, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on July 11, 2025.

Dated: July 11, 2025                      */s/Shannon L. Hopkins*
                                          Shannon L. Hopkins