# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEFFREY ADAM TRAINA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SYMBOTIC INC., RICHARD B. COHEN, THOMAS C. ERNST, CAROL J. HIBBARD, and WALTER ODISHO,<br><br>Defendants. | No. 1:24-cv-12976-DJC<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Leave to File Excess Pages Granted on August 12, 2025 [Dkt. 30] |

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................3

I.     Symbotic's Automated Warehousing System Business ....................................3

II.    Symbotic Outsourced System Deployments to Meet Heightened Demand and Cautioned Investors Regarding the Risks the Company Faced .......................4

III.   One Outsourcing Partner Performed Poorly and Symbotic Pivoted Back In-House.......5

IV.   Symbotic Misstates But Then Diligently Corrected Its Financials.................5

V.    Symbotic Improves System Deployments in 2025 ..........................................6

VI.   This Action .........................................................................................................7

LEGAL STANDARD........................................................................................................7

ARGUMENT ...................................................................................................................8

I.     Plaintiffs Fail to Plead Facts Giving Rise to a Strong Inference of Scienter.................8

    A.   That Defendants' Financial Statements and SOX Certifications Were Mistaken Does Not Plead a Strong Inference of Scienter ...................................8

    B.   The Confidential Witness Allegations Do Not Support Scienter.....................11

        1.   The Confidential Witnesses Lack the Requisite Reliability.................14

        2.   The Confidential Witness Allegations Lack Specificity ......................15

            i.   Financial Statements and Internal Controls (CW1)…………...15

            ii.  Deployment (CW1, CW2, CW3, CW4, CW5)…………………16

    C.   The Single Day of Stock Sales by One of Four Individual Defendants Does Not Support a Finding of Scienter.........................................................18

    D.   Plaintiffs' Other Scattershot Scienter Allegations Cannot Save Their Claims .19

    E.   Defendants' Disclosures Weaken Any Inference of Intent to Mislead ............21

II.    Many of the Challenged Statements Are Not Actionable or Misleading .....................22

    A.   Plaintiffs Challenge Statements Protected by the PSLRA Safe Harbor............22

1.    Many of the Challenged Statements are Forward-Looking ..................23

2.    The Forward-Looking Statements Were All Accompanied by Meaningful Cautionary Language ........................................................24

3.    The Forward-Looking Statements are Protected by the Safe Harbor Because They Were Made Without Actual Knowledge of Falsity .......26

B.    Plaintiffs Fail to Allege that Defendants' Statements Regarding Deployments Were False or Misleading....................................................................26

C.    Opinions and Expressions of Corporate Optimism Are Not Actionable .........27

D.    Plaintiffs Have Not Alleged a Duty to Disclose or Correct .............................29

III.    Plaintiffs Fail to Plead Any Fraudulent Scheme ...........................................................31

IV.    Plaintiffs Fail to Plead Loss Causation Regarding the SEC Investigation ...................34

V.    Plaintiffs' Section 20(a) Claim Fails For Lack of a Predicate .......................................35

CONCLUSION........................................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abbate v. Wells Fargo Bank, N.A.*, 2011 WL 9698215 (C.D. Cal. Nov. 17, 2011) ..................... 33

*ACA Fin. Guar. Corp. v. Advest Inc.*, 512 F.3d 46 (1st Cir. 2008) .................................................. 8

*Angelos v. Tokai Pharms., Inc.*, 494 F. Supp. 3d 39 (D. Mass. 2020) ......................................... 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................... 3, 7

*Backman v. Polaroid, Corp.*, 910 F.2d 10 (1st Cir. 1990) ..................................................... 29, 30

*Berlik v. Baker*, No. 21-CV-11723-AK, Dkt. 47, slip op. (D. Mass. Sept. 30,
2022) ................................................................................................................ 31, 33

*Borteanu v. Nikola Corp.*, 2023 WL 1472852 (D. Ariz. Feb. 2, 2023) ........................................ 34

*Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444 (D. Mass. 2016) .................................................. 20

*Brennan v. Zafgen, Inc.*, 853 F.3d 606 (1st Cir. 2017) ................................................................ 19

*Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296 (11th Cir. 2015) ............................................. 21

*Capri Optics Profit Sharing v. Digital Equip. Corp.*, 950 F.2d 5 (1st Cir. 1991) ................. 17, 26

*Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235 (D. Mass. 2001) ............... 16, 18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632
F.3d 751 (1st Cir. 2011) .............................................................................................. 22

*Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31 (1st Cir. 2017) ....................................... 19, 30

*Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259 (D. Mass. 2020) ................................................ 17

*Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1 (D. Mass. 2004) ........................................................ 20

*Day v. Staples, Inc.*, 555 F.3d 42 (1st Cir. 2009) ............................................................9

*Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012) ....................15

*Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270 (E.D.N.Y. 2025) .................11, 30

*Ezra Charitable Tr. v. Tyco Int'l, Ltd.*, 466 F.3d 1 (1st Cir. 2006) .............................8, 9

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015) ...................................................................................................................8, 14

*Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12 (D. Mass. 2000)...................................27

*Godinez v. Alere Inc.*, 272 F. Supp. 3d 201 (D. Mass. 2017) ......................................11, 14, 15, 16

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999).......................................23

*Hackel v. AVEO Pharms., Inc.*, 474 F. Supp. 3d 468 (D. Mass. 2020) ........................................25

*Hensley v. Imprivata, Inc.*, 260 F. Supp. 3d 101 (D. Mass. 2017)................................17

*In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551 (E.D. Pa. 2009) ...........................17

*In re Analogic Corp. S'holder Litig.*, 2019 WL 4804800 (D. Mass. Sept. 30, 2019) .............26, 28

*In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5 (D. Mass. 2016)...................................20

*In re Biogen Inc. Sec. Litig.*, 857 F.3d 34 (1st Cir. 2017).......................................*passim*

*In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249 (D. Mass. 2022) ...................8, 16

*In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21 (1st Cir. 2012)........................................8

*In re Burlington Coat Factory Sec. Litig*, 114 F.3d 1410 (3d Cir. 1997).......................30

*In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir. 2002)...............................12, 14, 15, 20

*In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240 (8th Cir. 2008) ....................................21

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675 (D.N.J. Aug. 8, 2018) ..............................................................................................................27

*In re Comshare Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999) ......................................10

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223 (D.N.J. Apr. 27, 2017) ..............................................................................................................11

*In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018) ......................................11

*In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294 (D. Mass. 2006)................................26

*In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007) ..................................9

*In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124 (D. Mass. 2021) .................9, 14, 15

*In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188 (S.D.N.Y. 2020) .......................33

*In re Peregrine Sys., Inc. Sec. Litig.*, 310 F. App'x 149 (9th Cir. 2009).......................33

*In re Pharms., Inc. Sec. Litig.*, 2007 WL 951695 (D. Mass. Mar. 28, 2007) ...............15

*In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131 (D. Mass. 2001) ..................................9

*In re Royal Dutch/Shell Transport*, 2006 WL 2355402 (D.N.J. Aug. 14, 2006)...........34

*In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477 (S.D.N.Y. 2004)...............28

*In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015) .......................................28

*In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161 (D. Mass. 2000) ................9

*In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102 (D. Mass. 2003) ...........24

*In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187 (1st Cir. 2005)............................9

*In re Teva Sec. Litig.*, 512 F. Supp. 3d 321 (D. Conn. 2021) ........................................33

*In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011) .........................23

*In re Vivendi Universal, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ........................................23

*In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332 (D. Mass. 2020) ...........................................11

*Isham v. Perini Corp.*, 665 F. Supp. 2d 28 (D. Mass. 2009) ...............................................23, 24, 25

*Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48 (1st Cir. 2018)...........................................19, 22

*Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674 (9th Cir. 2005) ...............................................18

*Kushner v. Beverly Enters., Inc.*, 317 F.3d 820 (8th Cir. 2003) .....................................................11

*Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) .....................................27

*Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176 (D. Mass. 2020) .....................................19

*Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167 (D. Mass. 2012) ...............................8

*Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49 (D. Mass. 2022) .............................................3, 20

*Levy v. Gutierrez*, 2017 WL 2191592 (D.N.H. May 4, 2017) ..................................................31, 33

*Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144 (S.D.N.Y. 2015)....................................21

*Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76 (1st Cir.
    2016) ...........................................................................................................................................10

*Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014)..........................................................34, 35

*Lydon v. Local 103, Int'l Bhd. of Ele. Workers*, 770 F.3d 48 (1st Cir. 2014).................................3

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009) .....................11

*Mehta v. Ocular Therapeutix, Inc*, 955 F.3d 194 (1st Cir. 2020) ..................................................22

*Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181 (D. Mass. 2018)......................9, 14

*Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151 (1st Cir. 2019) ....................................9, 35

*Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013) ........................................................34

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35 (1st
    Cir. 2008) .........................................................................................................12, 14

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S.
    175 (2015) ...............................................................................................................28

*Paice v. Aldeyra Therapeutics, Inc.*, 2025 WL 815065 (D. Mass. Mar. 14, 2025) ................20, 30

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90
    (2d Cir. 2021) ............................................................................................................7

*Premca Extra Income Fund LP v. iRobot Corp.*, 763 F. Supp. 3d 121 (D. Mass.
    2025) .............................................................................................................16, 20, 21

*Public Pension Fund Group v. KV Pharm. Co.*, 679 F.3d 972 (8th Cir. 2012)............................34

*Quinones v. Frequency Therapeutics, Inc.*, 665 F. Supp. 3d 156 (D. Mass. 2023)................18, 19

*Quinones v. Frequency Therapeutics, Inc.*, 106 F.4th 177 (1st Cir. 2024)...................................18

*State Tchr. Ret. Sys. of Ohio v. Charles River Labs. Int'l, Inc.*, 2025 WL 2374498
    (1st Cir. 2025) .........................................................................................................10

*Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353
    (S.D.N.Y. 2019) .......................................................................................................28

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008) ..................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)................................................8

*Wasson v. LogMeIn, Inc.*, 496 F. Supp. 3d 612 (D. Mass. 2020) ...........................................23, 27

*Zhou v. Desktop Metal, Inc.*, 120 F.4th 278 (1st Cir. 2024) .........................................................29

## STATUTES, RULES, AND REGULATIONS

15 U.S.C. § 78u-5 ........................................................................................................22, 23, 24, 26

17 C.F.R. § 240.10b-5.................................................................................................7, 29, 31, 33

Fed. R. Civ. P. 9(b) ........................................................................................................2, 8, 31, 34

# INTRODUCTION

Symbotic Inc. ("Symbotic" or the "Company") creates robots and warehouses that work together to move goods around faster than their human counterparts. After going public in 2022, the Company experienced the typical growing pains it had cautioned could occur with such an adjustment. Indeed, Symbotic warned that the contractors to which it outsourced warehouse construction might cause delays. But the Company did not—as Plaintiffs contend with no support—know that its revenue recognition practices were flawed, and certainly did not know that its optimistic statements regarding the duration of its construction projects would turn out to be too sunny. When issues with one contractor became too pronounced, Symbotic prudently brought portions of the deployment process back in-house. And as soon as Symbotic discovered that its financial results were in error, it restated its financials, explained the mistake it had made, and took action to ensure the error would not recur. This is decidedly not fraud.

Now, Plaintiffs seek to convert a freshly public company's growing pains, which it promptly corrected, into securities fraud. They challenge statements made between November 20, 2023 and February 5, 2025 concerning expected deployment rates, financial statements (including representations that those statements complied with Generally Accepted Accounting Principles ("GAAP")), and revenue forecasts. Plaintiffs also challenge Sarbanes-Oxley Act ("SOX") certifications that Symbotic's executives signed, certifying their belief that the Company had effective internal controls. But despite a 411-paragraph complaint and statements of five former employees, at best, Plaintiffs have alleged inactionable fraud by hindsight (or mismanagement), for six independent reasons:

*First*, Plaintiffs do not plead scienter with respect to any challenged statement or alleged conduct. That some financial statements and SOX certifications were incorrect does not give rise

to a strong inference of scienter. And Plaintiffs' confidential witnesses—who do little other than bemoan the performance of a single contractor at a limited number of job sites—lack the reliability and specificity the law requires to add to any scienter inference. The single day of trading by one defendant involving a trivial percentage of his shares similarly adds nothing to the analysis. Nor do Plaintiffs' allegations about generic motives, core operations, or a United States Securities and Exchange Commission ("SEC") investigation.

*Second*, the Private Securities Litigation Reform Act's ("PSLRA") safe harbor protects many of the challenged statements (*i.e.*, those regarding anticipated deployment times and forecasted financials) because they were forward looking, identified as such, and accompanied by meaningful cautionary language. The safe harbor separately protects those forward-looking challenged statements because Plaintiffs fail to allege that they were made with actual knowledge by the speaker that they were false or misleading.

*Third*, several challenged statements are not actionable as a matter of law because they are puffery or honestly held opinions.

*Fourth*, Plaintiffs fail to allege that Defendants had a duty to disclose or "correct" any information relating to Symbotic's generalized efforts to improve its deployment times.

*Fifth*, Plaintiffs' allegations do not support a claim for scheme liability because those allegations are merely duplicative of their misstatement claim, do not plead reliance on the supposed scheme, and otherwise fail to satisfy Federal Rule of Civil Procedure 9(b).

*Finally*, the SEC investigation cannot plead loss causation, and, in any event, the SEC has concluded its investigation without recommending an enforcement action.

## BACKGROUND

### I.    Symbotic's Automated Warehousing System Business

Symbotic sells innovative technology designed to improve businesses' efficiencies by using robotics and software automation in commercial warehouses. ¶¶ 40–41;[1] Ex. 2 (Dec. 11, 2023 Symbotic Form 10-K) at 3.[2] Symbotic's automated warehousing systems consist of high-speed, artificially intelligent mobile robots that move goods through warehouses designed for those robots' use. ¶ 43. Symbotic deploys these systems in three phases: (1) procurement; (2) installation; and (3) commissioning. ¶¶ 45–48. The systems become operational upon acceptance, at which point the customer takes over. ¶¶ 45–48. The Company went public in June 2022. Ex. 2 at 72.

Symbotic recognizes revenue based on the percentage of completion method of accounting, which is recognized by GAAP. ¶¶ 49, 275–78. For example, if Symbotic has incurred 20% of the estimated costs, Symbotic recognizes 20% of the total projected revenue and profits from the sale of that system. ¶ 49. Consequently, Symbotic recognizes most of its revenue from the systems' lifecycles during the installation phase, which incurs the largest portion of costs. ¶ 50. Plaintiffs assert that Symbotic initially had the ability to pass cost overruns on to customers, but new contracts for projects beginning in 2024 were written to disallow this cost overrun transfer. ¶ 107.

---

[1]    All paragraph references refer to the paragraphs in the Amended Complaint. Defendants accept the factual allegations of the Amended Complaint as true solely for purposes of this motion, but do not accept any misleading or incomplete characterizations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2]    All exhibits referenced herein ("Ex.") are attached to the Declaration of Andrew S. Dulberg, filed herewith. These exhibits are all documents to which the Amended Complaint or the Company's SEC filings cite or refer. In ruling on a motion to dismiss, a court may consider "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." *Lydon v. Local 103, Int'l Bhd. of Ele. Workers*, 770 F.3d 48, 53 (1st Cir. 2014) (alteration in original). In addition, courts routinely take judicial notice of statements contained in a defendant's regulatory filings. *See, e.g.*, *Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 57–58 (D. Mass. 2022) (Casper, J.) (considering at motion to dismiss stage excerpts from SEC filings).

Symbotic also receives and recognizes revenue from software maintenance and other services. ¶¶ 44, 48.

The Individual Defendants[3] are Symbotic's current or former executives. Cohen is the Chairman and Chief Executive Officer; Ernst was the Chief Financial Officer; Hibbard was the Chief Financial Officer and Treasurer; and Odisho is the Chief Manufacturing and Supply Chain Officer. ¶¶ 27–30.

## II.    **Symbotic Outsourced System Deployments to Meet Heightened Demand and Cautioned Investors Regarding the Risks the Company Faced**

In 2022, to meet the heightened demand for its systems, Symbotic outsourced its engineering, procurement, and construction ("EPC") function to third-party general contractors. ¶¶ 5–6, 67. EPC is a project delivery method where a contractor manages the entire project from deployment to completion. The Company's executive team was optimistic about this shift and made forward-looking statements about accelerating deployments and anticipated revenue. For example, Symbotic told investors that "as we look forward, we continue to expect that we're going to deliver systems faster," ¶ 147, its general contractors were improving "more and more from deployment to deployment," ¶ 190, and it expected that its revenue would grow, ¶¶ 164, 167, 196, 241, 248. But Symbotic explicitly cautioned investors that its results could be affected by issues with suppliers. *See* Ex. 1 (Dec. 9, 2022 Symbotic Form 10-K) at 22; Ex. 2 at 23–24. Symbotic also cautioned investors that it had limited experience reporting financial data as an early-stage public company. *See* Ex. 1 at 37–38; Ex. 2 at 39. As it continued its operations, Symbotic added more customers, started new system deployments, and completed system deployments every quarter from Q4 2023 to Q1 2025. ¶ 61.[4]

---

[3]    Cohen, Ernst, Hibbard, and Odisho are referred to collectively herein as the Individual Defendants.
[4]    Symbotic also filed Form 10-Qs on February 8, 2024, May 7, 2024, and July 29, 2024, in which it represented that it had effective disclosure controls and procedures and its financial statements were prepared in accordance with

### III.     One Outsourcing Partner Performed Poorly and Symbotic Pivoted Back In-House

As it turned out, the executive team was wrong about one prediction, *i.e.*, that Symbotic could build systems faster with assistance from external EPC contractors.  One of its contractors was Fluor Corporation ("Fluor"), a Fortune 500 enterprise with a global footprint.  ¶ 70.  Unbeknownst to Defendants, Fluor was unable to perform the system deployments as well as Symbotic.  When it became clear that Fluor was not likely to solve its issues through additional experience, Symbotic pivoted to bring that function back in-house, which Symbotic promptly announced to investors.  *See* ¶ 102.  Plaintiffs allege that before Symbotic did so, a fraction (20-25%) of the deployments that Fluor handled suffered cost overruns.  ¶ 97.  Because of new terms in its contracts for projects beginning in 2024, Symbotic could no longer pass on those overruns for newer projects.  ¶ 107.

### IV.     Symbotic Misstates But Then Diligently Corrected Its Financials

On November 18, 2024, Symbotic issued a press release announcing that it was restating its financial results for Q1, Q2, and Q3 of fiscal year 2024 because it had inadvertently recognized revenue in the wrong quarters:

> We have restated our financial statements for the quarters within fiscal year 2024 with respect to our accounting of goods and services received . . . [because] goods and services, primarily relating to specific milestone achievements, were expensed prior to the time that the corresponding milestones were achieved.  This resulted in the acceleration of the recognition of cost of revenue.  Given that we recognize revenue on a percentage of completion basis, this resulted in the acceleration of recognition of revenue.

¶ 116 (emphasis omitted).

---

GAAP.  ¶¶ 176, 178, 204, 206, 232, 234.  Appended to the Form 10-Qs were SOX certifications by which Cohen and Hibbard stated, among other things, that they had effectively designed and evaluated the Company's disclosure controls and procedures and internal control over financial reporting.  ¶¶ 179–81, 207, 235.

On November 27, 2024, Symbotic announced in a press release that it was restating its financial results for all of fiscal year 2024, and that management had identified weaknesses in the Company's internal control over financial reporting. Specifically, Symbotic stated that certain cost overruns (those that affected newer deployments and were therefore not billable to the customer) had been improperly recognized:

> Symbotic identified errors in its revenue recognition related to cost overruns that will not be billable on certain deployments, which additionally impacted system revenue recognized in the second, third, and fourth quarters of fiscal year 2024.

¶ 118 (emphasis omitted). The Company also disclosed that it "identified in its preliminary assessment of internal control over financial reporting for the fiscal year ended September 28, 2024 certain material weaknesses" and announced that it was implementing a remediation plan designed to enhance controls and financial reporting. ¶ 118. In the same press release, Symbotic also revised its fiscal year Q1 2025 Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") forecast, which it later outperformed. ¶ 119; Ex. 6 (Feb. 5, 2025 Symbotic Form 10-Q) at 31. On December 4, 2024, Symbotic filed its Form 10-K for fiscal year 2024 addressing the issues disclosed on November 27, 2024. ¶ 121.[5]

## V.  Symbotic Improves System Deployments in 2025

By 2025, Symbotic "continue[d] to bring more deployment functions in-house and [wa]s building out its team in support of this." Ex. 14 (Feb. 7, 2025 Seeking Alpha Analyst Report) at 3. Indeed, "insourcing of engineering, procurement and construction" went "to plan and has [since] been completed." *Id.* As of Q1 2025, analysts anticipated the number of system starts

---

[5]    Plaintiffs also allege that Symbotic reported an SEC investigation "into the Company's attempts to silence whistleblowers about the multiple restatements." ¶ 120; *see* ¶¶ 123, 262. But, as the Company recently disclosed, the SEC has concluded its investigation and recommended no further action. *See* Ex. 7 (Aug. 27 2025 Symbotic Form 8-K) at 2.

would "ramp in 2025," *id.* at 4, and "expect[ed] systems deployment [to] continue[] to accelerate in FY25," Ex. 13 (Feb. 5, 2025 Raymond James Analyst Report) at 2.

**VI.    This Action**

On July 11, 2025, Plaintiffs filed this Amended Complaint pursuant to the Securities Exchange Act of 1934 challenging Symbotic's public statements between November 20, 2023 and February 5, 2025 (the "Class Period") concerning expected deployment rates, ¶¶ 139, 143, 147, 151, 166–69, 189–92, 198, 211–13, 250; financial statements (including representations that those statements complied with GAAP, ¶¶ 176, 204, 232), ¶¶ 161–62, 174, 185–87, 202, 224–25, 229, 240, 242–44, 245, 250; and forecasts, ¶¶ 164, 241, 248, 196.  Plaintiffs also challenge SOX certifications made by Cohen and Hibbard concerning the effectiveness of the Company's internal control over financial reporting, ¶¶ 179–81, 207, 235.

**LEGAL STANDARD**

On a motion to dismiss, the Court must credit well-pleaded facts but need not accept "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  To state a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must adequately plead: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017).  To state a claim for scheme liability under Section 10(b) and Rule 10b-5(a) and (c), a plaintiff must plausibly allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

A complaint asserting securities fraud must comply with both the heightened pleading standard of Federal Rule of Civil Procedure 9(b) and the stringent requirements of the PSLRA. *See In re Biogen Inc. Sec. Litig.*, 857 F.3d. at 27, 29–30.   Under the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Id*. at 30.   Plaintiffs must also allege "with particularity facts giving rise to a 'strong inference' that defendants acted with a conscious intent 'to deceive or defraud investors . . .' or 'acted with a high degree of recklessness.'"   *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 240 (1st Cir. 2015).   Recklessness "does not include ordinary negligence, but is closer to being a lesser form of intent." *Id*.   "'[C]lear allegations . . . suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so' are often necessary to meet the PSLRA's scienter requirement."   *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 284 (D. Mass. 2022) (quoting *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012)).   Finally, the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## **ARGUMENT**

**I.**    **Plaintiffs Fail to Plead Facts Giving Rise to a Strong Inference of Scienter**

**A.    That Defendants' Financial Statements and SOX Certifications Were Mistaken Does Not Plead a Strong Inference of Scienter**

Simply pointing to the restatement of a company's financial results (fraud by hindsight) does not provide a strong inference of scienter.   *See Ezra Charitable Tr. v. Tyco Int'l, Ltd.*, 466 F.3d 1, 13 (1st Cir. 2006); *Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 185 (D. Mass. 2012) (similar); *see also ACA Fin. Guar. Corp. v. Advest Inc.*, 512 F.3d 46, 62 (1st

Cir. 2008) ("A plaintiff may not plead 'fraud by hindsight'; i.e., a complaint 'may not simply contrast a defendant's past optimism with less favorable actual results.'").[6] Relying on purported GAAP violations is similarly inadequate. *See Day v. Staples, Inc.*, 555 F.3d 42, 57 (1st Cir. 2009); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 147 (D. Mass. 2001).

Rather, in the context of alleged accounting fraud, Plaintiffs must plead specific, contemporaneous allegations of Defendants' knowledge of improper accounting treatment or insufficiency of internal controls. *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 199 (1st Cir. 2005) ("supervisory involvement with the accounting" did not create inference that officers were aware of improper accounting treatment); *Ezra Charitable Tr.*, 466 F.3d at 9 (no scienter where plaintiff did not allege officer "was aware of any impropriety"). Alleging that Defendants were involved with the financial statements, or were aware of the underlying facts themselves, *e.g.*, the deployment issues or cost overruns, is not enough. *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 140 (D. Mass. 2021) (Casper, J.) (citing *Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 162 (D. Mass. 2018), *aff'd*, 928 F.3d 151 (1st Cir. 2019)) (allegation that defendants were "hands-on managers who performed the necessary research and analyses required to make the representations" to market did not establish scienter "absent any further information regarding what [defendants] learned from such monitoring, and whether what [they] learned was at odds" with public statements). Nor do generalized allegations regarding Defendants' awareness of accounting weaknesses establish a strong inference of scienter with respect to SOX certifications. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 289–90 (D.N.J. 2007) (no scienter "unless the complaint asserts facts indicating that, at the time of

---

[6]    Indeed, inferring scienter from a restatement "would create a perverse incentive for management to conceal mistakes, thereby defeating a core purpose of the securities laws." *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 169–70 (D. Mass. 2000).

certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their SOX certification erroneous").

Plaintiffs do not identify any documents, conversations, meetings, admissions, or other specific facts suggesting that at the time of the challenged statements anyone at the Company was aware (or reckless in not knowing) that Symbotic's internal controls were materially weak or that revenue was being recognized improperly.  *See infra* § I.B.2.i; *cf. State Tchr. Ret. Sys. of Ohio v. Charles River Labs. Int'l, Inc.*, 2025 WL 2374498, at *8 (1st Cir. 2025) (company "told its investors that its suppliers were not implicated in the federal proceeding when it knew that its supply was coming from the entities subject to investigation, seizure, and indictment").  Nor do Plaintiffs point to any contemporaneous red flags or obvious errors that Defendants ignored.[7]  *See Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 82–83 (1st Cir. 2016) (affirming dismissal where "complaint fail[ed] to establish that the announced results, on their face, contained such an obvious incongruity" to require further inquiry); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) (plaintiffs did not allege defendants "knew or could have known of the errors," or "facts that illustrate 'red flags' that should have put [d]efendants on notice of the revenue recognition errors").

At most, Plaintiffs allege that Defendants were aware of certain cost overruns, *e.g.*, ¶¶ 299, 312, and of contractual terms that prohibited Symbotic from billing customers for certain overruns, ¶ 327.  *See* ¶ 302 (purported admission that cost overruns were "[n]ot a surprise," but no admission that overruns were improperly recorded) (emphasis omitted).  But again, mere knowledge of these underlying facts is not tantamount to knowledge that the cost overruns were being accounted for

---

[7]     Plaintiffs' reliance on a third-party report discussing purported "red flags" **after** the Company restated the financials and disclosed material weaknesses, *see* ¶¶ 130–36, is not indicative of any contemporaneous knowledge by Defendants or anyone else at the Company of a red flag that was ignored before the disclosures.

improperly. Similarly, conclusory allegations invoking the "tone at the top," ¶ 296, do not evidence that "[d]efendants knew or were reckless about the impact their management style had on the Company's control environment or accounting decisions." *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *16 (D.N.J. Apr. 27, 2017), *aff'd sub nom.*, *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018); *see Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009) ("tone at the top" allegations failed to suggest defendants acted with scienter when they issued financial statements).

With no contemporaneous, specific allegations suggesting conscious misbehavior or recklessness, Plaintiffs' claims reduce to impermissible fraud by hindsight: the financial statements and SOX certifications were false, therefore, Defendants must have known they were false at the time. *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003) ("Without allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance . . . or that they were aware of a GAAP violation and disregarded it, a showing in hindsight that the statements were false does not demonstrate fraudulent intent."); *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 316 (E.D.N.Y. 2025) (similar); *In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 345 (D. Mass. 2020) (similar, "saying that any time a company's financial projection is wrong, the speaker has engaged in securities fraud . . . . is not the law"); *Godinez v. Alere Inc.*, 272 F. Supp. 3d 201, 214 (D. Mass. 2017) (no inference of scienter based on admission of material weakness in internal controls).

## B.     The Confidential Witness Allegations Do Not Support Scienter

The confidential witnesses fail to supply any specific, contemporaneous allegations of scienter. Indeed, none of the confidential witnesses meets the First Circuit's standard for evaluating whether confidential source material is sufficient under the PSLRA: "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including

from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008) (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29–30 (1st Cir. 2002)).  First, all of the confidential witnesses are non-executive employees at least two steps removed in the reporting chain from any Individual Defendant.  Most had little to no interaction with the Individual Defendants.  Second, the confidential witness allegations rely on conclusory assertions without the requisite level of specificity.  No witness claims that any Individual Defendant was on notice of any issues with the financial statements or internal controls. At most, they assert that some Defendants were aware of deployment delays and cost overruns at a small fraction of Symbotic's sites.  Accordingly, these allegations cannot support an inference that any Individual Defendant knew their statements were false at the time they were made.

Plaintiffs attempt to rely on the following five confidential witnesses:

**CW1**: The Amended Complaint describes CW1 as a "Senior Financial Analyst" from September 2023 to February 2025, allegedly responsible for "forecasting, budgeting, and revenue modeling, which included working with . . . Hibbard, on scenario planning and analyzing variances between projected financial results and actual results." ¶ 35.  CW1 was allegedly an indirect report (three levels below) to Hibbard.  ¶ 35.  CW1 does not describe any specific meetings or discussions with Hibbard but makes various allegations about Hibbard's "awareness."  *See* ¶¶ 64, 65, 106, 108–10, 142(f), 146(f); 150(f); 154(f); 172(f); 195(f); 197(f); 199(f); 216(f), 304–07.  Finally, CW1 claims to have participated in quarterly Financial Planning and Analysis Group meetings, which Hibbard supposedly attended, ¶¶ 65, 304, and to have "interacted with Hibbard . . . by way of 'the chain of command,'" ¶ 309.

**CW2**: The Amended Complaint describes CW2 as an "Advanced PLC Integration Specialist" from January 2023 to December 2024.  ¶ 36.  CW2 was allegedly responsible for "commissioning projects, which included ensuring that equipment had been installed and was performing correctly."  ¶ 36.  CW2 claims to have observed Cohen and Odisho visiting deployment sites, ¶ 332, but does not describe any specific meetings or discussions.

**CW3**: The Amended Complaint describes CW3 as a "Strategic Director of Supply Chain" from January 2022 to October 2022 and a "Consultant" from October 2022 to August 2024.  ¶ 37.  CW3 was allegedly responsible for "vendor management and supply chain matters, including coordinating with Symbotic's suppliers."  ¶ 37.  CW3 was allegedly an indirect report (two levels below) to Cohen.  ¶ 37.  CW3 also allegedly participated in virtual weekly and bi-weekly meetings attended by Cohen, during which CW3 was allegedly instructed by unnamed "superiors" that delays should be downplayed to customers.  ¶¶ 96, 310.

**CW4**: The Amended Complaint describes CW4 as a "Warehouse Operations Supervisor and Logistics Specialist" from September 2016 to December 2023.  ¶ 38.  CW4 was responsible for "coordinating the shipping of vendor products directly to Symbotic's project sites and assisting accounts payable with reviewing and approving vendor invoices."  ¶ 38.  CW4 was allegedly an indirect report (three levels below) to Cohen and an indirect report (two levels below) to Odisho, ¶ 38, but does not describe any specific meetings or discussions with Cohen or Odisho.

**CW5**: The Amended Complaint describes CW5 as an "Advanced System Reliability Test Engineer" from January 2023 to January 2024.  ¶ 39.  "CW5 was responsible for testing and evaluating systems that had been installed by general contractors," which "required CW5 to visit approximately ten different deployment sites."  ¶ 39.  CW5 allegedly "spoke with" Cohen at a site visit on one occasion, ¶¶ 89, 331, but provides no specifics as to the discussion, even its subject.

1.    The Confidential Witnesses Lack the Requisite Reliability

The confidential witnesses do not have a clear basis of knowledge to report reliably on the Individual Defendants' state of mind.  *Biogen IDEC Inc.*, 537 F.3d at 51.  None was a direct report to any Individual Defendant; all were multiple steps removed, and CW2, CW3, and CW4 never spoke to any of the Individual Defendants.[8]  This is clearly insufficient.  *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d at 142 (confidential witnesses who did not report to or have any interaction with upper management could not adequately plead scienter); *Abiomed, Inc.*, 778 F.3d at 245 (no scienter where confidential witnesses did not hold "senior management positions" and "appear to have had relatively little ongoing contact with senior management"); *Godinez*, 272 F. Supp. 3d at 218 (similar); *Biogen*, 857 F.3d at 43 (similar).  While CW3 participated in "virtual weekly and bi-weekly meetings" allegedly attended by Cohen, ¶¶ 96, 310, he or she does not report anything said by (or to) Cohen, and CW5 "spoke with" Cohen once at a site visit but does not say what was discussed, ¶¶ 89, 331.[9]  Similarly, CW1 claims to have participated in meetings that Hibbard allegedly attended, ¶¶ 65, 304, but does not describe any specific meetings or discussions with Hibbard.  These witnesses simply cannot speak to the Individual Defendants' state of mind. *Cabletron*, 311 F.3d at 30 (analyzing whether "the sources have a strong basis of knowledge for [each of] the claims they make").

---

[8]    *See* ¶¶ 35, 309 (CW1 indirect report, three levels below, to Hibbard), 36 (CW2 not in reporting line to any Individual Defendant), 37 (CW3 indirect report, two levels below, to Cohen), 38 (CW4 indirect report, three levels below, to Cohen and indirect report, two levels below, to Odisho), 39 (CW5 not in reporting line to any Individual Defendant).

[9]    Relatedly, to the extent any of the confidential witness allegations are corroborative of each other, ¶¶ 72, 82, 87–88, 90, 142(d), 146(d), 150(d), 154(d), 172(d), 195(d), 197(d), 199(d), 216(d) (all alleging confidential witnesses "corroborated" the accounts of other confidential witnesses), that cannot alone support an inference of scienter, particularly where the facts that are corroborated (*e.g.*, vendor errors and project delays) do not relate to any defendant's mental state.  *See Metzler*, 305 F. Supp. 3d at 214 ("The confidential-witness allegations, although multiple and generally corroborative, are insufficient to support a strong inference of scienter.").

2.    <u>The Confidential Witness Allegations Lack Specificity</u>

Moreover, the "level of detail provided by the[se] confidential sources" is insufficient under the PSLRA.  *Cabletron*, 311 F.3d at 29–30.

i.    *Financial Statements and Internal Controls (CW1)*

Of the five confidential witnesses, only one (CW1) makes allegations with respect to the Individual Defendants' knowledge regarding the Company's financial statements or internal controls.  CW1 alleges Hibbard "was told of" or "received information about" the financial impact of Symbotic's project delays (and cost overruns).  *See* ¶¶ 65, 304, 305.  These vague allegations do not come close to pleading that Hibbard ***knew*** that the Company's financial statements were false when made or that the Company lacked adequate internal controls.  *See In re Pharms., Inc. Sec. Litig.*, 2007 WL 951695, at *12 n.14 (D. Mass. Mar. 28, 2007) (allegation that confidential source "informed management" regarding flawed pricing structure could not alone establish that management itself knew pricing structure to be flawed); *see also In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d at 143 (mere access to reports and information insufficient for scienter).

Relatedly, the Amended Complaint alleges that the falsity of the Individual Defendants' SOX certifications regarding the Company's internal control over financial reporting is evidenced by Hibbard's knowledge (per CW1) that "customer contracts in 2024 did not allow Symbotic to bill customers for cost overruns."  ¶¶ 184(d), 209(d), 237(c).  But any such knowledge does not connect to her knowledge of internal controls, much less their insufficiency.  *Godinez*, 272 F. Supp. 3d at 214 ("[C]onfidential witnesses quoted in the complaint suggested that there were issues with internal controls, [but not that] the company or the individual defendants were or should have been aware of the revenue recognition issues."); *cf. Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d

228, 246–48 (S.D.N.Y. 2012) (scienter where confidential witness was "senior-level audit executive" and directly informed defendants about deficiencies in internal control).

Further, CW1's allegations regarding Hibbard's approval of Symbotic's quarterly financial forecasts, ¶¶ 64, 106, 306, and approval of greater than $1 million purchase requests, ¶¶ 100, 111, 324, similarly do not show that she had knowledge that contradicted the Company's financial statements or forecasts. "[C]laims of knowledge through access to information," are "'tantamount to the 'scienter by status' theory, which has been 'uniformly rejected.'" *Premca Extra Income Fund LP v. iRobot Corp.*, 763 F. Supp. 3d 121, 159 (D. Mass. 2025); *see In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d at 288 ("That they . . . had access to the company sales dashboard, without more, does not establish that these [d]efendants intentionally lied to investors."); *Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 255 (D. Mass. 2001) (similar). At best, these allegations show Hibbard's knowledge of the underlying facts, not of any impropriety. *See Godinez*, 272 F. Supp. 3d at 214 ("[N]o confidential witnesses allege[] that senior management knew prior to disclosure that revenue was being ***improperly*** recognized, *i.e.*[,] by [prematurely] recognizing the revenue in the improper quarters[.]") (emphasis added).

ii.    *Deployment (CW1, CW2, CW3, CW4, CW5)*

As an initial matter, Plaintiffs contend that only "20-25% of Symbotic's projects suffered from cost overruns because of [Fluor's project] delays" that the confidential witnesses describe in ¶¶ 74–96, which means that Plaintiffs allege that most projects did not suffer from the types of serious delays on which Plaintiffs focus. ¶ 97. The Individual Defendants' supposed knowledge of a small number of cost overruns caused by project delays does not equate to knowledge of any larger problem (which Plaintiffs have not alleged existed) that could have rendered misleading their statements about accelerating deployments generally. *Compare* ¶ 97 (suggesting 75-80% of

deployments did not suffer delays that affected cost overruns) *with* ¶¶ 139, 143, 147, 151, 166–69, 189–92, 212–13, 250 (all statements about deployments generally); *see, e.g.*, *Capri Optics Profit Sharing v. Digital Equip. Corp.*, 950 F.2d 5, 10 (1st Cir. 1991) (statement that "[b]usiness overall is firm" not rendered misleading by "some small matters . . . going less well"); *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 568–69 (E.D. Pa. 2009) (positive statements about overall drug study results not rendered misleading by poor results for particular patient subgroup).

In any event, CW2, CW3, CW4, and CW5's statements regarding deployment issues at a few sites focus on the delays themselves, not any Individual Defendant's knowledge thereof. ¶¶ 57–58, 74–88, 90–95, 101, 323; *see Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 267, 271 (D. Mass. 2020) (finding confidential witness allegations were "both conclusory and too vague" and included "no specific facts capable of demonstrating that [d]efendants knew the information that [plaintiff] alleges contradicted their public statements"). In addition, most of the confidential witnesses' allegations regarding some deployments are not specific in time and many others involve events that took place before the start of the Class Period in November 2023. *See, e.g.*, ¶¶ 74 (allegations concerning events in 2022), 75 (same), 78 (same), 93 (same); *Biogen*, 857 F.3d at 43 (where statements from confidential witnesses do not "go specifically to what the defendants knew at the time they made [the allegedly misleading] statements," they are insufficient to establish scienter); *see also Hensley v. Imprivata, Inc.*, 260 F. Supp. 3d 101, 122 (D. Mass. 2017) (confidential witness's allegations "of minimal value" in part because they "concern[ed] a time well outside the class period").

Even the most specific scienter allegations by CW2, CW3, CW4, and CW5 regarding knowledge of alleged deployment delays at a fraction of Symbotic's sites are still too vague to satisfy the PSLRA. The fact that CW2 and CW5 observed Cohen and Odisho visiting deployment

sites, ¶¶ 89, 331–32, does not demonstrate that either Defendant knew Symbotic was not accelerating deployments overall.  And CW3's conclusory allegation that "it was 'always known' internally at Symbotic that there were delays in meeting project milestones," ¶ 90, does not demonstrate any Individual Defendant's knowledge of delays, let alone the falsity of statements relating to project status.  *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 681–82 (9th Cir. 2005) ("The allegation that [something] was 'common knowledge' . . . does not comport with the PSLRA[.]").  CW3's allegation that he was "instructed by superiors" at meetings attended by Cohen that "customers should only be told that parts were going to be delivered on time or at most there would be a small delay," ¶ 310, does not contradict any challenged statement.  Finally, in this regard, CW1's claims that Hibbard had access to information regarding, or was told of, deployment delays, *see* ¶¶ 65, 109–10, 142(f), 146(f), 150(f), 154(f), 172(f), 195(f), 197(f), 199(f), 216(f), 324, does not adequately plead her scienter with respect to her statements about deployment generally—for the reasons explained above.  *See supra* § I.A.; *Carney*, 135 F. Supp. 2d at 255 (D. Mass. 2001).

### C.    The Single Day of Stock Sales by One of Four Individual Defendants Does Not Support a Finding of Scienter

Plaintiffs do not allege that Individual Defendants Hibbard, Ernst, or Odisho sold stock during the Class Period, and the Court therefore cannot draw a strong inference on the part of Symbotic and these defendants based on any trading activity.  *See Quinones v. Frequency Therapeutics, Inc.*, 665 F. Supp. 3d 156, 174, 175–76 (D. Mass. 2023), *aff'd*, 106 F.4th 177 (1st Cir. 2024) (no scienter where CEO was only executive alleged to have sold stock during class period).  With regard to Cohen's trading, his sales, which occurred on February 26, 2024, are not suspicious or unusual in timing or amount.  *See* ¶ 350.  Plaintiffs allege that Cohen and his wife sold a total of 5,000,000 shares of Class A common stock as part of a previously announced

Primary and Secondary Offering.  ¶¶ 349–50.  Far from being the "colossal sale" alleged by Plaintiffs, ¶ 352, these sales amounted to only 1.36% of the Cohens' total holdings of Class A common stock in Symbotic at that time.  *See* Ex. 4 (Feb. 21, 2024 Form 424B5) at S-7.  This is not close to sufficient to support a claim.  *Quinones*, 106 F.4th at 183 (sale of 15% of shares not "enough to allow for the strong inference of scienter"); *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 615–16 (1st Cir. 2017) (inference of scienter "marginal" when insiders "kept the vast majority of their [] holdings"); *Angelos v. Tokai Pharms., Inc.*, 494 F. Supp. 3d 39, 59 (D. Mass. 2020) (allegations that insiders sold around 2% and 6% of holdings did not support strong inference of scienter).  The proceeds generated from the sale, ¶ 350, are not indicative of scienter.  *See Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 188 (D. Mass. 2020) ("[R]eliance on proceeds from insider trading is insufficient to establish a strong inference of scienter.").  The offering was also early in the Class Period, before many of the alleged misstatements and challenged conduct, and not close in time to any alleged corrective disclosure.  Indeed, the Amended Complaint alleges at least an additional 30 purported misstatements after Cohen's stock sales on February 26, 2024.  *See* ¶¶ 185–250.  This too undercuts any inference of scienter.  *See Quinones*, 665 F. Supp. 3d at 177 (sales were not suspicious where most occurred before alleged misstatements because had defendant "sought fraudulently to profit on his sales, he would presumably have waited to make the bulk of his sales after those dates, when the price of [the company's] stock peaked").

### D.    Plaintiffs' Other Scattershot Scienter Allegations Cannot Save Their Claims

Plaintiffs' additional allegations do not bolster their claim of scienter.  Plaintiffs speculate that Defendants were motivated to "hit forecasts and avoid reporting a dramatic drop in EBITDA." ¶ 348.  But this is a generic motive that all corporate officials share and cannot support an inference of scienter.  *See Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 60 (1st Cir. 2018) (requiring "something more than the ever-present desire to improve results") (quoting *Corban v. Sarepta*

*Therapeutics, Inc.*, 868 F.3d 31, 41 (1st Cir. 2017)); *Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444, 468 (D. Mass. 2016) ("[T]he same incentives to increase a company's earnings and stock price exist for almost every executive at every company.").  Plaintiffs must allege a concrete personal benefit to establish motive, which is absent here.  *See Premca*, 763 F. Supp. 3d at 161 (motive was "generalized" and "insufficient" where plaintiff failed to allege "special benefit to the [d]efendants"); *cf. Cabletron*, 311 F.3d at 39 (motive alleged where "the executives' careers and the very survival of the company were on the line").[10]

Plaintiffs' "core operations" theory, *see* ¶¶ 340–44, misses the mark.  The core operations theory assumes "facts critical to a business's core operations . . . are so apparent that their knowledge may be attributed to the company and its officers." *bluebird bio, Inc.*, 599 F. Supp. 3d at 66 (quoting *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004)).  "Courts, however, 'have been hesitant to apply significant weight to 'core operations' allegations without other significant evidence of a defendant's intent or recklessness, or a 'plus factor.''" *Id.* (quoting *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 51 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017)); *see also Premca*, 763 F. Supp. 3d at 59 (noting First Circuit "has not defined the contours of [the core operations' doctrine]").  No such particularized allegations exist here.  And in any event, as explained above, knowledge of the underlying facts regarding deployments and cost overruns does not equate to knowledge that any statement was false when made.  *See supra* § I; *Paice v. Aldeyra Therapeutics, Inc.*, 2025 WL 815065, at *10 (D. Mass. Mar. 14, 2025) (Casper, J.) (core operations doctrine did not apply because allegations did "not show that [d]efendants knew they were not complying with FDA Guidance").

---

[10]    For this reason, "CW3's account that incomplete robots were usually shipped within a couple of weeks before the end of a quarter" is irrelevant.  ¶ 347.  Even if Defendants were generally motivated to hit quarterly projections, this would not establish scienter.

Similarly, Plaintiffs' allegations regarding Defendants' purported visibility into deployment times, ¶¶ 300–01, 313–22, general duty to keep customers updated on the status of deployments, ¶¶ 328–29, or signature on major customer agreements, ¶ 327, are just status allegations that provide no specific facts about the Individual Defendants' state of mind with respect to the alleged misstatements. *Premca*, 763 F. Supp. 3d at 159 (reliance on executives' "high level of access" to information and merger agreement cooperation provision was "dressed-up 'must have known' claim" "tantamount to the 'scienter by status' theory, which has been 'uniformly rejected' and which cannot sustain a showing of scienter").

The SEC investigation, ¶¶ 337–38, also adds nothing to the analysis. *See Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("[T]he government investigations cannot bolster allegations of scienter that do not exist . . . the government investigations are just that, investigations."); *see also Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015) ("The 'mere existence of an SEC investigation' likewise does not equip a reviewing court to explain which inferences might be available[.]"). Even if it were relevant, the fact that the SEC has now declined to recommend an enforcement action cuts against any fraudulent intent that could be inferred from the investigation. *See* Ex. 7 at 2; *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248–49 (8th Cir. 2008) ("that the SEC investigation uncovered no evidence of fraud" supported innocent inference that there was none).

### E.    Defendants' Disclosures Weaken Any Inference of Intent to Mislead

Plaintiffs' own allegations refer to language where Defendants explain that they "don't expect that we'll see accelerations every quarter" and disclose that the Company faces "challenges" from both its "own capabilities" and "customer issues." ¶ 147. Defendants warned about "straggler deployments," noting that some projects "might take a little bit longer . . . because each deployment is not the same size or complexity." ¶ 192. *See also* Ex. 8 (Nov. 20, 2023

Earnings Call) at 4 (Ernst explaining "system deployment starts were down slightly from last quarter"); Ex. 9 (Feb. 5, 2024 Earnings Call) at 2 (Cohen explaining "we can't currently deploy all systems this quickly"); *id.* at 11 (Hibbard stating the Company could not deploy every system in 20 months and some projects "will take additional time to go ahead and deploy").  Defendants also disclosed information regarding the Company's financial controls.  *See* Ex. 1 at 39 (cautioning investors regarding limited experience with "the accounting policies, practices or internal control over financial reporting" as early-stage public company).  These negate any inference of fraudulent intent.  *See Mehta v. Ocular Therapeutix, Inc*, 955 F.3d 194, 208 (1st Cir. 2020) (informative disclosures "undercut any inference that defendants intentionally or recklessly misled investors"); *Kader*, 887 F.3d at 58 ("[P]roviding warnings to investors, or otherwise disclosing potential risks, erodes inferences of scienter."); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.,* 632 F.3d 751, 759–60 (1st Cir. 2011) (similar).

In sum, Plaintiffs fail to include any proper and particularized allegation regarding Defendants' state of mind and, even considered holistically, the allegations fail to support a strong inference of scienter.

## II.    Many of the Challenged Statements Are Not Actionable or Misleading

### A.    Plaintiffs Challenge Statements Protected by the PSLRA Safe Harbor

Under the PSLRA, statements identified as forward-looking and accompanied by adequate cautionary language fall within the safe harbor, 15 U.S.C. § 78u-5(c)(1)(A)(i), as do other forward-looking statements unless they were made by an individual "with actual knowledge . . . that [they were] false or misleading" or made by a business entity with the approval of an executive officer "with actual knowledge . . . that [they were] false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i), (ii).  Moreover, the safe harbor is disjunctive, meaning that if a forward-looking statement is

identified as such and accompanied by sufficient cautions, the statement is not actionable regardless of knowledge of falsity. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 201 (1st Cir. 1999). Forward-looking statements include "a statement of the plans and objectives of management for future operations," "a statement of future economic performance," and "any statement of the assumptions underlying or relating to any [such] statement." 15 U.S.C. § 78u-5(i)(1)(B)–(D). Statements are forward-looking if their "accuracy can only be verified after they are made." *In re Vivendi Universal, S.A. Sec. Litig*., 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016).

### 1. Many of the Challenged Statements are Forward-Looking

Defendants' statements regarding the Company's expected improvement to deployment schedules and strategies are forward looking. *See, e.g.*, ¶¶ 139 (expecting "even faster deployments"), 147 ("as we look forward, we continue to expect that we're going to deliver systems faster").[11] *See, e.g.*, *Wasson v. LogMeIn, Inc.*, 496 F. Supp. 3d 612, 635 (D. Mass. 2020) (statement that business area "will accelerate" and "[w]e expect it will grow faster"); *Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 40 (D. Mass. 2009) ("[s]tatements that the [Company] remained 'on track' or 'on schedule'").

Defendants' statements regarding the Company's projected revenue and "profitability" are also forward looking. *See, e.g.*, ¶¶ 164 (forecasted revenue), 196 (same), 241 (same), 248 (same), 167 (projected second quarter margins reflect that "we continue to be on a trajectory to improve, and you're going to see that start to improve in the second half of the year and year-over-

---

[11]    *See also* ¶¶ 151 (expecting "the systems that we're rolling out now . . . to be under 22 months"), 167 (anticipated "flexibility to . . . accelerate deployment schedules"), 168 ("outsourcing partners" "improving on each" deployment and company "standardizing [build instructions and test procedures] more and more from deployment to deployment"), 190 ("We expect quarterly system starts to accelerate during the rest of the year."), 192 ("So, going forward, . . . we're still on target for the future to have a number of opportunities that we see driving deployment time less than 12 months").

year"). *See* 15 U.S.C. § 78u-5(i)(1)(A) (defining forward-looking statements to include "a statement containing a projection of revenues"); *Perini Corp.*, 665 F. Supp. 2d at 40 (statements concerning company's "anticipated revenue" and "profit or earnings per share"); *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 116 (D. Mass. 2003) ("[s]tatements about 'improved margins'").

Moreover, the earnings calls and press releases in which these statements were made all included prefatory language that forward-looking statements were being made.[12]

> 2. The Forward-Looking Statements Were All Accompanied by Meaningful Cautionary Language

The earnings calls and press releases also incorporated the risk factors appearing in Symbotic's annual reports.[13]  Those risk factors warned investors of contingencies that could cause the actual results to differ from Symbotic's expectations with respect to delayed deployments.  *See* Ex. 1 at 22 ("We rely on suppliers to provide equipment, components and services.  Any disruption to the suppliers' operations could adversely affect our business, financial condition and results of operations."); Ex. 2 at 23 (same).  The annual reports' risk factors also included the same cautions regarding the Company's forecasted revenue.  *See* Ex. 1 at 39 (cautioning investors regarding limited experience with "the accounting policies, practices or internal control over financial reporting" as early-stage public company); Ex. 2 at 40 (same).

---

[12]    Ex. 8 at 2 ("[D]iscussion today will include forward-looking statements"); Ex. 3 (Feb. 5, 2024 Press Release) at 2 ("This press release contains forward-looking statements"); Ex. 9 at 2 ("[D]iscussion today will include forward-looking statements"); Ex. 10 (May 6, 2024 Earnings Call) at 2 ("[S]tatements we make today . . . may be considered forward-looking"); Ex. 5 (May 6, 2024 Press Release) at 2 ("[P]ress release contains forward-looking statements"); Ex. 12 (Nov. 18, 2024 Earnings Call) at 2 ("[S]tatements we make today . . . may be considered forward-looking").
[13]    Ex. 8 at 2 (referring investors to "Symbotic's financial release and regulatory filings with the SEC") (emphasis omitted); Ex. 3 at 4 (referring investors to "Symbotic's Annual Report on Form 10-K"); Ex. 9 at 2 (referring investors to "Symbotic's financial release and regulatory filings with the SEC"); Ex. 10 at 2 (referring investors to "our Forms 10-K and 10-Q"); Ex. 5 at 4 (referring investors to Symbotic's Annual Report on Form 10-K . . . Quarterly Report on Form 10-Q"); Ex. 12 at 2 (referring investors to "our Form 10-K").

The earnings calls and press releases also included additional cautions regarding deployments and forecasted revenue.[14]  *See Hackel v. AVEO Pharms., Inc.*, 474 F. Supp. 3d 468, 478–80 (D. Mass. 2020) (referring to written documents containing cautionary language sufficient to trigger safe harbor for oral statements).  Symbotic specifically mentioned the risks of a "supplier[']s operations . . . adversely affect[ing] [Symbotic's] business" and that the company "do[es]n't expect . . . accelerations every quarter," and it disclosed "personnel[']s . . . limited knowledge" regarding both "accounting practices" and "internal control over financial reporting." *See supra* § I.E.  This was far more than enough; the "cautionary statement does not necessarily have to include the particular factor that ultimately causes the forward-looking statement not to come true." *Perini Corp.*, 665 F. Supp. 2d at 39 (internal quotation marks omitted).  Plaintiffs' contention that Symbotic needed to go even further and specifically discuss problems with Fluor is wrong.  Plaintiffs also allege that the safe harbor does not apply because the Company had no internal controls or adequate forecasting mechanisms.  ¶ 380.  But the applicability of the safe harbor by its terms depends only on the language of the challenged statement and the cautions

---

[14]    *See, e.g.*, Ex. 8 at 4, 7 (containing alleged misstatements regarding deployment and cautioning "[w]e don't expect that we'll see accelerations every quarter.  In fact, we anticipate some quarters, you can see challenges and these can come not just from our own capabilities" and "system deployment starts were down slightly from last quarter"); Ex. 3 at 3, 4 (containing alleged misstatements regarding revenue forecast and cautioning that risks included "meet[ing] the technical requirements of existing or future supply agreements with its customers, including with respect to existing backlog," "execut[ing] [Symbotic's] growth strategy," "timely and effectively remediat[ing] any material weaknesses in [Symbotic's] internal control over financial reporting," and "[t]he assumptions and estimates underlying the projected results are inherently uncertain and are subject to a wide variety of significant business, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projections"); Ex. 9 at 2, 9, 11 (containing alleged misstatements regarding revenue forecast and deployment and cautioning "we can't currently deploy all systems this quickly" and "if you had one project . . . complete a month late or even a week here and there" it "driv[es] the variation in the revenue" and "[w]e have some systems that we're implementing, which will be significantly larger, and those will take additional time to go ahead and deploy.  But overall, the average, we're looking to continue to reduce that time of deployment"); Ex. 10 at 5, 7 (containing alleged misstatements regarding revenue forecast and deployment and explaining "the single biggest driver" of revenue is when following deployments, "systems . . . went operational" and that company "will likely not see the same level [of systems brought online] that [analysts] saw this quarter," and cautioning that "we do have some straggler deployments"); Ex. 5 at 3, 4 (containing alleged misstatement regarding revenue forecast and disclosing same risks as February 5, 2024 press release); Ex. 12 at 5 (containing alleged misstatements regarding revenue forecast and cautioning about "elongated construction delays").

given, not whether the statement itself had a sufficient factual basis.  Plaintiffs conflate the standard for opinions with the standard for forward-looking statements.  *See In re Analogic Corp. S'holder Litig.*, 2019 WL 4804800, at *9 (D. Mass. Sept. 30, 2019) (opinion can be actionable if based on false facts).

3.    The Forward-Looking Statements are Protected by the Safe Harbor
Because They Were Made Without Actual Knowledge of Falsity

The forward-looking statements are independently shielded under the safe harbor because Plaintiffs fail to allege that Defendants had "actual knowledge" they were false or misleading when made.  15 U.S.C. §§ 78u-5(c)(1)(B)(i), (ii).  The Amended Complaint contains no allegations showing any Defendant's actual knowledge that any forward-looking statement was false.  *See supra* § I.  Indeed, Plaintiffs have not even pled recklessness, which, in any event, would not be enough.  *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 310–11 (D. Mass. 2006) ("[U]nder the safe harbor provisions, 'recklessness' is not sufficient to establish liability for forward-looking statements.").

**B.    Plaintiffs Fail to Allege that Defendants' Statements Regarding Deployments Were False or Misleading**

As explained above, Plaintiffs concede most projects did not suffer from the types of serious delays on which Plaintiffs focus.  *See supra* § I.B.2.ii; ¶ 97.  The small fraction of sites with purported cost overruns caused by project delays does not render misleading Symbotic's statements about accelerating deployments generally (*e.g.*, company accelerating deployment times overall, ¶¶ 139, 147, 151, 167, 168, 190, 192, 213, 250).  *See supra* § I.B.2.ii; *Capri Optics Profit Sharing*, 950 F.2d at 10.  Similarly, delays and cost overruns at a small portion of Symbotic's sites did not make misleading statements regarding specific deployments (*e.g.*, regarding "the system we recently deployed" or "proof points where [Symbotic's deployment life cycle was]

- 26 -

down to 20 months," ¶¶ 166, 211).  Plaintiffs do not plead any facts that suggest these narrow statements about specific sites were false or misleading.

### C.    Opinions and Expressions of Corporate Optimism Are Not Actionable

Several challenged statements are inactionable expressions of corporate optimism or puffery.  *E.g.*, ¶¶ 143 (Symbotic "continue[s] to see significant opportunities and gain efficiencies over time" and is "executing well" and "ramping up so well"),[15] 168 ("We've also got increased collaboration from our entire deployment team . . . . And we've really seen an increase in that collaboration."), 192 ("We've got increased collaboration across ourselves and our customer."), 198 (touting "effective cost management and solid project execution").  Courts routinely hold that expressions of "loose optimism about both a company's current state of affairs and its future prospects" are not actionable as a matter of law because they do not offer "details on which a reasonable investor would rely."  *Wasson*, 496 F. Supp. 3d at 632–33 (quoting *Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 23, 26 (D. Mass. 2000)); *see, e.g.*, *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (statements that "business strategies [would] lead to continued prosperity," "consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable"); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *24 (D.N.J. Aug. 8, 2018) ("terms like . . . 'efficiency' are general and therefore inactionable" puffery).

---

[15]    Separately, the Amended Complaint asserts that Ernst's statements at ¶ 143 regarding revenue growth were false and misleading because "Symbotic's revenue growth was driven by improperly recording revenue from cost overruns and accelerating revenue recognition." ¶ 144.  This is illogical.  Ernst made this statement at the fiscal year 2023 earnings call and was discussing revenue for the fourth quarter of fiscal year 2023.  ¶ 143.  Defendants did not disclose, nor do Plaintiffs allege, that the mistakes regarding revenue recognition impacted any fiscal year 2023 financial results.

Plaintiffs' challenges to Defendants' expressions of opinion regarding deployment fare no better.[16]  To start, courts routinely find similar statements are opinions.  *See, e.g.*, *Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 364 (S.D.N.Y. 2019) ("grow[ing] at a significant pace" was inactionable opinion); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015) (statements expressing "expectations for the future" were opinions and not "presently existing, objective facts").

Therefore, to survive a motion to dismiss, Plaintiffs must allege that Defendants did not subjectively believe the opinion, that self-embedded facts within the opinion were untrue, or that material facts related to Defendants' inquiry into or knowledge concerning the opinion were omitted.  *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184–89 (2015); *In re Analogic Corp. S'holder Litig.*, 2019 WL 4804800, at *9.  Plaintiffs do not point to any facts suggesting Defendants did not genuinely believe their opinions that deployments would accelerate.  *See supra* § I; *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 490 (S.D.N.Y. 2004) ("[I]n a false statement of opinion case, [falsity and scienter] are essentially identical.").  Nor do Plaintiffs allege that Defendants omitted material facts about the speaker's inquiry into or knowledge concerning these opinions.  *See infra* § II.D.

Finally, Plaintiffs do not plead that Defendants' honestly held beliefs—that deployments were generally accelerating—were objectively false, that is, that they rested on false facts.  As explained above, the fact that only "20-25% of Symbotic's projects suffered from cost overruns

---

[16]    ¶¶ 139 (Company believes it will "continue to accelerate" deployments and have "even faster deployments"), 147 (Company believes deployments are "getting faster" and "expect[s] that we're going to deliver systems faster"), 151 (Company believes "the systems that we're rolling out now . . . to be under 22 months"), 167 (Company believes it will have "flexibility to . . . accelerate deployment schedules"), 168 (Company believes "outsourcing partners" are "improving on each" deployment and that Company is "standardizing [build instructions and test procedures] more and more from deployment to deployment"), 169 (Company believes "we can go faster, we can go a lot faster"), 190 (Company "expect[s] quarterly system starts to accelerate during the rest of the year"), 192 (Company believes "we're still on target for the future to have a number of opportunities that we see driving deployment time less than 12 months").

because of [Fluor's project] delays" described in ¶¶ 74–96 does not render misleading Defendants' statements regarding deployments generally.  ¶ 97; *see supra* § II.B.

### D.    Plaintiffs Have Not Alleged a Duty to Disclose or Correct

Plaintiffs contend that Defendants had a purported "duty to correct and/or disclose" information regarding the performance of the outsourcing partners, and that their failure to do so made their statements at the fiscal year 2023 earnings call, Q1 2024 earnings call, Q2 2024 earnings call, and the May 9, 2024 investor day presentation materially misleading.  ¶¶ 141, 145, 149, 153, 171, 194, 215.  Plaintiffs also allege that during the Q2 2024 earnings call and at the May 9, 2024 investor day presentation, Defendants had a "duty to correct and/or disclose" that Symbotic was "already hiring to bring EPC back in-house." ¶¶ 194, 214–15.  Neither theory passes scrutiny.

"[S]ection 10(b) and Rule 10b-5 'do not create an affirmative duty to disclose any and all material information.'"  *Zhou v. Desktop Metal, Inc.*, 120 F.4th 278, 292 (1st Cir. 2024).  "An omission, even if material, is actionable only if it 'renders affirmative statements made misleading.'"  *Id.* (citation omitted).  Accordingly, "revealing one fact" about a topic does not require a company to "reveal all others that . . . would be interesting, market-wise." *Backman v. Polaroid, Corp.*, 910 F.2d 10, 16 (1st Cir. 1990).

The relevant statements discuss generalized efforts to improve Symbotic's deployment times.[17]  Defendants neither said nor implied anything about the performance of Fluor with respect

---

[17]     ¶¶ 139 ("[W]e have hardened our supply chain to position Symbotic for even faster deployments."); *id.* (goal in 2024 to achieve "rapid growth as we continue to accelerate our time to deploy systems"), 143 ("[A]cceleration of system installations saw a marked improvement."), 147 ("We've seen very healthy improvement in our ability to deliver across the spectrum of our build phase and installation phase of our deployments, meaningful improvements in our speed to do so."), *id.* ("[W]e are getting faster."), 151 ("[W]e expect to be under 22 months.  So what we're seeing progress in is we're carving days out and occasional innovations or carving weeks out") 166–167 (discussing reductions in system deployment time), 169 ("[W]e can go faster."), 191 ("[W]e accelerated the pace of innovation significantly during the quarter."), 192 (discussing future opportunities that may drive deployment times down); 211

to specific projects, nor did Fluor's alleged performance on a minority of projects otherwise render the statements misleading. Similarly, Plaintiffs have not explained how bringing the EPC function, which was "just one element" of deployments, Ex. 11 (July 29, 2024 Earnings Call) at 4, back in-house made statements about improved deployment times misleading.[18] *See Corban*, 868 F.3d at 40 (failure to "mention specific factors (many of them intricate and technical)" regarding FDA's position on company's data was not actionable omission where company provided FDA's overall position); *Eden Alpha CI LLP*, 763 F. Supp. 3d at 303–04 (conclusory allegations that defendants were "duty-bound" to disclose alleged improper business practices, without explaining why, failed to state omission claim); *Paice*, 2025 WL 815065, at *12 (plaintiff failed to plead why favorable data was misleading in light of alleged omissions). This is particularly so given that, at the time Defendants made the cited statements, they also explained to investors that there was a learning curve with the outsourcing partners.[19] At the same time, Defendants also provided information to the market about delays. *See, e.g.*, ¶ 192 (describing "straggler deployments"); Ex. 8 at 4 ("[S]ystem deployment starts were down slightly from last quarter."); Ex. 9 at 2 (Symbotic could not "deploy all systems" as quickly as 20 months); *id.* at 11 (certain projects "will take additional time to go ahead and deploy"). While additional information on Fluor's performance may have been interesting to investors, in context, its omission did not mislead.

A duty to correct may arise if the speaker learns that a prior statement was misleading when made because of specific, later-discovered errors. *See Backman*, 910 F.2d at 16–17; *In re*

---

(referring to "proof points" where cycle was down to 20 months), 212 ("how we're engineering greater efficiency, faster deployment times").

[18]    Moreover, Cohen explained on the July 29, 2024 earnings call that, with respect to any EPC hires, they had recently "finally got in place." Ex. 11 at 6. It would have been premature to disclose these hirings any earlier.

[19]    *See* ¶ 192 ("[W]e're seeing the benefit of continuous learning over multiple deployments from our supply chain, as well as our own folks."); Ex. 8 at 4 (Symbotic "continue[s] to see significant opportunities and gain efficiencies over time"); Ex. 10 at 8 (outsourcing partners and company were "going through our learning curve, and we continue to learn at every single site installation as do our suppliers").

*Burlington Coat Factory Sec. Litig*, 114 F.3d 1410, 1431 (3d Cir. 1997) (duty to correct applies "when a company makes a *historical statement* that, at the time made, the company believed to be true, but as revealed by *subsequently discovered* information actually was not").  Here, Plaintiffs do not allege a duty to correct any particular ***prior*** statement, but simply allege that certain statements were misleading when made due to omissions.  *See, e.g.*, ¶ 140 (alleging that Defendants' statements at the fiscal year 2023 earnings call were materially false and misleading *when made* based on performance of Symbotic's primary outsourcing partner).  The "duty to correct" is not properly invoked and needs no further analysis.[20]

### III.    <u>Plaintiffs Fail to Plead Any Fraudulent Scheme</u>

Plaintiffs' scheme claim under Rule 10b-5(a) and (c) is duplicative of their misstatement claim and fails to satisfy basic pleading requirements.  To state a claim for scheme liability, Plaintiffs must "satisfy Rule 9(b)'s pleading requirements by 'specify[ing] what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and what effect the scheme had on investors in the securities at issue.'"  *Levy v. Gutierrez*, 2017 WL 2191592, at *22 (D.N.H. May 4, 2017).  Scheme liability claims are "based on deceptive conduct rather than deceptive statements" and cannot be derivative of misstatement or omission claims.  *See Berlik v. Baker*, No. 21-CV-11723-AK, slip op. at 11–13 (D. Mass. Sept. 30, 2022) (rejecting attempt to recharacterize disclosure claims as scheme claims).

Here, Plaintiffs include passing references to a purported "scheme" throughout the Amended Complaint.  ¶¶ 298, 353, 391, 392, 400, 402, 404.  But these conclusory allegations are "not afforded the Court's deference at the pleadings stage."  *Berlik*, slip op. at 11.  Plaintiffs also purport to identify deceptive conduct, namely that the Individual Defendants: (i) accelerated

---

[20]    Plaintiffs fail to plead that Odisho made any false or misleading statements.  Count I must be dismissed as to him.

recognition of costs to increase revenue and/or improperly recorded revenue from cost overruns that customers were not obligated to pay; (ii) sent incomplete robots to project sites near the end of the quarter to accelerate and increase recognized project costs; and (iii) concealed that they had begun hiring for the EPC function to bring it back in-house due to Fluor's performance six months before Defendants disclosed the project delays and cost overruns.  ¶ 402.  This, too, fails.

First, a close read shows that Plaintiffs have done nothing more than take their omissions allegations and then characterized the omitted conduct as a "scheme."  *Compare* ¶ 402 ("secretly accelerating recognition of costs to increase revenue and/or improperly recording revenue from cost overruns that customers were not contractually obligated nor willing to pay") *with* ¶¶ 184, 209, 237 (alleging "Defendants' improper recognition of revenue from cost acceleration and cost overruns" evidenced purported falsity of Defendants' statements) *and* ¶¶ 187–93 (alleging statements made at Q2 2024 earnings call were materially false and misleading because "Defendants were prematurely and improperly boking revenue"); *compare* ¶ 402 ("sending incomplete robots to project sites one or two days prior to quarter end to accelerate and increase recognized project costs") *with* ¶ 142 (alleging falsity of Defendants' statements was supported by fact that "incomplete robots were being shipped to project sites") *and* ¶¶ 150, 154, 172, 195, 197, 199, 216 (similar); *compare* ¶ 402 ("Defendants also secretly concealed that they had begun hiring for the EPC function to bring it back in-house[.]") *with* ¶ 194 (alleging omission "that Defendants were already hiring to bring EPC back in-house" rendered Defendants' statements materially misleading) *and* ¶¶ 142, 146, 154, 172 (similar).

Indeed, Plaintiffs elsewhere expressly conflate the two claims.  *See* ¶¶ 391 (alleging Defendants engaged in a scheme pursuant to which they knowingly "made various untrue statements of material facts and omitted to state material facts"), 392 (similar), 400 ("In furtherance

of this unlawful scheme, plan and course of conduct, Defendants made false statements[.]").
Because these allegations are "indistinguishable from the misstatements and omissions alleged,"
they cannot support the separate claim under Rule 10b-5(a) and (c).  *In re Mindbody, Inc. Sec.
Litig.*, 489 F. Supp. 3d 188, 216–17 (S.D.N.Y. 2020); *see also In re Teva Sec. Litig.*, 512 F. Supp.
3d 321, 336 (D. Conn. 2021) (rejecting scheme claims that were "plainly misstatements and
omissions cases"); *Berlik*, slip op. at 10 (plaintiffs could not plead scheme claim that arose out of
defendants' fraudulent material omissions).

Second, the Amended Complaint does not plead reliance.  A court may presume reliance
for purposes of scheme liability only where "there is an omission of a material fact by one with a
duty to disclose" or "the investing public had knowledge . . . of respondents' deceptive acts during
the relevant time."  *Levy*, 2017 WL 2191592, at *26 (quoting *Stoneridge Inv. Partners, LLC v.
Scientific-Atlanta*, 552 U.S. 148, 159 (2008)).  For the reasons discussed *supra*, Defendants did
not have a duty to disclose the conduct alleged to be part of the purported scheme.  *See supra*
§ II.D.   Further, Plaintiffs repeatedly allege the "scheme" was secret.   *See, e.g.*, ¶¶ 7
("***Unbeknownst to investors***, Symbotic secretly tried to compensate for these problems by
shipping incomplete robots to customer sites[.]") (emphasis added), 402 (alleging Defendants
"secretly" accelerated recognition of costs and "secretly concealed" return of EPC function in-
house).  Thus, Plaintiffs cannot rely on the second prong of the *Stoneridge* test.  *See Stoneridge*,
552 U.S. at 159 (no reliance where "[n]o member of the investing public had knowledge, either
actual or presumed, of respondents' deceptive acts during the relevant times"); *In re Peregrine
Sys., Inc. Sec. Litig.*, 310 F. App'x 149, 151 (9th Cir. 2009) (no presumption of reliance when press
releases "did not communicate the . . . allegedly deceptive acts"); *Abbate v. Wells Fargo Bank,*

*N.A.*, 2011 WL 9698215, at *5 (C.D. Cal. Nov. 17, 2011) ("No act by either [d]efendant was made public, such that no investor could have relied on their allegedly improper conduct.").

Third, Plaintiffs' scheme claim is not pleaded with the particularity required by Rule 9(b). Plaintiffs must allege "that each Individual Defendant committed a deceptive act in furtherance of an alleged scheme." *See Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *23 (D. Ariz. Feb. 2, 2023). The Amended Complaint is silent as to each Individual Defendant's role in the purported "scheme" and instead relies on boilerplate allegations referring to Defendants collectively. *See, e.g.*, ¶¶ 400, 401. This is fatal to any scheme claim. *See Borteanu*, 2023 WL 1472852, at *23–26; *Public Pension Fund Group v. KV Pharm. Co.*, 679 F.3d 972, 986 (8th Cir. 2012) (affirming dismissal of scheme claim because plaintiffs did "not allege what specific manipulative acts either [individual defendant] performed, or when the manipulative acts were performed"); *In re Royal Dutch/Shell Transport*, 2006 WL 2355402, at *9 (D.N.J. Aug. 14, 2006) (similar).

Finally, the Amended Complaint does not allege that Defendants engaged in the purportedly deceptive conduct with the requisite intent to deceive Plaintiffs. *See supra* § I.

## IV.    Plaintiffs Fail to Plead Loss Causation Regarding the SEC Investigation

Plaintiffs allege the "SEC investigation was a materialization of the risk" of Defendants' alleged "accounting improprieties," ¶ 370, and that "[u]pon the news, Symbotic's stock price fell" on February 5, 2025. ¶ 371. But this theory fails because the existence of an SEC investigation does not suffice to plead loss causation. *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (holding disclosure of investigation "simply puts investors on notice of a *potential* future disclosure of fraudulent conduct" and therefore any associated stock drop "can only be attributed to market speculation about whether fraud has occurred"); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) (SEC investigation "can be seen to portend an added *risk* of future corrective

action" but was not corrective disclosure for purposes of loss causation).  And, in any event, the SEC investigation was closed without further action, meaning the "potential future disclosure of fraudulent conduct" never materialized.  *Loos*, 762 F.3d at 890; *see supra* § I.D.

## V.    Plaintiffs' Section 20(a) Claim Fails For Lack of a Predicate

Given Plaintiffs' failure to state a claim under Counts I and II, the Court should dismiss Count III.  *See Metzler*, 928 F.3d at 158 n.3 (affirming dismissal of Section 20(a) claim based on deficiencies in Section 10(b) claims).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint in its entirety with prejudice.

Dated: September 11, 2025                   Respectfully submitted,


                                            */s/ Michael G. Bongiorno*
                                            Michael G. Bongiorno (BBO # 558748)
                                            Andrew S. Dulberg (BBO # 675405)
                                            Elizabeth E. Driscoll (BBO # 705302)
                                            Margaux Malasky (BBO # 705494)
                                            WILMER CUTLER PICKERING
                                                 HALE AND DORR LLP
                                            60 State Street
                                            Boston, MA 02109
                                            Tel: (617) 526-6000
                                            Fax: (617) 526-5000
                                            michael.bongiorno@wilmerhale.com
                                            andrew.dulberg@wilmerhale.com
                                            elizabeth.driscoll@wilmerhale.com
                                            margaux.malasky@wilmerhale.com

                                            *Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I, Michael G. Bongiorno, certify that on the 11th day of September, 2025, the foregoing was electronically filed using the Court's electronic filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno (BBO # 558748)
