# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEFFREY ADAM TRAINA, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>v.<br><br>SYMBOTIC INC., RICHARD B. COHEN, THOMAS C. ERNST, CAROL J. HIBBARD, and WALTER ODISHO,<br><br>                    Defendants. | No. 1:24-cv-12976-DJC<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Leave to File Granted on August 12, 2025 [Dkt. 30] |

# REPLY IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE AMENDED COMPLAINT

# <u>TABLE OF CONTENTS</u>

I. Plaintiffs Do Not Allege A Compelling Inference Of Scienter ...........................................1

 A. Plaintiffs Do Not Allege That Any Defendant Knew Revenues Were Improperly Booked or the Company's Internal Controls Were Deficient..............1

 B. Defendants' Purported Admissions Do Not Support an Inference of Scienter .......3

 C. The Confidential Witness Allegations Do Not Support Scienter ...........................6

 D. Plaintiffs' Additional Allegations Cannot Bolster an Inference of Scienter...........8

II. Certain Statements Were Not False Or Misleading.........................................................10

 A. Expected Deployment Timelines and Forecasts Are Protected by PSLRA Safe Harbor ....................................................................................................10

 B. Deployment Statements Were Not False or Misleading.......................................11

 C. Several Deployment Statements Are Inactionable Opinion or Puffery.................11

 D. Defendants Did Not Have a Duty to Disclose or Correct Prior Statements .........12

III. Plaintiffs Fail To Allege A Scheme Claim .....................................................................13

IV. Plaintiffs Should Not Be Granted Leave To Amend The Complaint ...............................15

CONCLUSION.................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Backman v. Polaroid Corp.*,
  910 F.2d 10 (1st Cir. 1990)................................................................12

*Berlik v. Baker*,
  No. 21-CV-11723-AK, slip op. (D. Mass. Sept. 30, 2022) ....................13

*Blue v. Doral Fin. Corp.*,
  123 F. Supp. 3d 236 (D.P.R. 2015)....................................................2, 7

*Brennan v. Zafgen, Inc.*,
  853 F.3d 606 (1st Cir. 2017)..............................................................9

*Chalverus v. Pegasystems, Inc.*,
  59 F. Supp. 2d 226 (D. Mass. 1999) ................................................2, 9

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. Cerence Inc.*,
  2024 WL 1258149 (D. Mass. Mar. 25, 2024)......................................7

*Collier v. ModusLink Glob. Sols., Inc.*,
  9 F. Supp. 3d 61 (D. Mass. 2014) ..................................................2, 3, 6

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004) ..................................................2, 8

*Dahhan v. OvaScience, Inc.*,
  321 F. Supp. 3d 247 (D. Mass. 2018) ................................................8

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..............................................................11

*Ezra Charitable Tr. v. Tyco Int'l, Ltd.*,
  466 F.3d 1 (1st Cir. 2006)................................................................3

*Fitzer v. Sec. Dynamics Techs., Inc.*,
  119 F. Supp. 2d 12 (D. Mass. 2000) ..................................................12

*Gelfer v. Pegasystems, Inc.*,
  96 F. Supp. 2d 10 (D. Mass. 2000) ..................................................3

*Godinez v. Alere Inc.*,
  272 F. Supp. 3d 201 (D. Mass. 2017) ................................................7

*In re Bos. Tech., Inc., Sec. Litig.*,
　　8 F. Supp. 2d 43 (D. Mass. 1998) ........................................................................12

*In re Cabletron Sys., Inc.*,
　　311 F.3d 11 (1st Cir. 2002) ...................................................................................7

*In re Gen. Motors Co. Sec. Litig.*,
　　773 F. Supp. 3d 429 (E.D. Mich. 2025) .................................................................5

*In re iRobot Corp. Sec. Litig.*,
　　527 F. Supp. 3d 124 (D. Mass. 2021) ....................................................................5

*In re Mindbody, Inc. Sec. Litig.*,
　　489 F. Supp. 3d 188 (S.D.N.Y. 2020) ..................................................................14

*In re Pharms., Inc. Sec. Litig.*,
　　2007 WL 951695 (D. Mass. Mar. 28, 2007) ..........................................................6

*In re Plug Power, Inc. Sec. Litig.*,
　　2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022) ........................................................8

*In re Raytheon Sec. Litig.*,
　　157 F. Supp. 2d 131 (D. Mass. 2001) ....................................................................3

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
　　604 F. Supp. 2d 332 (D. Mass. 2009) .................................................................5, 6

*In re Sonus Networks, Inc. Sec. Litig.*,
　　2006 WL 1308165 (D. Mass. May 10, 2006) .........................................................2

*In re Suprema Specialties, Inc. Sec. Litig.*,
　　438 F.3d 256 (3d Cir. 2006) ..................................................................................9

*Isham v. Perini Corp.*,
　　665 F. Supp. 2d 28 (D. Mass. 2009) .................................................................10, 11

*Kader v. Sarepta Therapeutics, Inc.*,
　　887 F.3d 48 (1st Cir. 2018) ...................................................................................9

*Kinney v. Metro Glob. Media, Inc.*,
　　170 F. Supp. 2d 173 (D.R.I. 2001) ........................................................................3

*Leavitt v. Alnylam Pharms., Inc.*,
　　451 F. Supp. 3d 176 (D. Mass. 2020) ....................................................................9

*Leung v. bluebird bio, Inc.*,
　　599 F. Supp. 3d 49 (D. Mass. 2022) ......................................................................4

*Lorenzo v. SEC*,
    587 U.S. 71 (2019)..................................................................................................14

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..................................................................................................12

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008).......................................................................................8

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ..................................................................................5

*N.Y.C. Emps.' Ret. Sys. v. Berry*,
    616 F. Supp. 2d 987 (N.D. Cal. 2009) ....................................................................15

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019).........................................................................5

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010)....................................................................................15

*Pizzuto v. Homology Meds., Inc.*,
    2024 WL 1436025 (D. Mass. Mar. 31, 2024)...........................................................4

*Premca Extra Income Fund LP v. iRobot Corp.*,
    763 F. Supp. 3d 121 (D. Mass. 2025) .......................................................................8

*Quinones v. Frequency Therapeutics, Inc.*,
    106 F.4th 177 (1st Cir. 2024)....................................................................................9

*Rosen v. Textron, Inc.*,
    321 F. Supp. 2d 308 (D.R.I. 2004)............................................................................3

*SEC v. Durgarian*,
    477 F. Supp. 2d 342 (D. Mass. 2007) .....................................................................14

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011).....................................................................14

*SEC v. Papa*,
    555 F.3d 31 (1st Cir. 2009).....................................................................................14

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) ......................................................................................14

*SEC v. Wilcox*,
    663 F. Supp. 3d 146 (D. Mass. 2023) ...............................................................13, 14

*Shih v. Amylyx Pharms., Inc.*,
    2025 WL 2807756 (D. Mass. Sept. 30, 2025) ........................................................................12

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013) ..........................................................................................................15

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) ......................................................................................................................15

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
    28 F. Supp. 3d 93 (D. Mass. 2014) ...........................................................................................2, 3, 6

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ..........................................................................................5

The Opposition underscores the fatal problems with the Amended Complaint:  Among other dispositive flaws, Plaintiffs have not pled a strong inference of scienter.  Plaintiffs overstate their confidential witness allegations, rely improperly on hindsight, draw unwarranted inferences from ordinary stock trading, and cite a plethora of easily distinguishable cases.  Plaintiffs also fail to refute that many of the challenged statements are inactionable because they are forward-looking, opinions, or puffery.  And the Opposition reinforces the fundamental defects with Plaintiffs' "scheme" claim.  The Amended Complaint should be dismissed.

## I.    Plaintiffs Do Not Allege A Compelling Inference Of Scienter

Plaintiffs' scienter allegations fail both individually and "holistically."

### A.    Plaintiffs Do Not Allege That Any Defendant Knew Revenues Were Improperly Booked or the Company's Internal Controls Were Deficient

Plaintiffs still have not identified a single particularized allegation that any Defendant knew or should have known that the figures reported in the Company's financial results were incorrect at the time they were issued.  Nor have Plaintiffs alleged that any Defendant was aware of or ignored red flags regarding problems with the Company's internal controls.

In particular, Plaintiffs cite no allegations suggesting Cohen, Odisho, or Ernst was exposed to any adverse information concerning issues with the Company's financials, GAAP compliance, or internal controls.  As to Hibbard, Plaintiffs now claim that she "was aware Symbotic booked revenue for uncollectible cost overruns from her review of quarterly reports at meetings with CW1."  Opp. at 27 (citing Opp. § IV(A)(2)).  But the Amended Complaint does not support that argument:  Plaintiffs alleged that Hibbard's responsibilities included reviewing and approving the Company's financial forecasts, that the revenue line included cost overruns, and that Hibbard was purportedly aware that new contractual terms in 2024 eliminated Symbotic's ability to bill customers for cost overruns for certain unspecified "newer projects."  *See* ¶¶ 107, 306–307.

Plaintiffs concede, however, that some cost overruns for previous contracts could still be passed on. *See* ¶ 107. So even Hibbard's alleged knowledge that the revenue line included unspecified cost overruns does not support a strong inference that she was aware that any cost overruns were improperly included, much less that they materially overstated revenues. Unlike here, in Plaintiffs' cited authorities, there were specific allegations of defendants' knowledge of accounting mistakes. *See, e.g.*, *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 111 (D. Mass. 2014) ("[N]ot only did [CEO] know that the [] revenue was inappropriately accounted up front, but he actually decided to do so."); *Blue v. Doral Fin. Corp.*, 123 F. Supp. 3d 236, 270 (D.P.R. 2015) (individual defendant was informed of improper appraisals, but instructed that no changes be made); *see also Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 72 (D. Mass. 2014) (Casper, J.) (confidential witness "identified accounting inconsistencies and was consequently dismissed from her position").

Plaintiffs also fail to build an inference of scienter from the restatements. *See* Opp. at 26–28. As Plaintiffs concede, *see* Opp. at 27, and as their own authorities make clear, these allegations are insufficient on their own and can only serve to bolster "stronger allegations" of scienter, which are lacking here. *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 20 (D. Mass. 2004) (lack of internal controls or mismanagement "does not constitute scienter" without other allegations of intent or motive); *see Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 233 (D. Mass. 1999) ("A defendant's failure to recognize revenue in accordance with GAAP does not, by itself, suffice to establish scienter."); *In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165, at *19 (D. Mass. May 10, 2006) ("'magnitude, duration and pervasiveness' of the accounting irregularities" could not alone support strong inference of scienter).

To be sure, there are cases where the facts are compelling and do suggest scienter. *See*

*Collier*, 9 F. Supp. 3d at 65–66 ("wide ranging" restatement for over four fiscal years that reduced net income by 97% percent); *Washtenaw*, 28 F. Supp. 3d at 113 (restatement still not complete year after it was announced); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001) ("divergence" between losses recognized on internal documents and information made available to public); *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 16 (D. Mass. 2000) ("inference of recklessness" where three restatements occurred after improper accounting was brought to light by resignation of auditor, including two "long after Defendants should have remedied their improper accounting methods").[1]

In contrast, all Plaintiffs claim here is that Symbotic issued two restatements to remedy errors that the Company identified when preparing its year-end financials.  ¶¶ 238, 252.  No inference of scienter arises from these circumstances.  *See Ezra Charitable Tr. v. Tyco Int'l, Ltd.*, 466 F.3d 1, 7 (1st Cir. 2006) (no scienter despite close proximity between restatements).

### B.    Defendants' Purported Admissions Do Not Support an Inference of Scienter

Plaintiffs' selective quotation of Defendants' statements during and after the Class Period does not plausibly allege admissions that Defendants knowingly or recklessly misled investors.

*First*, Cohen's statement regarding the EPC function was not an admission that he was aware of deployment delays and cost overruns since the start of the Class Period.  Opp. at 21.  In context, the statement suggests only that the Company was hiring people in the "EPC space" during the Class Period and it was not until those people were in place that they told the Company that it should perform aspects of the EPC function itself.  *See* Dkt. 34-11 (July 29, 2024 Earnings Call)

---

[1] *See also Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 324 (D.R.I. 2004) (defendants "had detailed knowledge" of "need to adjust [company's] profit estimates to conform to GAAP . . . , but purposely delayed making the adjustment"); *Kinney v. Metro Glob. Media, Inc.*, 170 F. Supp. 2d 173, 177 (D.R.I. 2001) (SEC informed defendant of accounting errors, defendant ignored "this red-flag" and continued improperly to report revenue that later required restatement for three years).

at 6 (new EPC hires "actually the ones that are saying we should do this ourselves").[2]  Cohen was clear in that same earnings call that the Company "did not anticipate this."  *Id.*

*Second*, that Hibbard viewed delays that "developed really late in the [third] quarter" as "[n]ot a surprise," Dkt. 34-11 at 6, does not demonstrate her overall awareness of "deployment delays and cost overruns since the start of the Class Period," Opp. at 21.  It is one thing to be "not surprised," it is quite another to **know** all along that something would happen.  In any event, Hibbard's statement says nothing that undermines her prior statements regarding expectations for **average** deployment times.[3]  The same flaw applies to Plaintiffs' spin on Hibbard's statement that the Company was still averaging 24-month deployment times because Plaintiffs point to no statement during the Class Period in which Symbotic asserted that the average deployment time was *less* than 24-months.[4]  Hibbard's use of the word "still" in February 2025 does not "confirm[]" that Defendants had monitored average deployment times "throughout the Class Period."  Opp. at 22.  It reflects only that by the time she spoke, she knew the relevant history.

*Third*, to establish scienter from Defendants' "monitoring," Plaintiffs must show both "what information [Defendants] learned from their daily monitoring," Opp. at 22, and how "what

---

[2]   The Court may consider all of the exhibits that Defendants submitted in support of the Motion to Dismiss.  As an initial matter, Plaintiffs are incorrect that Exhibit 14 is not incorporated by reference—Plaintiffs cited the analyst report in ¶ 373 of the Amended Complaint.  *See* Opp. at 32, n.16; Dkt. 34 at 2; ¶ 373.  Plaintiffs are also incorrect that the Court cannot take judicial notice of Exhibits 1 and 7, both of which are SEC filings that are unquestionably relevant to Plaintiffs' allegations.  *See* Opp. at 32, n.16.  SEC filings are judicially noticeable even when they are not incorporated by reference.  *See Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 57–58 (D. Mass. 2022) (judicial notice of SEC filings as official public records); *cf. Pizzuto v. Homology Meds., Inc.*, 2024 WL 1436025, at *2 (D. Mass. Mar. 31, 2024) (courts may decline to consider SEC filings from outside class period if they are irrelevant).
[3]   In context, the statement is obviously not an admission that the Company was previously aware of all issues surrounding construction costs and delays because Hibbard goes on to explain that in the final elements of the installation "we perhaps weren't getting the visibility we need."  Dkt. 34-11 at 6.
[4]   Plaintiffs try to sidestep this fatal flaw by citing to a statement made not by Defendants but by an analyst in the February 6, 2024 Cantor Fitzgerald report.  *See* Opp. at 11.  Plaintiffs also omit key language from that report explaining that the approximate 20-month average was limited to "[**n**]**ew system** deployments" and did not reflect the average for all of Symbotic's deployments.  ¶ 173 (emphasis added).  Similarly, the alleged statements regarding 22-months, *e.g.*, ¶ 151, referred to the Company's "**expect[ations]**" for "the systems that we're rolling out now" and did not represent anything with respect to average deployment times. (emphasis added).

[they] learned was at odds with" the Company's disclosures about deployments, *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 140 (D. Mass. 2021) (Casper, J.).  But none of the statements to which Plaintiffs point suggests that any Individual Defendants *personally* monitored anything.  Dkt. 34-11 at 8; ¶¶ 300–301, 325; *In re Gen. Motors Co. Sec. Litig.*, 773 F. Supp. 3d 429, 451 (E.D. Mich. 2025) (no scienter where "[n]othing shows that [individual defendant] personally monitored [company's] data . . . [b]ecause the Court would have to engage in speculation").  Moreover, Plaintiffs point to no concession regarding monitoring average deployment times as opposed to deployment times for specific sites.  *See* Opp. at 14, 21 (citing ¶ 300); Dkt. 34-11 at 8 ("we try and do a six-month and a 12-month outlook" with specific customers about "start[ing] deployment at a particular site").  Plaintiffs also point to no allegations explaining how or to what extent any specific delay, cost overrun, or lost inventory affected the calculation of average deployment times for the Company overall.  Indeed, those averages included corresponding improvements at other sites, which Plaintiffs concede occurred here.  *See* Opp. at 14 (acknowledging "examples of faster deployments").  Thus, Plaintiffs have not plausibly alleged that the information Defendants purportedly learned from their "monitoring" contradicted the Company's statements regarding expected average deployment times.  *See* Opp. at 14.  Plaintiffs' cases do not apply.  *See, e.g.*, *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 884 (N.D. Cal. 2023) (defendants aware of customer demand data that contradicted statements regarding demand); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 338 (D. Mass. 2009) (similar); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (defendant aware of rising channel inventory levels, which contradicted statements regarding "flat" channel inventory levels); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("three top executives said that they monitored portions of"

database that contradicted revenue recognition statements).

###### C.    The Confidential Witness Allegations Do Not Support Scienter

Plaintiffs' CW allegations—including that Defendants attended meetings, received reports, and visited sites—are similarly insufficient to establish scienter.  Although CWs need not "directly report to a defendant" to "'have a basis of knowledge to report on the inner workings' of a company," Opp. at 9, they must have sufficient interaction with a defendant to have a basis of knowledge to report on the state of mind of that defendant.  MTD at 14 (citing cases).  Plaintiffs' cases are all inapplicable here.  *Collier*, 9 F. Supp. 3d at 70–71 (some CWs had "high-ranking positions," one CW "reported directly" to an individual defendant, and five CWs "interacted with" at least one individual defendant); *Washtenaw*, 28 F. Supp. 3d at 111 (CW "attended weekly meetings" with CEO and reported it was his decision how to recognize revenue); *Smith & Wesson*, 604 F. Supp. 2d at 344 (twelve CWs "had interactions with the executives at sales meetings and other situations where . . . it was clear that the executives knew [of the subject matter of the fraud]").

CW1 and CW3 claim to have attended meetings involving Cohen and Hibbard, but neither describes any specific statements by or discussions with them.  ¶¶ 65, 96, 304, 310.  Similarly, CW5 notes a single conversation with Cohen during a site visit yet provides no details about what was discussed, much less how it shows scienter as to any challenged statement.  ¶¶ 89, 331.

Plaintiffs now argue that "CWs 1 and 3 had direct interactions with defendants on the subjects of the fraud."  Opp. at 25 n.10.  But Plaintiffs' allegations do not support their argument. CW 1 allegedly provided Hibbard with reports of the Company's forecasts.  But Hibbard being generally aware of "project delays and cost overruns" "impacting Symbotic's business and financial results," Opp. at 23, is not the same as knowing that the Company's financial statements inaccurately reflected those delays and overruns.  *See supra* § I.A; MTD at 15; *In re Pharms., Inc.*

*Sec. Litig.*, 2007 WL 951695, at *12 n.14 (D. Mass. Mar. 28, 2007) (more than allegation that confidential source "informed management" regarding flawed pricing structure "would be needed to support an allegation that 'management' itself knew the structure to be flawed, as opposed to knowing simply that someone else . . . thought that to be the case"); *see also Godinez v. Alere Inc.*, 272 F. Supp. 3d 201, 212, 214 (D. Mass. 2017) (financials restated but confidential witnesses stated only that "there were issues with internal controls, . . . [not that] the company or the individual defendants were or should have been aware of the revenue recognition issues").

CW3 allegedly participated in virtual weekly and bi-weekly meetings attended by Cohen, during which CW3 was allegedly instructed by unnamed "superiors" that delays should be downplayed to customers. Opp. at 5, 24. But tellingly, CW3 does not report anything said by or to Cohen. In contrast, the cases that Plaintiffs cite involve specific information received by defendants. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (defendants allegedly received "regular information about [a product's] problems" that contradicted statements "about the rollout of the product"); *Doral Fin. Corp.*, 123 F. Supp. 3d at 270 (confidential witness alleged incorrect data "brought to [individual defendant's] attention" and individual defendant "instructed that the data should not be touched"); *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. Cerence Inc.*, 2024 WL 1258149, at *3–4 (D. Mass. Mar. 25, 2024) (confidential witness alleged individual defendants "personally instruct[ed]" personnel to increase prepayment deals "[d]espite knowing" that prepayment deals hurt future revenue). In any event, instructions on how to deal with **customers** at best show a general awareness of delays for those customers' sites but not enough specific knowledge to render any challenged statement false.

Plaintiffs also now claim that Cohen and Odisho "were briefed on project status and witnessed the ongoing installation issues described by CW2 and CW5," Opp. at 5, but the

Amended Complaint only alleges that CW2 and CW5 observed Cohen and Odisho visiting deployment sites.  ¶¶ 89, 331–332.  In any case, Plaintiffs' new spin still lacks any particulars about deployment delays that could show knowledge that any particular statement was false.  MTD at 16–18.  Finally, contrary to Plaintiffs' assertion, the "CW allegations" are not "corroborated by [any] defendant's [purported] admissions."  Opp. at 24; *see supra* § I.B.

### D.    Plaintiffs' Additional Allegations Cannot Bolster an Inference of Scienter

*First*, as to core operations, Plaintiffs concede that they must plead more than the notion that accelerating deployments was important to Defendants, *see* Opp. at 29, but Plaintiffs' purported "plethora of supporting allegations" all fail to show knowledge of any misstatement for the reasons discussed *supra*.  Plaintiffs' cases rely on other "plus factor" allegations of scienter that are absent here.  *See Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 256 (D. Mass. 2018) (defendants "changed their reporting practices in order to conceal poor sales figures" and offered "false excuse" for failure to reach stated goals); *Crowell*, 343 F. Supp. 2d at 19 ("email indicating that the fraudulent sales practice was company-wide, ordered by [a company] Vice President").

*Second*, Plaintiffs offer no plausible inference of motive.  *See Premca Extra Income Fund LP v. iRobot Corp.*, 763 F. Supp. 3d 121, 161 (D. Mass. 2025) (financial motive insufficient without "special financial benefit to the Defendants").  Cohen's stock sales add nothing.  For one thing, the other three Individual Defendants did not sell at all.  *See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 56 (1st Cir. 2008).  For another, Cohen's sales were a trivial percentage of his holdings, and were weeks—not days—after Symbotic announced quarterly results.  *See* MTD at 19; ¶ 161 (Company announced quarterly fiscal results for Q1 2024 on February 5, 2024); ¶ 352 (sale occurred on February 26, 2024).  It is simply not "reasonable to infer that Cohen had a 'powerful incentive' to commit securities fraud."  Opp. at 30; *see In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *14 (S.D.N.Y. Sept. 29, 2022) (sales less than two

weeks after announcement and six weeks before corrective disclosure did not support scienter).[5]

With respect to Hibbard, Odisho, and Ernst, Plaintiffs can offer only the vague, generic motive that but for the alleged fraud Symbotic would have missed its Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") and revenue quarterly forecasts. Opp. at 30–31. But the First Circuit is clear that such motives shared by all executives at every company cannot establish scienter, absent extraordinary circumstances not present here. *See, e.g.*, *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 60 (1st Cir. 2018); *cf. Chalverus*, 59 F. Supp. 2d at 236 (plaintiff alleged generic financial motive to have profitable quarter, but court considered only personal motive of executives to commit fraud). And Plaintiffs' reliance on CW1 and CW3's reports that the Company shipped incomplete robots near quarters' end and "booked cost overruns as revenue while knowing they were not collectible,"[6] Opp. at 31, does nothing to explain what personal benefit Defendants sought to gain.

*Third*, Plaintiffs claim that Defendants' answers to analysts' questions "could only be known through their review of internal data." Opp. at 26. This is classic impermissible "scienter-by-status" based on Defendants' senior positions and roles. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) ("[G]eneralized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."). In any event, the argument proves too much, as everyone who speaks with authority would be deemed to have scienter.

---

[5] Plaintiffs try to distinguish *Alnylam Pharms., Inc.* by arguing that Cohen's sale totaled more than the combined $66 million netted in that case. Opp. at 30 n.13. But the sales in *Alnylam* represented a far greater percentage of the defendants' holdings. *See Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 188 (D. Mass. 2020) (defendants sold 22% and 47% of holdings during class period). Plaintiffs' arguments also ignore that Cohen retained vast holdings in the Company and suffered huge losses in the value of his shares along with the public shareholders when the stock declined. *See* MTD at 19, Dkt. 34-4 (Feb. 21, 2024 Form 424B5) at S-7; *Quinones v. Frequency Therapeutics, Inc.*, 106 F.4th 177, 183 (1st Cir. 2024) ("When a defendant keeps the 'vast majority' of their holdings, the 'strength of the insider trading allegations drifts toward the marginal end.'" (quoting *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 615–16 (1st Cir. 2017))).
[6] This claim appears nowhere in the Amended Complaint. *See supra* § I.A.

*Fourth*, Plaintiffs contend that the cost overruns were substantial and that the large EBITDA overstatement demonstrates Defendants' scienter.  Opp. at 14, 25.  But the magnitude of a restatement alone does not indicate scienter.  *See supra* § I.A.

*Finally*, Plaintiffs concede that the SEC investigation alone cannot support an inference of scienter and, for the reasons explained *supra*, Plaintiffs' "other indicia of scienter" all fail.  Opp. at 31.  Moreover, given Plaintiffs' own attempt to rely on the SEC investigation, ¶¶ 337–339, it is inconsistent for them now to claim that the SEC's announcement that it would close that investigation without an enforcement action has no relevance to the Court's scienter analysis.

## II.    Certain Statements Were Not False Or Misleading

### A.    Expected Deployment Timelines and Forecasts Are Protected by PSLRA Safe Harbor

Plaintiffs concede Defendants' statements regarding financial forecasts are forward-looking.  Opp. at 18.  And, despite Plaintiffs' protests, Defendants' statements regarding expected deployment times were also forward-looking, and many literally referred to events forward in time.  *See, e.g.*, ¶¶ 147 ("**as we look forward**, we continue to expect that we're going to deliver systems faster") (emphasis added), 190 ("**We expect** quarterly system starts to accelerate during **the rest of the year**.") (emphasis added), 192 ("So, **going forward**, . . . we're still on target **for the future** to have a number of opportunities that we see driving deployment time less than 12 months.") (emphasis added).  Plaintiffs have no answer to *Wasson* or *Isham*, which held that similar statements were forward-looking.  *See* MTD at 23; Opp. at 18 n.6.

Further, Symbotic's cautionary language was sufficient.  *See* MTD at 24–26.  Defendants would have needed a crystal ball to see the specific risks that Plaintiffs would require them to disclose.  *See* Opp. at 19.  Indeed, that is exactly why the "cautionary statement does not necessarily have 'to include the particular factor that ultimately causes the forward-looking

statement not to come true.'"  *Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 39 (D. Mass. 2009).

Finally, the Amended Complaint contains no allegations showing any Defendant's actual knowledge that any forward-looking statement was false, *see supra* § I, and Plaintiffs' boilerplate, single sentence in their Opposition does not overcome this deficiency, *see* Opp. at 18.

### B.    Deployment Statements Were Not False or Misleading

Plaintiffs concede that they are challenging Defendants' statements regarding expectations for average deployment times rather than statements regarding deployment times for specific sites. Opp. at 14.  This admission reinforces the fact that what Defendants allegedly knew—that a minority of sites ("20-25%") suffered cost overruns caused by delays—does not show Defendants were aware of any broader issue with the Company's average deployment times, which necessarily included the "examples of faster deployments" that Plaintiffs concede existed.  Opp. at 14; MTD at 16–17.  Plaintiffs now claim to have alleged that "Flour was 'constantly' causing delays."  Opp. at 14 (citing ¶ 74).  But the Amended Complaint instead alleges only that Fluor "lost inventory and system components constantly," not how that affected average deployment times.  ¶ 74.

### C.    Several Deployment Statements Are Inactionable Opinion or Puffery

Plaintiffs contend that Defendants' puffery and opinions are actionable because they omitted material facts.  *See* Opp. at 15–16.  They claim that a statement is not puffery where "it directly addresses a known, undisclosed problem central to the [C]ompany's business."  Opp. at 16.  This is wrong:  puffery depends not upon the importance of the subject matter, but on the language used.  *See, e.g.*, *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197, 206 (2d Cir. 2009) (inactionable puffery where statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance").  And Defendants' loose optimism regarding "efficiencies," "increased collaboration," and "effective" methods are the exact type of statements the securities laws are

designed to protect because they do not offer concrete facts on which a reasonable investor would rely. *Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 23, 26 (D. Mass. 2000); MTD at 27 (citing ¶¶ 143, 168, 192). Moreover, Plaintiffs do not sufficiently identify any omitted facts or context undercutting Defendants' opinions concerning deployments. *See* MTD at 28.

### D.    Defendants Did Not Have a Duty to Disclose or Correct Prior Statements

Plaintiffs' arguments regarding an alleged duty to disclose or correct are misplaced here because Defendants' statements were not false or misleading in the first place. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" (quoting 17 C.F.R. § 240.10b-5)); *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (duty to correct if "disclosure is in fact misleading when made"). Plaintiffs' cited statements regarding increases in certain aspects of deployment times or improvements at certain sites make no representations and imply nothing about Fluor's performance specifically or even mention Fluor. Opp. at 16–17 (citing ¶¶ 143, 147, 166, 168, 192); *see In re Bos. Tech., Inc., Sec. Litig.*, 8 F. Supp. 2d 43, 72 (D. Mass. 1998) (no duty to disclose alleged struggle in European market where statements did not "touch[] on the . . . health of [the company's] European business").[7] Unlike *Shih v. Amylyx Pharms., Inc.*, Plaintiffs do not allege with particularity how the omission of Fluor's alleged performance issues rendered misleading each of Defendants' prior statements on expected average deployment times or related financial projections. *See* 2025 WL 2807756, at *3–4 (D. Mass. Sept. 30, 2025) (omission of data on "high, unreported discontinuation rate" that limited potential growth rendered misleading statements regarding potential growth

---

[7]    Plaintiffs seek to rewrite the securities laws by arguing that "each time" Defendants received more information about alleged problems with Fluor, Defendants had a duty to correct their earlier statements. Opp. at 17. Symbotic neither said nor implied anything specific about Fluor's performance, and thus had no duty to disclose each new datapoint.

opportunities). In any event, Plaintiffs do not identify any specific information about Fluor that became available (or when, or to whom) that would have required a "correction."

Moreover, Defendants' statements could not have been misleading under the circumstances because Defendants had cautioned investors about issues that could arise from their outsourcing partners' performance. *E.g.*, Dkt. 34-4 at 5; *see* MTD at 21, 24–25, 30. Plaintiffs argue that Defendants' disclosures were "generic and hypothetical," Opp. at 17, but they were anything but—*see* ¶ 192 (some projects "might take a little bit longer . . . because each deployment is not the same size or complexity"); Dkt. 34-5 (May 6, 2024 Press Release) at 4 ("failure to realize the benefits expected from adding to our base of outsourcing partners"); ¶ 147 ("We don't expect that we'll see accelerations every quarter.").[8]

## III.    Plaintiffs Fail To Allege A Scheme Claim

"Claims brought under . . . Rule 10b-5 require proof of scienter." *SEC v. Wilcox*, 663 F. Supp. 3d 146, 155 (D. Mass. 2023). For all the reasons explained *supra*, Plaintiffs have failed to establish any plausible inference that Defendants intended to mislead investors or to offer any plausible motive for them to engage in the alleged fraudulent scheme.

Plaintiffs also cannot allege misrepresentations based on omitted or contrary facts, and then label those facts a scheme. *See Berlik v. Baker*, No. 21-CV-11723-AK, slip op. at 11–13 (D. Mass. Sept. 30, 2022). For example, Plaintiffs allege that statements that outsourcing partners were improving were materially misleading because Defendants failed to disclose the EPC hiring. *E.g.*, ¶ 194. They then rely on the same alleged fact to claim that there was a scheme to "conceal the

---

[8]   Plaintiffs now claim Odisho "presented" allegedly misleading slides at the May 9, 2024 Investor Day, Opp. at 12 & n.2, but the Amended Complaint only alleges he sat on a panel, not that he actively participated in the preparation or discussion of the slides. ¶¶ 210–213. Mere presence is not enough for liability and, in any event, the Investor Day statements were not false or misleading. *See supra* § II.B. Relatedly, Plaintiffs' allegations are lacking with respect to scienter because as to Hibbard, Odisho, and Ernst, Plaintiffs do not allege any stock sales and as to Ernst and Odisho, Plaintiffs do not offer any CW allegations as to their state of mind beyond that a single CW observed Odisho visiting deployment sites.

failures of the outsourcing strategy." Opp. at 34. This is not a separate scheme but rather one that is "indistinguishable from the misstatements and omissions alleged." *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216–17 (S.D.N.Y. 2020). Moreover, shipping incomplete robots to project sites and recording revenue are not inherently deceptive acts that can sustain a scheme claim, but are only alleged to have "support[ed] . . . the misstatements." Opp. at 32; *see* ¶ 402 (alleging Defendants shipped incomplete robots to project sites "to accelerate and increase recognized project costs"); *SEC v. Kelly*, 817 F. Supp. 2d 340, 343–44 (S.D.N.Y. 2011) (dismissing scheme claim based not on "conduct that is itself deceptive" but "conduct that *became* deceptive only through [the company's] misstatements in its public filings").[9] And contrary to Plaintiffs' argument, *Lorenzo* did not generally abrogate the requirement of pleading inherently deceptive conduct beyond misrepresentations. Rather, it specifically allowed scheme liability for persons who disseminate misstatements. *See Lorenzo v. SEC*, 587 U.S. 71, 74 (2019); *see also SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (no scheme, post-*Lorenzo*, where defendants made misstatements or omissions without allegations of dissemination or other deceptive conduct).

What is more, Plaintiffs do not even allege that any Individual Defendant engaged in the deceptive conduct. *See SEC v. Durgarian*, 477 F. Supp. 2d 342, 354–55 (D. Mass. 2007), *aff'd sub nom. SEC v. Papa*, 555 F.3d 31 (1st Cir. 2009) (no scheme where "there are no explicit details outlining specific actions taken by" defendants). Plaintiffs are stretching far beyond their allegations when they argue that the Amended Complaint "clearly alleges" the Individual Defendants "directed deceptive acts." Opp. at 34 (citing ¶¶ 63–65, 96). The cited paragraphs do not allege that any Individual Defendant directed anything. *Cf. Wilcox*, 663 F. Supp. 3d at 160–61 (defendant "directly and indirectly implemented improper revenue recognition practices

---

[9] In every case involving misstated revenue, someone initially "recorded" the revenue. That cannot plead scheme liability; it would mean every case about financial statements also could be brought as a scheme claim.

necessary for the scheme" by rejecting adjustments that would undermine fraud, directing employee to "find" additional revenue to meet predetermined financial metrics, and directing staff to "cherry-pick" data to conceal fraud); *N.Y.C. Emps.' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 996–97 (N.D. Cal. 2009) (alleged specific deceptive acts by defendant).

Finally, Plaintiffs do not plead reliance on the alleged scheme because they concede that they were unaware of the purportedly deceptive acts during the Class Period. *See* MTD at 33; *e.g.*, Opp. at 32 (Defendants were "**secretly** bringing EPC functions back in-house" (emphasis added)). They claim it is enough that the acts at issue were reflected in financial statements on which they relied, but that is not the law.[10] *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 160 (2008) (rejecting argument that "in an efficient market investors rely not only upon the public statements relating to a security but also upon the [conduct] those statements reflect"); *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 159 (2d Cir. 2010) ("Under *Stoneridge*, it does not matter that those transactions were 'reflected' in [company's] financial statements.").[11]

## IV.    Plaintiffs Should Not Be Granted Leave To Amend The Complaint

Despite Plaintiffs' token request for leave to amend again (Opp. at 35 n.22), dismissal here should be with prejudice. Plaintiffs have already amended. Moreover, Plaintiffs provide no "reasons supporting their request" nor the "substance of possible amendments." *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 107 (1st Cir. 2013).

## CONCLUSION

For these reasons and those in Defendants' opening memorandum, the Court should dismiss the Amended Complaint in its entirety, with prejudice and without leave to amend.

---

[10]   Plaintiffs cited authority for this proposition pre-dates *Stoneridge*. *See* Opp. at 33. Moreover, Plaintiffs' attempt to distinguish *Stoneridge*, *see* Opp. at 34, does not address the relevant reliance analysis.

[11]   Given Plaintiffs' failure to state a claim under Counts I and II, Plaintiffs' allegations regarding "Defendant's direct control," Opp. at 35, are irrelevant and should be dismissed.

Dated: December 11, 2025                    Respectfully submitted,


                                            /s/ Michael G. Bongiorno
                                            Michael G. Bongiorno (BBO # 558748)
                                            Andrew S. Dulberg (BBO # 675405)
                                            Elizabeth E. Driscoll (BBO # 705302)
                                            Margaux Malasky (BBO # 705494)
                                            WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                            60 State Street
                                            Boston, MA 02109
                                            Tel: (617) 526-6000
                                            Fax: (617) 526-5000
                                            michael.bongiorno@wilmerhale.com
                                            andrew.dulberg@wilmerhale.com
                                            elizabeth.driscoll@wilmerhale.com
                                            margaux.malasky@wilmerhale.com

                                            *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Michael G. Bongiorno, certify that on the 11th day of December, 2025, the foregoing was electronically filed using the Court's electronic filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno (BBO # 558748)