UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

MATTHEW DECKER, et al.,

              Plaintiffs,      Civil Action
                             No. 24-12976-DJC

V.

                             December 16, 2025

SYMBOTIC INC., et al.,      3:00 p.m.

              Defendants.
_____


TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA   02210


DEBRA M. KANE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA   02210
debrakane0711@gmail.com

APPEARANCES:

FOR THE PLAINTIFFS:

SHANNON L. HOPKINS, ESQ.
JOSHUA EVAN KLUGER, ESQ.
Levi Korsinsky LLP
1111 Summer Street
Suite 403
Stamford, CT 06905
203-992-4523
shopkins@zlk.com
jkluger@zlk.com


FOR THE DEFENDANTS:

MICHAEL G. BONGIORNO, ESQ.
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center, 250 Greenwich Street
New York, NY 10007
212-937-7220
michael.bongiorno@wilmerhale.com

ELIZABETH E. DRISCOLL, ESQ.
ANDREW S. DULBERG, ESQ.
Wilmer Cutler Pickering Hale and Dorr LLP (Bos)
60 State Street
Boston, MA 02109
617-526-6278
elizabeth.driscoll@wilmerhale.com
andrew.dulberg@wilmerhale.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on December 16, 2025.)

THE CLERK:  Civil action 24-12976, Decker, et al. v. Symbotic, Inc., et al.

Would counsel please state your name for the record.

MS. HOPKINS:  Good afternoon, your Honor.  Shannon Hopkins with Levi Korsinsky for the plaintiffs.

THE COURT:  Good afternoon, counsel.

MR. KLUGER:  Good afternoon, your Honor.  Joshua Kluger also with Levi Korsinsky for the lead plaintiff.

THE COURT:  Good afternoon.

MR. BONGIORNO:  Good afternoon.  Mike Bongiorno, Wilmer Hale for the defendants.

THE COURT:  Good afternoon.

MR. DULBERG:  Good afternoon.  Drew Dulberg also for the defendants.

THE COURT:  Good afternoon.

MS. DRISCOLL:  Good afternoon.  Elizabeth Driscoll on behalf of the defendants.

THE COURT:  Good afternoon.

Counsel, I know we're here on the defendants' motion

to dismiss.  I've read the motion papers through the reply and I'm prepared to hear argument.  Just fair warning, I do need to be off the bench a little before 4:00, so I'll try to split the time evenly between both sides.

Counsel.

MR. BONGIORNO:  Thank you, your Honor.  Good afternoon.

THE COURT:  Good afternoon.

MR. BONGIORNO:  On behalf of the defendants, your Honor, we move to dismiss this case.  You have a case with some statements about deployment early in the class period, middle of the class period and then toward the end of the class period.  We have a couple of restatements.  And I want to address all of those issues.  I'll try to do so briefly and without repeating what's in our reply, because I understand our reply was just filed just within the past week or so.

This is a classic fraud by hindsight case, your Honor. This is a case where the company said some things about its expectations and beliefs regarding improved deployment times for its systems that turned out to be too optimistic, and the plaintiffs turn around and take that and say, well, there must have been a scheme to defraud.  Well, of course there was no scheme to defraud.  It makes no sense.  There was no reason for that.  There's no motivation.  And of course, there's no *scienter*.

This case can easily rise or fall on *scienter.* It's not a strict liability case, it's not a Section 11 case. It's a pure open market 10(b)(5) case with no motive and no *scienter* and no recklessness or any other type of theory that the plaintiffs try to put forward today.

The challenged statements themselves were not misleading. So there's no falsity here in the first instance.

Of course we do not challenge the fact that the financial statements had some incorrect numbers in them, and those were corrected. They were corrected in short order. There were two restatements. They were within a couple of weeks of each other. So we're not contesting that.

But on the deployment statements, we're certainly contesting falsity, but on all of it there's a *scienter* problem here.

The plaintiffs haven't offered any compelling or plausible case for an inference of *scienter.*

Plaintiffs' theory is that the four individuals somehow engaged in this fraudulent scheme together. But, apparently, only one of them tried to capitalize on that scheme by selling their stock; the others did not. And curiously, the one who did, sold very early in the class period and sold a minuscule portion of his holdings. To the extent they even are his holdings, which he disclaims because they're through trusts of course --

THE COURT:  So does it matter that that one individual I think is the CEO?  And does it matter what the actual number is as opposed to the percentage?

MR. BONGIORNO:  I don't think either of those things matter, your Honor.

Certainly, as the CEO he's one of the named defendants, but he is far removed from many, if not all, of these allegations.  There's very little about Mr. Cohen and what he -- what involvement he had in, you know, these deployments and the delays and the issues with the very substantial and reputable contractor, Fluor, that the company engaged to try to ramp up these deployments.

It is the CEO (sic.), Ms. Hibbard, who is the one who they really try to dig in with in terms of what she knew and when she knew it and with whom she was speaking and when.  Not so much Mr. Cohen.  You hear Mr. Cohen, things like, oh, he visited a site and he talked to some people while he was there.  Putting all of that aside --

THE COURT:  I apologize, counsel.  Was there -- were there some allegations about some of the confidential witnesses being present in meetings with Mr. Cohen in regards to the sort of -- the delays in, what is it, the Fluor deployments?

MR. BONGIORNO:  The short answer to your question is yes, your Honor.  The longer answer is not really, though.  Because it's important to distinguish between presence at a

meeting and what people said to each other at that meeting.

Nobody, none of these confidential witnesses -- and there are only five -- and the one they lean on most heavily, Confidential Witness No. 4, was there for about a few weeks of the entire class period. He or she left in December of 2023. The class period starts November 20, 2023, I believe.

But to your question, your Honor about Mr. Cohen and his interaction with any of these individual confidential witnesses and what he may have learned or said or whatever at these meetings, you get virtually nothing. You get virtually nothing.

You know, attendance at a site or attendance at a meeting -- I mean, some of these meetings were quite large. They were on a quarterly basis. And nobody says, I spoke to Mr. Cohen and he knew X about average deployment times. He knew X and he said Y.

They suggest that that's the case when they try to summarize the confidential witness allegations. But if you look at what is actually attributed to these confidential witnesses in the complaint, there is nothing of the sort. You hear things about specific sites. Again, I'll go back to Confidential Witness No. 4. I think this person had visibility into maybe three sites, and this person then speculates in paragraph 97 of the complaint -- there's a statement that he or she estimates that 20 to 25 percent of the sites experienced

some delays and cost overruns.  Wow.  That's the basis for this fraud claim, an estimate by a former employee who overlapped with the class period by a few weeks is going to estimate -- I'm going to use the word "guess" -- estimate that 20 to 25 percent had delays?  Okay.  So on their best day, somebody who has visibility into just a few of these deployment sites is saying that 70 to 75 percent of them had no delays.  And that's their estimation.  And that person is going to say that Mr. Cohen, who held onto 98-plus percent of his stock, was motivated to commit fraud.  That's truly incredible.

THE COURT:  And so, counsel, I was -- and I may have just missed it, in terms of -- is Fluor the right way to pronounce it?  Fluor --

MR. BONGIORNO:  I think so, your Honor.

THE COURT:  I guess I wasn't clear on what percent -- and if I know this yet -- if it's alleged, what percentage Fluor was of the sort of deployment plan.  Like, meaning, it just wasn't entirely clear to me if Fluor was responsible for an overwhelming number of the deployment sites or because there seemed to be reference to multiple vendors.

MR. BONGIORNO:  There were multiple vendors.  There were many deployment sites.  There's -- you know, the allegations are and the public documents say that somewhere between, I don't know, around four and around nine were coming on every quarter.  So it wasn't like there were hundreds or

thousands, but there were scores of deployment sites.  And Fluor was the primary outside contractor that was brought in to help.  They weren't responsible for everything.  They weren't responsible for every site, but I think there is a reference in the complaint to one of the witnesses or someone saying 85 to 90 or 95 -- 90 to 95 percent of the sites they had at least some involvement.

But, of course, at the same time the plaintiffs are saying they were bringing all of this back in-house because it wasn't working with Fluor.  So, okay, maybe Fluor was very involved in a large number of -- a large percentage of sites for a period of time, but certainly not for the entire class period.  Because a big part of their case hinges on this notion that there's some sort of admission during the class period that at some point -- that in July of last year, Mr. Cohen said that for the past six months we've been bringing some of this back in-house.  And they take that to mean, oh, okay, so then in early February, which was about five days after, you know, the six months before he said that, so you would have to take him literally that he means six months to the day they started bringing something in-house.  And then they say but in February, you said things were going well and deployment times -- you know, we think deployment times are going to get better and they've started to get better, et cetera, and that couldn't possibly be true and you must have been

misrepresenting it because six months and a week later you said for the past six months you've been bringing some of this in-house. So that sort of cuts against the notion that your Honor was just asking about what percentage of the sites were being run by Fluor or Fluor was involved in because the company was bringing some of it back in-house.

I'll use this opportunity to make that point, though, which I was just starting to make which is the notion that saying for the past six months we've been bringing some of this back in-house, and, as we did so, some of the folks that we hired started to tell us, you know, these Fluor folks, they don't necessarily know what they're doing as well as we know what we're doing so we should probably do more of this ourselves, we should bring more of it in-house. That is hardly an admission that back in February, when the company was talking about its recent experience with decreasing deployment times, they were somehow misrepresenting and leaving important facts out, because they would have had to hire a whole bunch of folks exactly six months ago as opposed to over the course of the past six months. They would have to get onsite, immediately decide there were problems, immediately tell the speakers that there were problems and have that be to the point where they were so concerned that they felt that they couldn't say what they were saying, which, by the way, I don't think is actionable in a vacuum or otherwise because they're not saying

a whole lot.  And it's forward-looking for the most part, it's puffing for the most part.  There's reasonable cautionary language with it, of course.  And they're saying -- as they're saying, you know, we're trying to reduce these deployment times, things are going well from one to another, they seem to be getting -- be reducing -- and by the way, they had reduced deployment times.  I mean, originally it was two-and-a-half years.  At that point it's at 24 months.  They're trying to get it lower.

By the way, this is an incredibly successful company. We're not coming here with a dumpster fire of a company and saying, hey, we didn't know it was falling apart.  The stock price has more than doubled what it was during the class period.  It's trading at, like, $62 a share today.  The company has a $35 billion market cap today, has billions of dollars of revenue every year.  It's a very successful, well-run company.

But at the time of the class period, it was a new public company.  They said we're newly public, we may have issues with that as we get used to it, and they did.  There were bumps in the road.  They didn't hit a brick wall.  They hit a couple of bumps in the road.

And to say that when a CEO and a CFO get on a conference call and say, hey, we haven't been able to reduce deployment times the way we've wanted to, we've started to bring some of this back in-house, our contractor, Fluor --

which, by the way, they didn't name Fluor in any of this.  They didn't tell them in particular.  It hasn't gone as well as it should have, whatever it is.  But we're still hoping to get better and improve, et cetera.  That is not securities fraud.  You have three out of the four defendants selling no shares.  You have one defendant selling 2 percent of his shares.

I guess I didn't answer your question, your Honor, when you asked about does the amount matter.  I guess I never got to that, and I'm sorry.  I don't think we're going to meet our deadline if I keep talking so much here.  I will answer that.

It does not matter.  You have cases like Alnylam, who had $60 million of stock sales.  The court said that that in and of itself certainly does not show motive.

Here, when somebody is selling less than 2 percent of their overall holdings -- never seen a case where somebody sells 2 percent of their holdings and there's a problem.

And as to when in the class period they sold, he sold way toward the beginning of the class period.

I remember a case against Ms. Hopkins -- I'm sure she remembers as well, maybe not as fondly as I do -- from six to seven years ago, Tetraphase --

MS. HOPKINS:  Definitely not as fondly.

MR. BONGIORNO:  -- in front of Judge Sorokin where she was telling the judge how obvious that it was a fraud because

the CFO sold two or three days before the end of the class period and how clear it was that that was fraudulent because that's perfect timing, it's when the stock is at its high.

Here we are, one sale, the very beginning of a very long class period makes no sense whatsoever that that is the way to try to parlay a high stock price into cash proceeds.

THE COURT:  Thank you.

MR. BONGIORNO:  If I may just a little bit.  I would like, your Honor, to save some time for after she finishes because I know Ms. Hopkins brought a demonstrative with her, which she did share with me this morning, and I told her I was not going to object to it because I certainly want the Court to get whatever information the parties would like to put in front of the Court, but I want to see how she uses it, and then I would like to respond to it.

Let me go just quickly through the *scienter*.

THE COURT:  And you have about nine more minutes left to give your sister about the same amount of time, 25 minutes, and I'll give you a few minutes.

MR. BONGIORNO:  Okay.  So I'll only use a portion of that now and maybe we can finish a little earlier, maybe I'll take up the rest later.

On *scienter*, your Honor.  The allegations regarding the confidential witnesses' interaction with these individual defendants is critical here because there was so little of it.

It sounds like a lot because they repeat it over and over again, and it shows up early in the complaint, it shows up in the middle of complaint.  You get to paragraph 300 something in the complaint and it shows up again.  And every time it gets a little bigger and a little bigger.  But if you go back to what is actually said, there's this notion, for example, with regard to Ms. Hibbard, the CFO, that she somehow knew that within the financial statements was revenue that was based on cost overruns that was not billable, and therefore, should not have been included in the revenue number because, as I'm sure as the Court knows from reading all the briefs, the company recognized revenue on a percentage completion basis based on the costs associated with whatever stage of the project we were at.

Keep in mind that the change -- and I hope I'm not speaking too fast -- that the change in the contract terms that said you can no longer charge for cost overruns occurred last year.  Last year, 2024.

The class period begins in late 2023.  These deployments take around 24 months.  So that means today there are still projects that aren't done yet that had -- that would have cost overruns that could be charged because 24 months ago we were still in 2023 and they say the contract terms changed in 2024.

So what the confidential witnesses do not say is whether and how much supposedly Ms. Hibbard knew about any

potential cost overruns for new contracts that did not allow for charging the client for cost overruns that were included in those revenue numbers.

All it says is she knew -- and there's no basis for it, there's no number associated with it whatsoever.  It just says she knew that there were -- there was revenue in the numbers that was for cost overruns.  Again, the company was allowed to and did charge and collect for cost overruns for its entire existence up until last year.  And with project deployments that take 24 months, that's still true to this day, just not for the newer contracts.

So it's a very important point because that is really --

THE COURT:  So, counsel, if I'm understanding you, you're saying that there's no distinction about when she allegedly had this knowledge, and that would matter because it wasn't contrary to the contract terms before 2024.

MR. BONGIORNO:  Exactly, your Honor.  And I'll just put a little bit of finer point on it, which is that they say, well, every quarter they had meetings and she would look and she would see this revenue and in the revenue were these cost overruns and she knew they couldn't charge for the cost overruns.  But they don't say what cost overruns were in the revenue numbers, whether any of it was for newer contracts where it couldn't be charged and whether she knew that, and, if

so, how she knew that. They can't put that knowledge in her head. Why? Because they have no idea. They have no idea.

And then I ask the question: Why would she do it? Again, under Tellabs, we're using competing inferences. And they have to have an inference that's at least equally plausible to the inference -- the non-fraudulent inference. And here, zero motivation for this woman who is a CFO of a newly public company to add additional revenue to the bottom-line number. All they -- she didn't sell any stock. All they have is this sort of generic motivation of, well, the company wouldn't have met this quarter if they didn't do this, or they wouldn't have achieved this goal if they didn't do that. We know -- I know your Honor has done a number of these cases -- that that's not enough. That's never enough. If that were enough, every misprojection would be fraud. And of course that's not the case. And of course that's not the case for a company that has billions of dollars in revenue and is very successful. What's the point? You're going to look good for a quarter and then you're going to look bad for the rest of your life?

And I'll end on this note for now. The plaintiffs loved, loved the SEC investigation until they didn't. The SEC investigation was evidence of fraud, it was evidence of *scienter*. It's in the complaint. Now, SEC closes the investigation, takes no action. All of a sudden the SEC

investigation is irrelevant and it evaporates into thin air.

There's no fraud here.  There's no *scienter*.  Many of the statements are not actionable on their face.  But, regardless, there is no *scienter*, and therefore, there's no claim.

I'll leave the scheme liability alone, for a number of reasons, including that if there's no *scienter* and there's no false statement, there's certainly no scheme; and because in order to have a scheme claim, you have to have something independent of the underlying fraudulent activity, and they don't have that here.

I don't know why this has become a trend in recent years.  I've been doing this for 34 years.  All of a sudden scheme claims are popular.  I don't know why.  But they fall if the rest of the case falls.  And those claims fall anyway because there's nothing independent to support them.  But I don't really think it matters.  I don't think the Court needs to spend much time on it.

I'll stop for now, unless the Court has more questions, and then I'll jump back in later.

THE COURT:  Thank you.

Counsel.

MS. HOPKINS:  Thank you, your Honor.  May I approach the bench?  I did bring a demonstrate.  I've shared it with counsel.

THE COURT:  And I understood you had already shared it with your brother?

MS. HOPKINS:  Yes, your Honor.

MR. BONGIORNO:  It's my birthday, your Honor, so I think this was a gift.

MS. HOPKINS:  Happy birthday.

THE COURT:  Happy birthday.

MS. HOPKINS:  Thank you, your Honor.

Defendants' argument hinges on recasting this case as one where defendants claim that Symbotic was just experiencing growth pains shortly after the IPO and the forward-looking predictions about Sym -- your Honor, is it okay if I call it Sym instead of Symbotic?

THE COURT:  That's fine.

MS. HOPKINS:  Okay.  -- that Sym was just experiencing growth pains after the IPO and their forward-looking prediction about Sym's efforts to deliver on its growth plan that it touted to the market to go public and reduce deployment time to scale and increase revenue predictions which later on turned out to be wrong were not false because Symbotic warned of the risk and this was just a fraud by hindsight claim.

(Court reporter interrupted.)

MS. HOPKINS:  Your Honor, this case has most, if not all, of the hallmarks of a securities fraud claim.  There were multiple restatements.  There are CWs recounting

contemporaneous internal meetings and reports where information contradicting the defendants' public statements was discussed and reported.  There was a regulatory investigation and insider selling and more.

So let's take a step back, your Honor.  I'd like to direct your Honor to the second page of the presentation.

Symbotic went public prior to the class period.

Symbotic had not turned a profit or reported positive adjusted EBITDA which was a key metric that the company reported on every quarter.

To go public in June 2022, Sym sold investigators on the large and growing demand for its warehousing systems and a growth plan that would allow Sym to become profitable and meet that demand.

The growth plan hinged on outsourcing the EPC, the engineering, procurement and construction, function of its deployment process, though.

So defendants viewed outsourcing EPC as, quote, critical, because, quote, the most revenue comes from this phase of the project deployment under percentage of completion.

And outsourcing EPC would allow Sym to accelerate deployments, shorten the time and scale.

In fact, defendant Cohen stated at the beginning of the class period on the November 20, 2023 earnings call, quote, With such high demand for our systems, our ability to scale

operation is the primary governor on our revenue growth.

Defendants told investors that outsourcing EPC would allow Sym to improve deployment times from the 24 months it was taking at the start of the class period to eventually down to six months. And therefore, your Honor, analysts alike were laser focused on the company's ability to reduce deployment time, scale, increase revenue and finally become profitable.

Sym chose Fluor as its outsourcing partner in 2023. CW-1 reported that Fluor handled 90 to 95 percent of Sym's projects.

Now, your Honor, in the complaint in paragraph 98, defendant Hibbard herself says that as of May 2024, there are only 37 deployments out there. There were not a ton of deployment projects out there.

Fluor handled 90 to 95 percent of those deployments. And defendants projected Fluor to be fully ramped up by Q2 or Q3 at which time investors could expect to see reduced system costs and reduced deployment times and scaling. That would be by the time the class period started. But that didn't happen, your Honor.

Turning to the third bullet. The confidential witnesses confirm that Fluor lost, quote, truckloads of inventory and system components constantly. CW-4 reported that this occurred throughout 2023 during CW-4's employment, and that Fluor was terrible at keeping track of inventory, and, as

a result, missed many go-live dates by as much as six months for the projects.

Fluor attempted to compensate for this by moving parts around between projects, but that just resulted in further delays and incomplete and inaccurate inventory recordkeeping.

CW-4 reported that because of all these delays and lost inventory, that Fluor could not reduce the project deployment time to less than 24 months.

CW-2 corroborated this and said by at least 2024 that Fluor failed to order parts on time, left hundreds of thousands of unused parts on project sites, and, like CW-4, said that parts were taken from one project and moved to another to try to compensate.

CW-3, who was there throughout the class period, reported that prior to and throughout the class period, Fluor caused delays by failing to order parts on time.  Fluor ordered parts 45 days late and so the inventory arrived late and only partially filled.  This resulted in Fluor having to pay expedited freight costs, and, as defendants admitted at the end of the class period, left tons of employees around project sites for weeks standing around because there were no parts to finish the project.

CW-5 reported throughout 2023 of the significant delays including Wal-Mart, which was the company's largest customer, accounting for 88 percent of its revenue.  CWs 2

through 5 all reported that Symbotic took incomplete robots and sent them to project sites even though they were not complete and that these robots were not finished for months.

CW-3 said the directive to ship incomplete robots came from somebody above CW-3's boss, who was Jason Hardy, the VP of supply chain who reported to defendant Cohen.  It can be inferred that defendant Cohen, thus, either made the directive or was in the executive circle that directed it.

And CW-3 recalled that incomplete robots typically shipped within a couple of weeks before the end of the quarter in order to increase revenue through the percentage of completion.

As a result of the persistent project delays, which resulted in cost overruns, Sym had changed its contract terms in 2024 because customers, like Wal-Mart, didn't want to pay for them anymore.

Defendants attempted to cover this up by improperly recognizing revenue for cost overruns that were unavailable, shipping incomplete robots to project sites before they were complete to recognize the revenue early in a percentage of completion, and tried to hire back over the course of six months before the end of the class -- before the first corrective disclosure EPC back in-house, investors none the wiser.

THE COURT:  So, I guess, counsel, I guess I want to

ask you the reverse of what I asked your brother, because, as I understood it, there were different phases, right, that were being contracted out.  And I mean, I've certainly read the allegations in the complaint as to the confidential witnesses and these delays by Fluor, and, as I understand it, one of the restatements is in regards to an acknowledgment of sort of the timelines being different now.

But, I guess, I'm not entirely sure how these reflect on *scienter* or the falsity of statements that were predictive or, you know, perhaps optimistic at the beginning of the time period about decreasing the deployment time.

MS. HOPKINS:  Your Honor, I can skip to that if you'd like.

THE COURT:  Sure.

MS. HOPKINS:  So the EPC function was the most important, as I mentioned at the beginning of my presentation. The statements that -- for those particular statements, if I could just turn your Honor's attention to the slide that's page 5 of the presentation.

THE COURT:  Yes.

MS. HOPKINS:  This relates to the *scienter* knowledge of the project deployment times.

And so, your Honor, the confidential witnesses say that the deployment -- that Fluor was a hot mess, for lack of a better word, at the outset.

So the company hired Fluor in 2023, and the witnesses say they were there with the company during this time, which is all of them, that Fluor was losing truckloads of parts, causing delays, causing cost overruns.  This was all happening throughout 2023.  That's when it all started.

So defendants were aware of this through several ways.  And if you look at slide 5, one of I think maybe the most important admissions here is defendant Hibbard spoke on May 9, 2024 and said that she and Walter Odisho, who is also a defendant in this case -- and what Walt Odisho and I do is we chair a weekly cross-functional meeting that goes through critical paths on those schedules, and as you're ramping up and growing at that level we are, that's critical.

At the beginning of the quote there she says there are 37 systems in deployment currently.  She says they cross-chair -- they chair a cross-functional meeting to go through the schedule for all of those projects.  And one of the reasons is to ensure that material is arriving on time and to review the critical paths on those schedules.

So right here, your Honor, you have defendant Hibbard admitting that she and Odisho have a meeting with cross- -- they go over the schedules and the progress on all of the projects in deployment.

Now, you take -- you know, the Court is required to look at *scienter* holistically with the other allegations.  You

take the confidential witnesses' allegations of all the delays that were occurring.  You have Hibbard saying she is personally getting into the weeds with these cross-functional teams reviewing the schedules on every single project.

Next on this slide we have weekly -- weekly, your Honor.  This -- my brother here seemed to indicate that these meetings and things didn't happen that often.  These were weekly and biweekly deployment status meetings that CW attended with defendant Cohen.  And the allegations are that CW-3 discussed CW-3's concerns about project delays, including with customer Wal-Mart, which is 88 percent of the company's revenue, a big deal, your Honor, at the meeting with Cohen.

And CW-3 wanted to tell the customers about the delays but reported that his superiors, someone above his boss -- or superiors at this meeting said, no, don't tell them of the delays, either tell them no delay or it's just a slight delay.

Your Honor, that is more than sufficient to show defendant Cohen knew at these weekly and biweekly meetings that occurred throughout the class period that there were project delays and they were occurring with the company's largest customer.

In addition, your Honor, CW-1, which we hadn't gotten to yet, is very relevant for the *scienter* on the false financial statements.

CW-1 had quarterly -- every quarter -- quote, every

quarter during the class period met with defendant Hibbard. During those meetings CW reported actual financial results compared to forecasted results.  And also at those meetings CW-1 reported to defendant Hibbard there were cost overruns from these project delays that were negatively impacting the company's financial statements.

There would be no negative impact if the revenue was billable, but it wasn't.

CW told defendant Hibbard every quarter when they met at these quarterly meetings this is a problem, these cost overruns are having a negative effect on the company's financial statements.

So, your Honor, not only did defendant Hibbard admit to meeting and chairing, chairing a meeting every quarter to go over all the projects, but there were also meetings that the CW attended with Cohen and with Hibbard, two I just described, both of them were told at weekly or quarterly meetings throughout the class period about the cost overruns.

And, your Honor, the CWs all say that this started right after Fluor was retained in 2023 and was going on throughout 2023.

Does that answer your question, your Honor?

THE COURT:  Yes, thank you.

MS. HOPKINS:  With respect to the *scienter* for the false financial statements, your Honor, if you could turn to

slide 4.

As I was just talking about, CW-1 was part of the financial planning and analysis group and CW-1 met with defendant Hibbard every quarter during the class period.  And during their -- CW-1 had prepared a PowerPoint presentation that compared the forecasts for the actual results and said that the cost overruns were included in the revenue and cost line items.  Defendant Hibbard approved the quarterly forecasts and reviewed the forecasts versus the actual results.

Defendant Hibbard was so concerned about the cost overruns that CW-1 reported she was actively engaging in an initiative over 2024 to reduce those because she knew they were negatively --

THE COURT:  So, counsel, do we have allegations in the complaint about whether or not these are before the contract term changes?

MS. HOPKINS:  Your Honor, in paragraph 61 of the complaint -- so, your Honor, if you start with -- we have CW-1 saying that these -- first of all, we have CW-1 saying that they forecasted every quarter for unbillable cost overruns. CW-1 is saying, yes -- as your Honor has held in other cases in ModusLink and whatnot, the CW does not have to remember every single detail of their employment.  CW-1 said that every quarter the company forecasted -- the forecast that Hibbard approved included unbillable cost overruns.  Does CW-1 quantify

that?  No, your Honor, CW-1 did not.  But I think we can see from the restatement itself that those were material, as well as CW-4s account that 20 to 25 percent of projects had cost overruns.

In addition, if you look at paragraph 61 of our complaint, we detail system deployments started.

And so, your Honor, defendant Hibbard said there were 37 deployments as of May 2024.  You can see from our chart on paragraph 61, if you add up the new system deployments started, you have five in Q1, three in Q2, five in Q3 and nine in Q4.  So that's 22 deployments, your Honor.  If you take the 37 deployments from May 2024 and you add Q3 and Q4, you have 51 deployments, 22 of which were 2024.

So, your Honor, not only did CW-1 confirm that the cost overruns were -- the unbillable cost overruns were in the revenue and the forecast line items, and CW-1 expressed concern to Hibbard at these meetings that it was negatively impacting the company's financial results because they couldn't recoup them.  Not only do you have CW-2's account that was forecasted for her and was included every quarter, you also have the fact that 22 of the 51 deployments were 2024 project starts.

So you can infer from that, your Honor, almost half, half of the 2024 -- half of the deployments were 2024.

So taking that with CW-1's accounts and the fact, again, that Hibbard reviewed all of the projects, she said I

co-chair a meeting where I go through the schedules for all the deployments that I just showed your Honor, you put all of that together, plaintiffs have to allege it's an inference of *scienter* at least as compelling. And I submit, your Honor, we've done more than that here with these facts taken together at least as compelling with all of these meetings with defendants and so on and so forth.

Your Honor, the frequency and magnitude of the restatements also supports the *scienter* for the false financial statements. So not only do we have the meetings and whatnot, there were multiple restatements and the adjusted EBITDA was restated every quarter in 2024, sometimes twice, by as much as 93 percent in some quarters.

THE COURT: Counsel, is there more than -- well, aren't the two restatements close together or am I --

MS. HOPKINS: Yes, your Honor, they're within a week and a half of each other.

The first restatement was to correct for premature revenue recognition. So they recognized revenue before the milestone was complete, which I submit, your Honor, was based on what the CW said and defendant Cohen's admission at the end of the class period that robots had been sent to project sites before they were complete. The first restatement was to correct for the premature recognition of revenue before the milestone had been met.

The second restatement 10 days later was to remove revenue that had been improperly booked from the unbillable cost overruns.  That's what resulted in the adjusted EBITDA restatement of as much as 93 percent of earnings gone from this.  That was in Q3.

Your Honor, if your Honor doesn't have any more questions, I'd like to turn to the next slide --

THE COURT:  Sure.

MS. HOPKINS:  -- which is page 6 on *scienter*.

Your Honor, in the 1st Circuit, the corroborative nature of the other facts alleged is a key factor in determining the CW reliability.  Plaintiffs need only demonstrate the CWs have a basis of knowledge to report on the inner workings of the company.  Here we've met that burden, your Honor.  And I submit the defendants' own admissions corroborate the CW allegations.

So if you look at the chart here, the CWs on the left-hand side reported truckloads of inventory that was missing, bad recordkeeping, lost inventory, that Fluor placed orders late and incomplete robots were shipped.

The defendants confirmed this in their admissions on July 29th when they said, Defendant Cohen said parts aren't here and you have hundreds of people standing around the site for weeks.  Robot -- quote, cables came in late.  We shipped the bots to the customers so they could still do 90 percent of

what they were supposed to, meaning the robots were not complete.

These issues cause elongated construction schedules and implementation costs, which is why the company started hiring in early 2024 to bring this back in-house.  Now, obviously that takes time and they were hoping that they would get this done before the market learned the truth.  Unfortunately, they were unable to do that because they had been recording unbillable costs in the revenue line item on top of the other issues.

If you look at the next line item, your Honor, CW-1 told Hibbard every quarter that there were cost overruns that are negatively impacting the company's financials.  That's because they weren't billable, your Honor.

And at the end of the class period, on July 29th, Hibbard says that the cost overruns were not a surprise.

Despite what my brother says here, "not a surprise" to me tells me that you knew about it before.  It's the same thing.

The next, your Honor, is CW-4 had reported that Symbotic was unable to improve the deployment times.  Well, defendant Hibbard admitted on February 5, 2025, only when it was pulled out of her from an analyst, that Symbotic had not reduce the deployment times at all, and in fact, they were, quote, still averaging 24 months.

CW-3 attended those weekly and biweekly meetings with defendant Cohen where they talked about the project delays for Wal-Mart and was told not to tell the customer about the delays. Well, during the July 29, 2024 earnings call, defendant Hibbard admitted that Symbotic does a six-month and 12-month outlook and stays, quote, lockstep with our customers. So, clearly, Symbotic was in close contact with their customers and following those schedules closely.

On page 7, your Honor, we have bullet points of several admissions defendants make about monitoring the data. And I think when you take those collectively with all the meetings and the CW accounts, we can safely infer that it was defendants here who were monitoring this data. Because we know Hibbard and Odisho co-chaired a meeting where they went over the data, for example.

On slide 8 we have other facts that support a strong inference of *scienter*, your Honor. The fact that the defendants discussed deployment times in detail every quarter means they knew and they were laser focused on that, and that's the reason, because that was their growth plan. Their whole IPO -- they pitched the whole IPO on we're going to meet this demand by outsourcing EPC so we can then scale our deployments and we're going to do that by reducing deployment time so we can do more. Their whole growth plan and their path to profitability hinged on a successful growth plan.

Defendants -- they needed to hit these quarterly forecasts to show Sym executing on this growth plan.

And if you look -- we'll see in a moment, your Honor, that for Q1 and Q2, before they revealed the truth in Q3, they missed EBITDA, adjusted EBITDA forecasts but for the fraud. And they also missed revenue in one quarter.

Lastly, defendant, defendant Cohen -- while motive is not required, your Honor -- I think the law is very clear motive is not required.  Here -- we have alleged motive here. Not only for -- that the defendants needed to deliver on this growth plan that they promised investors just a year before, but defendant Cohen's suspicious stock sales.  They totaled $183 million or 2 percent, occurred mere days after Symbotic released its false and misleading financial statements and at the same time defendants secretly decided to start hiring back the EPC function.

Keep in mind, your Honor, when they started doing this, these issues had been going on throughout 2023.  This wasn't just all of a sudden we have to bring this in.  This was happening throughout 2023.  And at that point, in early 2024, they were like, okay, crap, we're going to have to bring this function back in-house, let's try to do it before anyone finds out.

And so, your Honor, defendant Cohen sold his stock, which is a total of $183 million, or 2 percent, mere days after

they released the false financial statements and at the same time that Sym was bringing in-house the EPC function.

Now, your Honor, my brother said he hadn't seen a case where 2 percent had been found sufficient to support *scienter*, but our brief actually cites a case for that exact proposition. On page 29, the Nursing Home case found sales around 2 percent of defendant's stock to strongly infer *scienter*, as a, quote, truly astronomical figure.

So, your Honor, we have cited a case that has found that.

Again, taking these allegations holistically with what was going on in the company at the time --

THE COURT: I mean --

MS. HOPKINS: -- that contributes to *scienter*.

THE COURT: So, obviously, not to quibble with how much $183 million is, but as I understand it, it's a small percentage, right, of his purchases. And shouldn't I consider the fact that the other corporate leaders charged here don't have any stock sales, and his, Cohen's, is a singular one, right?

MS. HOPKINS: Your Honor, I think you can certainly consider that in your holistic analysis, but I also think you need to consider the fact that Cohen attended weekly meetings where he was told about delays on projects for the company's largest customer which was Wal-Mart. I think we need to

consider the other holistic facts here with that.  I know that motive alone is not enough to show *scienter* in this circuit, but motive contributes to *scienter*, your Honor.  And here, we've shown defendant Cohen didn't sell nearly this much in prior periods, and he sold it at a suspicious time right when they were bringing this back in-house after Fluor had been a disaster the year before and at the same time when the company issued its first false financial statements in 2024 after the contracts changed and they started booking revenue they shouldn't have been booking for unbillable costs.

So I think you have to look at the suspicious timing.  And again, there are cases saying what your Honor is saying, but we've also cited cases in our brief that show when the other circumstances around are suspicious, that the insider selling lends support to *scienter*.  It's a factor that considers towards the holistic analysis.

THE COURT:  Thank you.

MS. HOPKINS:  Your Honor, if I could just quickly turn you to page 11 of the presentation.

THE COURT:  Yes.

MS. HOPKINS:  The defendants' statements on the accelerated were increased deployment times were not all forward-looking.  Defendants made statements about the current state of the overall deployment times.

So, you know, in 2023, you know, we continue to

accelerate our time to deploy systems.

They are touting -- next bullet -- Ernst, in November 2023, is touting the revenue growth in this quarter was driven primarily from faster execution on deployments.

We continue to shrink the time of deployments with the help of our partnership initiatives.

Continued reduction in system deployment times.

Accelerate deployment progress.

So they continued -- these weren't forward-looking statements.  They continued to tout every quarter that deployment times were decreasing.  And if you -- I mean increasing.  And they were delivering on the growth plan, and they were saying our revenue is showing you this.

But what investors didn't know is that, actually, the revenue was up because they were booking unbillable cost overruns that would later be restated.  They said it was due to the better deployment times.  As we learned in February 2025, when defendant Hibbard said the deployment times were, quote, still 24 months, they hadn't made any improvements at all.

So, your Honor, if you look at page 12, not only were those statements not forward-looking, they were speaking about the current situation of deployment times.  You can see that the analysts -- how the analysts -- this is what matters, your Honor, how did the market, how did investors understand the statements, how were investors mislead?

Well, slide 12 we've given different points of time of how the analysts were interpreting what the defendants were telling the market. And the fact that the analysts are reporting on this means it was of huge importance. That's what they were looking for to make sure the company was delivering on its growth plan.

So Northland Capital. Faster deployments aided by outsourcing and standardization efforts.

Citi. Enabling the company to deploy more system as well as leading to faster execution on ongoing deployment.

Cantor Fitzgerald. Deployment times are shrinking. New systems now average about 20 months.

Deployment timelines continue to shrink.

I mean, the analysts were laser focused on this and they understood defendants' statements not to be forward-looking predictions or puffery or anything like that. These analysts understood that this company's delivering on the growth plan that it sold us at the IPO. You can see that from all the different analysts here, your Honor. What's important here is how the market and how the investors were mislead.

Your Honor, I -- unless your Honor has any questions, I'll turn quickly to the forecasts.

THE COURT: Sure.

MS. HOPKINS: So, financial forecasts, your Honor, I'll concede those are forward-looking statements. But

forward-looking statements can be actionable if, as here, they lack any reasonable basis.  The defendants have, you know, internal facts that contradict them and there are not adequate warnings.  And that's what was happening here.

As we know, defendant Hibbard every quarter approved false -- approved financial forecasts that include unbillable cost overruns.  But for the inflated forecasts, they would have missed -- defendants would have missed their forecasts in two of the three-quarters in 2024.

So, here, while forward-looking, defendants had facts internally because defendant Hibbard admittedly, you know, cross-chaired a meeting going over the deployment schedule. She knew where every project stood, new and old.  And she also met with CW-1 and knew from the quarterly meetings what was in those forecasts because she approved them.  And therefore, your Honor, we submit that those financial forecasts were knowingly false when made.

And defendants cite cautionary language that they say warns about this.  But the cautionary language, your Honor, if you see what they actually cite, is basically we haven't been audited before so maybe our internal controls are a problem. But they did not warn about intentional manipulation of the revenue.  The warning was not specific to the risk here, which was intentional manipulation of the financial data, and the risk had materialized.

THE COURT:  Thank you.

MS. HOPKINS:  Your Honor, just, I guess, quickly on the scheme claim if your Honor doesn't have any other questions.

And the scheme claim -- our scheme claim is not based entirely on the false statements.  Here we allege that the defendants execute -- engaged in several acts that affected the financial statements that were reported to the market that the market relied on, your Honor.

So, one, as we've talked about at length today, they knowingly booked revenue from unbillable cost overruns.  This is on slide 14.

Defendant Hibbard approved and issued forecasts that included unbillable cost overruns to the market.

They shipped incomplete robots to project sites so they could recognize revenue early.  Four witnesses all corroborated this.  And then, at the class period on July 29th, defendant Cohen confirmed, yes, that that's what they had done, they shipped incomplete robots.

And then, your Honor, Sym began hiring back in January 2024 to bring this back in-house but didn't tell anyone.  They continued to tell the market deployment times are getting better.  We just saw that on the earlier side.  Deployment times are getting better thanks to our outsourcing partners.  They're doing better and better, touting all of this when,

unbeknownst to the market, they were secretly hiring back this function over the prior six months because they knew they had to bring it back in-house, that Fluor was not working.

Defendants also attributed their revenue growth to the performance of the projects, your Honor.

THE COURT:  And, counsel, I'll just give you one more minute.

MS. HOPKINS:  Okay.  Your Honor.

My brother didn't speak about lost causation.  They challenged only the February 5, 2025 disclosure, but, as we said in our brief, that corrective disclosure is based on defendant Hibbard's disclosure that the project deployment times had not improved at all.  We are not relying on the SEC investigation disclosure in that corrective disclosure.  That corrective disclosure is based on the admission that the project deployment times had not improved at all, which corrects the prior misstatements that we had spoken about earlier, that project times were getting better, were around 20 months and so on and so forth.

Lastly, with respect to the SEC investigation, your Honor, the SEC did not take any action.  That doesn't cut against *scienter*.  That doesn't weigh either way, your Honor. We would submit the reason the SEC took no action is because defendants restated their financial statements already twice and implemented some internal controls.  So what was left?

THE COURT:  Thank you.

MS. HOPKINS:  Thank you, your Honor.

MR. BONGIORNO:  What was left, your Honor, my goodness.  She's accusing four individuals of fraud.  Fraud, okay?  And now she's shrugging her shoulders and saying, oh, they restated, so no big deal.  No harm, no foul.

These are people.  This isn't some imaginary group of defendants and they -- I don't mean to personalize it -- they, the plaintiffs, are accusing them of fraud.  And then to get up and say, well, the SEC wasn't going to do anything because no big deal, there was a restatement.

There's an entire -- probably 120 paragraphs in the complaint about some scheme of fraud associated with deployment times, and now the SEC is going to walk away from that?  It's truly astonishing, your Honor.

Just to hit on a few points here because there was a lot that was said that was vastly different than what's in the complaint and what's on the record here.  But I'll start just quickly with the case cite, Oracle, close to a billion dollars of stock sales just a few weeks before the end of the class period when there had been no stock sales in the five years before.  That's suspicious timing and amount, at least on a pleading.

Here, the very beginning of the class period, suspicious timing?  Of course not.  Of course not.  It was in

connection with the company selling stock.  That's why the CEO sold a tiny percentage of his stock at that time.  Vastly different than that case.

In terms of this chart.  We have things like on page 5, project delays occurred constantly, quote-unquote, at the top of page 5.  Constantly?  They were guessing 20 to 25 percent of the time.  I assume that's the high end of what they could stretch the employees' allegations to.  That's not constantly.

Fluor left hundreds of thousands of unused parts and equipment -- and equipment at the project site.  She mentioned that a few times.  The allegation is actually hundreds of thousands of dollars of equipment, not hundreds of thousands of parts.  These are valuable parts.  There weren't hundreds of thousands of them.

Then you have CW-3 was told to lie to customers.  That's not in the complaint.  What's in the complaint is some statement about how Cohen was at meetings -- he didn't say this, no one claims he said this -- Confidential Witness 3 was instructed by supervisors they should only be told parts were going to be delivered on time -- sorry, I know I'm reading too fast, I'm sorry -- or at most there would be a small delay.  The word "lie" sure doesn't appear there.

Then you heard, I don't know, 10 times, maybe 15 times that Confidential Witness 3, I think it was, told Hibbard all

these things.  That's nice.  Not what the complaint says.
Complaint doesn't say -- sorry, Confidential Witness No. 1.
Complaint doesn't say Confidential Witness No. 1 told Hibbard
anything.  It says, Confidential Witness No. 1 recalled that
Hibbard was told Symbotic was experiencing -- and my note says,
by whom?  What context?  Why do I say that?  Because it's the
passive voice.  Because Confidential Witness No. 1 doesn't say
that they told her that.  But that's what you heard today.

With regard to Confidential Witness No. 1, you also
have the problem that the visibility that this person has is
not into the entirety of all of these financial statements that
Hibbard supposedly knew about and knew they included cost
overruns and knew that the cost overruns were related to 2024
projects which were just getting started at that moment.
Somehow, the moment they started, there were cost overruns,
they couldn't be billed and Hibbard knew about that.  That all
happened in a nanosecond.  You heard that it was 21 of the 55
projects were 2024 projects.  Well, those were brand new.  So a
lot would have had to happen very quickly if a few weeks later
Hibbard knew all this.

And then you have this startling admission in
paragraph 111 of the complaint that you didn't hear about this
afternoon.  Confidential Witness No. 1 only had access to the
data and applications that pertained to Confidential Witness
No. 1's positions.

So that person sure didn't know everything and see everything. So these guesses about 25 percent delay and that cost overruns could be charged up until the beginning of last year and that most of the deployments started before January of last year, and certainly most of the ones that were generating a lot of revenue started before the beginning of last year by the time they spoke in February of last year about what was going on.

So --

THE COURT: And, counsel, given the time, I'm going to have to give you 30 seconds to wrap up.

MR. BONGIORNO: I will wrap up, your Honor.

You still haven't heard anything that any confidential witness said to or heard from any of these individual defendants that could attribute *scienter* to them. And with no *scienter*, there's no claim and this case should be dismissed.

Thank you, your Honor.

THE COURT: Thank you.

Counsel, I appreciate your arguments and keeping within the time limits.

I will give it further thought. I want to go back to the complaint and your papers, which I'll do, and we'll go from there.

Thank you.

MR. BONGIORNO: Thank you, your Honor.

THE CLERK:  All rise.

(Court adjourned at 4:01 p.m.)

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/Debra M. Kane                    December 29, 2025
Debra M. Kane, RMR, CRR, FCRR       Date
Official Court Reporter