**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **MATTHEW DECKER, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiff**<br><br>**v.**<br><br>**SYMBOTIC INC., RICHARD B. COHEN, THOMAS C. ERNST, CAROL J. HIBBARD, and WALTER ODISHO,**<br><br>**Defendants.** | ) | **Case No. 24-cv-12976-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, C.J.** **July 23, 2026**

## I. Introduction

Lead Plaintiff Jeffrey Adam Traina and Plaintiff Joseph De John (collectively, "Plaintiffs")[1] assert this putative class action against Defendants Symbotic Inc. ("Symbotic"), Richard B. Cohen ("Cohen"), Thomas C. Ernst ("Ernst"), Carol J. Hibbard ("Hibbard") and Walter Odisho ("Odisho") (collectively, "Defendants"), alleging securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"), between November 20, 2023, and February 5, 2025 (the "Class Period"). D. 23. Specifically, Plaintiffs assert claims against Defendants for violations of Section 10(b) and Rule 10b-5(b) (Count I), and Section 10(b) and

[1] The Court, upon motion, appointed Jeffrey Adam Traina as Lead Plaintiff in this matter. D. 21.

Rule 10b-5(a) and (c) (Count II), and against Cohen, Ernst, Hibbard and Odisho (collectively, "Individual Defendants") for violations of Section 20(a) (Count III). Id. Defendants have moved to dismiss the amended complaint. D. 32. For the reasons stated below, the Court ALLOWS the motion as to Count I with respect to Ernst, Hibbard and Odisho but DENIES the motion as to Count I with respect to Cohen and Symbotic; ALLOWS the motion as to Count II; and ALLOWS the motion as to Count III with respect to Ernst but DENIES the motion as to Count III with respect to Cohen, Hibbard and Odisho. Id.

## II. Standard of Review

For allegations of securities fraud under Sections 10(b) and 20(a) of the Exchange Act, "a plaintiff must plead the circumstances of the fraud with particularity, pursuant to Rule 9(b)," Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011), and, where liability is premised on alleged misstatements, pursuant to the Private Securities Litigation Reform Act ("PSLRA") must also "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," id. (alteration in original) (citation and internal quotation marks omitted). As part of the inquiry under Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007), courts engage in particularized scrutiny of private securities complaints. See, e.g., Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009). As required by Tellabs, the Court considers the allegations collectively to determine whether they give rise to a strong inference of scienter. Id. at 991-92 (citing Tellabs, 551 U.S. at 322-23).

As with any Rule 12(b)(6) motion, the Court must "accept well-pleaded factual allegations in the complaint as true and view all reasonable inferences in the plaintiffs' favor." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).

## III. Factual Background

### A. Materials Outside the Pleadings

As an initial matter, Plaintiffs argue that the Court may not consider, or may consider only in a limited capacity, exhibits marked 1 through 14 submitted by Defendants in connection with their motion to dismiss. D. 38 at 47 n.16; see D. 34. According to Plaintiffs, the Court may take notice of Exhibits 2 through 6 and 8 through 13, which reference documents filed with the SEC and cited in the amended complaint, but cannot consider them for the truth of their contents. D. 38 at 47 n.16. Further, Plaintiffs contend that the Court may not consider Exhibits 1, 7 or 14 because they are not cited in the amended complaint, are outside the Class Period and are not properly subject to judicial notice. Id.

Ordinarily, at the motion to dismiss stage, the Court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alt. Energy, Inc. v. Saint Paul Fire & Marine Ins., 267 F.3d 30, 33 (1st Cir. 2001). "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

Exhibits 2 through 6 and 8 through 12—SEC filings and earnings call transcripts, see D. 34 ¶¶ 3-7, 9-13, all cited in the amended complaint—constitute "documents sufficiently referred to in the complaint" for consideration at the motion to dismiss stage. See Alt. Energy, 267 F.3d at 33.[2]

[2] While Defendants may have intended for Exhibit 3 to be the press release announcing Symbotic's financial results for the first quarter of fiscal year 2024, as filed with the SEC, see D. 34 ¶ 4, Exhibit 3 is instead the press release announcing Symbotic's first-quarter results for fiscal year 2025, see D. 34-3 at 2.

Plaintiffs argue that, while the Court may note these exhibits' existence, it may not consider them for the truth of any matter asserted therein, D. 38 at 47 n.16, which Defendants do not appear to contest, see D. 42 at 10 n.2. These exhibits are "relevant not for the truth of anything asserted in [them]," see Torréns v. Lockheed Martin Servs. Grp., 396 F.3d 468, 473 (1st Cir. 2005), but rather because they evidence Symbotic's representations to the investing public. See, e.g., Kader v. Sarepta Therapeutics, Inc., No. 14-cv-14318-ADB, 2016 WL 1337256, at *12 (D. Mass. Apr. 5, 2016) (noting that court considered exhibits containing alleged misrepresentations "to determine the full content of [d]efendants' statements, and the context in which [d]efendants made them"), aff'd on other grounds, 887 F.3d 48 (1st Cir. 2018).

Exhibits 1 and 7 are SEC filings from outside the Class Period. See D. 34 ¶¶ 2, 8. While Exhibit 1 is not relied upon in the amended complaint, it is subject to consideration here as a document publicly filed with the SEC, and it is relevant to the Court's analysis of whether certain alleged misstatements qualify for safe harbor protection. The Court also takes judicial notice of Exhibit 7, which Defendants cite to note that the SEC closed its investigation into Symbotic without recommending enforcement. D. 33 at 15 n.5, 30. While the Court takes notice of the fact that Symbotic asserted, in this SEC filing, that the SEC closed its investigation, see, e.g., Pietrantoni v. Corcept Therapeutics Inc., 640 F. Supp. 3d 197, 205 (D. Mass. 2022) (noting that it is appropriate "to take judicial notice of government records for the fact that they exist or contain certain information and not for the truth of the facts asserted within them"), the Court notes that it does not draw any inference adverse to Plaintiffs based on same. See, e.g., In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 274 & n.2 (D.N.J. 2007) (taking notice of SEC no-action letter "for the limited purpose of acknowledging that the SEC investigation of the matters related to [the defendant's] [r]estatement was terminated without any enforcement action" but "stress[ing]" that

notice should "not be interpreted as the [c]ourt's determination that the SEC examined" same matters raised in complaint "or that the SEC lacked agency discretion to terminate the investigation even if the SEC did find that [the defendant] violated securities provisions"). Exhibits 13 and 14 are analyst reports. D. 34 ¶¶ 14-15. Plaintiffs seem to acknowledge that Exhibit 13 is cited in the amended complaint, see D. 38 at 47 n.16; D. 23 ¶ 372, and it appears that Exhibit 14 is as well, see D. 23 ¶ 373; D. 42 at 10 n.2, so the Court may consider both.

## B. Factual Allegations

The Court draws the following facts from the amended complaint, D. 23, and from the exhibits Defendants filed in support of their motion, see D. 34, to the extent discussed above.[3]

### *1. Symbotic and Its Business*

Symbotic presents itself as using its "end-to-end, A.I.-powered robotic and software platform [to] reinvent[] the warehouse as a strategic asset." D. 23 ¶ 40 (alterations in original); see D. 34-3 at 3. During the Class Period, Symbotic's primary business was the sale of its warehousing systems to large retailers and wholesalers. D. 23 ¶ 4. These systems accounted for nearly all Symbotic revenue in 2023 and 2024, id. ¶ 44, and Walmart accounted for eighty-eight percent of Symbotic's annual sales during the Class Period, id. ¶¶ 4, 52.

The project deployment lifecycle for Symbotic warehousing systems consists of four phases: (1) procurement, (2) installation, (3) commissioning and (4) "go-live." Id. ¶ 45. One component of the installation phase is Engineering, Procurement and Construction ("EPC"). Id. ¶ 46. EPC involves directing equipment and resources throughout the installation phase. See id. ¶ 47. Symbotic accounts for system sales revenues on a percentage-of-completion basis, meaning

[3] When quoting the amended complaint, the Court omits any emphases Plaintiffs may have added.

revenue is recognized based on the proportion of deployment costs incurred. Id. ¶ 49. The strongest concentration of revenue is recognized during the installation phase. Id. ¶ 50.

Demand for Symbotic systems was high during the Class Period, and analysts and investors viewed Symbotic's ability to reduce project deployment times as critical to Symbotic's growth. Id. ¶ 5. Symbotic tracked various deployment metrics during the Class Period, including new system installations started during a given period, systems deployed at a customer site and total backlog of customer orders that had not been started. See id. ¶¶ 54-56. According to Confidential Witnesses ("CWs") 2 and 3,[4] Symbotic used tools to track deployment progress. Id. ¶¶ 57-58, 101. Certain of Symbotic's contracts with customers, including its master agreement with Walmart, required Symbotic to report regularly on deployment progress. See id. ¶ 60. Symbotic's stated goal during the Class Period was to reduce deployment times from an average of approximately twenty-four months to approximately twelve and then six months. Id. ¶ 5; see D. 34-8 at 9; D. 34-9 at 8.

As part of this plan, Symbotic outsourced aspects of its deployment process, including EPC functions, to outsourcing partners beginning in 2022. D. 23 ¶¶ 6, 67. By January 2023, Symbotic utilized outsourcing partners throughout the deployment process, and Cohen stated during an earnings call on January 30, 2023, that he thought "a full benefit of the outsourcing" should be

[4] Plaintiffs rely upon the statements of five CWs. CW2 was employed by Symbotic as an Advanced "PLC" Integration Specialist throughout 2023 and 2024. Id. ¶ 36. CW2 was responsible for ensuring that equipment was installed and performing correctly and performed at least some of this work at deployment sites. Id. CW3 was a Strategic Director of Supply Chain between January and October 2022 and reported indirectly to Cohen. Id. ¶ 37. From October 2022 to August 2024, CW3 was a consultant. Id. As an employee, CW3 had responsibility for vendor and supply chain management. Id. As a consultant, CW3 entered vendor data and assisted Symbotic project managers with purchase orders. Id.

apparent in "the next 3 to 6 months." Id. ¶¶ 68-69. According to CW4,[5] Symbotic's primary EPC outsourcing partner was Fluor, a company Symbotic engaged in approximately August 2022. Id. ¶¶ 7, 70.[6] Fluor's responsibilities also included logistics and inventory management, which CW4 indicated are distinct from EPC functions. See id. ¶ 70. CW1 and CW2 corroborated that Fluor had certain responsibilities at deployment sites. Id. ¶¶ 71-72.

CW4 described Fluor as "terrible" prior to the Class Period and through CW4's departure in December 2023, because, *inter alia*, Fluor was unresponsive and "did not prioritize Symbotic's needs." Id. ¶¶ 74, 81. CW4 stated that project delays caused by Fluor placed Symbotic's contracts with Walmart and another customer in jeopardy, id. ¶¶ 76-77; see id. ¶ 8, although it is unclear when. Symbotic incurred cost overruns during CW4's tenure, including from having to replace lost parts and pay expedited shipping for late-ordered parts. Id. ¶¶ 75, 79; see id. ¶ 8. CW4 "got in trouble" for attempting to verify Fluor's vendor invoices before approving payment. Id. ¶ 80. CW2 agreed that Fluor caused deployment delays and was unresponsive, id. ¶¶ 82, 84, 86, and CW1[7] agreed that CW1 had "heard" that Fluor was not performing well, id. ¶ 85.

Although not specific to Fluor, CW5[8] agreed that in 2023, outsourcing partners' slow

---

[5] CW4 was a Warehouse Operations Supervisor and Logistics Specialist at Symbotic between September 2016 and December 2023. Id. ¶ 38. For at least part of this time, CW4 reported indirectly to Cohen and Odisho. See id.

[6] Although at the motion hearing, Plaintiffs' counsel instead represented that Symbotic partnered with Fluor beginning in 2023, see D. 44 at 20, 24, 26, the Court accepts the amended complaint's allegation as true.

[7] CW1 was a Senior Financial Analyst at Symbotic throughout the Class Period, reporting indirectly to Hibbard. Id. ¶ 35. CW1's role required "forecasting, budgeting, and revenue modeling, which included working with Symbotic's senior executives, including . . . Hibbard, on scenario planning and analyzing variances between projected financial results and actual results." Id.

[8] CW5 was an Advanced System Reliability Test Engineer between approximately January 2023 and January 2024, id. ¶ 39, or possibly April 2023 to February 2024, see id. ¶ 89. CW5

progress caused Symbotic to miss deadlines for Walmart. Id. ¶ 87. CW4 stated that between June 2022 and CW4's departure in December 2023, Symbotic shipped incomplete robots to customer sites and removed parts from one site for use in another site, which put projects behind. Id. ¶ 78. CW2 and CW5 corroborated this account, id. ¶¶ 83, 88, and CW3 agreed that Symbotic shipped incomplete robots, id. ¶¶ 91-96. CW3 corroborated that Symbotic paid to expedite shipping of missing parts, although it is unclear if this reflects events during the Class Period. Id. ¶ 93. CW3 agreed that during the Class Period, "it was 'always known' internally at Symbotic that there were delays in meeting project milestones." Id. ¶ 90. CW3 partly attributed this to the fact that Symbotic's vendor contracts required a ninety-day lead time for orders, but Symbotic's system deployments were scheduled based on a forty-five-day lead time. Id. CW4, who left Symbotic in December 2023, id. ¶ 38, estimated that twenty to twenty-five percent of projects suffered from cost overruns due to delays, id. ¶ 97.

During a July 29, 2024, earnings call, Hibbard disclosed that Symbotic would bring EPC back in house. Id. ¶¶ 102, 217-19; D. 34-11 at 5. Discussing outsourcing partners on this call, Cohen stated that robots were shipped without full functionality and that missing parts were leading to "hundreds of people standing around the site for weeks." D. 23 ¶ 103; D. 34-11 at 7, 9. Cohen further stated that Symbotic had been "hiring people in the supply chain in the EPC space over the last 6 months." D. 23 ¶¶ 104, 220, 223; D. 34-11 at 7.[9]

2. *The Individual Defendants*

The Individual Defendants are current and former Symbotic executives. Ernst was

---

tested and evaluated system installations by Symbotic's general contractors, which involved visiting approximately ten deployment sites. Id. ¶ 39.

[9] As alleged, Symbotic kept Fluor on to manage projects through the end of the Class Period. See D. 23 ¶ 72 (alleging that Fluor managed deployment projects throughout CW1's tenure); id. ¶ 35 (alleging that CW1 worked at Symbotic throughout Class Period).

Symbotic's Chief Financial Officer ("CFO") from 2020 through the end of 2023. D. 23 ¶ 28.

At all relevant times, Cohen was Symbotic's Chief Executive Officer ("CEO") and Chairman. Id. ¶ 27. Between at least April 2023 and February 2024, Cohen visited deployment sites to interact with Symbotic customers and employees. Id. ¶ 89. CW5 spoke with Cohen during one such visit. Id. CW3 participated in weekly and biweekly meetings attended by Cohen and others. Id. ¶ 96. CW3 allegedly advocated for telling customers like Walmart about project delays, but CW3 was instructed in meetings attended by Cohen "that customers should only be told that parts were going to be delivered on time or at most there would be a small delay," even when this was untrue. Id. On February 26, 2024, during the Class Period, Cohen[10] sold five million shares of Symbotic stock controlled by him for proceeds of $183.45 million. Id. ¶¶ 12, 349-52; see D. 34-4 at 10-11.[11]

Hibbard was Symbotic's CFO and Treasurer beginning in December 2023 and continuing through the remainder of the Class Period. D. 23 ¶ 29. According to CW1, Symbotic's Financial Planning and Analysis ("FP&A") group prepared Symbotic's revenue models and quarterly financial forecasts, which Hibbard approved. Id. ¶ 64. The group also provided Hibbard with quarterly reports on variances between projected and actual financial results. Id. CW1 provided a presentation to Hibbard and the FP&A group at quarterly meetings, and the presentation topics included variances and business risks and opportunities. Id. ¶ 65. CW1 recalled that at every quarterly meeting during the Class Period, Hibbard was informed that Symbotic was experiencing project delays and cost overruns that were negatively impacting Symbotic's financial results. Id.

[10] The shares were sold by Cohen and his wife, "through entities, trusts, and GRATs they controlled." Id. ¶ 350. Accordingly, there were multiple transactions, and, as alleged, all transactions occurred on the same day. See id. ¶ 351.

[11] The Court uses the sales proceeds figure alleged by Plaintiffs. See D. 23 ¶ 352.

CW1 also stated that multiple Symbotic teams reported to Hibbard regarding system deployment scheduling. Id. ¶ 110.

Odisho was Symbotic's Chief Manufacturing and Supply Chain Officer throughout the Class Period. Id. ¶ 30. According to CW2, Odisho visited deployment sites during CW2's tenure at Symbotic. Id. ¶ 332. Hibbard stated during a May 9, 2024, Investor Day presentation that she and Odisho chaired a weekly, cross-functional meeting regarding deployment schedules. See id. ¶ 98. Odisho was on a panel with Hibbard during this event, during which Hibbard stated that she and Odisho were focused on deployment improvements and claimed that Symbotic had successfully accelerated deployments. Id. ¶¶ 210-11. Odisho stated during the presentation, "we can clearly understand [deployment] progress on a daily basis and monitor it with the tools that we have in place." Id. ¶ 301 (alteration in original). Odisho also stated that Symbotic was able to reduce "commissioning hours" over sites shown during the presentation. Id. ¶ 321.

### 3. *Alleged Fraud*

The crux of the amended complaint is that Symbotic allegedly concealed Fluor's subpar performance and the resulting financial impact. As alleged, Symbotic falsely represented to investors that Symbotic was accelerating deployments with help from outsourcing partners. Id. ¶ 9. According to CW1, however, Symbotic's average system deployment time was approximately twenty-four months throughout the entire Class Period. Id. ¶ 51.

Symbotic also allegedly "improperly recogniz[ed] revenue for cost overruns in Symbotic's financial statements," which led to material overstatements during the Class Period. Id. ¶ 10. Although as of September 2023, some preexisting customer contracts allowed Symbotic to pass overruns on to customers, "new contracts in 2024 were written to disallow" same. Id. ¶ 107. CW1 confirmed that Hibbard was aware of this change and led an effort to reduce cost overruns in 2024. Id. ¶ 108. As alleged, Defendants falsely told investors that Symbotic was absorbing cost overruns.

Id. ¶ 112.[12] According to CW1, the FP&A group's revenue forecasts and financial results discussed with Hibbard continued to include cost overruns recorded as revenue. Id. ¶¶ 106, 109.

On November 18, 2024, Symbotic announced its fiscal year 2024 fourth-quarter and full-year financial results as well as restated financial results for the first three quarters of 2024. Id. ¶ 116. At the time, Symbotic stated that the quarterly restatements were due primarily to recognizing revenue prematurely (i.e., before certain project milestones were achieved under the percentage-of-completion method) and did not impact full-year results. Id. ¶¶ 116-17, 238. On November 27, 2024, however, Symbotic announced that it had subsequently "identified errors in its revenue recognition related to cost overruns" and had determined that it would be unable to timely file its fiscal year 2024 annual report to the SEC ("10-K"). Id. ¶¶ 118, 252-53. Symbotic also lowered its 2025 first-quarter EBITDA forecasts and revenue guidance. Id. ¶¶ 119, 254. On December 4, 2024, Symbotic filed its 2024 10-K and amended quarterly reports ("10-Qs"). Id. ¶¶ 121-22, 256-60. The 2024 10-K stated for the first time that Symbotic was subject to an ongoing SEC investigation involving alleged violations of SEC whistleblower rules. Id. ¶¶ 123, 262.[13] Further, the 2024 10-K announced that Symbotic had determined its financial reporting internal controls were deficient as of the end of fiscal year 2024 and that Symbotic was implementing a remediation plan. Id. ¶¶ 124-26, 260. Symbotic's external auditor issued an adverse opinion regarding Symbotic's internal control over financial reporting, which noted that Symbotic "did not

[12] Plaintiffs do not allege a specific misrepresentation in this regard. See id. ¶¶ 112, 312.

[13] Plaintiffs characterize this disclosure as "reveal[ing] for the first time that Symbotic was being investigated by the SEC for alleged attempts to silence a whistleblower in connection with its earlier announced multiple restatements of financial results in November 2024," D. 23 ¶ 123, and "disclos[ing] for the first time that the SEC was investigating Defendants' alleged efforts to impede a whistleblower from coming forward about Defendants' restatement," id. ¶ 262, but the quoted disclosure does not state that the investigation was related to the restatements. As discussed below, Defendants subsequently disclosed receipt of a subpoena from the SEC related to the restatements. Id. ¶ 265.

effectively design and execute controls over the timing of the recognition of revenue and cost of revenue" and "did not effectively design and execute controls over the recognition of revenue from cost overruns that are not billable to customers." Id. ¶ 127; see id. ¶ 261.

On February 5, 2025, the last day of the Class Period, Hibbard stated during Symbotic's quarterly earnings call that Symbotic was "still averaging 24 months" to complete deployments and that acceleration would "take some time." Id. ¶¶ 16, 264. Defendants also announced that Symbotic received a subpoena from the SEC, id. ¶¶ 16, 265, which was related to the November 2024 restatements "and certain other matters," D. 34-6 at 24.

*4. Alleged Misrepresentations or Omissions*

Plaintiffs allege that during the Class Period, Defendants made materially misleading statements and/or omissions on numerous occasions. See D. 23 ¶ 137. First, Plaintiffs allege that Defendants misrepresented Symbotic's deployment timelines (the "deployment timeline statements"). Id. ¶¶ 139, 143, 147, 151, 166-69, 189-92, 198, 211-13, 250. Additionally, Plaintiffs allege that Defendants made misrepresentations regarding Symbotic's fiscal year 2024 financials and forecasts, including GAAP compliance, and made misrepresentations regarding Symbotic's internal control over financial reporting, including in SOX certifications (the "revenue statements"). Id. ¶¶ 161-62, 164, 174, 176, 178-82, 185-87, 196, 202, 204, 206-07, 224-25, 229, 232, 234-35, 240-45, 248, 250.[14]

## IV. Procedural History

This putative class action was initiated on December 3, 2024. D. 1. Plaintiffs filed the

[14] While the subject matter of these statements is not limited to Symbotic's revenues, the Court refers to them as such for simplicity given that Plaintiffs' theory of fraud concerns Symbotic improperly recording certain revenues. See D. 38 at 16.

amended complaint on July 11, 2025. D. 23.[15] Defendants have now moved to dismiss. D. 32. The Court heard the parties on the pending motion and took the matter under advisement. D. 43.

## V. Discussion

### A. Section 10(b) and Rule 10b-5(b) Misrepresentation or Omission (Count I)

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff "must allege '(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc., 152 F.4th 1, 9 (1st Cir. 2025) (alteration in original) (quoting Karth v. Keryx Biopharms., Inc., 6 F.4th 123, 135 (1st Cir. 2021)). Defendants challenge the sufficiency of Count I with respect to the first, second and sixth elements. D. 33 at 17-40, 43-44.

#### *1. Actionable Misrepresentations or Omissions*

"To establish a material misrepresentation or omission, [Plaintiffs] must show 'that [D]efendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading.'" Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (quoting Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001)). With respect to affirmative statements, the truth or falsity of same is "a relatively straight forward analysis," see In re Cytyc Corp. Sec. Litig., No. 02-cv-12399-NMG, 2005 WL 3801468, at *14 (D. Mass. Mar. 2, 2005), report and recommendation adopted, No. 02-cv-12399-NMG (D. Mass. Mar. 22, 2005), but whether a statement is misleading "depends on the perspective of a

[15] The same day, Plaintiffs voluntarily dismissed Maria G. Freve, who was named as a defendant in the original complaint. See D. 24.

reasonable investor," Karth, 6 F.4th at 135 (quoting Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 186 (2015)). With respect to omissions, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011); see SEC v. Johnston, 986 F.3d 63, 72 (1st Cir. 2021) (noting that "[i]t is well-settled that the 'mere possession of . . . nonpublic information does not create a duty to disclose it'" (second alteration in original) (quoting In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68, 74 (1st Cir. 2012))). Moreover, the duty to disclose "extends . . . only where affirmative statements are made and the speaker fails to 'reveal [] those facts that are needed so that what was revealed would not be so incomplete as to mislead.'" In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 27 (1st Cir. 2012) (second alteration in original) (quoting Hill, 638 F.3d at 57).

"Information is material if a reasonable investor would have viewed it as having significantly altered the total mix of information made available." Ponsa-Rabell v. Santander Sec. LLC, 35 F.4th 26, 33 (1st Cir. 2022) (internal quotation marks omitted) (quoting Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 85 (1st Cir. 2008)). The Court considers "the entirety of the relevant facts available at the time of the allegedly misleading statement, not simply the words of the statement itself." Id. Although "[m]ateriality is usually a matter for the trier of fact," ACA Fin., 512 F.3d at 65, "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." Shaw v. Digit. Equip. Corp., 82

F.3d 1194, 1217 (1st Cir. 1996), superseded by PSLRA on other grounds as stated in Greebel v. FTP Software, Inc., 194 F.3d 185, 196-97 (1st Cir. 1999).

a) Materially False or Misleading

Plaintiffs challenge numerous deployment timeline statements. See D. 23 ¶¶ 139, 143, 147, 151, 166-69, 189-92, 198, 211-13, 250. The thrust of Plaintiffs' theory concerning these statements is that "Defendants' narrative that outsourcing partners [like Fluor] were continually accelerating the pace of deployments was a lie." D. 38 at 27.

The Court agrees with Defendants, see D. 33 at 35-36, that Plaintiffs have not sufficiently alleged the falsity or misleadingness of several statements.[16] At the heart of their argument is CW1's statement that between September 2023 and February 2025, the "average system deployment time remained around 24 months," see D. 23 ¶ 51, and CW4's related statement that between August 2022 and CW4's departure in December 2023, "Fluor's inability to manage inventory and logistics prevented Symbotic from reducing average deployment times below 24 months," see id. ¶¶ 74, 76. Initially, it is unclear how these allegations would undermine statements about past performance during Symbotic's November 20, 2023 earnings call regarding fiscal year 2023. See D. 23 ¶¶ 143, 147, 151 (stating that the "pace of new system starts and the acceleration of system installations saw a marked improvement," Symbotic saw "very healthy improvement" in deployment speed and was "getting faster," saw "progress in . . . carving days out and occasional innovations or carving weeks out" and, "particularly here in the second half of 2023," had "not had those kinds of things [like a natural disaster] that have really slowed us down

[16] As Plaintiffs note, D. 38 at 25-26, Defendants do not dispute that most revenue statements were materially false or misleading when made. See D. 33 at 31-40.

that are beyond our control").[17] Accepting as true CW1's statement that deployments took "around" twenty-four months on average between September 2023 and February 2025, id. ¶ 51, this does not render misleading Defendants' statements regarding progress they were seeing around the end of fiscal year 2023, which ended on September 30, 2023, see id. ¶ 129 n.1, in an earnings call that took place on November 20, 2023, id. ¶ 138. Similarly, while Ernst's statement during this call that Symbotic "continue[s] to shrink the time of deployments with the help of . . . partnership initiatives," id. ¶ 143, used the present tense, it does not appear to be rendered misleading by CW1 or CW4's statements, particularly where Ernst also described that Symbotic's earlier systems took "north of 2.5 years" to deploy, id. ¶ 151; cf. Olsen v. Agenus Inc., No. 24-cv-12299-AK, 2026 WL 810814, at *9 (D. Mass. Mar. 24, 2026) (noting that a securities plaintiff "must explain why a statement was materially false or misleading at the time it was made" (emphasis in original)).[18] Moreover, Ernst noted in the same breath that at the time of the call, Symbotic was "hitting effectively on these systems here in [fiscal year] 2024 are going to hit on that 2-year time frame," D. 23 ¶ 15, which conveyed that the deployments Symbotic had in progress as of then should have been expected to take approximately two years—the very timeframe Plaintiffs complain about.

Additionally, while multiple CWs discuss project delays allegedly attributable to outsourcing partners like Fluor, without specific factual allegations regarding the scale and timing

[17] The Court agrees with Defendants, D. 33 at 36 n.15, and Plaintiffs appear to acknowledge, see D. 38 at 26 n.1, that Plaintiffs have not alleged falsity of Ernst's statement during this call that "revenue growth" in the fourth quarter of fiscal year 2023 "was driven primarily by faster execution on deployments," see D. 23 ¶ 143.

[18] On the same call, Cohen stated that Symbotic had "hardened" its supply chain "to position Symbotic for even faster deployments, continued revenue growth and steadily improving margins." Id. ¶ 139. This statement is inactionable puffery because it is too vague for a reasonable investor to rely upon it. See Shaw, 82 F.3d at 1217.

of the impacts, Plaintiffs have not sufficiently alleged that Ernst's statement at that time was misleading. See id. ¶ 146 (alleging that in 2022 and 2023, partners caused significant delays to "multiple" deployments); D. 34-8 at 5 (representing on earnings call that at the end of fiscal year 2023, Symbotic had thirty-five systems in progress); Wasson v. LogMeIn, Inc., 496 F. Supp. 3d 612, 635 (D. Mass. 2020) (concluding that even if customer churn was negatively impacting operating segment, it did not necessarily follow that segment would not accelerate). Plaintiffs' challenges to at least three statements concerning Symbotic's multiple twenty-month deployments fare no better, where Plaintiffs do not suggest that such timelines were not achieved, see D. 38 at 29 (acknowledging that Defendants "did provide a couple of one-off purported examples of faster deployments"), and the Court concludes that the context of the statements makes clear that those particular deployments were being referenced. See D. 23 ¶ 166; D. 34-9 at 4 (stating that "[c]ontinued reductions in system deployment time as demonstrated by the system we recently deployed in just 20 months leave[] us well positioned to support customer demand"); D. 23 ¶ 192; D. 34-10 at 5-6 (discussing "some of the things that are enabling that faster deployment" in reference to "several [deployments] that also achieved a 20-month deployment time"); D. 23 ¶ 211 (stating that "over the last couple of quarters, we've had several proof points where we have that [deployment] down to 20 months"); see also Wasson, 496 F. Supp. 3d at 628 (concluding that accurate statement regarding gross renewal rate at point in time could not support fraud claim).[19] For similar reasons, the Court disagrees with Plaintiffs, see D. 38 at 28-29, 31-32, that Defendants

---

[19] Although Plaintiffs point to an analyst report stating, based on Symbotic's February 5, 2024, press release and earnings call, that "[n]ew system deployments now average ~20 months," D. 23 ¶ 173; D. 38 at 29, Plaintiffs have not pointed to any statement to that effect by Defendants. Indeed, Defendants did not make such a statement during that earnings call. See D. 34-9. Instead, Cohen disclosed that Symbotic had, at that point, completed a twenty-month deployment for the first time. Id. at 3 (referring to same as "a new deployment record"); see id. at 8 (question from analyst regarding Symbotic "getting to 1 deployment in the 20-month zone").

had a duty to disclose additional information to prevent these statements from being misleading half-truths.

Defendants also argue that a statement Hibbard made on the earnings call for the fourth quarter of fiscal year 2024 concerning "accelerating deployments generally" was not false or misleading. See D. 33 at 35 (citing D. 23 ¶ 250). The Court agrees, insofar as Hibbard stated that "scheduled delays that we had in the third quarter that we talked about those elongated construction delays, they corrected faster than we had planned." See D. 23 ¶ 250; D. 34-12 at 6. Defendants' argument is unpersuasive as to the other challenged aspects of the statement, however, which concern Symbotic's quarterly financial results rather than deployment timelines. See D. 23 ¶ 250.

b) Optimism, Puffery or Opinion

Defendants argue that ten challenged statements contain inactionable expressions of corporate optimism or puffery, see D. 33 at 36 (citing D. 23 ¶¶ 143, 168, 192, 198), and/or opinion, see id. at 37 n.16 (citing D. 23 ¶¶ 139, 147, 151, 167-69, 190, 192). "[L]oosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available" are immaterial. Shaw, 82 F.3d at 1217. Such statements include those "about both a company's current state of affairs and its future prospects." In re Bos. Sci. Corp. Sec. Litig., No. 10-cv-10593-DPW, 2011 WL 4381889, at *11 (D. Mass. Sept. 19, 2011) (internal citation and quotation marks omitted), aff'd on other grounds, 686 F.3d 21. Statements that amount to "rosy affirmation" of a company's prospects or products are not actionable statements for a securities fraud claim. See In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 41-42 (D. Mass. 2016) (claiming that company sold a "terrific product that is going to perform very well in the market" was not actionable), aff'd on other grounds, 857 F.3d 34 (1st Cir. 2017). "Statements of opinion can be actionable if 'the real facts are otherwise, but not provided.'" Yan v. ReWalk Robotics Ltd., 973

F.3d 22, 32 (1st Cir. 2020) (quoting Omnicare, 575 U.S. at 188). A statement of opinion differs from a statement of fact in that a statement of fact "expresses certainty about a thing, whereas a statement of opinion . . . does not." Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 7 (1st Cir. 2021) (quoting Omnicare, 575 U.S. at 183). The use of words like "think" or "believe" to qualify a statement can help demonstrate that it is an opinion. Id. Even an opinion, however, "may convey three facts: that the speaker has such a belief; that the belief fairly aligns with the facts known to the speaker; and, if stated in the context of the securities market, that the speaker has made the type of inquiry that a reasonable investor would expect given the circumstances." Id. A complaint, therefore, "must plausibly allege the falsity of at least one of these facts to survive a motion to dismiss." Brill v. Invivyd, Inc., No. 23-cv-10254-JEK, 2024 WL 4228832, at *7 (D. Mass. Sept. 18, 2024).

Here, the statements that describe Symbotic's outsourcing partners as "executing well" or "ramping up so well," D. 23 ¶ 143, tout "increased collaboration," id. ¶¶ 168, 192, and "solid project execution," id. ¶ 198, and state that Symbotic management continued to "see significant opportunities and gain efficiencies over time," id. ¶ 143, fall within the range of vague optimism that a reasonable investor would not find important. See, e.g., Greebel, 194 F.3d at 189-90, 207 (concluding that statements regarding "strong" sales performance and "new ventures [that were] off to a good start," among others, were puffery); In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d 332, 338-39 (D. Mass. 2020) (concluding that "the defendants' claims that they were 'delighted' with the progress [the company] was making, that they were 'bullish' about their business, and that market share would grow are examples of expressions of loose optimism and here immaterial"); Thant v. Karyopharm Therapeutics Inc., 43 F.4th 214, 223 (1st Cir. 2022) (providing additional examples of inactionable puffery, including describing product as a "breakthrough,"

stating company would "lead the market" with its "well[-]received" new products and predicting that product would expand customer base).

Regarding Defendants' characterization of certain statement portions the Court has not already addressed as opinions, the Court concludes that they are not actionable. Specifically, statements that Symbotic's outsourcing partners were "improving" on each deployment and Symbotic was "standardizing" build instructions and test procedures, D. 23 ¶ 168, and that Symbotic was "still on target for the future to have a number of opportunities that we see driving deployment time less than 12 months," id. ¶ 192, are "vague proclamations of progress to which a reasonable investor would assign little weight." Bos. Sci. Corp., 646 F. Supp. 3d at 274-75 (reaching same conclusion for statements that company was "on track" to meet goal, that launch was "gaining momentum" and that company was seeing "strong" sales and order rates).

c) Safe Harbor

The PSLRA's "safe harbor" provisions "sharply limit liability of companies and their management for certain 'forward-looking statements,' . . . when such statements are accompanied by appropriate cautionary language." Smith & Wesson, 669 F.3d at 71 n.3. Forward-looking statements can include statements containing revenue projections, statements of management plans and objectives for future operations and statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). "In analyzing a forward-looking statement, the aspect of the statement that is based on [a] present fact must be distinguished from the aspect of the statement that is a future projection," as only the forward-looking component is protectable. N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 45 n.13 (1st Cir. 2008). "Forward-looking statements are not actionable if they are 1) identified and accompanied by meaningful cautionary language; 2) immaterial or 3) the plaintiff fails to prove that the statement was made 'with actual knowledge' that it was false or misleading." Leavitt v. Alnylam Pharms., Inc., 451 F. Supp. 3d

176, 183 (D. Mass. 2020) (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)); see In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 212 (1st Cir. 2005). "[T]o be meaningful, cautionary statements must be 'substantive and tailored to the specific future projections, estimates or opinions . . . which [the] plaintiffs challenge.'" Isham v. Perini Corp., 665 F. Supp. 2d 28, 39 (D. Mass. 2009) (second alteration in original) (quoting In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332, 341 (D. Mass. 2009)).

Here, Defendants argue that eleven of the challenged statements are at least partly forward looking. See D. 33 at 32 & n.11 (citing D. 23 ¶¶ 139, 147, 151, 164, 167, 168, 190, 192, 196, 241, 248). Plaintiffs agree that four are revenue forecasts, D. 23 ¶¶ 164, 196, 241, 248, which qualify as forward looking for safe harbor purposes. See D. 38 at 33-34.[20] The Court agrees that several statements are forward looking. See D. 23 ¶ 139 (discussing on earnings call Symbotic's "plan to achieve" various "goal[s]," including "scaling for rapid growth as we continue to accelerate our time to deploy systems"); id. ¶ 147 (stating on earnings call that "as we look forward, we continue to expect that we're going to deliver systems faster"); id. ¶ 151 (explaining on earnings call that, "the systems we're rolling out now, we expect to be [deployed in] under 22 months"); id. ¶ 167; D. 34-9 at 5 (stating during earnings call that guidance for upcoming quarter reflected Symbotic's "flexibility to accommodate increased spending if needed as we need to accelerate deployment schedules" and that market would "see [profitability] start to improve in the second half of the year and year-over-year"); D. 23 ¶ 190 (providing "expect[ation]" during earnings call that "quarterly

[20] The Court notes, however, that one challenged aspect of one such statement includes a portion that is not forward looking and thus does not qualify for safe harbor protection. See D. 23 ¶ 241 (stating that Symbotic "grew revenue 55%" in fiscal year 2024); Stone & Webster, 414 F.3d at 212-13.

system starts" would "accelerate during the rest of the year").[21] Further, all five statements were made during earnings calls that began with a disclaimer that the call would "include forward-looking statements." D. 34-8 at 3; D. 34-9 at 3 (same); D. 34-10 at 3 (similar); see Grobler v. Neovasc Inc., No. 16-cv-11038-RGS, 2016 WL 6897760, at *5 (D. Mass. Nov. 22, 2016) (noting that "courts have routinely considered a warning at the beginning of an investor call to be sufficient to satisfy the safe harbor requirements").

Forward-looking statements must be accompanied by meaningful, tailored cautionary language to receive safe harbor protection. Leavitt, 451 F. Supp. 3d at 185-86. Each of the challenged statements was accompanied by certain cautionary language and referenced further cautionary language included in Symbotic's SEC filings, including its 2022 10-K, D. 34-1 at 5, and its 2023 10-K, D. 34-2 at 6; see D. 34-5 at 5; D. 34-8 at 3; D. 34-9 at 3; D. 34-10 at 3; D. 34-12 at 3.[22] The annual reports, in turn, included detailed discussions of risk factors, including potentially inadequate internal controls, see D. 34-1 at 41-42; D. 34-2 at 44-45, and potential supplier disruptions, see D. 34-1 at 26; D. 34-2 at 28-29. With respect to the revenue forecasts, Plaintiffs argue that the language Defendants point to is insufficient because it "did not warn of the specific risks that (1) Symbotic may improperly recognize revenues . . . and (2) Symbotic's primary outsourcing partner . . . may lose critical inventory, fail to place orders on time, and fail

---

[21] As to the statement portion, "we continue to be on a trajectory to improve," see D. 23 ¶ 167, even if it is not forward-looking, the Court concludes that in context, it is inactionable as puffery or because Plaintiffs have not adequately alleged it was false or misleading. See D. 34-9 at 5 (stating that "in terms of the longer term profitability, we continue to be on a trajectory to improve").

[22] As the Court has already stated, see *supra* note 2, Defendants appear to have failed to submit to the Court the press release regarding Symbotic's financial results for the first quarter of 2024. Defendants also have not submitted the press release announcing Symbotic's fourth-quarter 2024 financial results. The Court considered same, which are publicly filed with the SEC as Exhibits 99.1 to Forms 8-K dated February 5, 2024, and November 18, 2024, respectively, and which also include cautionary language and refer the reader to Symbotic's 2023 10-K.

to accelerate deployments as needed to achieve the forecasts." D. 38 at 34. The Court agrees with Defendants, see D. 42 at 16-17, that such specificity was not required. See Isham, 665 F. Supp. 2d at 39-40. Moreover, even accepting Plaintiffs' argument that the cautionary language "would not have been meaningful because those risks had already come to fruition," see D. 38 at 34, the statements are independently shielded because Plaintiffs have not pled facts sufficient to raise a strong inference that they were made with actual knowledge that they were false or misleading. See In re Pharms., Inc. Sec. Litig., No. 04-cv-12581-GAO, 2007 WL 951695, at *8 n.9, *9 (D. Mass. Mar. 28, 2007); see also Grobler, 2016 WL 6897760, at *4 (explaining that "the safe harbor provisions are written disjunctively" such that "proof of known falsity is governing only where meaningful cautionary statements are lacking").

d) Remaining Statements

In light of the analysis above, a few alleged misrepresentations remain for further discussion. First are two statements made during Symbotic's May 9, 2024, Investor Day, as part of a panel discussion that allegedly included Hibbard and Odisho. See D. 23 ¶¶ 210-13. One was made by Symbotic's Vice President of Investor Relations, Jeffrey Evanson ("Evanson"), prior to introducing the second, a presentation slide. Id. ¶¶ 212-13. As alleged, Evanson stated, "[w]e're going to present some slides that show actual . . . efficiency improvement data," which he explained would be "a very accurate representation of the progress we're making." Id. ¶ 212. The slide, titled "Increased Installation Efficiency," showed a downward-trending bar chart with the header, "33% Total Project Duration Improvements with Projects Delivered in Last 2 Years." Id. ¶ 213. Although the "numbers [were] stripped" from most data points, id. ¶ 212, a note above "Site 14" on the x-axis highlighted, "Install to 100% Go-Live in 9 months," id. ¶ 213. Taken together in the limited context available to the Court, the two statements are plausibly materially misleading considering Plaintiffs' allegation that average deployment time remained stagnant for

(at least) the approximately eight months leading up to the Investor Day. See id. ¶ 51.

As to the Evanson statement, however, the amended complaint includes no scienter allegations pertaining to him, as he is referenced here for the first and last time. Id. ¶¶ 210, 212. As to the second, the amended complaint does not specify how this information was conveyed. Id. ¶ 213. In response to Defendants' argument that Odisho should be dismissed because no statements are attributed to him, see D. 33 at 40 n.20, the parties debate whether the amended complaint alleges that Odisho presented the allegedly misleading slide. See D. 38 at 27 n.2; D. 42 at 19 n.8. Plaintiffs are correct that a person who does not "make" a statement within the meaning of Rule 10b-5(b) can still be liable for "dissemination" of it, see Lorenzo v. SEC, 587 U.S. 71, 78 (2019), but Lorenzo's holding in this regard was in the context of liability under subsections (a) and (c), not subsection (b), id. at 74; see SEC v. Rio Tinto PLC, 41 F.4th 47, 53 (2d Cir. 2022) (noting that under Lorenzo, the "scheme subsections [of Rule 10b-5] can cover conduct that involves a misstatement even if the defendant was not the maker of it").[23] Even so, the "maker" of a statement within the meaning of Rule 10b-5(b) is the one "with ultimate authority" over it, "including its content and whether and how to communicate it," not solely—and sometimes not at all—the literal speaker. See Janus Cap. Grp. v. First Derivative Traders, 564 U.S. 135, 142-43 (2011). "Since Janus, courts have disagreed as to whether Section 10(b) contemplates liability for the corporate executive who knowingly permits third parties to make false statements in her presence but does not author such statements herself." Bos. Sci. Corp., 646 F. Supp. 3d at 275 n.29 (assuming without deciding that statement by director of investor relations could be attributed

[23] Plaintiffs do not raise this allegation in defense of their fraudulent scheme claim in Count II, which is instead focuses on Defendants allegedly "shipping incomplete robots, recording cost overruns as revenues, and secretly bringing EPC functions back in-house." See D. 38 at 47-49; D. 23 ¶¶ 402-03.

to defendant vice president of investor relations). The amended complaint, however, does not include sufficient factual allegations for the Court to assess whether this applies here. See D. 42 at 19 n.8. Thus, Plaintiffs' allegations regarding these statements do not survive the motion to dismiss.

Also remaining are several deployment timeline statements made by Cohen and Hibbard. On February 5, 2024, during the first-quarter 2024 earnings call in which Symbotic disclosed its twenty-month-deployment achievement, see D. 23 ¶ 166, an analyst asked about "the pace of deployments in general." See D. 34-9 at 11. After noting that Symbotic had "seen a lot of progress . . . since the outsourcing strategy ramp-up," the analyst asked whether as of that day, there were "any constraints to[,] not maintaining that current pace, but accelerating it further." Id. Cohen responded that the deployments Symbotic then had in progress "were actually started a year ago" and that "what we know a year later, which is now[,] from where we were a year ago, we can go faster, we can go a lot faster." Id. at 12. The Court agrees with Plaintiffs that in context and as alleged, Cohen's response that Symbotic could "go faster, . . . a lot faster," see D. 23 ¶ 169, was plausibly misleading in light of Plaintiffs' allegations regarding the stagnancy of average deployment timelines as of at least September 2023 and the allegedly disastrous performance of Symbotic's primary outsourcing partner. See D. 38 at 26-27; cf. Zhou v. Desktop Metal, Inc., 120 F.4th 278, 294-95 (1st Cir. 2024) (concluding that statement was not misleading by omission where "the statement itself [left] no impression about" omitted information).

Similarly, during the second-quarter earnings call on May 6, 2024, Cohen described "accelerating deployment" as a "[k]ey innovation" that occurred during the quarter, see D. 23 ¶ 191; D. 34-10 at 3, and Hibbard stated that Symbotic's financial results "reflect[ed] that significant revenue growth can be driven by [Symbotic's] ability to accelerate deployments in

progress," see D. 23 ¶ 190; D. 34-10 at 4. The Court agrees that a reasonable investor could have been misled as to Symbotic's progress on accelerating deployment timelines (or lack thereof) by these generalized statements regarding acceleration. See Johnston, 986 F.3d at 74 (noting that use of "carefully crafted half-truths and distortions to convey a false understanding" can violate "duty to make accurate statements regarding material facts").[24] Plaintiffs also challenge statements by Cohen and Hibbard in the press release published in advance of the second-quarter earnings call. See D. 34-5 at 2; D. 23 ¶ 189. The Court concludes that Hibbard's statement that certain advancements "helped [Symbotic] to accelerate deployment progress during the quarter," see D. 34-5 at 2; D. 23 ¶ 189, could have misled a reasonable investor as to Symbotic's general deployment acceleration progress. Further, Hibbard's statement that Symbotic "achiev[ed] faster revenue growth, higher margins and stronger cash generation than planned for the quarter," see D. 34-5 at 2; D. 23 ¶ 189, falls within the category of revenue statements rather than deployment timeline statements. Cohen's statement in the press release, however, stands on different footing. While Plaintiffs allege that "Cohen attributed Symbotic's positive second quarter results, in part, to Symbotic's purported ability to 'accelerate deployment times,'" D. 23 ¶ 189, Cohen's actual statement was that Symbotic "made significant advances in both software and hardware this quarter that will benefit customers, accelerate deployment times and increase [Symbotic's] deployment capacity." See D. 34-5 at 2. Accurately characterized, Plaintiffs have not sufficiently alleged that this statement was false or misleading.

Thus, the Court addresses scienter only as to the remaining revenue statements or partial statements, see D. 23 ¶¶ 161-62, 174, 176, 178-82, 185-87, 189-90, 193, 202, 204, 206-07, 224-

---

[24] As alleged, Hibbard's statement was also false or misleading given Symbotic's subsequent restatements. See D. 23 ¶ 193 (alleging that "revenue growth was improving because Defendants were prematurely and improperly booking revenue").

25, 229, 232, 234-35, 240-45, 250; and the remaining deployment timeline statements or partial statements, see id. ¶¶ 169, 189-91.

*2. Scienter*

"To establish scienter, plaintiffs must 'show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness.'" Charles River Lab'ys, 152 F.4th at 12 (quoting Mehta v. Ocular Therapeutix, Inc., 955 F.3d 194, 206 (1st Cir. 2020)). Recklessness in this context refers to "a highly unreasonable omission" involving "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers [or] sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Brennan v. Zafgen, Inc., 853 F.3d 606, 613 (1st Cir. 2017) (quoting Greebel, 194 F.3d at 198). Defendants must have had the requisite scienter at the time of the allegedly fraudulent statements. See In re Ariad Pharms., Inc. Sec. Litig., 842 F.3d 744, 751 (1st Cir. 2016).

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), meaning that the inference "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," Tellabs, 551 U.S. at 314. Thus, in evaluating securities class action complaints, courts "must take into account plausible opposing inferences." Id. at 323. Courts conducting such an inquiry must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23 (emphasis in original).

The First Circuit has found relevant to this inquiry "insider trading in conjunction with false or misleading statements; a divergence between internal reports and public statements; disclosure of inconsistent information shortly after the making of a fraudulent statement or omission; bribery by top company officials; evidence of an ancillary lawsuit, charging fraud, which

was quickly settled; disregard of current factual information acquired prior to the statement at issue; accounting shenanigans; and evidence of actions taken solely out of self-interest." Geffon, 249 F.3d at 36. Moreover, "[c]ompelling evidence of scienter most often includes 'clear allegations of admissions, internal records or witnessed discussions' that suggest that defendants were 'aware that they were withholding vital information or at least were warned by others that this was so' when they made the misleading statements." Biogen, 193 F. Supp. 3d at 44-45 (quoting Bos. Sci. Corp., 686 F.3d at 31). Further, "where a complaint is devoid of any direct-evidence allegations, the indirect-evidence allegations in the complaint will need to do more work." Brennan, 853 F.3d at 615 n.8. A "plaintiff may not simply rely on a 'fraud by hindsight' theory of scienter—that is, 'a plaintiff may not simply contrast a defendant's past optimism with less favorable actual results, and then contend that the difference must be attributable to fraud.'" Metzler Asset Mgmt. GmbH v. Kingsley, 305 F. Supp. 3d 181, 204 (D. Mass. 2018) (quoting Shaw, 82 F.3d at 1223), aff'd, 928 F.3d 151 (1st Cir. 2019). Still, the First Circuit "has rejected any rigid formula for pleading scienter," Cabletron, 311 F.3d at 38, and so the Court looks to the particular "mix of facts" alleged in each case to determine whether securities plaintiffs have met their burden. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002).

a) Reliance Upon Confidential Witnesses

The confidential witness allegations here do not give rise to a strong inference of scienter. Securities fraud plaintiffs may rely upon confidential witnesses without specifically naming them "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." See Cabletron, 311 F.3d at 29 (internal citation omitted). Even then, however, the value of confidential witness allegations in the scienter inquiry varies, including based on the witness's role and the specificity of the witness's statements. See Biogen, 857 F.3d at 42-44 (noting

weakness of confidential witness allegations and emphasizing lack of particularity, consistency with defendants' public disclosures and "significant timing problem[s]" as well as the "little contact" between witnesses and senior managers); Metzler, 928 F.3d at 161-62 (explaining that witness statements and related allegations did not illuminate relevant mental states, and noting as to some witnesses that they were "several levels removed from the company's executive team"); Biogen IDEC, 537 F.3d at 52-53 (concluding that confidential witness allegations did not create strong inference of scienter due to lack of specificity); Quinones v. Frequency Therapeutics, Inc., 106 F.4th 177, 182 (1st Cir. 2024) (concluding that confidential witness allegations did not give rise to inference of scienter, including because witness stated that defendant officer was warned of certain information but complaint did not allege when this was communicated); Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 245 (1st Cir. 2015) (concluding that confidential witness allegations did not establish scienter where witnesses had little contact with senior management, some witnesses "did not even work at [the company] during the [c]lass [p]eriod and so would not have had [relevant] firsthand knowledge," others "did not identify the time period to which most of their statements related" and witness statements, in any event, were not probative of intent to deceive). Accordingly, courts "must [take] a hard look at such allegations to evaluate their worth." Biogen IDEC, 537 F.3d at 51.

CW1 was a Senior Financial Analyst at Symbotic from September 2023 through the Class Period. D. 23 ¶ 35. In this role, CW1 reported indirectly to Hibbard and worked with executives, including Hibbard, "on scenario planning and analyzing variances between projected financial results and actual results." Id. Plaintiffs primarily rely upon CW1 to support their scienter allegations regarding Hibbard, see id. ¶¶ 304-09, 324, and the Court concludes CW1 would have

been knowledgeable regarding Symbotic's financial operations, including certain deployment status information.

CW3 was an employee of Symbotic prior to the Class Period. Id. ¶ 37. Starting more than a year prior to the Class Period through August 2024, CW3 was a consultant, during which time CW3 entered vendor data and assisted Symbotic project managers with purchase orders. Id. As alleged, CW3 participated in weekly and biweekly meetings attended by Cohen, id. ¶ 96, although it is not clear when.

As to the other CWs, CW4 was employed at Symbotic through, at most, about the first five weeks of the Class Period, and the Court cannot ascertain what job responsibilities CW4 held after 2020. See id. ¶ 38. CW4 indirectly reported to Cohen and Odisho for at least some part of CW4's employment, id., but there is no allegation that CW4 interacted with any Individual Defendant. See Biogen, 857 F.3d at 43 (noting that "confidential witness statements are 'not described with sufficient particularity' to give rise to a strong inference of scienter as to senior management if none of the witnesses were senior managers and they had little contact with such managers" (internal citation omitted) (quoting Abiomed, 778 F.3d at 245)). To the extent CW4 "was told to approve Fluor's vendor invoices for payment without first confirming" this was warranted, see D. 23 ¶ 80, there are no allegations that this directive came from Cohen or Odisho or detailing when this occurred. Plaintiffs do not rely upon CW2 or CW5 in their scienter arguments.[25] As pled, these three CWs lack sufficient knowledge for the allegations reliant upon them to support a

[25] Plaintiffs do argue in the factual background section of their opposition that "Cohen and Odisho also personally visited deployment sites where they were briefed on project status and witnessed the ongoing installation issues described by CW2 and CW5." D. 38 at 20. The amended complaint, however, merely alleges that CW5 spoke with Cohen during one site visit, that CW2 "observed" Cohen visit deployment sites and that CW2 "stated that Defendant Odisho also visited deployment sites." D. 23 ¶¶ 89, 331-32. These allegations do not address what, if anything, Cohen or Odisho learned from any site visit.

strong inference of scienter.

As to the revenue statements, the allegations attributed to CW1 and CW3 do not support a strong inference of scienter. At first glance, CW1's report that Hibbard approved revenue forecasts that included cost overruns booked as revenue despite knowing customer contracts prohibited same, see id. ¶¶ 108-09; D. 38 at 38-39, appears significantly probative with respect to Plaintiffs' improper-revenue-recognition theory. The value of these allegations is undercut, however, by the amended complaint's acknowledgement that the prohibition on certain cost pass-throughs applied only to "newer projects," see D. 23 ¶ 107; see D. 42 at 7-8. Thus, these allegations do not strongly support the inference that Hibbard was aware Symbotic was improperly recognizing revenue from unbillable cost overruns. Further, the vague allegations that "CW3 recalled that . . . incomplete robots typically shipped [to customers] within a couple weeks to a couple days before the end of a quarter," D. 23 ¶ 91, and "believed that Defendants shipped incomplete robots to avoid disclosing project delays to customers and to be able to recognize revenue by completing milestones," id. ¶ 94, do not go to Defendants' scienter.

With respect to the deployment timeline statements made by Cohen and Hibbard in February and May 2024, see D. 23 ¶¶ 169, 189-91, the statements of CW1 and CW3 are no more helpful in this regard. Although CW3 reported that Symbotic tracked project milestones on "burn down charts," id. ¶ 323, and that these would have shown "that Symbotic was not improving its average time to deploy a system," id. ¶ 95, there is no allegation that Cohen or Hibbard reviewed those charts. Moreover, CW3 reported that "during meetings attended by [] Cohen, CW3 was instructed by superiors that customers should" not be told about delays, id. ¶ 310, but it is unclear when any such meetings occurred. Similarly, although it is conceivable that during these regular meetings, in which Symbotic's manufacturing director allegedly "provided [project] updates," see

id. ¶ 96, Cohen learned information supporting an inference of scienter as to his statements, the amended complaint contains no details to this effect. As to CW1's statements, as alleged, Hibbard was informed during quarterly meetings throughout the Class Period that "Symbotic was experiencing project delays and cost overruns," id. ¶ 304, and she "also received information about project delays and cost overruns every quarter during the Class Period from other teams," id. ¶ 305. This information, however, is not sufficiently particular to create an inference that Hibbard knew information contrary to her statements regarding Symbotic's deployment progress. See Metzler, 928 F.3d at 161-62 (noting that confidential witness statements did not create strong inference of scienter where allegations did not convey what defendant learned from available information and whether what he learned was at odds with any alleged misstatement).

b) Symbotic's Financial Restatements

As Defendants argue, D. 33 at 17-20, it is true that "the fact that a company voluntarily restated its income does not in and of itself establish a strong inference of scienter." Lenartz v. Am. Superconductor Corp., 879 F. Supp. 2d 167, 185 (D. Mass. 2012). While "[s]ignificant GAAP violations" may provide evidence of scienter, Cabletron, 311 F.3d at 39; see In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 159 (D. Mass. 2001) (noting that "the magnitude and frequency of [any] restatements may support an inference of scienter"), a complaint should still include facts supporting an inference that these violations were known, see Ezra Charitable Tr. v. Tyco Int'l, Ltd., 466 F.3d 1, 9 (1st Cir. 2006) (concluding that GAAP violations did not establish scienter because there were "no alleged facts that strongly suggest[ed] that the defendants knew any of the challenged statements were false when made"); Godinez v. Alere Inc., 272 F. Supp. 3d 201, 214 (D. Mass. 2017) (noting that to plead scienter, "[p]laintiffs must allege GAAP violations coupled with corresponding fraudulent intent").

Here, the 2024 10-K corrected a $34 million understatement of net losses and corresponding $34 million overstatement of adjusted EBITDA. D. 23 ¶ 122. In announcing restatements on November 18 and 27, 2024, Symbotic also disclosed that during fiscal year 2024, it had both improperly accelerated recognition of certain revenue, id. ¶ 116, and improperly recognized revenue for certain unbillable cost overruns, id. ¶ 118. Symbotic further disclosed that management had determined that Symbotic's internal controls over financial reporting were not effective as of the end of fiscal year 2024 due to these revenue recognition issues, id. ¶ 124, and Symbotic's external auditor issued an adverse opinion regarding same, id. ¶ 127. The Court concludes, on these facts, that restatements and the related violations of GAAP and internal policy and acknowledged internal control failures provide some support for an inference of scienter with respect to the revenue statements given the magnitude of the restatements. See Focus Enhancements, 309 F. Supp. 2d at 159. The value of these allegations is limited, however, because Plaintiffs are largely reliant upon the fact of the violations and disclosures, rather than any more specific, accompanying allegations concerning Defendants' "corresponding fraudulent intent." See Godinez, 272 F. Supp. 3d at 214. Additionally, although Symbotic restated its financials twice, D. 38 at 41-42, this is not a compelling example of "frequent" restatements where Symbotic announced the second restatement just nine days after the first. See D. 23 ¶¶ 238, 252; cf. Gelfer v. Pegasystems, Inc., 96 F. Supp. 2d 10, 12, 16 (D. Mass. 2000) (highlighting frequency where company announced numerous restatements over fifteen-month period, and noting frequency supported inference of recklessness because defendants were on notice of improper practices and some restatements occurred "long after" issues should have been addressed).

c) The Individual Defendants' Positions and Information Access

Plaintiffs argue that a strong inference of scienter is supported by the Individual Defendants' "admissions," including with respect to their access to internal information, and their

attendance at meetings. D. 38 at 36-41. As to the revenue statements, to the extent Plaintiffs contend that Hibbard "admitted" during Symbotic's July 29, 2024, earnings call that certain "cost overruns were '[n]ot a surprise,'" see D. 23 ¶ 302 (alteration in original); D. 38 at 36, it is unclear contextually that Hibbard's statement was even about cost overruns, see D. 34-11 at 7, and even assuming it was, the statement certainly does not strongly support an inference that Hibbard was aware any such overruns were improperly recorded as revenue.

As to the deployment timeline statements, Cohen's disclosure during the July 29, 2024 earnings call that Symbotic had been hiring people "in the EPC space" over the six months preceding the call, and that those people were "actually the ones that [were] saying" that Symbotic should bring EPC back in house, see D. 34-11 at 7; D. 38 at 36, supports an inference of scienter concerning his plausibly misleading statement during the February 2024 earnings call regarding constraints on further deployment acceleration, see D. 23 ¶ 169; Aldridge, 284 F.3d at 83 (noting that "the fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter"). Although it is possible to interpret this statement differently, as Defendants point out, see D. 42 at 9-10, even under the heightened requirements of the PSLRA, the Court "must draw all reasonable inferences in the plaintiff's favor" before weighing whether those inferences "satisfy the statutorily mandated strong inference." Stone & Webster, 414 F.3d at 200 n.8 (internal citation and quotation marks omitted). A reasonable inference from Cohen's statement is that he was aware of EPC insourcing over the time period he described, and in combination with other evidence of scienter, the Court concludes that the inference of scienter as to Cohen, is "cogent and at least as compelling as any

opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314.[26]

Plaintiffs' reference to internal data allegedly available to and/or monitored by some of the Individual Defendants, see D. 38 at 36-37, does not weigh in their favor, however, because Plaintiffs do not explain what was "learned from such monitoring, and whether what [was] learned was at odds with" the relevant statements. Metzler, 928 F.3d at 162. Plaintiffs' attempt to resist this conclusion by arguing that "Defendants' admissions in this case demonstrate what information they learned," see D. 38 at 37, is unpersuasive, as is their similar argument regarding Defendants' attendance at meetings and their answers to analyst questions, see id. at 38-41; cf. Shash v. Biogen, Inc., 84 F.4th 1, 14 (1st Cir. 2023) (concluding that scienter requirement was satisfied in part, where complaint alleged that company "invested tremendous resources into carefully analyzing" particular clinical data, court could infer from defendants' statements that company analyzed subgroup data, and subgroup data was inconsistent with misstatement describing "all" data).

d) Core Operations Theory

Plaintiffs contend that a "core business operations" theory supports a strong inference of scienter. D. 23 ¶¶ 340-44; D. 38 at 44. The First Circuit has left open "the standard by which 'core operations' allegations may give rise to a strong inference of scienter," see Biogen, 857 F.3d at 44, but has "said that the importance of a particular item to a defendant can support an inference that the defendant is paying close attention to that item, if that close attention would have revealed an incongruity so glaring as to make the need for further inquiry obvious," see Carbonite, 22 F.4th

[26] By contrast, Plaintiffs ask too much of Hibbard's alleged use of the word "still" on February 5, 2025, see D. 23 ¶ 369, to suggest that it indicates that Defendants knew throughout the Class Period that average deployment timelines were not accelerating. See D. 38 at 37. The Court notes that Plaintiffs do not rely on Hibbard's statement to support their scienter allegations in the amended complaint. See D. 23 ¶¶ 299-303. Even assuming that such an inference is reasonable, however, the Court concludes that it does not support a "strong" inference of scienter as to Hibbard, even when combined with other evidence.

at 9 (internal citation and quotation marks omitted). Courts "have been hesitant to apply significant weight to 'core operations' allegations without other significant evidence of a defendant's intent or recklessness, or a 'plus factor.'" Biogen, 193 F. Supp. 3d at 51 (quoting In re A123 Sys., Inc. Sec. Litig., 930 F. Supp. 2d 278, 285 (D. Mass. 2013)). "As a general matter, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter." Metzler, 928 F.3d at 165 (internal quotation marks omitted) (quoting S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784-85 (9th Cir. 2008)); see Carbonite, 22 F.4th at 9-10 (noting that "it is not enough to say that senior management would have paid some attention to the product that they were raving about; the complaint must allege particular facts strongly suggesting that that attention exposed them to information that either rendered their public statements false or necessarily invited further investigation"); Quinones, 106 F.4th at 184 (noting that while it was "reasonable to think that senior management paid attention to what they were told about" clinical study impacting core product, importance of product did not provide "sufficient basis for determining when and what senior management were told").

Here, Plaintiffs argue that the core operations doctrine supports a strong inference of scienter regarding "the deployment delays and cost overruns that rendered [Defendants'] public statements false and misleading," see D. 38 at 44, because "the revenues Symbotic derived from system deployments comprised more than 95% of the [c]ompany's overall revenues" during the Class Period, D. 23 ¶ 340. The centrality of the deployment systems to Symbotic's business certainly supports an inference that management was paying attention to their status. The Court concludes that this is "one relevant factor" in support of a strong inference of scienter, see Olsen,

2026 WL 810814, at *11, but only to the extent that there is other significant evidence of intent or recklessness or a "plus factor." See Biogen, 193 F. Supp. 3d at 51.

e) Insider Trading Allegations

Defendants argue that Cohen's stock sales, occurring on a single day early in the Class Period, do not support a strong inference of scienter. D. 33 at 27-28. Plaintiffs respond that the sales support scienter because they netted a suspiciously large sum (over $180 million) and occurred at a suspicious time and outside of a 10b5-1 trading plan. D. 38 at 44-45. "Insider training cannot establish scienter on its own, but it can be used to do so in combination with other evidence." Miss. Pub. Emps.' Ret. Sys., 523 F.3d at 92 (noting that "trading in suspicious amounts or at suspicious times may be probative"); see Cabletron, 311 F.3d at 39-40 (concluding that $177 million individual defendant gained from stock sales "add[ed] some weight to the other evidence of scienter," even in light of mitigating information); cf. Mehta, 955 F.3d at 210 n.18 (noting that an insider's acquisition of company stock during class period can "somewhat" negate inference of scienter, at least as to that insider and the company).

Some factors weigh against concluding that the insider trading allegations here bolster the inference of scienter. First, despite the high value of the sales, the Court is mindful that the Cohens' apparent retention of nearly ninety-nine percent of their holdings of Class A common stock, see D. 33 at 28,[27] limits the probative value of the insider trading allegations as to Cohen's scienter. See Brennan, 853 F.3d at 615-16 (noting that "the strength of . . . insider trading

[27] Defendants contend that the "sales amounted to only 1.36% of the Cohens' total holdings of Class A common stock in Symbotic at that time." D. 33 at 28 (citing D. 34-4 at 10). This percentage, derived from the referenced exhibit, is not included in the amended complaint, but Plaintiffs acknowledge that the sales represented "only a small percentage of [Cohen's] holdings," see D. 38 at 44-45; see also Bos. Sci. Corp., 646 F. Supp. 3d at 272 n.24 (considering CEO's 10b5-1 trading plan documents as "records integral to the [c]omplaint" and noting that securities plaintiff "[did] not appear to dispute the authenticity or accuracy of their contents").

allegations drifts toward the marginal end" when the insider keeps "the vast majority" of holdings); Quinones, 106 F.4th at 183-84 (explaining that "fifteen percent is not a talismanic number below which any defendant is immune from claims of fraud," but concluding that insider "did not reduce his investment in the company by enough to allow for the strong inference of scienter claimed by plaintiffs"). Additionally, Plaintiffs have provided little context to situate these sales. To strengthen an inference of scienter, "[a]t a minimum, the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants." Greebel, 194 F.3d at 198; accord Abiomed, 778 F.3d at 246. Courts have discounted insider trading allegations where the complaint "provide[s] no information about . . . trading history that would support [the] determination" that the alleged sales were unusual. See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 761 (1st Cir. 2011); Leavitt, 451 F. Supp. 3d at 187-88 (noting that the "plaintiff bears the burden of showing that insider sales were suspicious and must provide a complete picture of the defendant's trading, both before and after the class period").[28] Some trades, however, "may, from the face of things, be unusual." Waters Corp., 632 F.3d at 761; see City of Bristol Pension Fund v. Vertex Pharms. Inc., 12 F. Supp. 3d 225, 240 (D. Mass. 2014) (noting that defendant's "substantial trades" in the week after announcement of erroneous clinical study results were "unusual on their face, without regard to her retirement or her prior trading history"). Finally, Defendants are correct that typically, "even unusual sales by one insider do not give rise to a strong inference of scienter when other insiders ha[ve] not engaged in suspicious trading during the class period," Quinones, 106 F.4th at 183 (alteration in original) (internal citation and quotation marks

---

[28] Although Plaintiffs' counsel stated at the motion hearing that Plaintiffs had "shown [that] Cohen didn't sell nearly this much in prior periods," see D. 44 at 35, Cohen's trading history is not alleged in the amended complaint. See D. 23 ¶¶ 349-52.

omitted); see Biogen IDEC, 537 F.3d at 56-57 (concluding that sales of one defendant, who was not named in the Section 10(b) claim, did not give rise to a strong inference of scienter where he "made none of the statements alleged to be misleading, and there [was] no specific allegation that [he] was any more knowledgeable than any of the other individual defendants").

On these facts, although the "insider trading claims as alleged are on the weaker end of the spectrum," the Court still considers them to add to the mix of facts because they "fit[] with [Plaintiffs'] theory" that Cohen traded on the market's belief that Symbotic's outsourcing strategy was successfully accelerating deployment timelines, while knowing that Symbotic was working to undo that strategy, at least partly. See Miss. Pub. Emps.' Ret. Sys., 523 F.3d at 92-93. As alleged, Cohen's sales occurred in the weeks after one of Cohen's plausibly misleading statements, during the period in which the Court has determined it can reasonably be inferred that Cohen was aware of problems with Symbotic's outsourcing partners that would ultimately lead to insourcing EPC. See D. 38 at 45. Although Defendants highlight that the sales were "part of a previously announced Primary and Secondary Offering," see D. 33 at 27-28, the announcement came just five days before the sales were finalized, see D. 23 ¶¶ 349-50, and the sales were not made pursuant to a trading plan. D. 38 at 44-45; see Smith & Wesson, 604 F. Supp. 2d at 345 (noting that 10b5-1 plans generally rebut inference of scienter); see also 17 C.F.R. § 240.10b5-1(c)(1)(ii)(B) (setting cooling-off periods for 10b5-1 plans, including ninety days for directors and officers and thirty days for other persons). Moreover, even where trading is pursuant to such a plan, an insider is not shielded from liability where plaintiffs allege that a trading plan was "executed after the beginning of [a] fraudulent scheme." Ariad, 842 F.3d at 754 n.6. Thus, the Court concludes that these allegations provide some support for a strong inference of scienter as to Cohen.

f) Motive and Opportunity

Defendants argue that Plaintiffs' allegations regarding Defendants' motive to hit forecasts do not support scienter. D. 33 at 28-29. Plaintiffs respond that the fact "[t]hat Symbotic would have missed its EBITDA and revenue quarterly forecasts but for Defendants' fraud adds to the strong inference of scienter." D. 38 at 45-46. As part of the "mix of facts" supporting scienter allegations, securities plaintiffs "may allege that the defendants had the motive ('concrete benefits that could be realized by . . . the false statements and wrongful nondisclosures') and opportunity ('the means and likely prospect of achieving concrete benefits by the means alleged') to commit the fraud." Aldridge, 284 F.3d at 82 (alteration in original) (quoting Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)). The Court agrees with Defendants that the allegations regarding their "motive to hit forecasts and avoid reporting a dramatic drop in EBITDA," D. 23 ¶¶ 345-48, do not meaningfully add to the scienter analysis here, because this Circuit "require[s] something more than the ever-present desire to improve results" to support this type of argument. Corban v. Sarepta Therapeutics, Inc., 868 F.3d 31, 41-42 (1st Cir. 2017) (noting that allegations did not "suggest[] that [the company's] capital was insufficient for continued operations, much less that [it] would shutter its doors unless it padded earnings by deceiving investors"); see Cabletron, 311 F.3d at 39 (noting that "catch-all allegations which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA" (internal citation and quotation marks omitted)); Kader, 887 F.3d at 60 (concluding that allegations that publicly reporting positive news was critical to company's existence did not support strong inference of scienter because complaint did not allege company "was financially on the ropes" or would close its doors absent cash influx from deceit).

g) SEC Investigation

Plaintiffs acknowledge that the existence of the SEC investigation does not "in isolation, support[] scienter," but the parties disagree about whether it adds to the Court's analysis. See

D. 33 at 30; D. 38 at 46-47. A "government investigation can be seen as one more piece of the [scienter] puzzle, a series of circumstances that add up to a strong inference of scienter." Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc., 28 F. Supp. 3d 93, 115 (D. Mass. 2014). The amended complaint describes Symbotic's December 4, 2024, disclosure that the company was responding to an SEC investigation regarding alleged whistleblower violations, D. 23 ¶ 337, and a February 5, 2025, disclosure that Symbotic had received a subpoena from the SEC, which was related to Symbotic's restatement of revenues, id. ¶ 338, "and certain other matters," D. 34-6 at 24. As already noted, the Court declines to draw an inference against Plaintiffs based on Defendants' submission, D. 34-7 at 3, that the SEC closed its investigation without recommending an enforcement action. Nonetheless, having concluded that the only concrete scienter allegations relate to the plausibly misleading deployment timeline statements rather than the revenue statements, and where the amended complaint does not suggest that the SEC investigation concerned the deployment timeline statements, see D. 23 ¶¶ 337-39, the investigation does not add to the relevant scienter picture.

In sum, having considered the complaint as a whole, including "plausible opposing inferences," Tellabs, 551 U.S. at 323, the Court concludes that the strongest inferences favor Plaintiffs, but only as to Cohen (and, by imputation, Symbotic, see, e.g., Bos. Sci. Corp., 646 F. Supp. 3d at 293 & n.41), and only as it relates to his plausibly misleading deployment timeline statements.

3. *Loss Causation*

The First Circuit has left open "the precise pleading standard for loss causation." Shash, 84 F.4th at 19 n.15. "Loss causation is easiest to show when a corrective disclosure is associated with a drop in share price." Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 238 (1st Cir. 2013). Defendants challenge loss causation only with respect to the SEC investigation. See D. 33

at 43-44. Plaintiffs allege that "the SEC investigation was a materialization of the risk of Defendants' accounting improprieties." D. 23 ¶ 370. Because the Court concludes that the revenue statements do not survive Defendants' motion because there is no strong inference of scienter regarding same, it need not resolve the parties' arguments regarding loss causation as to the SEC investigation.

Accordingly, the Court allows Defendants' motion to dismiss Count I as to Ernst, Hibbard and Odisho but denies it as to Cohen and Symbotic.

**B. Section 10(b) and Rule 10b-5(a) and (c) Fraudulent Scheme (Count II)**

Plaintiffs also bring a claim for "scheme liability" under Rule 10b-5(a) and (c). D. 23 ¶¶ 399-405. "To state a scheme liability claim, a plaintiff must show: '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'" Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021) (quoting In re Mindbody, Inc. Sec. Litig., 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)). Because a scheme liability claim does not require a misleading statement or omission, Mindbody, 489 F. Supp. 3d at 216, the heightened pleading requirement applicable to Rule 10b-5(b) (i.e., misstatement) claims through the PSLRA does not apply, see Rio Tinto, 41 F.4th at 54-55 (citing 15 U.S.C. § 78u-4(b)(1)). That said, scheme claims still sound in fraud and must satisfy Rule 9(b), see Danske Bank, 11 F.4th at 105, and are subject to the PSLRA's heightened pleading requirement for scienter, see 15 U.S.C. § 78u-4(b)(2)(A).

Defendants first argue that Plaintiffs "cannot allege misrepresentations based on omitted or contrary facts, and then label those facts a scheme." D. 42 at 19-20; see D. 33 at 41-42. Plaintiffs contend that the alleged deceptive conduct is "distinct from the misrepresentations alleged" and was "undertaken to provide support for the misstatements" and further argue that "it is well accepted that misrepresentations can give rise to scheme liability, particularly when they

are made in connection with the kinds of deceptive acts" alleged. D. 38 at 47-48. To the extent Plaintiffs argue that conduct "connect[ed]" to a misrepresentation can support a scheme liability claim, see id. at 48, this is correct under Lorenzo, where, as this Court has already noted, the Supreme Court concluded that "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5, . . . even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." Lorenzo, 587 U.S. at 78. There, the petitioner was an investment banker who sent false or misleading emails to prospective investors "at the direction of his boss, who supplied the content and 'approved' the messages." Id. at 75.[29] Although the parties here purport to disagree as to the extent of permissible overlap between scheme liability and misstatement liability, at core, they appear to agree that Plaintiffs must allege a deceptive act distinct from an alleged misstatement, and so the Court proceeds on the same understanding.

As alleged, the conduct underlying Plaintiffs' scheme liability claim is, for one, "secretly accelerating recognition of costs to increase revenue and/or improperly recording revenue from cost overruns that customers were not contractually obligated nor willing to pay and sending incomplete robots to project sites one or two days prior to quarter end to accelerate and increase recognized project costs." D. 23 ¶ 402; D. 38 at 47. With respect to scienter, Plaintiffs rely upon the arguments that the Court has already rejected as to these issues, see D. 38 at 49, so the Court concludes that the aspect of the scheme claim premised thereon fails for at least this reason.[30]

---

[29] The petitioner in Lorenzo did not challenge the D.C. Circuit's conclusion that he sent the emails with the requisite intent, and the Supreme Court also did not revisit the D.C. Circuit's conclusion that the petitioner did not "make" the statements. Id. at 76.

[30] At the motion hearing, see D. 44 at 39, Plaintiffs' counsel pressed Cohen's statement during the July 29, 2024, earnings call that because certain "cables came in late," Symbotic had "shipped the bots to the customer so they could still do 90% of what they were supposed to do." See D. 34-11 at 9; see also D. 23 ¶¶ 103, 221, 347. Even assuming, *arguendo*, that the other

The further conduct to which Plaintiffs point is that "Defendants also secretly concealed that they had begun hiring for the EPC function to bring it back in-house due to Fluor's performance in early 2024, approximately six months before they disclosed the project delays and cost overruns to the market." D. 23 ¶ 402. The Court agrees that it is possible that such allegation could encompass "conduct" distinct from a misstatement. See, e.g., SEC v. Carchedi, No. 25-cv-10599-PBS, 2026 WL 810610, at *7 (D. Mass. Mar. 24, 2026) (concluding that deception of company's board and redaction of negative information in materials sent to another company constituted "fraudulent practices beyond [d]efendants' preparation of misleading statements to investors" and could support scheme liability); SEC v. Wilcox, 663 F. Supp. 3d 146, 160-61 (D. Mass. 2023) (concluding that providing "false support to an external audit firm constitutes a deceptive act that, even if related to the making of a false statement by another, may establish [scheme] liability"); SEC v. Esposito, 260 F. Supp. 3d 79, 91 (D. Mass. 2017) (concluding, in resolving motion for default judgment, that SEC had pled scheme claim against defendant company where company and individual defendant who controlled it "directly or indirectly fabricated corporate documents and regulatory filings, and submitted them to [a] transfer agent, along with false attorney opinion letters"). The problem with the alleged scheme, however, is that Plaintiffs do not "articulate with precision . . . which specific acts were conducted in furtherance of it." See Danske Bank, 11 F.4th at 105; see, e.g., Levy v. Gutierrez, No. 14-cv-443-JL, 2017 WL 2191592, at *22-24 (D.N.H. May 4, 2017) (concluding that deceptive act allegations did not satisfy Rule 9(b) where plaintiffs failed to allege "how (or, for that matter, if) the confidentiality [agreement] provisions . . . that they contend [the defendant] utilized to perpetrate fraud[] were

---

elements required for scheme liability are met with respect to this alleged conduct, the Court is not persuaded that this statement tips the scales as to scienter.

enforced by [the defendant]"). Although the Court has concluded for purposes of Count I that it is reasonable to infer Cohen's awareness of the hiring based, at least in part, on this statement, this does not absolve Plaintiffs of their burden to allege, with particularity, deceptive conduct that would support their scheme liability claim in Count II. The only allegation Plaintiffs point to in support of their argument that the amended complaint "clearly alleges that the Individual Defendants made misstatements and directed deceptive acts to conceal the failures of the outsourcing strategy" is that Cohen allegedly "participated in [a] call during which CW3 was instructed to conceal [the] true length of delays." D. 38 at 49 (citing D. 23 ¶ 96). Even assuming, *arguendo*, that such conduct would support Plaintiffs' claim, the Court has already noted that Plaintiffs have made no allegations regarding when such meeting or meetings took place, or if they even took place during the Class Period. See D. 23 ¶¶ 96, 310. Accordingly, the Court allows Defendants' motion as to Count II.[31]

**C. Section 20(a) Claim (Count III)**

Plaintiffs claim that the Individual Defendants are liable under Section 20(a) of the Exchange Act based upon their positions of control and authority within Symbotic. D. 23 ¶¶ 406-11. Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a securities fraud violation. 15 U.S.C. § 78t(a). Thus, to state a claim under Section 20(a), Plaintiffs must allege a primary violation of the Exchange Act. ACA Fin., 512 F.3d at 67-68 (stating that "[t]he plain terms of [S]ection 20(a) indicate that it only creates liability derivative of an underlying securities violation"). Here, Defendants argue for dismissal of Count III because Plaintiffs have "fail[ed] to state a claim under Counts I and II." D. 33 at 44. In light of the Court's conclusion that Plaintiffs adequately plead a primary securities law violation

[31] Because the Court concludes that this claim fails for reason explained above, it does not reach Defendants' reliance argument, see D. 33 at 42-43; D. 42 at 21.

against Symbotic (and Cohen), it will not dismiss Plaintiffs' claim under Section 20(a) against Cohen, Hibbard or Odisho. See, e.g., PS Lit Recovery, LLC v. Pegasystems Inc., 814 F. Supp. 3d 190, 211 (D. Mass. 2026) (denying motion to dismiss Section 20(a) claim against control persons where defense's only argument was failure of primary claim, which court rejected). Although the parties have not addressed it, the Court will allow the motion as to Ernst, who left Symbotic at "the end of calendar year 2023," see D. 23 ¶ 28, because the Court has concluded that Plaintiffs have only stated a primary violation as to Cohen's deployment timeline statements in February and May 2024. The amended complaint does not allege any facts suggesting that Ernst had any involvement with Symbotic after 2023, so even as alleged, Ernst could not have been a control person at the time of the conduct for which Symbotic faces primary liability. See, e.g., In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 248-49 (S.D.N.Y. 2010) (noting, where plaintiffs had only stated viable claim for primary violations occurring over one-year period, that they could "succeed on a claim for control person liability only against those defendants who functioned as control persons and who culpably participated in the alleged fraud during the relevant time frame"). Thus, the Court allows Defendants' motion to dismiss Count III as to Ernst but denies it as to Cohen, Hibbard and Odisho.

## VI. Leave to Amend

In a one-sentence footnote at the end of their opposition, Plaintiffs request that if "the Court determine[s] there are any pleading deficiencies," they be granted leave to further amend the complaint. D. 38 at 50 n.22. Courts have refused such "informal request[s]." See, e.g., Biogen, 193 F. Supp. 3d at 55 (denying "plaintiffs' informal request for leave to amend" in a securities fraud class action where, instead of "formally request[ing] leave to amend the amended complaint," plaintiffs requested same "on the final page of their thirty-page opposition to defendants' motion to dismiss"). Indeed, the "general rule . . . is that a district court need not pay

heed to a contingent request for leave to amend made only in opposition papers." Amyndas Pharms., S.A. v. Zealand Pharma A/S, 48 F.4th 18, 38 n.6 (1st Cir. 2022). Seeing no reason to depart from the general rule here, the Court denies Plaintiffs' informal request to amend the amended complaint.

## VII. Conclusion

For the foregoing reasons, the Court ALLOWS IN PART and DENIES IN PART Defendants' motion to dismiss the amended complaint. D. 32. The Court ALLOWS the motion as to Count I with respect to Ernst, Hibbard and Odisho, but DENIES the motion as to Count I with respect to Cohen and Symbotic; ALLOWS the motion as to Count II; and ALLOWS the motion as to Count III with respect to Ernst, but DENIES the motion as to Count III with respect to Cohen, Hibbard and Odisho. Id.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge